**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

MCNEIL-PPC, INC., et al
      **Plaintiff(s)**

        **v.**                              **CIVIL NO.** 04-1090 (JAG)

MERISANT COMPANY, et al
      **Defendant(s)**

**MEMORANDUM, FINDINGS OF FACT AND CONCLUSIONS OF LAW GRANTING
PRELIMINARY INJUNCTIVE RELIEF**

Civil No.  04-1090 (JAG)                                              ii

## TABLE OF CONTENTS

Background  . . . . . . . . . . . . . . . . . . . . . . . . .   1

FINDINGS OF FACT  . . . . . . . . . . . . . . . . . . . . . .   2

The Market for No-Calorie Sweeteners  . . . . . . . . . . .   2

Trade Dress of No-Calorie Sweeteners  . . . . . . . . . . .   4

Merisant's New Same Product . . . . . . . . . . . . . . . .   7

CONCLUSIONS OF LAW  . . . . . . . . . . . . . . . . . . . .   10

I.    McNeil Is Likely To Succeed On the Merits of Its Trade Dress

      Infringement Claim . . . . . . . . . . . . . . . . . .   10

      A.   The Splenda Trade Dress Is Entitled To Protection  .  12

         1. The Splenda Trade Dress Is Inherently Distinctive  .  12

         2. The Splenda Trade Dress Has Acquired Secondary Meaning 20

            a. McNeil's Secondary Meaning Survey . . . . . . . .  21

            b. Additional Evidence of Secondary Meaning  . . . .  28

         3. The Splenda Trade Dress Is Not Functional  . . . . .  31

      B. The Yellow Same Trade Dress Is Likely To Cause Confusion 35

         1. Similarity of the Marks  . . . . . . . . . . . . . .  36

         2. Similarity of the Goods  . . . . . . . . . . . . . .  43

         3. Relationship Between the Parties' Channels of Trade   43

         4. Relationship Between the Parties' Advertising  . . .  43

Civil No.  04-1090 (JAG)                                     iii

5. Classes of Prospective Purchasers  . . . . . . . . .  43

6. Evidence of Actual Confusion . . . . . . . . . . . .  44

7. The Defendant's Intent In Adopting Its Trade Dress .  53

8. Strength of Plaintiff's Mark . . . . . . . . . . . .  56

II.  McNeil Will Suffer Irreparable Injury Absent Preliminary

Relief   57

III. The Balance of Hardships Favors McNeil  . . . . . . . .  59

IV.  The Public Interest . . . . . . . . . . . . . . . . . .  60

V.   Scope of Relief and Bond  . . . . . . . . . . . . . . .  62

A.   McNeil Is Entitled To A Product Recall . . . . . . .  62

B.   McNeil Is To Post a Bond in the Amount of $350,000 .  63

CONCLUSION   . . . . . . . . . . . . . . . . . . . . . . .  66

**Background**

      This is an action for trade dress infringement and false advertising in violation of Sections 43(a)(1)(A) and 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125; common law trademark infringement; violation of Articles 3 and 25 of the Puerto Rico Trademarks Act, 10 L.P.R.A. § 171a and w; and violation of the unfair competition doctrines of Puerto Rico under Article 1802 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 5141.

      Plaintiffs McNeil-PPC, Inc. and Johnson & Johnson Hemisferica S.A. (collectively "McNeil") market Splenda®, the leading no-calorie sweetener (based on dollar sales) in the United States and in Puerto Rico.  Defendants Merisant Company and Merisant Puerto Rico, Inc. (collectively "Merisant") market a variety of no-calorie sweeteners in competition with Splenda, including three such products in Puerto Rico:  Equal®, NutraSweet® and Same®.  In terms of volume (as opposed to dollar sales), Same is currently the best selling no-calorie sweetener in Puerto Rico.

      On February 5, 2004, McNeil filed a Complaint and Motion for a Preliminary Injunction seeking to prevent Merisant from marketing, under the Same brand name, a new no-calorie sweetener in packaging that is confusingly similar to the trade dress used by McNeil for Splenda.  An evidentiary hearing was held on

Civil No.  04-1090 (JAG)                                              2

February 26, February 27 and March 2, 2004, and arguments of

counsel were heard on March 3, 2004.  At the conclusion of the

hearing, the Court requested the parties to file simultaneous

briefs and proposed findings of fact and conclusions of law. Based

on the submissions by the parties as well as the evidence admitted

at the hearing the Court grants McNeil's Motion for Preliminary

Injunctive Relief based on the Findings of Fact and Conclusions of

Law that follow.

### FINDINGS OF FACT

***The Market for No-Calorie Sweeteners***

      1.   Each year, American consumers spend more than $500

million on artificial sweeteners – products that take the place of

sugar but have no calories.  Sandler[1], Tr. 2/26/04 at 54.[2]  The

market for no-calorie sweeteners is comprised almost entirely of

products that contain one of three sweetening ingredients:

saccharin, aspartame and sucralose.  *Id*. at 55-56.

---

[1]  Debra Sandler, Vice-President of Marketing for McNeil
Nutritionals, hereinafter "Sandler".

[2] The citations to the witnesses' testimony, identified by the name
of the witness, the date of the testimony and the transcript page,
correspond to the following transcripts on record: 1) transcript for
the preliminary injunction hearing held on February 26, 2004, Docket
No. 17; 2) transcript for the continuation of the preliminary
injunction hearing held on February 27, 2004, Docket No. 23; 3)
transcript for the continuation of the preliminary injunction
hearing held on March 2, 2004, Docket No. 24; 1) transcript for the
continuation of the preliminary injunction hearing held on March 3,
2004, Docket No. 25.

Civil No.  04-1090 (JAG)                                    3

　　　2.　The first artificial sweetener to be sold in the United States was saccharin, which was introduced in roughly 1957 and is the ingredient found in Sweet'N Low, the leading saccharin brand.  Sandler, Tr. 2/26/04 at 55.

　　　3.　In 1982 an alternative to saccharin – aspartame – was approved by the U.S. Food and Drug Administration ("FDA") for sale in the United States.  Sandler, Tr. 2/26/04 at 55.  Aspartame is the main sweetening ingredient found in a variety of no-calorie sweetener products, including Equal, the best selling aspartame brand.  *Id*. at 56.

　　　4.　McNeil sells a third type of no-calorie sweetener called sucralose.  Sandler, Tr. 2/26/04 at 56; Sandler Decl. ¶ 6.  Sucralose has a different taste from aspartame.  Sandler, Tr. 2/26/04 at 57.  Sucralose is also more heat stable than aspartame, so sucralose (and not aspartame) can be used for cooking and baking.  *Id.*  Splenda is marketed to consumers not only in single-serving packets but also in granular form.  *Id.* at 58; *see* PX 31.

　　　5.　McNeil's Splenda is the first and only no-calorie sweetener made from sucralose.  Sandler, Tr. 2/26/04 at 58.  First introduced in Canada in 1991, Splenda is currently available in a dozen countries around the world.  *Id*.  McNeil first offered Splenda for sale in the United States via the Internet in 1999.  *Id.* at 58.  In September 2000, McNeil launched Splenda in retail

Civil No.  04-1090 (JAG)                                              4

stores in the United States.  *Id.*  The retail launch of Splenda in
Puerto Rico occurred in November 2000.  *Id.* at 65.

6.    Splenda has been a noteworthy success.  Within one
year of its introduction, Splenda captured nearly 14 percent of
the U.S. dollar market for no-calorie sweeteners.  By January
2004, Splenda's dollar share of the U.S. market had risen to 45.2
percent  –  more than Equal and Sweet'N Low combined.  Annual
sales of Splenda have soared from about $32 million in 2001 to
more than $200 million in 2003.  Sandler, Tr. 2/26/04 at 64-65; PX
71.

7.    In Puerto Rico, Splenda currently enjoys a 35.1
percent market share and is the retail market leader based on
dollar sales.  Annual sales of Splenda have risen from about $1.7
million in 2001 to almost $5 million in 2003, and the number of
packages sold has increased from roughly 30,000 to more than
200,000 over the same time period.  Sandler, Tr. 2/26/04 at 65; PX
72.

### Trade Dress of No-Calorie Sweeteners

8.    Each of the leading products in the no-calorie
sweetener market is sold in distinctive packaging that helps
consumers identify the products and distinguish them from other
sweeteners in the market.  For example, Sweet'N Low, the leading
saccharin brand, is marketed in a red and white box and in pink,
single-serving packets that feature a musical staff and treble

Civil No.  04-1090 (JAG)                                          5

clef.  Sandler, Tr. 2/26/04 at 67-68; PX 6; PX 26.  Equal, the
best selling aspartame brand, is distributed in blue packets and
in a distinctive blue box that features a large red strawberry on
the front panel.  Sandler, Tr. 2/26/04 at 69; PX 10; PX 25.

     9.   Splenda likewise is sold in packaging that readily
distinguishes the product from its competitors.  The evidence
shows that McNeil devoted significant time and resources to
develop a trade dress for Splenda that would be distinctive,
aesthetically pleasing and memorable to consumers.  In particular,
McNeil chose a color scheme – pastel yellow with white and blue
accents – that easily differentiates Splenda from other no-calorie
sweetener products.   Sandler, Tr. 2/26/04 at 70-72.

     10.  The Splenda box is oriented horizontally – that is,
it is wider than it is tall.  The background color of the box is a
soft, pastel yellow.  The trade name "Splenda" appears within a
white, oval-shaped "cloud," and is printed in blue, cursive-like
letters that dim from light to dark blue.  On the lower right side
of the box's front panel is a photograph of a white coffee cup and
saucer, with a yellow Splenda packet resting on the saucer.  On
the left side of the front panel is a photograph of a glass and
pitcher of iced tea with slices of lemon.  In the bottom left
corner is a circular logo that reads, "made from sugar, tastes
like sugar."  *See* Sandler, Tr. 2/26/04 at 72-73; PX 8.  The
individual Splenda packets are yellow with blue lettering.  PX 22.

Civil No.  04-1090 (JAG)                                                6

The box for granular Splenda uses a similar color scheme and logo, but has different photographs and is oriented vertically instead of horizontally.  Sandler, Tr. 2/26/04 at 74; PX 31.

        11.  McNeil has devoted substantial resources to publicize the Splenda trade dress so that consumers will readily recognize the package on store shelves.  Sandler, Tr. 2/26/04 at 74-75.  The package has been prominently featured in product advertising in both the continental U.S. and Puerto Rico.  *Id.* at 75-76; *see* PX 35; PX 36; PX 63.  Since launching Splenda in late 2000, McNeil has spent roughly $100 million to promote and publicize the brand to consumers.  Approximately $3 million of this investment has been directed specifically to the Puerto Rico market.  Sandler, Tr. 2/26/04 at 76.

        12.  Research commissioned by McNeil in the ordinary course of business indicates that, as of late 2002, about 60 percent of consumers were aware of Splenda, and roughly 79 percent of those who have used the product within the past month, know that Splenda "comes in a yellow package."  Sandler, Tr. 2/26/04 at 85; PX 18 at 2; PX 19 at 10.  In contrast, according to the same market study, only 7 percent of consumers are aware of a brand of sugar – cited by Merisant in support of its contention that the color yellow is "functional" for sugar and/or no-calorie sweeteners – comes in a yellow package.  Sandler, Tr. 2/26/04 at 84; *see* PX 7.

Civil No.  04-1090 (JAG)                                           7

### Merisant's New Same Product

13.  For approximately the past 10 years, the market for no-calorie sweeteners in Puerto Rico has included an aspartame product known as Same.  The record indicates that Same was first introduced in Puerto Rico in 1994.  Cuervo[3], Tr. 3/2/04 at 84; PX 69.  At some point thereafter, The Monsanto Company took over ownership and marketing of the Same brand.  Merisant acquired the brand from Monsanto.  Cuervo, Tr. 3/2/04 at 7, 63-64.

14.  From its introduction until shortly before the commencement of this action, Same was sold in vertically oriented, dark blue boxes with white and light blue lettering, and in predominantly blue single-serving packets.  The "Same" brand name appeared on the box in a distinctive blue and white typeface that gave the letters a three-dimensional appearance.  This longstanding Same product ("Original" or "Blue" Same) has used aspartame as its sweetening ingredients.  PX 3; Sandler, Tr. 2/27/04 at 66; Cuervo, Tr. 3/2/04 at 7, 26.

15.  In December 2003, Merisant introduced for sale in Puerto Rico a new no-calorie sweetener product that is the focus of this lawsuit and McNeil's motion.  This new product ("New Same" or "Yellow Same") uses the same artificial sweeteners – aspartame and ace-k – as Blue Same.  However, instead of dextrose with

---

[3]  Francisco Javier Cuervo-Escalona, Vice-President and General Manager for Latin America at Merisant Latin America, hereinafter "Cuervo".

Civil No.  04-1090 (JAG)                                              8

maltodextrin, Yellow Same uses sugar as its bulking agent or
filler.  The sugar in New Same does not affect its taste or
performance.  For example, New Same is no more suitable for
cooking than Original Same.  Sandler, Tr. 2/26/04 at 182-83;
Cuervo, Tr. 3/2/04 at 49-51.  Rather, according to the testimony
by one of Merisant's executives, sugar is included in the product
solely for two reasons:  (i) to reduce production costs; and (ii)
to give the product a more "natural" image.  Cuervo, Tr. 3/2/04 at
51.

        16.  Aside from the fact that they use different
fillers, the primary difference between Original Same and New Same
is their packaging.  While Original Same comes in a blue,
vertically oriented box and blue packets, New Same comes in a
pastel yellow, horizontally oriented box and yellow packets.
Indeed, the color scheme and overall design of the New Same
packaging is radically different from that of Original Same.  But
it is strikingly similar in appearance to the trade dress of
Splenda.  Sandler, Tr. 2/26/04 at 92-93; Cuervo, Tr. 3/2/04 at 52-
59; PX 2; PX 3.

        17.  Among other similarities, both the Splenda and
Yellow Same packages include:

        A closely similar, pastel yellow background
            color;

        A brand name positioned inside a white, oval-
            shaped cloud;

Civil No.  04-1090 (JAG)                                    9

> Brand name lettering that dims from light to
> dark blue;
>
> A photograph in the lower right corner of the
> front panel, taken from the same angle,
> of a white saucer and cup filled with
> coffee;
>
> An image of a beverage and fruit on the left
> side of the front panel;
>
> An informational banner in the lower left
> corner of the front panel, stating that
> the product is either "made from sugar"
> (in the case of Splenda) or "made with
> sugar" (in the case of Yellow Same);
>
> Identical orientation and closely similar box
> dimensions for all product sizes (*see*
> Sandler, Tr. 2/26/04 at 93-94; PX 33)[4];
> and
>
> A strikingly similar overall layout (*e.g.*,
> size and placement of photographs,
> selection of photos, size and location of
> brand name).

*See* PX 8; PX 9.

    18.  Merisant is marketing its New Same product in
direct competition with McNeil's Splenda.  A selling sheet used by
Merisant to market New Same to retailers points out that New Same
is priced lower than its "competitor."  The prices shown for the
"competitor" are those of Splenda (and only Splenda).  Sandler,
Tr. 2/26/04 at 95; PX 15.  Merisant's internal documents, offered
in evidence at the hearing by Merisant, reveal that New Same will

---

    [4] To the minor extent that the package dimensions differ, the
differences are attributable primarily to the depth of each
package which, ordinarily, is not visible to a consumer when the
products are viewed on store shelves.  Sandler, Tr. 2/26/04 at 93-
94; Cuervo, Tr. 3/2/04 at 60.

Civil No.  04-1090 (JAG)                                    10

be positioned "directly against other products that claim to be made from sugar."  DX W.  As the evidence showed, there is only one such product – Splenda.  Sandler, Tr. 2/26/04 at 96; Cuervo, Tr. 3/2/04 at 76-77.  Indeed, Merisant itself predicts that purchasers of Yellow Same "will derive . . . 60% [from] Splenda users . . . ."  DX X.

## CONCLUSIONS OF LAW

1.   A party seeking a preliminary injunction must establish that:

(1)  it is substantially likely to succeed on the merits of its claim;

(2)  it faces a significant risk of irreparable harm absent preliminary relief;

(3)  the balance of hardships weighs in the moving party's favor; and

(4)  the injunction serves the public interest.

*TEC Eng'g Corp. v. Budget Molders Supply, Inc.*, 82 F.3d 542, 544 (1st Cir. 1996).  McNeil has satisfied all four prongs of this test, and is entitled to preliminary injunctive relief.

## I.   McNeil Is Likely To Succeed On the Merits of Its Trade Dress Infringement Claim

2.   Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), prohibits the use of any word, term, name, symbol, or device that:

Civil No.  04-1090 (JAG)                                              11

> is likely to cause confusion, or to cause
> mistake or to deceive as to the affiliation,
> connection, or association of such person with
> another person, or as to origin, sponsorship,
> or approval of his or her goods, services or
> commercial activities by another person . . .

The Lanham Act protects not only words and symbols, but also "trade dress" – "the design and appearance of [a] product together with the elements making up the overall image that serves to identify the product presented to the consumer." *TeleRep Caribe, Inc. v. Zambrano*, 146 F. Supp. 2d 134, 138 (D.P.R. 2001) (citation and internal quotation signals omitted) (brackets in original). "Trade dress is the way a company dresses its goods for market." *Veryfine Prods., Inc. v. Colon Bros., Inc.*, 799 F. Supp. 240, 246 (D.P.R. 1992).  Trade dress may include features such as size, shape, color, graphics, and any combination of such features.  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765 n.1 (1992). Product packaging is the quintessential form of trade dress and "normally **is** taken by the consumer to indicate origin[.]"  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209, 215 (2000) (emphasis in original).

> 3.   The key elements that must be established to prove a claim of trade dress infringement are:

> > (1)      that the trade dress in question is
> > protectable – either because it is
> > "inherently distinctive" or because it
> > has acquired "secondary meaning" among
> > consumers; and

Civil No.  04-1090 (JAG)                                      12

> (2)      that the products at issue are
> sufficiently similar in appearance that
> consumers are likely to confuse them in
> the marketplace.

*See* 15 U.S.C. § 1125(a)(1)(A); *TeleRep Caribe*, 146 F. Supp. 2d at 138-39.  The trade dress in question must also be nonfunctional. *See Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982) (a feature is functional if it is essential to the use or purpose of the article or affects the cost or quality of the article).  McNeil has shown that it is highly likely to succeed in establishing each of these elements.

### A.    The Splenda Trade Dress Is Entitled To Protection

4.    Under the Lanham Act, trade dress can be protected either if it is inherently distinctive or if it has acquired secondary meaning.  The Splenda trade dress is entitled to protection on either theory.

### 1.    The Splenda Trade Dress Is Inherently Distinctive

5.    Trade dress is inherently distinctive if its "intrinsic nature serves to identify a particular source." *Wal-Mart*, 529 U.S. at 210.  Where, as here, the trade dress for which protection is sought is product ***packaging***, as opposed to product ***configuration***, the inherent distinctiveness test is more readily met.  As the U.S. Supreme Court recently explained:

> the very purpose of . . . encasing [a product]
> in [] distinctive packaging, is most often to
> identify the source of the product.  Although
> the . . . packaging can serve subsidiary

Civil No.  04-1090 (JAG)                                          13

> functions . . . [its] predominant function
> remains source identification.  Consumers are
> therefore predisposed to regard those symbols
> as indication of the producer, which is why
> such symbols "almost ***automatically*** tell a
> customer that they refer to a brand" and
> "immediately . . . signal a brand or a product
> 'source.'"

*Wal-Mart*, 529 U.S. at 212-13 (quoting *Qualitex Co. v. Jacobson*

*Prods.*, 514 U.S. 159, 162-63 (1995)).

        6.   To determine whether a particular package design is

inherently distinctive, a court must look to the test first set

out in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4,

9 (2d Cir. 1976) ("*Abercrombie*"), and later adopted by the U.S.

Supreme Court in *Two Pesos*.  Under the *Abercrombie* test, the court

first determines whether the trade dress sought to be protected is

(1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or

(5) fanciful.  If the design falls into the first category –

generic – it can never be protected.  If it falls into the second

category – descriptive – it may be protected upon a showing of

secondary meaning.  If the package design falls into any of the

remaining three categories – suggestive, arbitrary or fanciful –

it is deemed inherently distinctive and is automatically entitled

to protection.  *Two Pesos*, 505 U.S. at 768 ("The latter three

categories of marks, because their intrinsic nature serves to

identify a particular source of a product, are deemed inherently

distinctive and are entitled to protection.").

7.   The overall combination of elements used in the Splenda package – including its color scheme, dimensions, and graphical design – is not "generic," and does not merely "describe" the product.  In fact, the package's overall appearance is arbitrary or, at the very worst, "suggestive" of the nature of the goods.  Accordingly, the Splenda trade dress is inherently distinctive and entitled to protection.

8.   Merisant argues that the Splenda trade dress is not inherently distinctive because certain elements included on the Splenda package, such as the photographs of a coffee cup and a glass of iced tea, are commonly found on packaging for no-calorie sweeteners.  But "[t]he inquiry into distinctiveness turns on the total appearance of the product, not on individual elements." *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 39 (1st Cir. 1998) (citation omitted).  "One could no more deny protection to a trade dress for using commonly used elements than one could deny protection to a trademark because it consisted of a combination of commonly used letters of the alphabet." *Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 584 (2d Cir. 1993).

9.   Courts have repeatedly found product packages similar to that of Splenda to be inherently distinctive, notwithstanding their incorporation of some common or descriptive elements.  For example, in *Cumberland Packing Corp. v. Monsanto*

Civil No. 04-1090 (JAG)                                    15

*Co.*, 32 F. Supp. 2d 561, 568 (E.D.N.Y. 1999), a case on which
Merisant relies, the court found that the packaging of plaintiff's
sweeteners contained "generic" elements that are commonly found on
sweetener packaging, such as "images of a coffee cup, glass of ice
tea, or individually wrapped paper packets." *Id.* "Viewed as
discrete elements, these do not help distinguish plaintiff's
product[.]" *Id.* Nevertheless, the court held that "the
combination of the elements in plaintiff's trade dress creates a
'suggestive' package capable of identifying each product with a
particular source." *Id.* In explaining this holding, the court
noted that "[a] product's distinctiveness is based on the way the
trade dress appears to the observer **when viewed as a whole.**
**Individual aspects of the dress may be generic, but as long as the**
**overall combination of the design is likely to identify the**
**particular source of a product, its total impression is inherently**
**distinctive**." *Id.* (emphasis added) (citation omitted).

         10. Similarly, in *Mexican Food Specialties, Inc. v.*
*Festida Foods, Ltd.*, 953 F. Supp. 846, 850 (E.D. Mich. 1997), the
court held that the packaging for the plaintiff's tortillas was
inherently distinctive because "the overall appearance of the
product's packaging . . . is 'undeniably arbitrary.'" The court
acknowledged that "some of the features of the Don Marcos package
are generic or descriptive, [*e.g.,*] the depiction of an individual
wearing a sombrero, the use of red and green to signify a

Civil No.  04-1090 (JAG)                                16

connection to Mexico, the use of a corn or wheat stalk and the use
of the title 'Don.'"  The court nonetheless held that "it is the
combination of elements and the total impression that the dress
gives to the observer that should be the focus of a court's
analysis of distinctiveness."  *Id.* (citation omitted).

        11.  Merisant cites *Maple Grove Farms of Utah, Inc. v.
Euro-Can Prods., Inc.*, 974 F. Supp. 85, 93 (D. Mass. 1997), for
the proposition that "elements . . . typical of the industry are
not inherently distinctive."  *See* Response to Order To Show Cause
at 13.  In fact, *Maple Grove* holds the opposite:

> Notwithstanding the commonality of many of the
> elements of Plaintiff's trade dress, a
> reasonable jury could conclude that, in
> combination, such elements render Plaintiff's
> jugs inherently distinctive.  . . .  "Trade
> dresses often utilize commonly used lettering
> styles, geometric shapes, or colors, or
> incorporate descriptive elements, such as an
> illustration of the sun on a bottle of suntan
> lotion.  While each of these elements
> individually would not be inherently
> distinctive, it is the combination of elements
> and the total impression that the dress gives
> to the observer that should be the focus of a
> court's analysis of distinctiveness.  If the
> overall dress is arbitrary, fanciful, or
> suggestive, it is inherently distinctive
> despite its incorporation of generic or
> descriptive elements."

*Id.* at 93 (citing *Paddington*, 996 F.2d at 584).

        12.  In urging the Court to find that the Splenda trade
dress is not inherently distinctive, Merisant cites a collection
of cases that involve the design or configuration of an actual

Civil No.  04-1090 (JAG)                                              17

product, rather than its packaging.  Merisant's reliance on
product configuration cases is misplaced.

        13.  Courts have frequently expressed reluctance to
grant trade dress protection to the design of a product.  Such
protection can hinder competition and create monopoly rights of
indefinite term, exceeding the limited exclusivity available, for
instance, under the patent laws.  *See, e.g., Landscape Forms, Inc.
v. Columbia Cascade, Co.*, 113 F.3d 373, 380 (2d Cir. 1997)
("[G]ranting trade dress protection to an ordinary product design
would create a monopoly in the goods themselves.  For this reason,
courts have exercised particular 'caution' when extending
protection to product design."); *Thomas & Betts Corp. v. Panduit
Corp.*, 65 F.3d 654, 658 (7th Cir. 1995).  In contrast, when it
comes to product packaging, "the producer has 'almost unlimited'
choices among the possible ways it can present its product . . .
."  Thus, "[i]ndividual aspects of the dress may be generic, but
as long as the overall combination of the design is likely to
identify the particular source of a product, its total impression
is inherently distinctive."  For this reason, product packaging
"typically . . . will be arbitrary or fanciful and thus inherently
distinctive, and the only real question for the courts will be
whether there is a likelihood of confusion between the products .
. . ."  *Winner Int'l LLC v. Omori Enterprises, Inc.*, 60 F. Supp.
2d 62, 67 (E.D.N.Y. 1999) (citing *Paddington Corp.*, 996 F.2d at

Civil No.  04-1090 (JAG)                                            18

583, and *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58
F.3d 27, 32 (2d Cir. 1995)); *see also* Restatement (Third) of
Unfair Competition § 16 Comment b, at 158 (1995) ("The wide range
of designs available for labels and packaging generally permits
the recognition of exclusive rights without significantly
hindering competition. Trade dress that is unique and prominent
may thus be inherently distinctive.").

        14.  Merisant also relies on the First Circuit's holding
in *Yankee Candle Co., Inc. v. Bridgewater Candle Co.*, 259 F.3d 25
(1st Cir. 2001).  The plaintiff in *Yankee Candle* sought trade
dress protection for (1) a combination of its candles and the
objects used to display and promote them – items that the court
deemed to constitute product design or configuration, not
packaging; and (2) "features common to a set of labels, as opposed
to a specific label common to a host of [plaintiff's] goods."
*Yankee Candle*, 259 F.3d at 40, 42.  The court held that the
product design/configuration trade dress could only be protected
upon a showing of secondary meaning.  *Id.* at 41.  As for the
plaintiff's various stick-on labels, although the court
acknowledged that the labels presented a "classic case of product
packaging," it cautioned that "[a] trade dress plaintiff seeking
to protect a series or line of products faces a particularly
difficult challenge, as it must show that the appearance of the
several products is sufficiently distinct and unique to merit

Civil No.  04-1090 (JAG)                                      19

protection." *Id.* (citation and internal quotation signals
omitted).  "Moreover, trade dress claims across a line of products
present special concerns in their ability to artificially limit
competition, as such claims are generally broader in scope than
claims relating to an individual item." *Id.* at 42 (citation
omitted).  The court held that the individual features of the
labels used on plaintiff's entire product line (such as images of
particular plants or flowers to connote corresponding fragrances)
were functional and common and, therefore, not inherently
distinctive. *Id.* at 42-43.

        15.  The plaintiff in *Yankee Candle* thus sought much
broader protection than McNeil seeks here.  McNeil does not seek
to protect a product design/configuration, nor does it claim
exclusive rights in the labels or packaging for an entire line of
products.  McNeil seeks to protect only the packaging for its
Splenda packets.  Accordingly, *Yankee Candle* is inapposite.

        16.  *Landscape Forms*, upon which Merisant also relies,
is likewise inapposite.  In *Landscape* the plaintiff sought to
protect the design features of a line of outdoor furniture.  113
F.3d at 381.  *Landscape* is thus a product design/configuration
case *and* a product line case.  In rejecting the plaintiff's
claims, the Second Circuit noted the heavier burden that attaches
in such cases, while at the same time observing that the situation
is quite different when the trade dress sought to be protected is

Civil No.  04-1090 (JAG)                                        20

mere packaging.  As the Second Circuit put it, "packaging is
usually indicative of a product's source, while the design or
configuration of the product is usually not so."  *Id.* at 379.

        17.  In sum, the overall appearance of the Splenda
package is unique and identifiable, and is thus entitled to
protection as inherently distinctive.  Competitors in the no-
calorie sweetener market have at their disposal innumerable
combinations of colors, shapes, sizes, graphics, typefaces, and
other individual features that can be assembled to create
distinctive packaging.  There is no danger that granting
protection to the Splenda trade dress will stifle competition, as
Merisant suggests.  McNeil is substantially likely to prevail on
its claim that the Splenda package is inherently distinctive and
entitled to trade dress protection.

        **2.   The Splenda Trade Dress Has Acquired Secondary**
**Meaning**

        18.  Even if the Court were disinclined to find that the
Splenda trade dress is inherently distinctive, McNeil has shown a
substantial likelihood of success in demonstrating that the
packaging for Splenda has acquired secondary meaning.  Trade dress
acquires secondary meaning when "in the minds of the public, the
primary significance of [the dress] is to identify the source of
the product rather than the product itself."  *Wal-Mart*, 529 U.S.
at 211 (quoting *Inwood Labs.*, 456 U.S. at 851 n.11).  Direct

Civil No.  04-1090 (JAG)                                    21

evidence of secondary meaning includes consumer surveys and

testimony of individual consumers.  *See Yankee Candle*, 259 F.3d at

43.

### a.   McNeil's Secondary Meaning Survey

19.  At the preliminary injunction hearing, McNeil

offered into evidence a consumer survey that shows that the

Splenda trade dress has achieved secondary meaning among consumers

in Puerto Rico.  McNeil's survey was designed and analyzed by Dr.

Michael Mazis, a professor of marketing at the Kogod School of

Business, American University.  Professor Mazis is a highly

qualified expert with decades of experience in academia,

government, and business.  In addition to teaching university

courses and publishing dozens of scholarly articles on consumer

research, behavior and marketing, Professor Mazis has conducted

numerous surveys, including surveys on behalf of the Federal Trade

Commission, the FDA, the Consumer Product Safety Commission, the

United States Mint, the Bureau of Alcohol Tobacco and Firearms,

and the State of California.  *See* Mazis[5], Tr. 2/27/04 at 2-4; PX

55; PX 68.  Professor Mazis has previously testified as an expert

witness on behalf of a variety of parties, including the

government.

---

[5] Michael Mazis, Professor of Marketing in the School of Business at
American University in Washington D.C., hereinafter "Mazis".

Civil No.  04-1090 (JAG)                                              22

        20.  Professor Mazis prepared the questions for McNeil's
secondary meaning survey in English.  The questions were then
translated into Spanish and all interviews were conducted in
Spanish.  The survey was administered and validated[6] by Advanced
Research Center, Inc.  Interviews were conducted in geographically
dispersed locations throughout Puerto Rico by Conscious Marketing.
Mazis, Tr. 2/27/04 at 19; PX 56 at 1.

        21.  In the survey, consumers who *both* (a) have
purchased a no-calorie sweetener in the past three months, and (b)
plan to do so again in the next three months, were shown one of
two packages.  One group – the so-called "test" group – was shown
a package that contained the graphics used on the actual Splenda
package, but with all textual references to Splenda, including the
brand name, removed.  Mazis, Tr. 2/27/04 at 7; PX 49.  The package
was then removed, and respondents were asked a series of
questions.  Mazis, Tr. 2/27/04 at 14.  This methodology has been
used and approved by courts in numerous cases, including *McNeil-
PPC, Inc. v. Granutec Inc.*, 919 F. Supp. 198 (E.D.N.C. 1995), a
case on which Merisant relies.  *See* PX 45 (Granutec survey
report); *see also Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d
366, 384 (7th Cir. 1976), *superceded on other grounds by statute*

---

        [6] "Validation" involves recontacting respondents by telephone
to confirm that they were interviewed and gave the answers
indicated on their questionnaires.  Johnson, Tr. 2/27/04 at 183-
84.  Advanced Research validated approximately 50 percent of the
interviews in McNeil's survey.  PX 56 at 1.

Civil No.  04-1090 (JAG)                                         23

*as stated in Scandia Down Corp. v. Euroquilt, Inc.* 772 F.2d 1423
(7th Cir. 1985).

     22.  Consumers shown the test package were first asked,
"Have you ever seen or purchased a No-Calorie Sweetener that looks
like the one I showed you or don't you know?"  87 percent of the
respondents answered "Yes."  Mazis, Tr. 2/27/04 at 21; PX 59
(English Questionnaire); PX 61 (Spanish Questionnaire); PX 56 at 8
(Survey Tabulations); PX 73 (Survey Conclusions).

     23.  These consumers were then asked, "Have you seen or
purchased 'Only One Brand' or 'More Than One Brand' of No-Calorie
Sweetener that looks like the one I showed you or 'Don't You
Know?'"  146 of the 200 consumers in the test group – 73 percent –
said that they had seen or purchased "Only One Brand."  Mazis, Tr.
2/27/04 at 22; PX 59; PX 61; PX 56 at 10; PX 73.

     24.  Respondents were next asked, "What do you think is
the brand name of the No-Calorie Sweetener that I showed you?"
125 of the 146 respondents who had indicated that they had seen or
purchased only one such brand – 62.5 percent of all the category
purchasers in the test group – identified the product as Splenda.
Mazis, Tr. 2/27/94 at 22-23; PX 59; PX 61; PX 56 at 12.  When
asked "why do you think that?" respondents overwhelmingly cited
the color, design and configuration of the package as the basis
for their answers.  Mazis, Tr. 2/27/04 at 25-26; *see* PX 59; PX 61;
PX 56 at 14.  The reason most frequently cited (by 55 percent of

Civil No.  04-1090 (JAG)                                          24

all respondents in the test group) was the "[c]olor of the box."
Mazis, Tr. 2/27/04 at 25-26; PX 56 at 14.

         25.  A second group of 100 consumers – the so-called
"control" group – was shown a different package that does not
resemble the current Splenda trade dress, but nonetheless appears
to be an authentic package for a no-calorie sweetener.  Mazis,
 Tr. 2/27/04 at 9; PX 50.  Indeed, this package was actually used
by McNeil to market Splenda over the Internet (though not in
Puerto Rico) for a few months in 1999, before McNeil launched
Splenda in stores in its current packaging.  Sandler, Tr. 2/26/04
at 59-60; PX 51.  As with the test package, all textual references
to Splenda were removed.  *See* PX 50.

         26.  Consumers in the "control" group were asked the
same questions as those in the "test" group.  Mazis, Tr. 2/27/04
at 9-10, 23; PX 59; PX 61.  Only four respondents in the control
group – four percent – said that they associated the control
package with Splenda.  This represents the "noise" level of the
survey – *i.e.*, the approximate percentage of respondents who
answer "Splenda" for reasons unrelated to the package they are
shown (*e.g.*, guessing, brand awareness or popularity, etc.).
Mazis, Tr. 2/27/04 at 9-10, 23.  Subtracting this four percent
from the 62.5 percent of respondents in the test group who
associated the test package with only the Splenda brand, the
survey shows a "net" level of recognition of the Splenda trade

Civil No.  04-1090 (JAG)                                          25

dress of 58.5 percent.  This percentage is more than sufficient to

establish secondary meaning.  *See I.P. Lund*, 118 F. Supp. 2d at

107 ("a 50-percent figure (or higher) for consumer association of

a product with one unique source is typically regarded as

sufficient to establish secondary meaning") (citing *Spraying Sys.

Co. v. Delavan, Inc.*, 975 F.2d 387, 394 (7th Cir. 1992));

*Granutec*, 919 F. Supp. at 202 (finding secondary meaning based on

survey results showing a 38 percent recognition level among

category purchasers and 50 percent among product users).

     27.  Based on his secondary meaning survey, Professor

Mazis concluded that:

> The Splenda trade dress is recognized by a
> high percentage (87 percent) of
> purchasers of no-calorie sweeteners in
> Puerto Rico;

> A high percentage of category purchasers (73
> percent) associate the Splenda trade
> dress with only one brand of no-calorie
> sweetener; and

> A substantial majority of category purchasers
> – 58.5 percent net of "noise" – identify
> Splenda as the single brand or source
> associated with the Splenda trade dress.

PX 73.  These data strongly support a conclusion that McNeil is

likely to prevail in establishing that the Splenda trade dress has

acquired secondary meaning among consumers in Puerto Rico.

     28.  At the preliminary injunction hearing, Merisant

attacked McNeil's survey primarily on the basis that approximately

35 of the questionnaires from the control group bear a marking

Civil No.  04-1090 (JAG)                                    26

that suggests that the respondents might have been shown a yellow test package instead of a white control package.  *See* Mazis, Tr. 2/27/04 at 89-91, 118-123.   Merisant argues that this renders the entire survey unreliable, and that the Court should exclude the survey from consideration.

29.  As Professor Mazis explained, he originally intended that the questionnaires used for the "test" group be labeled "Version 1" and that those used for the control group be labeled "Version 2."  In addition, Professor Mazis directed that the "Version 1" or test group questionnaires be printed on yellow paper, and the "Version 2" or control group questionnaires be printed on white paper.  This would allow for two means of determining which questionnaires belonged in which group.  Mazis, Tr. 2/27/04 at 17-18.

30.  As it turned out, all of the questionnaires were printed with "Version 1" at the top; there were no "Version 2" questionnaires.  Mazis, Tr. 2/27/04 at 17-18.  Thus, the field at the top of each questionnaire that asked the interviewer to circle "Version 1" or "Version 2" became superfluous.  *Id*. at 120, 123. Professor Mazis confirmed that (1) interviewers *always* used the yellow questionnaire when they showed a respondent the yellow or test package, and used the white questionnaire when they showed a respondent the white or control package; and (2) *all* of the yellow questionnaires were tabulated as "test" interviews, and *all* of the

Civil No.  04-1090 (JAG)                                      27

white questionnaires were tabulated as "control" interviews.  *Id.*
at 120  This undoubtedly is correct; otherwise, when the results
were tabulated, there would have been more than 200 "test"
interviews and fewer than 100 "control" interviews.  Indeed, had
the error hypothesized by Merisant actually taken place, it would
have biased the results of the survey *against* McNeil, because
respondents in the control group mistakenly shown the yellow test
package would likely have identified it as Splenda – driving up
the "noise" percentage to be subtracted from the findings in the
test group.

          31.  It is true, of course, that the Supreme Court's
holdings in *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993),
and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 141 (1999), which
require that certain standards be met before expert scientific
testimony can be accepted and relied upon by a tribunal, apply to
survey research as well as other types of expert testimony.  But
in general, courts are loathe to exclude consumer surveys from
evidence.  "[T]he majority rule is that while technical
deficiencies can reduce a survey's weight, they will not prevent
the survey from being admitted into evidence."  *Mark Bric Display
Corp. v. Joseph Struhl Co.*, No. C.A. 98-532ML, 2003 WL 21696318,
*9 (D.R.I. July 9, 2003) (brackets in the original) (quoting J.
Thomas McCarthy, 5 *McCarthy on Trademarks and Unfair Competition* §
32:170, at 32-275).  So long as the survey is conducted according

Civil No.  04-1090 (JAG)                                          28

to accepted principles, "survey evidence should ordinarily be found sufficiently reliable under *Daubert*."  *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 (9th Cir. 1997).  *See also Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1544 (10th Cir. 1996) ("Technical and methodological deficiencies in the survey . . . bear on the weight of the evidence, not the survey's admissibility."); *Insty*Bit, Inc. v. Poly-Tech Indus., Inc.*, 95 F.3d 663, 671 (8th Cir. 1996) (flaws in surveys go to the weight the trier of fact should place on the survey's results); *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611 (7th Cir. 1993) (survey will *rarely* be so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible); Federal Judicial Center, *Manual for Complex Litigation* §11.493, at 103 (4th ed. 2004) ("Even if the court finds deficiencies in the proponent's showing" that the population was properly chosen and defined, that the sample was representative of that population, that the data was accurately reported and properly analyzed, "the court may receive the evidence subject to argument going to its weight and probative value.").  McNeil's survey satisfies these standards of admissibility, and Merisant's motion to exclude it should be denied.

       **b.**   **Additional Evidence of Secondary Meaning**

     32.  Even without Professor Mazis's survey, the record contains sufficient evidence to support the Court's conclusion

Civil No.  04-1090 (JAG)                                                    29

that McNeil is likely to prevail in demonstrating that the Splenda trade dress has acquired secondary meaning.  As courts have long recognized, aside from survey evidence, secondary meaning may be inferred from factors such as (1) the length and exclusivity of use of the trade dress; (2) the size or prominence of plaintiff's enterprise; (3) the existence of substantial advertising; (4) the product's established place in the market; and (5) proof of intentional copying.  *TeleRep Caribe, Inc. v. Zambrano*, 146 F. Supp. 2d 134, 140 (D.P.R. 2001); *accord Yankee Candle*, 259 F.3d at 43-44.  Here, these considerations strongly support a conclusion that the Splenda trade dress has achieved secondary meaning.

        33.  As noted above, since its introduction in 2000, Splenda has enjoyed an extraordinary level of commercial success. Its more than $200 million in annual U.S. sales, and $5 million of sales each year in Puerto Rico, make it the leading no-calorie sweetener (based on dollar sales) in both markets.  McNeil has spent more than $100 million to publicize the Splenda brand to consumers (roughly $3 million in Puerto Rico), and substantially all of this advertising includes prominent images of the Splenda trade dress.  It is therefore reasonable to conclude that consumers are familiar with the Splenda trade dress, and can readily identify the product when they go to the store to purchase a no-calorie sweetener.

34.  Moreover, apart from Yellow Same, Splenda is (and
since its introduction has been) the only no-calorie sweetener on
the market sold in pastel yellow packaging.  Sandler, Tr. 2/26/04
at 70-71.  Indeed, with the exception of an extremely minor brand
known as Sugar Twin (*see* Section I.B.6., ¶ 79, below), Splenda is
the only such product whose trade dress features any shade of
yellow.  As both Professor Mazis's secondary meaning survey and
McNeil's ordinary course of business survey indicate, consumers of
no-calorie sweeteners have come to strongly associate the color
yellow with Splenda.  PX 18 at 2; PX 19 at 10.  This supports a
finding of secondary meaning in this case.  *See Quaker Oats Co. v.
Mel Appel Enterprises, Inc.*, 703 F. Supp. 1054, 1058, 1061
(S.D.N.Y. 1989) (ordinary course of business survey showing
significant recognition of plaintiff's trade dress sufficient to
support finding of secondary meaning for purposes of preliminary
injunction).

35.  Finally, as discussed in greater detail below (*see*
Section I.B.7), the record strongly supports a conclusion that
Merisant intentionally copied the Splenda trade dress in order to
position Yellow Same to compete against Splenda.  Copying is
itself evidence that a trade dress has acquired secondary meaning,
because there is no incentive for a competitor to copy a design
that has no recognition among consumers.  *See Boston Athletic
Ass'n v. Sullivan*, 867 F.2d 22, 32 (1st Cir. 1989) (defendant's

Civil No.  04-1090 (JAG)                                          31

choice of similar designs showed intent to trade on the
plaintiff's sponsorship and management of the Boston Marathon).
Merisant's evident copying of the Splenda package design thus
bolsters the conclusion that McNeil is likely to succeed in
proving that the Splenda trade dress has acquired secondary
meaning.

        36.   Courts have found secondary meaning on the basis of
far less evidence than that presented here by McNeil.  *See*
*DanaBraun, Inc. v SML Sport Ltd.*, No. 03 Civ. 6405(BSJ), 2003 WL
22832265, *2 (S.D.N.Y. 2003) (concluding that plaintiff's catalog
had acquired secondary meaning solely on the bases that it is
distributed to 10,000 retailers three to four times a year and
evidence that defendants intentionally copied the trade dress);
*Direct Marketing of Virginia, Inc. v. E. Mishan & Sons, Inc.*, 753
F. Supp. 100, 105-06 (S.D.N.Y. 1990) (granting plaintiff's motion
for a preliminary injunction and concluding that the trade dress
of plaintiff's watch had acquired secondary meaning based on $5
million in advertising, $20 million in gross sales, and evidence
of intentional copying).  McNeil has shown that it is
substantially likely to succeed in establishing that the trade
dress of Splenda has acquired secondary meaning.

        **3.    The Splenda Trade Dress Is Not Functional**

        37.   To succeed on its claim of trade dress
infringement, McNeil must also show that the package design it

Civil No.  04-1090 (JAG)                                    32

seeks to protect is not functional.  Merisant argues that the
Splenda trade dress includes functional elements and therefore is
not entitled to protection.  Merisant's argument is misplaced.

        38.  As the First Circuit has explained, the "core
inquiry into whether trade dress is functional requires
examination of the effects that granting protection to a product
will have on the ability of others to compete."  *I.P. Lund*, 163
F.3d at 37.  A "functional product feature is one that is
'essential to the use or purpose of the article or [that] . . .
affects the cost or quality of the article.'"  *Id.* (quoting *Inwood
Labs.,* 456 U.S. at 851 n.10).  Put another way, a design feature
is functional if granting protection to that feature "would permit
one competitor . . . to interfere with legitimate (nontrademark-
related) competition through actual or potential exclusive use of
an important product ingredient."  *Qualitex*, 514 U.S. at 170.

        39.  No element of the Splenda trade dress – including
its yellow background color – falls within this definition.
Yellow packaging is not essential to the use or purpose of a no-
calorie sweetener, and does not affect its cost or quality.  As
the undisputed evidence showed, many products compete for sales in
the no-calorie sweetener segment.  Hardly any use yellow
packaging.

        40.  Merisant argues that, because one popular brand of
sugar (Domino) uses a bright yellow trade dress, the color yellow

Civil No.  04-1090 (JAG)                                      33

serves a "functional" purpose of indicating that the product is
somehow associated with sugar.  This position lacks evidentiary
support, and is incorrect.  Merisant's witness admitted on cross-
examination that he knew of no data to show that consumers
associate the color yellow with sugar.  Cuervo, Tr. 3/2/04 at 62.
In fact, the record shows that most brands of sugar come in white
packaging, not yellow.  Sandler, Tr. 2/26/04 at 88; PX 52; PX 53;
PX 54.  Indeed, as noted above, in McNeil's ordinary course of
business study only 7 percent of all consumers aware of a brand of
sugar said that sugar comes in a yellow package.  In contrast, as
of 2002, 60 percent of consumers aware of Splenda knew that
Splenda comes in a yellow package.  PX 18 at 2.  These data
strongly refute Merisant's claim that yellow is "functional" for
sugar.

        41.  Merisant's survey expert, Mr. Philip Johnson,
testified that his survey (discussed in Section I.B.6. below)
showed that "the color yellow serves to some extent as a
functional attribute suggesting membership in the product genre of
sugar substitutes . . . ."  DX MM; see Johnson[7], Tr. 2/27/04 at
249.  However, as Mr. Johnson conceded on cross-examination, his
survey did not measure any of the criteria used by courts to
assess whether a design element is functional.  Johnson, Tr.

---

[7] Philip Johnson, Chief Executive Officer at Leo J. Shapiro and
Associates, a Chicago-based market research and consulting company,
hereinafter "Johnson".

Civil No.  04-1090 (JAG)                                      34

2/27/04 at 252-53.  Accordingly, the Court should reject Mr.

Johnson's testimony on this issue.

     42.  During closing argument, Merisant raised for the

first time the defense of "aesthetic functionality."  "[I]f a

design's 'aesthetic value' lies in its ability to 'confe[r] a

significant benefit that cannot practically be duplicated by the

use of alternative designs,' then the design is 'functional.'"

*Qualitex*, 514 U.S. at 170 (quoting Restatement (Third) of Unfair

Competition § 17, Comment c, pp. 175-176 (1993)).  Thus, "where a

color serves a significant nontrademark function – whether to

distinguish a heart pill from a digestive medicine or to satisfy

the 'noble instinct for giving the right touch of beauty to common

and necessary things,' G. Chesterton, Simplicity and Tolstoy 61

(1912) – courts will examine whether its use as a mark would

permit one competitor (or a group) to interfere with legitimate

(nontrademark-related) competition through actual or potential

exclusive use of an important product ingredient."  *Id.*

     43.  In *Qualitex*, the Supreme Court held that the green-

gold color of the plaintiff's laundry pads did not serve an

aesthetic function, because, *inter alia*, there was "no competitive

need in the press pad industry for the green-gold color[;] . . .

other colors are equally usable."  *Id.* at 166 (citation omitted).

The same is true of the color yellow in the no-calorie sweetener

market.  As noted above, the vast majority of products in the

Civil No.  04-1090 (JAG)                                    35

category do not use the color yellow in their trade dress, and
there is no essential competitive reason to do so.  Accordingly,
Merisant's defense of aesthetic functionality lacks merit.

44.  McNeil has demonstrated that it is substantially
likely to prevail on its claim that the trade dress of Splenda is
not functional.  McNeil has further shown a substantial likelihood
of success in proving that the Splenda trade dress is inherently
distinctive, and has acquired secondary meaning.  Accordingly,
McNeil has met its burden of demonstrating a substantial
likelihood of success on its claim that the Splenda trade dress is
entitled to protection.

### B.   The Yellow Same Trade Dress Is Likely To Cause Confusion

45.  McNeil has also shown that it is substantially
likely to prevail on its claim that the trade dress adopted by
Merisant for New Same is likely to cause confusion among consumers
of no-calorie sweeteners in Puerto Rico.

46.  When a manufacturer launches a new product or
package into an established market, it has an affirmative duty to
avoid causing confusion with existing brands.  *Boston Athletic*,
867 F.2d at 29; *Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814
F.2d 812, 817-18 (1st Cir. 1987).  Merisant's New Same package
falls short of this standard.  To the contrary, it is highly
likely to cause consumer confusion with Splenda.

47.  The First Circuit has identified eight factors to be weighed when analyzing whether a defendant's trade dress is likely to cause confusion:

> (1)  the similarity of the marks;
>
> (2)  the similarity of the goods;
>
> (3)  the relationship between the parties' channels of trade;
>
> (4)  the relationship between the parties' advertising;
>
> (5)  the classes of prospective purchasers;
>
> (6)  evidence of actual confusion;
>
> (7)  the defendant's intent in adopting its mark; and
>
> (8)  the strength of the plaintiff's mark.

*Boston Athletic*, 867 F.2d at 29; *Volkswagenwerk Aktiengesellschaft*, 814 F.2d at 817.  As the First Circuit has explained, no one factor is determinative and not every factor must favor the owner of the trade dress to support a finding of likely confusion.  *Equine Techs., Inc. v. Equitechnology, Inc.*, 68 F.3d 542, 546-47 (1st Cir. 1995); *Maple Grove Farms*, 974 F. Supp. at 85.  Here, all eight factors weigh in McNeil's favor.

## 6.    Similarity of the Marks

48.  Similarity "is determined on the basis of the total effect of the designation."  *Boston Athletic*, 867 F.2d at 29 (citations omitted); *Volkswagenwerk Aktiengesellschaft*, 814 F.2d at 817.  The critical inquiry is whether the products "create the

same general overall impression." *Veryfine Prods.*, 799 F. Supp.

at 251 (quoting *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d

1058, 1060 (2d Cir. 1979)).  Similarity must be considered in

light of what occurs in the marketplace, taking into account the

"circumstances surrounding the purchase of the goods." *Calamari*

*Fisheries v. The Village Catch, Inc.*, 698 F. Supp. 994, 1009 (D.

Mass. 1988) (citation omitted).  Courts typically weigh

similarities more heavily than differences.  *Id.* (citation

omitted).

      49.  The similarities between the Splenda and Yellow

Same packages are numerous.  They include:

      (a)  the distinctive pastel yellow background;

      (b)  the gradually lighter to darker blue
           lettering of the brand name;

      (c)  the oval-shaped white cloud surrounding
     the brand name;

      (d)  the full, white coffee cup and saucer in
           the foreground on the right side of the
           package's front panel;

      (e)  the sweetener packets resting on the
           saucer;

      (f)  the yellow coloring and blue lettering
           on the sweetener packets;

      (g)  the depiction of a cold beverage
              with fruit on the left side of
             the package's front panel;

      (h)  the informational banner in the
              lower left corner with the
              reference to sugar; and

Civil No.  04-1090 (JAG)                                          38

        (i)  the size and orientation of the two
             packages.

     50.  These common elements are more than sufficient to find that the two trade dresses are closely similar.  For example, in *Veryfine Prods.*, the court found a "striking similarity" between the labels on the parties' fruit juice bottles based upon similar stylized depictions of fruit and trees, similar or identical bright pastels against a white background, and the same placement of the brand name, legal copy, UPC code, contents and other elements on the labels.  799 F. Supp. at 252.  The court noted that the similarity was enhanced by the fact that the parties used the same type of 10-ounce bottles with white caps and that no other competitor had a label and overall trade dress as similar.  *Id.*  The similarities between New Same and Splenda are at least as plentiful than those cited by the court in *Veryfine*.

     51.  Merisant argues that the prominent inclusion of its "house mark" – Same – dispels any risk of confusion with Splenda. Courts have repeatedly held that the presence of the defendant's brand name on a look-alike package does not prevent a finding of likely confusion.  As the court in *Veryfine* stated, "the argument that the addition of defendant's house mark prevents likely confusion has been labeled a 'smoke screen' and a 'poor excuse' for a blatant infringement because customers are likely to think that the plaintiff had authorized the defendant's use of the mark."  799 F. Supp. at 252; *see also Keds Corp. v. Renee Int'l.*

Civil No.  04-1090 (JAG)                                    39

*Trading Corp.*, 888 F.2d 215, 222 (1st Cir. 1989) (similarity of labels not cured by different brand names because individuals might assume that the defendant's goods were made by the plaintiff).

    52.  Merisant relies on *Bristol-Myers Squibb Co. v. McNeil-PPC, Inc.*, 973 F.2d 1033 (2d Cir. 1992), to support its contention that the prominent use of its house mark eliminates any risk of confusion.  In *Bristol-Myers* the trade names "Tylenol" and "Excedrin" were "the major features of otherwise ordinary boxes." 973 F.2d at 1046.  Indeed, as the Second Circuit noted, the trade dress of the accused product ("Tylenol PM") was "extremely similar to the trade dress of the other 'Tylenol' analgesic products." *Id*.  Essentially the only thing the Excedrin and Tylenol boxes had in common was their blue background color – a color that, in itself, was not protectable.

    53.  Here, the Yellow Same and Splenda packages share many design features aside from a common background color. Moreover, despite being well known in Puerto Rico, the brand name "Same" does not appear to have the same level of recognition as McNeil's famous Tylenol mark.  Indeed, in Merisant's own survey, more than 95 percent of consumers shown a box of Yellow Same could not immediately thereafter recall the brand name of the product. *See* DX MM ¶ 11; DX RR, Table 11-1.  This case thus falls outside

Civil No.  04-1090 (JAG)                                    40

the holding of *Bristol-Myers*, wherein the Second Circuit itself

cautioned:

> **We do not mean to intimate that the
> distinctive elements of any trade dress may be
> freely appropriated as long as the junior user
> clearly identifies the source of the goods.**
> In many cases, the distinctive elements of a
> trade dress may themselves be eligible for
> trademark protection.  In other cases the
> trade name may be a less dominant feature of
> the entire trade dress and thus have less
> force in countering other similarities between
> two trade dresses.  Also, the junior user's
> trade name may less strongly identify a
> particular source than the 'Tylenol' name at
> issue here.

*Bristol-Myers*, 973 F.2d at 1046 (emphasis added).

       54.  In part because of these important factual

distinctions, Merisant's argument that McNeil is judicially

estopped by the position it took in *Bristol-Myers* is without

merit.  Judicial estoppel prevents "a party from abusing the

judicial process through cynical gamesmanship" or from "'playing

fast and loose with the courts . . . .'"  *Patriot Cinemas v.

General Cinema Corp.*, 834 F.2d 208, 212 (quoting *Scarano v.

Central R. Co.*, 203 F.2d 510, 513 (3d Cir. 1953)).  "[A]lthough

the First Circuit had initially embraced the doctrine of judicial

estoppel with enthusiasm in *Patriot Cinemas*, it has since imposed

many requirements on a party seeking estoppel before a court may

take the extraordinary step of rejecting a litigant's entire

argument without any consideration of its merits."  *Unum Corp. v.*

Civil No.  04-1090 (JAG)                                              41

*United States*, 886 F. Supp. 150, 158 (D. Me. 1995).  In order for
judicial estoppel to apply, a litigant "must, in effect, 'have
made a bargain' with the tribunal of the first proceeding by
making certain representations to the tribunal in order to obtain
a particular 'benefit' from the tribunal."  *Id.* (quoting *United
States v. Levasseur*, 846 F.2d 786, 792 (1st Cir.), *cert. denied*,
488 U.S. 894 (1988)).  "Additionally, the position taken in the
second litigation must be 'inconsistent with one successfully and
unequivocally asserted by that same party in a prior proceeding.'"
*Unum*, 886 F. Supp. at 158 (quoting *United States v. Kattar*, 840
F.2d 118, 130 n.7 (1st Cir. 1988)).  Finally, "in the absence of
'deliberate dishonesty [or] . . . any serious prejudice to
judicial proceedings or the position of the opposing party,' the
doctrine should not be applied."  *Unum*, 886 F. Supp. at 158
(quoting *Desjardins v. Van Buren Comm. Hosp.*, 37 F.3d 21, 23 (1st
Cir. 1994)).

     55.  In *Bristol-Myers*, McNeil stated that it does not
ordinarily challenge generic manufacturers who copy the colors of
McNeil's branded products.  *See* Def.'s Supplemental Brief, Ex. A.
Merisant is not a generic manufacturer selling a product identical
to Splenda, so the statement on its face does not apply to
Merisant's conduct.  In any event, McNeil did not "prevail" on
this issue in *Bristol-Myers*, nor did it make a "bargain" with the
Second Circuit that, if it were to succeed in that case, McNeil

Civil No.  04-1090 (JAG)                                          42

would never assert its rights in a color scheme against any party
in the future.  The holding of *Bristol-Myers* was that, despite
their similar background color, the two trade dresses at issue
were *not* confusingly similar.  973 F.2d at 1046.  Here, the
Splenda and Yellow Same designs share far more than a common
background color, and they *are* confusingly similar.

        56.  Moreover, to the extent that the confusion between
Splenda and Yellow Same is attributable to similarities in color,
the law on color protection has changed since McNeil briefed and
argued *Bristol-Myers* to the Second Circuit in 1992.  Specifically,
in 1995 the U.S. Supreme Court held for the first time that color
alone can constitute a protectable trade dress if secondary
meaning in the relevant color or color scheme can be established.
*Qualitex*, 514 U.S. at 163, 173.  Therefore, any position that
McNeil took regarding the protection of a color scheme in *Bristol-
Myers* has been superceded by new, controlling law.

        57.  In fact, Merisant's "judicial estoppel" argument
based on *Bristol-Myers* has already been rejected by another court.
In *McNeil-PPC, Inc.  v. Granutec, Inc.*, Slip op. No. 5:94-CV-817-
H(2) (E.D.N.C. March 3, 1995) (Exhibit A hereto), the court held
that, in *Bristol-Myers*, "McNeil did not state that the law
prohibits one from bringing a claim for infringement of color
scheme.  Rather, McNeil merely stated that it generally did 'not

Civil No.  04-1090 (JAG)                                    43

challenge such use of its colors.'"  Slip op. at 8.  Merisant's

judicial estoppel theory is thus inapposite.

    58.  In sum, the first confusion factor – similarity of

the marks – weighs heavily in favor of a finding of likely

confusion.

### 2.   Similarity of the Goods

    59.  Although they use different ingredients, Splenda

and Same compete directly against one another in the market for

no-calorie sweeteners.  Sandler, Tr. 2/26/04 at 95.  They are

similarly priced, they are purchased by the same class of

consumers, they appear on the same store shelves and are used in

the same manner.  *Id* at 97.  The more similar the products, the

greater the likelihood of confusion.  *Boston Athletic*, 867 F.2d at

30.  This factor, too, weighs heavily in favor of a finding of

likely confusion.

### 3.   Relationship Between the Parties' Channels of Trade

### 4.   Relationship Between the Parties' Advertising

### 5.   Classes of Prospective Purchasers

    60.  In assessing whether there is a likelihood of

confusion, courts in this Circuit generally consider the above

factors together.  Each supports a finding of likely confusion in

this case.

    61.  When similarly packaged products are sold in the

same retail outlets and advertised by the same methods to the

Civil No.  04-1090 (JAG)                                        44

general public, there is an enhanced likelihood of consumer

confusion.  *Boston Athletic*, 867 F.2d at 30.  That is the

situation here:  New Same and Splenda are direct competitors, and

are sold to the same consumers through the same retail channels.

Sandler, Tr. 2/26/04 at 97.  Indeed, in some instances, the

products are situated directly next to one another on store

shelves (*see*, *e.g.*, Mundo[8], Tr. 2/26/04 at 205; PX 16; PX 34) – a

factor that courts have deemed significant in finding a likelihood

of confusion.  *See Veryfine Prods.*, 799 F. Supp. at 251-52 (noting

that consumers are particularly likely to be confused in making

quick selections off shelves when products with similar trade

dresses are placed side-by-side).

        62.  The probability of confusion is further enhanced by

the fact that the products are relatively inexpensive, so

consumers are less likely to make their selections with care than

they would be in choosing among more expensive items.  *Boston

Athletic*, 867 F.2d at 30.

            **6.   Evidence of Actual Confusion**

        63.  Anecdotal evidence that individual members of the

public have already been deceived strongly supports a finding that

such confusion is likely to occur.  *Boston Athletic*, 867 F.2d at

31-32.  Where, as here, a preliminary injunction is sought shortly

---

[8] Angel Mundo, Sales Representative for the Management Search and
Supporting Services, hereinafter "Mundo".

Civil No.  04-1090 (JAG)                                    45

after an infringing trade dress first appears, proof of actual

confusion is frequently not available, and is not required.  *See*

*DeCosta v. Columbia Broadcasting Sys., Inc.*, 520 F.2d 499, 514

(1st Cir. 1975) ("Plaintiff should not be expected to stand by and

await the dismal proof"); *Veryfine Prods.*, 799 F. Supp. at 253

("[P]laintiff can prevail even without any evidence of actual

confusion").  Nevertheless, the record before the Court contains

evidence of several instances of actual marketplace confusion

between Splenda and New Same.[9]

      64.  A witness for McNeil testified that he had

encountered a shopper confused by a store circular promoting New

Same.  According to the witness, the shopper mistakenly demanded

the reduced price Splenda product she believed had been depicted

in the circular.  In fact, the ad in the circular was for New

Same, not Splenda.  Muñiz[10], Tr. 2/26/04 at 192-93.  Another

witness testified that he had observed an instance in which a

store employee had confused the Yellow Same product with Splenda,

stocking the two products together as if they were one.  Mundo,

Tr. 2/26/04 at 205.  These anecdotal reports strongly support a

conclusion that New Same is likely to cause confusion in the

_____

[9] Defendants have objected to the credibility of witness Beatriz
Sifontes. This Court finds that there is sufficient evidence of
likelihood of confusion to support its finding regardless of what
Ms. Sifontes may have testified.
[10] Felix Muñiz, provides services such as placement of merchandise
for Management Search and Supporting Services, hereinafter "Muñiz".

Civil No.  04-1090 (JAG)                                                46

marketplace.  *See Ever-Ready*, 531 F.2d at 384 (store employees
presumed to be more knowledgeable than average consumers).

    65.  Evidence of actual and likely confusion can also be
found in the consumer survey conducted by Merisant.  Although the
survey was offered to show an *absence* of likely confusion, in fact
it shows that consumers who encounter New Same in the marketplace
*are likely to be confused* about the product's source or
affiliation.

    66.  In Merisant's survey, purchasers of no-calorie
sweeteners in San Juan were shown one of two products:  Yellow
Same or another brand relatively unknown in Puerto Rico called
Sugar Twin.  *See* PX 30.  Respondents in each group were permitted
to examine the box as if they were considering it for purchase.
The box was then removed and respondents were asked a series of
questions.  Immediately prior to the questioning, however, each
respondent was "admonished" to answer only if he or she "knew" and
not to guess.  Johnson, Tr. 2/27/04 at 193; DX NN.

    67.  The respondents in Merisant's survey were first
asked, "Based on what you just saw, do you or don't you know who
or what brand or company makes or puts out the sugar substitute
that I showed you?"  DX NN.  Although they had just finished
examining the product, only 3.4 percent of the 410 respondents
shown the Yellow Same package identified the brand as Same.  A

slightly higher percentage – 4.1 percent – identified it as
Splenda.  DX MM ¶ 11; DX RR, Table 11-1; Mazis, Tr. 2/27/04 at 32.

        68.  As Professor Mazis testified, the tortured wording
of this question likely contributed to its extremely low response
rate.  The question uses the word "or" four times in a single
sentence.  Mazis, Tr. 2/27/04 at 37.  Following the strong
"admonishment" to respond only if the they *knew* the correct
answer, and not to guess, participants in Merisant's survey
overwhelmingly indicated that they *did not* know "who or what brand
or company makes or puts out" the product they had just seen.

        69.  Merisant's expert Mr. Johnson testified that, in
formulating this question, he was guided by the survey conducted
and approved by the Court in *Union Carbide Corp. v. Ever-Ready
Inc.*, 531 F.2d 366 (7th Cir. 1976) ("*Ever-Ready*").  The actual
question asked in *Ever-Ready* was much simpler than the one
developed by Mr. Johnson:  "Who do you think puts out the lamp
shown here?"  *Ever-Ready*, 531 F.2d at 385 n.11.  The differences
between Mr. Johnson's question and the question in *Ever-Ready* are
material, and likely affected the responses.

        70.  Regardless of how they answered this initial query,
respondents were asked a follow-up question:  "Do you believe that
whoever makes or puts out the sugar substitute that I showed you
is or is not related to, sponsored by, or associated with any
other brands or manufacturer?"  DX MM at ¶ 12; DX NN.  22 percent

Civil No.  04-1090 (JAG)                                          48

of the 410 respondents shown the Yellow Same package answered

"Splenda."  A much lower percentage – 3.7 percent – named Same.

DX MM at ¶ 12; DX RR, Table 14-1; Mazis, Tr. 2/27/04 at 32-33.

        71.  Combining the answers from these two questions,

roughly one in four respondents (24.9 percent) shown the Yellow

Same box said that it was either produced by or associated with

the manufacturer of Splenda.  DX MM at ¶ 13; DX ZZ.  In

comparison, only 6.6 percent of the consumers shown the Yellow

Same package said it was produced by or associated with Same.  DX

RR, Tables 11-1 and 14-1.  In other words, ***roughly four times as***

***many respondents connected Yellow Same with the manufacturer of***

***Splenda than with the producer of Same***.

        72.  Merisant nonetheless argues that the results of

this survey support its position because the data from the

"control" group – respondents shown a package of Sugar Twin –

largely offset the results from the "test" or Yellow Same group.

20.6 percent of the respondents shown the Sugar Twin package said

it is produced by or associated with the manufacturer of Splenda.

DX MM at ¶ 13; DX ZZ.  Merisant and its expert Mr. Johnson thus

concluded that the "net" confusion rate between Yellow Same and

Splenda is a negligible 4.3 percent (24.9% "test" group less 20.6%

control group = 4.3%).  DX MM at ¶ 13.

        73.  The question, however, is whether the Sugar Twin

package shown to the "control" group was a real or appropriate

Civil No.  04-1090 (JAG)                                   49

"control" capable of identifying the "noise" level inherent in the
survey, or merely a different source of genuine confusion.
Professor Mazis testified, and the record as a whole strongly
indicates, that Sugar Twin was **not** an appropriate control for
Merisant's survey, and the results concerning Sugar Twin do not
reflect "noise" that should be subtracted from like responses in
the group exposed to Yellow Same.

     74.  As Merisant's witness Mr. Johnson noted in his
expert report, a control should "account for what ever [sic]
proportion of the relevant universe might guess or falsely name a
particular brand or manufacturer as a source simply because it is
a popular product in the same genre of products."  DX MM at ¶ 8.
Here, the respondents who named Splenda after seeing a package of
Sugar Twin were not responding based on Splenda's popularity; they
were answering based upon similarities between the trade dresses
of Splenda and Sugar Twin.  These two products share a number of
key design elements:  both are sold in horizontal packages; both
include images of coffee and iced tea; and, most importantly, both
use a yellow background color with white and blue accents  PX 1;
PX 30.  When asked "why" they believed that Sugar Twin and Splenda
share a common producer or are otherwise associated with one
another, respondents in Merisant's survey overwhelmingly cited
design attributes such as color, lettering style and package

Civil No.  04-1090 (JAG)                                         50

appearance as their reasons for making this connection.  *See* DX MM
at ¶ 13; DX RR, Tables 12-1, 12-3, 15-1 and 15-3.

    75.  It is firmly established that "[i]f . . . the
control stimulus in a case of alleged trademark infringement is
itself a likely source of consumer confusion, reactions to the
experimental and control stimuli may not differ because both cause
respondents to express the same level of confusion."  Shari
Seidman Diamond, Reference Guide on Survey Research, in Federal
Judicial Center, Reference Manual on Scientific Evidence (2nd ed.
2000) (PX 74), at 258.  The control stimulus chosen by Merisant
suffers from this fatal defect.  *See* Mazis, Tr. 2/27/04 at 49-50.

    76.  Merisant relies on *Cumberland Packing Corp. v.
Monsanto Co.*, 32 F. Supp. 2d 561 (E.D.N.Y. 1999), for the
proposition that, in a survey designed to measure confusion
between no-calorie sweeteners, a control package must use the same
background color as the test package.  In *Cumberland*, both the
plaintiff's and the defendant's aspartame products were sold in
predominantly blue boxes, as were several other aspartame brands.
32 F. Supp. 2d at 566, 568.  Indeed, according to the court, the
color blue had taken on the "functional" purpose in the no-calorie
sweetener market of identifying the ingredient aspartame.  *Id*. at
568.  The court thus determined that any control package had to
account for whatever confusion might have resulted from the fact

Civil No.  04-1090 (JAG)                                           51

that both products came in blue packaging – a design element that
any competitor was free to use.  *Id.* at 574-75, 579.

77.  Central to the court's holding in *Cumberland* was
the fact that, by the time the case was decided, numerous
aspartame products were being marketed in blue packaging.  Years
earlier Equal, the first aspartame brand, had attempted to secure
exclusive rights to the color blue, but its efforts failed due to
the prevailing law at the time that color alone could not be
protected as a trade dress.  *See NutraSweet Co. v. Stadt Corp.*,
917 F.2d 1024, 1027 n.6 (7th Cir. 1990) (noting that plaintiff
sought "to appropriate a mere color, *i.e.*, a color unconfined by
any design").  The U.S. Supreme Court abrogated this rule in 1995
in *Qualitex*.  *Qualitex*, 514 U.S. at 163 ("[w]e cannot find in the
basic objectives of trademark law any obvious theoretical
objection to the use of color as a trademark, where that color has
attained 'secondary meaning' and therefore identifies and
distinguishes a particular brand (and thus indicates its
'source')").  Unlike the situation in *Cumberland,* the color yellow
is not functional for the ingredient in Splenda (sucralose) and is
capable of serving as a source identifier for Splenda.  Thus there
is no reason in this case to "control" for any confusion caused by
the presence of yellow on both the Splenda and Yellow Same
packages.

78.  Merisant also argues that, because Sugar Twin does not *infringe* the Splenda trade dress, it is *ipso facto* a proper control for a trade dress confusion survey.  This is incorrect. Sugar Twin does not infringe the Splenda trade dress because it was first marketed prior to the introduction of Splenda.  When McNeil introduced Splenda in 2000, Sugar Twin was a fledgling brand with limited consumer awareness and no advertising support. Sandler, Tr. 2/26/04 at 101.  Today, it is teetering on the verge of extinction:  its share of the Puerto Rico no-calorie sweetener market is less than one-tenth of one percent, and few consumers in Puerto Rico have ever heard of it.  *See id.* at 101-03; Johnson, Tr. 2/27/04 at 188-89 (noting that Sugar Twin was chosen as a control for Merisant's survey in part because it is unknown to Puerto Rico consumers); DX V (survey introduced by Merisant showing no mentions of Sugar Twin among purchasers of no-calorie sweeteners in Puerto Rico).  McNeil did not adopt a yellow color scheme for Splenda in order to trade upon the goodwill or reputation of Sugar Twin.  Sandler, Tr. 2/26/04 at 103.  To the extent it has remained a viable competitor, the Sugar Twin brand has coexisted peacefully alongside Splenda.  *Id.* at 104.

79.  But Sugar Twin's "noninfringing" status does not rule out the possibility that a consumer unfamiliar with Sugar Twin may, upon first exposure to the product, associate it with Splenda.  The results of Merisant's survey indicate that roughly

Civil No.  04-1090 (JAG)                                           53

one in five consumers shown a box of Sugar Twin makes such a
connection, and does so for reasons relating to the respective
products' trade dress.  This suggests that, in light of the
acquired popularity of Splenda, there is a potential for
association between Splenda and Sugar Twin.  Of course, in view of
Sugar Twin's tiny market share, any confusion between these two
brands is necessarily minimal.  In any event, the fact that McNeil
could not take legal action against Sugar Twin (due to Sugar
Twin's priority) cannot justify Merisant's blatant infringement of
the Splenda trade dress.

　　　　80.  In sum, Merisant's survey shows that there is
actual and likely confusion in the market between Splenda and
Yellow Same, and greatly enhances McNeil's likelihood of success
on the merits.


              **7.   The Defendant's Intent In Adopting Its Trade Dress**

　　　　81.  A defendant's act of copying another's trade dress
is indicative of its intent to trade on that person's reputation
and goodwill, and supports a finding of likely confusion.  *See*
*Boston Athletic*, 867 F.2d at 32; *see also Shakespeare Co. v.*
*Silstar Corp. of Am., Inc.*, 110 F.3d 234 (4th Cir. 1997).

　　　　82.  At the preliminary injunction hearing, Merisant's
witness testified that New Same was conceived specifically to
compete against Splenda.  Cuervo, Tr. 3/2/04 at 19.  Merisant's

Civil No.  04-1090 (JAG)                                        54

internal documents reflect as much, noting that the product is
positioned "directly against other products that claim to be 'made
from sugar'" (DX W) and that sales of New Same will come "60%
[from] Splenda users" (DX X).  Nevertheless, according to
Merisant's witness, the striking similarities between the New Same
and Splenda packages are merely a coincidence.  For instance,
Merisant's witness claimed that the product's yellow background
color is similar to one that Merisant once considered (but
rejected) for another product, and that images used on the New
Same package were sourced from other no-calorie sweeteners sold by
Merisant elsewhere in Latin America.  Cuervo, Tr. 3/2/04 at 30,
32-33.

          83.  This testimony was simply not credible.  Especially
in view of Merisant's admission that it created Yellow Same and
positioned it specifically to compete against Splenda, it is
inconceivable that the stark similarity in appearance between the
two products is purely coincidental.   This conclusion is
reinforced by the fact that the trade dress of New Same bears no
resemblance whatsoever to the trade dress of Original Same.
*Compare* PX 2 with PX 3; *see Cooperativa de Cafeteros de Puerto
Rico v. F. Colón Colón*, 91 P.R.R. 361, 387 (1964) (finding trade
dress infringement where "appellee changed the label on its bags
for the purpose of increasing its sales, which had been decreasing
during the years prior to 1958, and for said purpose, in

Civil No.  04-1090 (JAG)                                        55

[choosing] a design very similar to appellant's, evidently he
tried to take advantage of appellant's good will").  To the extent
that Merisant claims that it picked a yellow color scheme because
yellow is "functional" for sugar, its assertion is belied by its
own admission that it has no data to suggest that consumers view
the color yellow in this fashion.  *See Cuervo*, Tr. 3/2/04 at 62.
In fact, as noted above, the available data show that consumers do
not associate sugar with yellow packaging.  PX 18 at 2.

        84.  A trademark plaintiff need not show intent to
deceive or fraudulent intent because "if potential purchasers are
confused, no amount of good faith can make them less so."  *Polo
Fashions, Inc. v. Fernández*, 655 F. Supp. 664, 667 (D.P.R. 1987)
(quoting *Fuji Photo Film v. Shimohara Shoji Kabushiki Kausha*,
754 F.2d 591, 596 (5th Cir. 1985)).  However, it "is well
established that if there is proof that a defendant intentionally
set out to deceive or mislead consumers, a presumption arises that
customers in fact have been deceived."  *Cashmere & Camel Hair
Manufacturers Institute v. Saks Fifth Avenue*, 284 F.3d 302, 316
(1st Cir. 2002).

        85.  Once a plaintiff establishes that a defendant has
adopted a mark for the purpose of trading on plaintiff's goodwill,
a presumption arises that consumer confusion is likely.  *See
Porous Media Corp. v. Pall Corp.,* 110 F.3d 1329, 1333 (8th Cir.
1997) (approving a presumption of consumer deception upon a

Civil No.  04-1090 (JAG)                                      56

finding that defendant acted deliberately to deceive); *Polo Fashions v. Fernández*, 655 F. Supp. at 667 (a "finding of bad faith . . . may give rise to a presumption that the adoption of a mark similar to that of another is likely to cause confusion and may without more prove infringement"); *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 34 (1st Cir. 1989); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir.), cert. denied, 449 U.S. 899 (1980).  "Once the intent to cause confusion is established, the court will presume that the infringer accomplished his purpose." *Polo Fashions, Inc. v. Extra Special Products, Inc.*, 451 F. Supp. 555, 562 (S.D.N.Y. 1978) (emphasis added).

     86.  Here, the evidence strongly supports a finding that Merisant copied numerous features of the Splenda trade dress for the purpose of enhancing the ability of New Same to compete with Splenda.  This not only supports a *finding* of likely confusion, but raises a *presumption* that confusion among consumers is likely to occur.  *Polo Fashions*, 451 F. Supp. at 562.

### 8.   Strength of Plaintiff's Mark

87.   In this Circuit, the strength of a plaintiff's trade dress is determined in light of:  (1) the length of time it has been used and the plaintiff's relative renown in its field; (2) whether there are any similar designs in the relevant market; and (3) whether the plaintiff has actively promoted its trade dress.  *Boston Athletic*, 867 F.2d at 32 (citations omitted); *Volkswagenwerk Aktiengesellschaft*, 814 F.2d at 819.  These factors are similar to those used to assess secondary meaning.

88.   The Splenda trade dress qualifies as a strong mark. Splenda is a well-know and fast selling no-calorie sweetener in both the U.S. and Puerto Rico; it is heavily advertised and promoted; and it is the only major brand with yellow packaging. When a strong mark is copied – as is the case here – the likelihood of confusion is enhanced.

89.   In sum, all of the factors enumerated by the First Circuit weigh in favor of a likelihood of confusion.  McNeil is highly likely to prevail on the merits of its trade dress infringement claim.

## II.  McNeil Will Suffer Irreparable Injury Absent Preliminary Relief

90.   In this Circuit, once a plaintiff demonstrates a likelihood of success on the merits of its trademark or trade

Civil No.  04-1090 (JAG)                                    58

dress infringement claim, irreparable injury is presumed. *Camel Hair & Cashmere Inst. v. Associated Dry Goods Corp.*, 799 F.2d 6, 14 (1st Cir. 1986); *Calamari Fisheries,* 698 F. Supp. at 1013. Because McNeil has shown a strong likelihood of success on the merits, this Court may presume that irreparable injury will follow absent preliminary relief.

     91.  Beyond this presumption, the record shows that McNeil in fact will face irreparable injury if Merisant is permitted to continue marketing Yellow Same during the pendency of this action.  First, McNeil stands to lose substantial sales of Splenda as consumers purchase Yellow Same in the mistaken belief that it is the same product as, or is otherwise associated with, Splenda.  Merisant projects that Yellow Same will achieve a 5 percent share of the Puerto Rico no-calorie sweetener market within one year, and that 60 percent of this business will come from current purchasers of Splenda.  DX X.  However, as Merisant's witness was quick to point out, these are mere estimates.  Cuervo, Tr. 3/2/04 at 19.  There is no way to quantify precisely the amount of business that McNeil will lose due to the marketplace confusion that Yellow Same will cause.  Sandler, Tr. 2/26/04 at 97-98.  This supports a finding of irreparable harm.  *See Perfumania, Inc. v. Perfulandia, Inc.*, 279 F. Supp. 2d 86, 103-04 (D.P.R. 2003) ("By its very nature, trademark infringement results

Civil No.  04-1090 (JAG)                                           59

in irreparable harm because the attendant loss of profits,
goodwill, and reputation cannot be satisfactorily quantified[.]").

92.  Second, because consumers erroneously associate
Yellow Same with Splenda, McNeil currently lacks full control over
the goodwill associated with its brand. Consumers who do not care
for the taste of Yellow Same may simply attribute their
unsatisfactory experience to Splenda and forego any future
purchase of the product, causing irreparable injury to McNeil.
Sandler, Tr. 2/26/04 at 98-99.

93.  Third, by utilizing a trade dress confusingly
similar to McNeil's, Merisant is receiving a "free ride" on the
immense popularity and goodwill that McNeil has achieved, at great
expense, for Splenda.  Such tactics permit Yellow Same to compete
effectively with Splenda without incurring the same marketing
costs, and constitute irreparable injury to McNeil.  *Boston
Athletic,* 867 F.2d at 33 ("Defendants thus obtain a 'free ride' at
plaintiffs' expense.").

94.  In sum, the record strongly supports a conclusion
that McNeil will suffer irreparable injury absent preliminary
relief.


**III. The Balance of Hardships Favors McNeil**

Civil No.  04-1090 (JAG)                                        60

95.  The third showing that McNeil must make is that the balance of hardships flowing from a preliminary injunction tips in McNeil's favor.  McNeil has met this burden.

96.  McNeil has invested more than $100 million in advertising and promotion of Splenda, and has established a brand that generates more than $200 million in annual sales – more than any other no-calorie sweetener.  In contrast, Merisant's investment to date in Yellow Same is minimal.  Its internal documents show that it has a marketing budget for Yellow Same of about $200,000.  DX W.  Clearly, McNeil has more at stake in this litigation than does Merisant, and the denial of an injunction would injure McNeil more than a grant of preliminary relief would injure Merisant.

97.  If an injunction were entered, Merisant would be free to market all of the products it sold in Puerto Rico prior to the introduction of Yellow Same, and still sell (Equal, NutraSweet and Blue Same).  Merisant would also be free to market its new formulation of Same.  The only direct effect on Merisant would be a prohibition against marketing New Same in packaging that is confusingly similar to Splenda.  That is not an undue hardship, particularly in view of the effect that denial of a preliminary injunction would have on McNeil.

98.  To the extent that Merisant would be damaged by an injunction, its injury is entirely self-inflicted.  In balancing

Civil No.  04-1090 (JAG)                                    61

hardships, courts generally place little weight on injuries that

parties bring upon themselves through blatant misconduct.  *See*

*Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc.*, 143 F.3d

800, 806 (3d Cir. 1998) ("The self-inflicted nature of any harm

suffered by [trademark infringer] also weighs in favor of granting

preliminary injunctive relief."); *Windsurfing Int'l, Inc. v. AMF,*

*Inc.,* 782 F.2d 995, 1003 (Fed. Cir. 1986) ("One who elects to

build a business on a product found to infringe cannot be heard to

complain if an injunction against continuing infringement destroys

the business so elected.").

99.  In sum, the balance of hardships favors McNeil and

weights in favor of a grant of preliminary injunctive relief.

**IV.  The Public Interest**

100.  There is a strong public interest in preventing

consumer confusion caused by a misappropriated trademark or trade

dress.  As the Supreme Court has observed,

> [T]rademark law, by preventing others from
> copying a source-identifying mark, reduces the
> customer's costs of shopping and making
> purchasing decisions, for it quickly and
> easily assures a potential customer that *this*
> item – the item with this mark – is made by
> the same producer as other similarly marked
> items that he or she liked (or disliked) in
> the past.  At the same time, the law helps
> assure a producer that it (and not an
> imitating competitor) will reap the financial,
> reputation-related rewards associated with a
> desirable product.  The law thereby encourages
> the production of quality products, and
> simultaneously discourages those who hope to
> sell inferior products by capitalizing on a

> consumer's inability quickly to evaluate the
> quality of an item offered for sale.

*Qualitex*, 514 U.S. at 163-64.  A preliminary injunction in this
case would prevent consumer confusion, and would clearly serve the
interests of Puerto Rico consumers.  *See Public Service Co. of New*
*Mexico v. Nexus Energy Software, Inc.*, 36 F. Supp. 2d 436, 439 (D.
Mass. 1999) (granting preliminary injunction because "eliminating
confusion in the marketplace and providing protection for an
established [trade dress] furthers the public interest").

101. Finally, the marketing of Yellow Same in packaging
that is confusingly similar to Splenda poses a potential health
risk to consumers with a rare disease known as phenylketonuria
(PKU).  All aspartame products, including Yellow Same, contain
phenylalanine, which can cause serious adverse effects if ingested
by individuals with PKU.  The FDA requires all products that
contain phenylalanine to carry a special label statement to that
effect, and the Yellow Same product includes this statement.
However, if a consumer with PKU were to mistakenly purchase Yellow
Same believing it to be Splenda, he or she may not re-read the
label of an apparently familiar product.  Such a consumer would
not receive the FDA-prescribed notice and may be put at risk due
to the confusing nature of the Yellow Same product.  Sandler, Tr.
2/26/04 at 99-100.  Thus, the public interest favors injunctive
relief.

102. All four elements of the test for preliminary injunctive relief are satisfied.  McNeil's motion for a preliminary injunction should be granted.

## V.   Scope of Relief and Bond

### A.   McNeil Is Entitled To A Product Recall

103. Where, as here, there is a strong likelihood of consumer confusion, a court may order as part of a preliminary injunction that defendant recall infringing goods, so as to restore the status quo pending a final resolution on the merits. *See, e.g., Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.,* 111 F.3d 993, 997 (2d Cir. 1997) (affirming preliminary injunction that required defendant to remove all infringing trade dress from retail stores around the world during pendency of action); *Chere Amie, Inc. v. Windstar Apparel, Corp.*, 191 F. Supp. 2d 343 (S.D.N.Y. 2001) (granting preliminary injunction and ordering that defendants recall from all distributors, wholesalers, jobbers, dealers, and retailers any products employing the plaintiffs' trademark).  Without such relief, McNeil will continue to be injured by confusingly similar packages that remain on store shelves throughout Puerto Rico.

### B.   McNeil Is To Post a Bond in the Amount of $350,000

104. As security for the preliminary injunction requested herein, McNeil shall post a bond in the amount of $350,000.  Such a bond would cover the full amount of Merisant's

Civil No.  04-1090 (JAG)                                          64

out-of-pocket expenses in launching New Same.  *See* DX W (noting

that "a successful . . . launch will require an investment of

approximately $200,000"). In addition, this figure takes into

account the $58,000 that were budgeted for trade activities

involving the product launch. This figure represents a fair

estimate of the out-of-pocket loss for which Merisant is entitled

to security.  *See I.P. Lund Trading ApS v Kohler Co.*, 11 F. Supp.

2d 127, 135 (D. Mass.) (Fed. R. Civ. P. 65(c)'s stated purpose is

to reimburse defendants for direct injuries due to the

injunction), *vacated in part on other grounds, I.P. Lund*, 163 F.3d

27 (1st Cir. 1998); *Bear U.S.A., Inc. v. A.J. Sheepskin & Leather*

*Outerwear, Inc.*, 909 F. Supp. 896, 9170 and n.25 (S.D.N.Y. 1995)

(amount of bond should reflect credible evidence as to the quantum

of injury that the defendant realistically might be expected to

sustain in the event that the injunction is wrongfully issued).

        105. Merisant asserts that, if an injunction is issued,

it will lose the value of existing inventories of its New Same

product.  However, on cross-examination Merisant's witness

admitted that, if enjoined, Merisant could sell its inventory of

Yellow Same in non-U.S. markets where Merisant currently markets

Blue Same.  Cuervo, Tr. 3/2/04 at 78.  Because it has at its

disposal a means to recoup its losses, Merisant is not entitled to

security to cover the value of its existing inventory.

Civil No.  04-1090 (JAG)                                                    65

          106. Merisant also claims that, should an injunction
issue, it may be required to reimburse retailers who incur fines
as a result of their inability to deliver a product they have
advertised.  *See* Cardona Aff. ¶¶ 11 and 14; Cuervo, Tr. 2/3/04 at
33-34.  There is no credible proof to support this assertion.
Indeed, it seems implausible that the Puerto Rico Department of
Consumer Affairs (DACO) would fine merchants solely for complying
with an order of this Court to cease selling infringing goods that
are likely to confuse consumers.  In any event, DACO's Regulation
on Misleading Practices and Advertisements, Regulation No. 6772,
Rule 14, permits businesses to provide the consumer, in
substitution of an announced good that is unavailable, a similar
good of equal or superior quality to the announced good.  The
record amply shows that any number of artificial sweeteners could
be substituted for Yellow Same should the need arise.
Accordingly, Merisant is not entitled to security to cover its
alleged (but unproved) costs for reimbursement of fines.

          107. Finally, Merisant contends that, in addition to its
out-of-pocket losses, it will suffer injury to its business
reputation if New Same is preliminary enjoined.  Such unquantified
losses, if any, are highly speculative, and need not be included
in the face amount of a security bond.  *Processed Plastic Co. v.*
*Warner Communications, Inc.*, 675 F.2d 852, 858-59 (7th Cir. 1982)

Civil No.  04-1090 (JAG)                                                66

(district court did not abuse its discretion in rejecting a bond request that was speculative).

108. For these reasons, the Court sets the amount of the bond at $350,000.

## CONCLUSION

For the foregoing reasons, this Court GRANTS McNeil's motion for a preliminary injunction. An order shall issue accordingly.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 29th day of July, 2004.

S/Jay A. Garcia-Gregory
JAY A. GARCIA-GREGORY
United States District Judge