February 26, 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO


MCNEIL-PPC, INC., ET AL.,        *   CIVIL 04-1090 (JAG)
                                 *
          Plaintiffs,            *
          vs.                    *   San Juan, Puerto Rico
                                 *   February 26, 2004
MERISANT COMPANY, ET AL.,        *   10:30 a.m.
                                 *
          Defendants.            *
- - - - - - - - - - - - - - - - - - - - - - - - - - - - *


PRELIMINARY INJUNCTION HEARING

BEFORE THE HONORABLE **JAY A. GARCIA-GREGORY**,
UNITED STATES DISTRICT COURT JUDGE


BARBARA DACHMAN, RPR, OCR
(787) 722-0132
barbarad@prtc.net

APPEARANCES

COUNSEL FOR PLAINTIFFS

STEVEN A. ZALESIN, ESQ.
KARLA G. SANCHEZ, ESQ.
DORA PEÑAGARICANO, ESQ.

COUNSEL FOR DEFENDANTS

GREGG F. LoCASCIO, ESQ.
HERIBERTO BURGOS, ESQ.

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

```
- - - - - - - - - - - - - - - - - - - -
MCNEIL-PPC, INC., ET AL.,          *   CIVIL 04-1090 (JAG)

        Plaintiffs,                *
    vs.                                San Juan, Puerto Rico
                                   *   February 26, 2004
MERISANT COMPANY, ET AL.,          *   10:30 a.m.

        Defendants.                *
- - - - - - - - - - - - - - - - - - - -
```

PRELIMINARY INJUNCTION HEARING

BEFORE THE HONORABLE JAY A. GARCIA-GREGORY,
UNITED STATES DISTRICT COURT JUDGE

BARBARA DACHMAN, RPR, OCR
(787) 722-0132
barbarad@prtc.net

APPEARANCES

COUNSEL FOR PLAINTIFFS

STEVEN A. ZALESIN, ESQ.
KARLA G. SANCHEZ, ESQ.
DORA PEÑAGARICANO, ESQ.

COUNSEL FOR DEFENDANTS

GREGG F. LoCASCIO, ESQ.
HERIBERTO BURGOS, ESQ.

---

3

1  THE COURT CLERK:  Civil Case 04- 1090; McNeil-PPC,
2  Inc., et al., v. Merisant Company, for Preliminary
3  Injunction.
4      For plaintiffs, Steven Zalesin, Karla Sanchez, and
5  Dora Peñagaricano.  For defendants, Gregg LoCascio and
6  Heriberto Burgos.
7      THE COURT:  Very well.
8      As we discussed in chambers, we will be taking the --
9  we would be swearing in all the witnesses now, except those
10 who are not here, and then all those who are going to be
11 fact witnesses, not experts, shall then wait in the witness
12 room to be called.
13     And there are also certain motions for pro hac vice
14 admissions in the court, and they are all granted.  Okay?
15 And, of course, counsel are welcome.
16     Shall we have all the witnesses come forward and be
17 sworn in?  We have an interpreter here, so...
18     (Whereupon, seven prospective witnesses are duly sworn
19 by the court clerk.)
20     THE COURT:  Then all the fact witnesses are
21 excused until they are called, and they shall be waiting in
22 the witness room.  Or they can wait outside.
23     MR. LoCASCIO:  Your Honor, one of our witnesses,
24 who is fifth, sixth, seventh in the queue, may he go right
25 back to the office right here?

---

4

1      THE COURT:  It's very close --
2      MR. BURGOS:  He will be going to our firm, your
3  Honor.
4      THE COURT:  Yes, no problem.
5      So I will be hearing now the brief opening statements
6  that we discussed in chambers.
7      MR. ZALESIN:  Thank you, your Honor.
8      Steven Zalesin for the plaintiffs McNeil-PPC, Inc.,
9  and Johnson & Johnson Hemisferica, S.A.  We appreciate the
10 opportunity to appear before you today.
11     This is a remarkable case.  It's remarkable, I think,
12 because there is really no legitimate question but that the
13 plaintiffs' trade dress, the famous Splenda package, is a
14 protectable trade dress, and there is no legitimate question
15 that there is going to be, and there is already happening,
16 confusion in the marketplace.  We have survey evidence of
17 confusion, we have actual instances of confusion, which you
18 will hear about today.
19     Your Honor asked for some additional briefing on the
20 subject of protectability.  I won't go over that in great
21 detail.
22     In essence, this is a case, your Honor, about product
23 packaging, not about product configuration or design.  We
24 are not talking about the actual product, the sugar, the
25 white, powdery stuff or the sugar substitute.  We are

**5**

1  talking simply about the box or the carton in which it
2  comes.  And trade dress cases that involve product packaging
3  are very different than trade dress cases that involve
4  product design.
5      The United States Supreme Court has told us as
6  recently as the year 2000 that ordinarily the primary
7  function of packaging is to identify the source or the brand
8  of the goods.  It isn't functional.  There could be an
9  instance where, if you have a laundry detergent container
10  and it has a handle that's part of the jug, that handle
11  would be a functional thing.  You need the handle to pick it
12  up and pour it.  So obviously no one could protect that type
13  of a design.
14      We are not talking about anything like that.  We are
15  talking about the most classic form of trade dress, the
16  design of the exterior package.  Ordinarily those will be
17  deemed inherently distinctive, and they should be deemed
18  inherently distinctive in this case.
19      If you were to determine for any reason that the
20  Splenda trade dress is not inherently distinctive because of
21  its unique design features, then you would also be able to
22  find a likelihood of success -- and that's what we are here
23  about.  The preliminary injunction is about whether or not
24  McNeil is likely to succeed on the merits -- you would also
25  be able to find a likelihood of success on the issue of

BARBARA DACHMAN, RPR, OCR

**6**

1  trade dress protection under the alternative rubric of
2  secondary meaning.
3      When we were before you 16 days ago, Merisant raised
4  an objection or argument that there wasn't the type of
5  survey evidence that courts ideally like to see when
6  assessing secondary meaning, a so-called Ever-Ready or a
7  *McNeil v. Granutech* type design survey.  That loophole, to
8  the extent that there was an opening, has completely been
9  closed now.  Over the two-week period since the last
10  conference with your Honor, McNeil completed a secondary
11  meaning survey.  An expert witness, a very well-known and
12  respected expert, Professor Michael Mazis from American
13  University, designed and supervised that survey.  He'll be
14  here to talk about it later this morning.  It shows a very,
15  very high recognition rate of the Splenda trade dress among
16  consumers in Puerto Rico, which is important, because that's
17  the market that we are here to talk about.
18      The other issue on the issue of protectability that
19  the defendants raise in their papers that we didn't brief --
20  because frankly I think it's a rather ridiculous argument,
21  to be frank -- is the issue of functionality.
22      We have the burden of showing not only that our trade
23  dress is either inherently distinctive or has secondary
24  meaning, but also that it isn't functional.  It isn't like
25  the handle on the laundry detergent jug that I referred to a

BARBARA DACHMAN, RPR, OCR

**7**

1  moment ago.
2      And the Supreme Court has told us what it means for
3  something to be functional in the case of *Inwood*
4  *Laboratories v. Ives*, 456 U.S. 844 in 1982, where the
5  Supreme Court stated that a functional product feature is
6  one that is, quote, "essential to the use or purpose of the
7  article or that affects the cost or quality of the goods."
8      And then in a more recent case, the *Qualitex* case,
9  which involved the protection of colors, the Supreme Court
10  added that the inquiry into functionality turns in part on
11  whether granting protection to a mark, quote, "would permit
12  one competitor to interfere with  legitimate
13  non-trademark-related competition through actual or
14  exclusive use of an important product ingredient."
15      That's the test for functionality.  You essentially
16  can't sell the product, or you would have to sell it at a
17  higher price, or it would be less useful to the consumer if
18  you weren't able to use particular trade dress at issue,
19  like a jug, like a handle on a jug for a laundry detergent.
20      We don't have anything close to that in this case,
21  your Honor.  There are dozens of low-calorie or no-calorie
22  sweeteners that are sold in blue packs or red packs or pink
23  packs and don't use yellow or pastel yellow or an overall
24  trade dress that looks anything like the Splenda trade
25  dress.

BARBARA DACHMAN, RPR, OCR

**8**

1      So to argue that you must use this shade of pastel
2  yellow and various other elements of the Splenda trade
3  dress, it's functional, you can't compete in this market
4  without it, frankly borders on the absurd.  It's not a
5  functional issue.
6      So what does this case come down to?  I said before
7  that there really isn't any significant question about
8  confusion.  You are going to hear instances where consumers
9  have actually been confused.  Not just consumers.  People
10  who work in the food service, in the grocery business.
11  People who should know the difference between one product or
12  another have mixed up Splenda and Same because they look so
13  similar.
14      You are also going to find that in the defendants' own
15  survey, fully 25 percent of consumers who were shown the
16  Same package, the one on the right on your screen, the Same
17  package and only the Same package, and then when they took
18  it away and said, "Well, what other products do you
19  associate with that or what other products are put out by
20  the same company that puts out Same," 25 percent said
21  Splenda.  That's a remarkably high confusion number,
22  especially when coming from the defendants' evidence rather
23  than the plaintiffs'.
24      So we know consumers are going to be confused.  We
25  know consumers are already confused.

BARBARA DACHMAN, RPR, OCR

9

1    So what does Merisant's defense come down to?  It
2 comes down to an argument that Merisant is allowed to
3 replicate the Splenda trade dress and confuse consumers
4 because there is another no-calorie sweetener sold in some
5 places that also comes in a yellow box, and it's this
6 product, Sugar Twin.
7    Your Honor, this is the classic red herring defense.
8 Sugar Twin should not even be an issue in this case.  Sugar
9 Twin, for all intents and purposes, does not exist in the
10 Puerto Rico market where it is sold in practically no stores
11 and has a market share of less than one tenth of one
12 percent.  It is not advertised, it has not been advertised
13 for the last three and a half years for which data exists.
14 In the United States market, this is a fledgling, obscure
15 brand with very low recognition and a market share of about
16 one percent.
17    Yes, it was on the market before the Splenda package,
18 but it was a very obscure, little-known brand that McNeil
19 was aware of but thinks, thought at the time and continues
20 to think comes in a neon-yellow package, with solid, dark,
21 bold, blue lettering that isn't confusing with the Splenda
22 package.  But in any event, it doesn't exist in the market
23 we are here to talk about.  No one in Puerto Rico is
24 familiar with Sugar Twin -- we have no evidence to that
25 effect in this record -- and certainly no one in Puerto Rico

10

1 associates any yellow packaging with the brand Sugar Twin.
2 When same was shown in the defendants' survey to Puerto Rico
3 consumers, hundreds of them, not a single other person said,
4 "Aha, that's Sugar Twin."  A silly argument.
5    So what do we have?  We have a case, again, in which
6 we know we have a protectable trade dress, we know there is
7 going to be and already is confusion, and their defense
8 comes down to, "Well, the level of confusion that we are
9 causing, even though it's high, even though it's
10 25 percent," they claim, based on their survey, "is no worse
11 than it would be if we were to sell Sugar Twin in Puerto
12 Rico."
13    That's an interesting hypothetical argument, Judge,
14 but it isn't one that you need to waste a lot of time on,
15 because they are not selling Sugar Twin in Puerto Rico, they
16 are selling Same, and they are selling it in a package which
17 is remarkably similar and confusingly similar to the Splenda
18 package.
19    Sugar Twin, again, is a red herring.  For all intents
20 and purposes, it doesn't exist in the Puerto Rico market.
21    And for all of these reasons, and as the evidence will
22 show, you should grant McNeil's motion for preliminary
23 injunction and force Merisant to stop confusing consumers in
24 Puerto Rico with its new yellow Same trade dress.
25    Thank you.

11

1    MR. LoCASCIO:   Thank you, your Honor.
2    May it please the Court.
3    May I also introduce my client representative from
4 Merisant.  This is Francisco -- my father's name is
5 Francesco, but this is Francisco Javier Cuervo Escalona.
6 He's here from Mexico today.  He represents Merisant as
7 well.  And Sammy Gonzalez, who you will hear from later as
8 well.
9    Mr. Zalesin describes this case as one that is much
10 simpler than it is.  Mr. Zalesin has essentially in his
11 opening suggested you, A, deem their product inherently
12 distinctive with no one else's.  He has said, despite the
13 Lanham Act's specific requirement that product packaging be
14 found nonfunctional, a burden on the plaintiffs, that we
15 should ignore that requirement.  And then at last he comes
16 back to what you will remember from chambers on the 10th
17 that 90 or a 100 percent of his case is that he thinks these
18 two boxes look too much alike.
19    Well, the standard is, is the mark protectable?  Is it
20 nonfunctional?  And then, is there a likelihood of
21 confusion.  If it's not protectable, even if people were
22 confused, it would not be a violation of the Lanham Act.
23 But certainly, if people are actually not confused -- and
24 that's what the evidence will show today and tomorrow -- and
25 if there is no likelihood of confusion, then protectable or

12

1 not, they do not win.
2    So let's start at the basics here and look at what the
3 law is and what the standard is.
4    Mr. Zalesin has said they need to show a likelihood of
5 confusion.  Well, that's not the law.  Here in Puerto Rico
6 in the First Circuit, it is a substantial likelihood of
7 success on the merits.  Substantial.  Clearly more than
8 preponderance.
9    Arguably, is it clear and convincing?  Where does it
10 fall between 50 and 75 percent?  That's for your Honor to
11 determine.  But it is certainly more than more likely than
12 not, which would be a standard I suggest they can't beat
13 anyway.  But for the extraordinary equitable remedy of
14 granting a preliminary injunction, they need to meet a
15 higher burden.
16    We have only had two weeks -- indeed, last night we
17 got the survey questionnaires from their expert, and I am
18 also anxious to see him on the stand because I think there
19 is going to be some serious credibility issues and some
20 serious methodology issues with the way he went about his
21 secondary meaning survey, which we will talk about, and
22 that's after I guess six hours of review by people this
23 evening or last night.
24    So we say the burden is a substantial likelihood, and
25 all of those burdens are on the plaintiffs.

13

1  They also have to show the balance of harms, something
2  Mr. Zalesin has entirely ignored.  The balance of harms
3  needs to favor the plaintiffs.  What is the potential harm
4  ongoing if an injunction is not granted, over here on that
5  side of the scale; over here, what is the harm to Merisant
6  if the injunction is granted.  Both financial impact on
7  their business, cost of destroying product, cost of new
8  packaging, but more importantly, reputational.  Consumers in
9  the marketplace who buy this brand, who buy the regular Same
10  in the blue package, who buy other Merisant brands,
11  distributors, and then, most importantly, grocery stores,
12  what is their reaction to the injunction.  That's the
13  irreparable injury on this side.
14  So we are back at the first step in their burden,
15  protectability.  We briefed this issue.  They suggest it's
16  automatically inherently distinctive because it's a package.
17  It's a package, it's inherently distinctive.  That is not
18  the standard.  It is still their burden.
19  The First Circuit, in Yankee Candle -- a case that
20  again in their brief I think is not accurately
21  represented -- it's described as a packaging -- I am sorry,
22  as a product configuration case versus a product packaging
23  case.
24  Mr. Zalesin's argument on protectability comes down to
25  the straw man they have set up that "they are arguing

BARBARA DACHMAN, RPR, OCR

14

1  product packaging, we are arguing product configuration."
2  That's not the case.  We are both here arguing product
3  packaging.  They would like a different standard than should
4  apply to apply in this case, so they have set up this straw
5  man in an effort to have an argument that is more
6  successful.
7  Yankee Candle, First Circuit (2001), talking about
8  labels, is in this part of the brief.  We are not talking
9  about what the product itself is shaped like.  We are
10  talking about the packaging.  As it says in the middle,
11  "detachable labels are a classic case of product packaging."
12  So to suggest that the First Circuit's Yankee Candle
13  decision from '01 is not applicable in this case is
14  contradicted clearly in the opinion itself.
15  They also talk about Yankee, the plaintiff, saying
16  "the features of the labels constitute an inherently
17  distinctive trade dress."  Mr. Zalesin would have you
18  believe that, well, it's a package, so it's automatically
19  inherently distinctive.  Deem that, move on.
20  Unfortunately, the First Circuit said, "We are
21  convinced that the label elements highlighted by Yankee do
22  not meet the inherent distinctiveness test."  So obviously
23  this isn't something we should automatically grant, the idea
24  that they have met inherent distinctiveness, simply because
25  it's a package.

BARBARA DACHMAN, RPR, OCR

15

1  In their brief, they also talk about a case that
2  you've seen on both sides.  There is some sweetener law out
3  there, your Honor.  This is a case between the people who
4  made at the time Equal, which was Monsanto, and the people
5  who make Sweet'N Low, which they still do, a company called
6  Cumberland Packaging.
7  In that case there were some arguments about blue
8  packets, pink pickets.  "Can you make the pink packet, we
9  are making a pink packet, you make a blue packet, we want to
10  make a blue packet, our box is blue, yours is blue, we've
11  got cups on them."  I am sure you've seen it.
12  In their brief they suggest those common elements can
13  be inherently distinctive.  Even though they are not
14  unusual -- and let me back up a step back to Yankee Candle.
15  Yankee Candle dealt with the very issue we have here, a
16  combination of functional and common elements.  So we have a
17  coffee cup.  Well, even from plaintiffs' table, it's fairly
18  clear that coffee cups are not something unique to their
19  product.  You can look at almost any sweetener and you are
20  going to find a coffee cup.  The same with iced tea.
21  The First Circuit, in Yankee Candle:  "Although such a
22  combination may be entitled" -- and this was clearly -- we
23  are talking about the label, your Honor, not the product --
24  "where such a combination may be entitled to protection
25  where secondary meaning is shown, it is less likely to

BARBARA DACHMAN, RPR, OCR

16

1  qualify as inherently distinctive.  While the particular
2  combination of common features may be, quote,
3  'arbitrary'" -- you put the cup over here, you put the iced
4  tea over there -- "we don't think any reasonable juror could
5  conclude these elements are so unique and unusual that they
6  are source indicative, in the absence of secondary meaning."
7  So for inherent distinctiveness, I suggest that we are
8  far apart on that issue.  The First Circuit Yankee Candle on
9  the defendants are over here (indicating), Mr. Zalesin is
10  over here (indicating) suggesting we just blow right past
11  inherent distinctiveness because it's a package, and that's
12  not what we should do.
13  THE COURT:  Were these candles packaged?
14  MR. LoCASCIO:  This is the labels.
15  THE COURT:  The labels on the candles themselves.
16  MR. LoCASCIO:  Yes, they are, your Honor --
17  THE COURT:  So it was affixed to the product, as
18  such.
19  MR. LoCASCIO:  It is affixed to the product, but
20  what the Court is talking about here in terms of the
21  protectable trade dress at this point in the opinion is the
22  label.  Does the label look too much like someone else's
23  label, not does my candle.  It is a candle --
24  THE COURT:  Well, in that case the only thing that
25  could qualify as a trade dress would be the label --

BARBARA DACHMAN, RPR, OCR

17

1    MR. LoCASCIO:   Correct, in this case --
2       THE COURT:   -- because the product is the candle.
3    MR. LoCASCIO:   Yes, and in this case it's the box,
4  in that case it's the label.
5       THE COURT:   And a series of elements that go with
6  the box.
7    MR. LoCASCIO:   Indeed.
8       And in that case, common elements were on all these
9  labels, and they were not unusual as to make it inherently
10  distinctive. In this situation, a cup, a picture of an iced
11  tea, and the name.   That's on the front of the box, and some
12  color.   We will talk about that.
13       The threshold burden that we pointed out in our brief
14  is that they need to clearly identify the trade dress.   They
15  come back and say, "We've done that, here's a list."   They
16  have given us a list.   No one is denying that.
17       What you heard in Mr. Zalesin's argument and which you
18  can see in their briefs, you can see it in their
19  declarations, they are not really arguing only the trade
20  dress.   They are arguing broader than that.   They are
21  arguing, "We've got different packages.   We've got one here
22  that has -- there's no cup, there's no iced tea.   We've got
23  pie and some cereal."   That's part of their proposed order.
24  This is part of what they are saying is their Splenda trade
25  dress.

BARBARA DACHMAN, RPR, OCR

18

1       We also have the suggestion that it's a shade of
2  yellow.   We have affiants from the plaintiffs.   "I got a
3  packet, the actual sugar packet" -- not the box, they never
4  saw the box -- "and it's yellow, and this one from Same with
5  sugar is yellow.   And, well, that's not right.   It's
6  confusing."
7       So let's -- are we talking about the trade dress at
8  issue, which I would suggest is this entire box (indicating)
9  and just this entire box?   If they want to go broader,
10  that's fine, your Honor, but then the standard only gets
11  harder for them.   If they want to suggest that it's the
12  common elements between all of those, well, now the cup and
13  the iced tea aren't on one box, so what are they really
14  seeking.   And that's why the First Circuit has said you need
15  to clearly define the elements of the trade dress, and
16  that's what you need to proceed your case on.   You can't
17  define a list and then go forward and say "we want
18  everything yellow because we are the market leader in the
19  yellow box."
20       Back to sweetener law and whether their box is
21  inherently distinctive.   The Sweet'N Low/NutraSweet cases.
22  They say sweeteners commonly feature on their boxes images
23  of a coffee cup, a glass of iced tea, and
24  individually-wrapped paper packets.   To suggest that those
25  elements are not descriptive of what their product does or

BARBARA DACHMAN, RPR, OCR

19

1  is both contrary to this case and I think contrary to
2  logic.   And if you look at the marketplace, cups of coffee,
3  iced tea, packets, you see those on almost every box.   So
4  what is inherently distinctive about their package?
5       In this case the Court found, with respect to Equal,
6  blue boxes, other companies that made a blue box, and
7  Sweet'N Low in the pink boxes, the dominant coloring of
8  those boxes served a functional purpose and doesn't
9  differentiate them from other products.
10       Mr. Zalesin's brief suggests that this Court, in the
11  case in front of you, in the Eastern District of New York,
12  found those packages inherently distinctive because of the
13  elements, because even though they were common, they were
14  placed in such a way to make this box inherently
15  distinctive.   That is wrong.   This case actually says the
16  presence of the trademarks prominently displayed as an
17  integral part of the trade dresses is a significant
18  indication of their distinctiveness.
19       And that's what we have said in our brief.   We said
20  you can't have it both ways.   If you are saying it's a
21  package without a label on it, like this (indicating), well,
22  then you have a much higher burden, because how is that
23  inherently distinctive?   Because you've got common elements,
24  you have an arrangement that is not inherently distinctive.
25  So what it is is the logo, Splenda, registered trademark for

BARBARA DACHMAN, RPR, OCR

20

1  McNeil and Johnson & Johnson, known to consumers.   That's
2  what some of their data shows.   If you ask them if they know
3  of Splenda, they say, "Yes, I know Splenda because I buy
4  Equal and I know Splenda is one of its other brands
5  competing with it."
6       With the name Splenda on the trade dress, if under
7  that situation it's found to be inherently distinctive, then
8  when you got to the likelihood of confusion argument, it is
9  the protection afforded to this box is not nearly as strong.
10       And then when our box at Merisant has a different
11  brand name, stipulated by all parties, well-known in Puerto
12  Rico, millions of boxes sold, Same -- regular Same has been
13  sold here for ten years with that brand name and a logo like
14  that, much longer than Splenda -- if we are talking about a
15  box with a logo in order to achieve inherent
16  distinctiveness, Splenda, name and logo, when it comes time
17  to get to confusion, the fact that Same with sugar, the
18  biggest thing you see on this box -- we can go 10 feet,
19  20 feet, 30 feet -- with all due respect, glasses or no
20  glasses, Same is on here, your Honor.
21       So now --
22       THE COURT:   Except that the boxes are different
23  because the Same box is taller and the other one is more
24  rectangular.
25       MR. LoCASCIO:   Indeed, your Honor.

BARBARA DACHMAN, RPR, OCR

21

So one of the other factors is how much do these look
alike in their overall impression. If you are in the store
and you see these on the shelf, you think, "Are these the
same product?" That's their argument.

They are suggesting that I can go in the store and
think I am picking this box up (indicating) and pick this
box up (indicating). Adding to what your Honor points out,
this box (indicating) is a lot more expensive than this box
(indicating), and that's what this case is really all about,
that Splenda is the highest-priced sweetener, and they make
a lot of money on Splenda, and if someone else is competing
with them, that's not good for their business model.

THE COURT: There is a differential in price?

MR. LoCASCIO: There is significantly, your Honor.
About 15 percent. It's more than a dollar.

THE COURT: Do you think that someone could think,
you know, right off the cuff, when you see these two boxes,
"Well, you know, Same could be the generic product of
Splenda"?

MR. LoCASCIO: Correct.

If someone looks at this and compares on price, as
some of their affiants say, "I went to the store" -- well,
they don't say "I went." It's "I saw someone go to the
store" -- so we've got issues there as to who is really the
confused person who is testifying -- "and I compared two

22

products, Same with sugar and Splenda, and I chose Same with
sugar," for whatever reason, because it actually has sugar
in the box and this does not, and they want that for some
reason. Perhaps it's because it is the price point. Same
with sugar and regular Same have always been in Puerto Rico,
a value brand. It is a brand at a lower price point than
Splenda. Regular Same is a brand at a lower price point
than Equal.

If a consumer is comparing the products, they are
obviously not confused into thinking it's the same product,
because then there would be nothing to compare. And as you
point out, your Honor, whether or not consumers think it's a
generic version, a cheaper alternative, an equivalent of
Splenda, there are some references in their arguments that
people might think what is inside this box (indicating) is
technically chemically the same thing as what is inside that
box (indicating).

That is not the case. If you look at the ingredients,
it says it's not the case. And that is certainly not in
violation of the Lanham Act for trademark infringement,
which is what this injunction hearing is about. This is
confusion as to source. That's all this hearing is about.
Not "I'm confused as to what's inside your box."

Do I think this product, Same with sugar, is made by
Splenda, is Splenda, or is otherwise affiliated with

23

Splenda. That's the standard they need to meet; that's
their burden for substantial likelihood.

Your Honor, the issue you raised about generic
manufacturers is very on point here. It's also not the
first time it's come up for McNeil. McNeil, we would
suggest, is -- on several issues of laws, as in our brief --
judicially estopped from making certain arguments. Judicial
estoppel in the First Circuit, you make an argument to a
court, you prevail on that argument, you now cannot play,
quote, "fast and loose with the courts, nor can you engage
in" -- the actual quote for your Honor --

THE COURT: It's the *Patriot* science.

MR. LoCASCIO: Exactly, it's the *Patriot* case,
your Honor.

And let me show you what McNeil said and won at the
Second Circuit. I am going to have a harder time with this
one, I think, your Honor.

"So long" -- let me see if I can get it focused a
little better.

"Because McNeil is frequently the market leader, its
color patterns have regularly been followed by others.
Generic copies of Tylenol's trade dress appear in nearly
every drugstore, typically in Tylenol's familiar white,
yellow, and red colors. So long as the generics do not
attempt to appropriate Tylenol's trademark, McNeil does not

24

challenge such uses of its colors, but recognizes it as an
accepted part of competition."

Why were they saying that then? It's because they
were on the other side of the table. They were the
defendant, they made a box that looked exactly like the
plaintiff's, much more so because there are different
elements here on ours than their box. They were both the
same color. And they said, first off, "Our name's on it.
It's across the box, 20 feet away, you see the Tylenol name,
and it's well known."

We stipulated the Same name is well known in this
case. From 20 feet away it's clearly visible, certainly
more than the distance you'd be in an aisle in a grocery
store.

They also said, with the name on it, that dispels
confusion. But what is protectable about this mark? They
are arguing they are the only person that can make the color
box blue. That's the case in front of you at the Second
Circuit that McNeil won. And they said blue has some
functionality here. All the boxes in this genre are blue.

Well, your Honor, there are other yellow boxes, as you
have seen before. And let's start chronologically. Domino,
a hundred years in a yellow box or bag, for at least the
last 40, yellow, blue and white.

And the reason Domino is important in this case is

25

1  they sometimes say Domino is not a competitor with sugar
2  substitutes. You are going to hear from anybody who comes
3  on the stand from McNeil, that's not true. Sugar is one of
4  their primary competitors. Much of McNeil's growth has been
5  convincing people to switch from sugar to Splenda. They
6  market their product in a way that says "made from sugar,
7  tastes like sugar." The message is, this product is close,
8  is, or is otherwise related to sugar, and you should buy it.
9      Well, part of that message is sent through the color
10  scheme. We haven't gotten any of these documents from
11  McNeil, but I will virtually ensure the Court that when we
12  do, if we are at that point in discovery, somebody at McNeil
13  thought, "What color should we use for Splenda?" The
14  original box wasn't yellow, blue and white. It was white
15  with some blue and some red.
16      Yellow, blue and white. Well, we have seen that
17  before. Domino. It was also already on the market for more
18  than 40 years than Sugar Twin, whose name is Sugar Twin,
19  after all. There is an association in consumers' minds
20  between yellow, or yellow, blue and white, and sugar.
21  Domino is one of the market leaders in sugar and it has been
22  for a century.
23      To suggest that yellow on their box is not serving
24  some functional purpose of sending this message that's the
25  target of their ad campaign -- sugar, like sugar, tastes

BARBARA DACHMAN, RPR, OCR

26

1  like sugar, pours like sugar -- I think is both contrary to
2  fact, and what you are going to see, contrary to their own
3  arguments that they have made before as to the
4  protectability and the likelihood of confusion analysis.
5      Back to secondary meaning, the second burden they've
6  got, a vigorous evidentiary requirement. It's the standard
7  in the cases in the First Circuit in Boston. Beer -- there
8  is only two types of direct evidence for secondary meaning:
9  One, survey evidence.
10      Well, when they filed their papers, they had some
11  mention that they had a, quote, survey. We have now got
12  that, and it's anything but a secondary meaning survey,
13  which we will look at. But now they have got an expert that
14  came in. And we haven't met him yet. He is going to come
15  here later. I look forward to that opportunity. We got
16  some of the papers from him only yesterday. We got his
17  report. His report was done at the last minute on the day
18  the brief was filed, and it shows. And it shows because we
19  had two weeks, your Honor.
20      Defendants got a likelihood of confusion survey.
21  Eight hundred people in Puerto Rico were questioned.
22  Plaintiffs only got a secondary meaning survey, which I
23  would suggest, if the standard for confusion is as clear as
24  they suggest, if people were so obviously confused by the
25  source of the product, who wouldn't go out and get a

BARBARA DACHMAN, RPR, OCR

27

1  likelihood of confusion survey with a huge number, 60, 80,
2  90 percent. I am going to suggest, your Honor, when you see
3  the defendants' survey doesn't show confusion, query whether
4  a survey was done in the first week and a half of the last
5  two weeks and it wasn't good so we don't see it here today.
6  The same with secondary meaning. The survey we are going to
7  see was done the last three days before the brief was filed,
8  and it's rife with problems.
9      MR. ZALESIN:   Your Honor, I object to that type of
10  speculation by counsel. There is absolutely no basis for
11  that. I will represent that it is completely false. There
12  are no surveys that were done in the case that have not been
13  provided to the other side and are going to be offered in
14  evidence, and it is absolutely improper to suggest that we
15  are hiding some piece of work product that hasn't been done,
16  as counsel just did. That is completely false and is
17  without any foundation.
18      MR. LoCASCIO:   Your Honor, in our findings and
19  conclusions of law and before the Court, before this is over
20  I will come to you with cases that say the plaintiff should
21  certainly have such a survey. Both do it before you file,
22  do it during the interim between your filing date and the
23  injunction hearing. And if they don't come forth with a
24  survey, that's something the Court can consider, because
25  it's a logical conclusion.

BARBARA DACHMAN, RPR, OCR

28

1      Maybe it wasn't done. Well, that's fine. That's
2  their burden. They haven't met it. Or maybe it was done.
3  And it's the first I've heard that someone confirming it
4  wasn't. But when we see the expert, we will ask him what he
5  did or if he knows if anyone else did anything.
6      THE COURT:   Well, you will have an opportunity to
7  explore that.
8      MR. LoCASCIO:   Thank you.
9      The survey itself shows what we talked about with the
10  functionality. People think the box is yellow. Okay,
11  Splenda's box is yellow.
12      In Puerto Rico, they say they are the market leader
13  and they claim they are the only party that sells a product
14  in a yellow box.
15      So when you test for secondary meaning, are we testing
16  for it on the box as a whole, or are we testing for it on
17  yellow, which they claim is not the trade dress they were
18  surveying? They say they are not seeking just yellow. Yet
19  their survey shows people are connecting yellow to their box
20  when shown. It's not a shade of yellow, it's not the
21  overall design.
22      This is what they showed consumers (indicating) to do
23  a secondary meaning survey. Two hundred people. This is
24  their control that they showed a hundred people
25  (indicating). As you can tell, it's not yellow. If we were

BARBARA DACHMAN, RPR, OCR

**29**

```
 1   really surveying people, if this box design as a whole has
 2   secondary meaning, you would make a control that narrowed it
 3   down.  The purpose of a control -- their own expert says
 4   it -- Mr. Zalesin painfully ignored it during his exam --
 5   his opening -- when you do a survey, you have a test and a
 6   control.
 7          In this case the control is faulty.  It's not yellow.
 8   Sure, people are more likely to think this (indicating) is
 9   associated with Splenda than this (indicating), but that's
10   not testing for the overall impression of the box.  Most of
11   their people who say "I think this is Splenda" say it's
12   yellow.
13          Well, if they want to have a case about whether they
14   have a right to yellow in this market space, that's a much
15   different case than they have presented you with.
16          When Mr. Zalesin talked about the survey done by
17   defendants, he claimed -- and McNeil, as well as plaintiffs'
18   counsel, know this well enough.  A survey has a test and a
19   control, and you subtract the control confusion from the
20   test to determine how many people are in the
21   likelihood-of-confusion group.  Otherwise, what is the point
22   of the control.  The control is to remove the noise, people
23   who just guess, people who think everything they know is
24   Equal or everything they know is Splenda because that's the
25   product they buy.  They are not making a decision based on
```

**30**

```
 1   the image of the box.
 2          This was the test.  People were shown this box
 3   (indicating):  "Look at it like you would in a grocery
 4   store.  Tell me who you think makes it," when it's taken
 5   away.  "Do you think it's Splenda?  Do you think it's
 6   associated with any other products you know?"
 7          If people said Splenda, okay.  This person thinks this
 8   box is associated in some way with Splenda.  Fine.  Let's
 9   net out the confusion.
10          This is the control (indicating).  It's possibly the
11   best control I've ever seen in a case.  They admit it's not
12   infringing, so certainly that's one test.  The control can't
13   also be infringing.
14          It has yellow, blue and white.  They say it's a
15   different shade of yellow.  They say the letters are a
16   different blue.  They say it has got an overall different
17   look and feel.  Well, okay.
18          They say Sugar Twin shouldn't be involved in this
19   case?  This is the perfect control involved in this case.
20   When people were asked, shown just this box, never saw the
21   Same box with sugar -- they showed them this and said, "Who
22   do you think makes that?  Who do you think is associated
23   with that in this market space?"  Twenty percent of people
24   said Splenda.
25          What that shows, and you will hear expert testimony
```

**31**

```
 1   on, is that that's the noise level.  People who see a yellow
 2   box, yellow, blue and white, a cup of coffee, a sweetener
 3   box in general, are guessing Splenda.  Well, that's the
 4   number you subtract from the people who saw this box
 5   (indicating) to really determine what is the level, if any,
 6   of confusion between the overall impression of this box and
 7   the overall impression of a control, and that net is less
 8   than five percent.
 9          To suggest that the only survey evidence in this case,
10   defendants', shows that there is a 20 percent likelihood of
11   confusion, both ignores the testimony in the report, ignores
12   every standard of trademark survey law that you have a test
13   and a control and you subtract the control.  It is less than
14   five percent.  And that's the only survey evidence, because
15   the plaintiffs didn't do any.
16          And why is the amount of confusion so low?  I would
17   suggest the same reason McNeil suggested to the Second
18   Circuit:  A, other people use boxes that are yellow; other
19   people use boxes with coffee cups, fruit, iced tea, packets;
20   and ours, that Same with sugar, has the brand name Same,
21   well-known in Puerto Rico, been here for ten years.
22          To wrap up, your Honor, the suggestion -- I am
23   troubled with the idea that Sugar Twin isn't in any stores,
24   it is not in the market, we can't get it, and it shouldn't
25   have anything to do with this case.  This was what was
```

**32**

```
 1   attached to the plaintiffs' original motion papers for
 2   preliminary injunction.  This was the marketplace as they
 3   described.  I can hand this over; it doesn't show up well on
 4   the monitor, your Honor.  And their version of the exhibit,
 5   probably, I would wager, is a better copy.  And it has Same
 6   with sugar, it has Same regular, it has Equal, it has
 7   Splenda.
 8          And in -- I will admit, I thought we should remove
 9   this.  I thought there is no way we should put this line in
10   our original brief.  We put this line in the brief, and I
11   will put that up for you.  I thought, there is no way anyone
12   would try to do that with a picture.
13          I took it out of my binder, your Honor, so I could
14   show it to you.
15          We said in this brief -- here it is.  We said Sugar
16   Twin is a player in the market.  McNeil knows it.  And we
17   don't know a lot about this picture.  They didn't tell us
18   where it was taken.  But moreover, given how little
19   information is provided and how the photo is cropped, one
20   can only wonder what other sweeteners are just out of view.
21          I saw that in the draft and I thought, you are
22   basically suggesting it's possible that Sugar Twin is in
23   this same store.  And I wouldn't do that.  I didn't think
24   anyone would.
25          This was in plaintiffs' exhibits (indicating).  This
```

33

1  is the same store.  We have the same boxes here.  We have
2  the same pie servers there.  You can compare anything you
3  want.  You can see there's boxes here on the side.  It's the
4  same identical store shown in their original brief where the
5  cropped photo said Sugar Twin is not in this marketplace,
6  it's not a player.
7       Well, over here (indicating), cropped out of the
8  original photo filed with the Court, is Sugar Twin.
9       To suggest it's not a player in the market is false.
10  It is certainly not a player on the scale of Splenda.  That
11  does not mean it's not out there; that does not mean it was
12  not there first.
13       This is about competition.  They've got burdens they
14  have to meet.  We shouldn't blow right through them.  We are
15  going to have evidence.  We will get to the point where we
16  then can say have they met their burden.  That's all
17  defendants have asked for since the day the papers were
18  filed, an opportunity respond, to be heard on the merits,
19  because on the merits, it's not protectable, arguably, as
20  functionality, which they ignore.
21       Certainly, from the only survey evidence you will
22  hear, no likelihood of confusion, as their own arguments,
23  brand name on a product, you can read it from 20 feet away,
24  how could there be confusion?  If there are, those aren't
25  consumers that we should be protecting because they aren't

BARBARA DACHMAN, RPR, OCR

34

1  paying attention in the store, and one can only do so much
2  about that.
3       Competition is what they fear.  Competition is what
4  they are seeing from saying "with sugar" at a lower price
5  point.  And, your Honor, the evidence we suggest is going to
6  show that that is all this is about and there is no
7  likelihood of confusion.
8       Thank you, your Honor.
9       THE COURT:  Very well.
10       MR. ZALESIN:  If I can just take literally one
11  minute, your Honor.  You know, there are a lot of
12  accusations of wrongdoing by counsel.
13       I can tell you that that photograph was not cropped
14  deliberately to eliminate Sugar Twin.  We have never
15  represented to the Court that there are no stores in Puerto
16  Rico that don't sell Sugar Twin.  We have said it's got a
17  one tenth of one percent market share.  It is for sale, if
18  you look hard enough.  it's out there.  It's got a one tenth
19  of one percent market share.  Those are the facts as we have
20  represented them to the Court.
21       That photograph was offered I believe to show that the
22  Same and Splenda products are being shelved directly next to
23  each other, and those are the facts.  There are no
24  misrepresentations going on here.  I think as the proof goes
25  forward, you will see who is being honest and who is being

BARBARA DACHMAN, RPR, OCR

35

Beatriz Sifontes - Direct (Sanchez)

1  dishonest in this case.
2       Thank you.
3       THE COURT:  We are going to take a five-minute
4  recess and I will be back.
5       (Whereupon, a short recess is taken.)
6       MS. SANCHEZ:  We are going to call Beatriz
7  Sifontes.
8       May I, your Honor?
9       Good morning.
10  Whereupon,
11       BEATRIZ SIFONTES,
12  was called as a witness, and after having been previously
13  duly sworn, was examined and testified as follows:
14       DIRECT EXAMINATION
15  BY MS. SANCHEZ:
16  Q.   Good morning.
17       Will you please state your name for the record.
18  A.   Yes.
19       Beatriz Sifontes.
20  Q.   And can you tell me what you do for a living.
21  A.   I am the translations manager for McConnell, Valdes.
22  Q.   Have you recently purchased a package of Merisant's
23  yellow Same product?
24  A.   Yes, I have.
25  Q.   And can you tell me about that.

BARBARA DACHMAN, RPR, OCR

36

Beatriz Sifontes - Direct (Sanchez)

1  A.   Yes.
2       I was shopping in my usual fashion at the supermarket,
3  and when I went through the aisle for the sweeteners, I
4  grabbed my sweetener --
5  Q.   Which is your sweetener?
6  A.   Splenda.
7  Q.   Okay.
8       Let me --
9       MS. SANCHEZ:  May I approach, your Honor?
10       THE COURT:  Yes.
11  BY MS. SANCHEZ:
12  Q.   Let me show you what we have marked for identification
13  as Plaintiffs' Exhibit 1.  I will give you your own copy.
14       MS. SANCHEZ:  I also have color copies for the
15  record to make it easier, which is 1(a).
16  BY MS. SANCHEZ:
17  Q.   Is this -- does this box, Exhibit 1(a), represent your
18  sweetener, as you called it?
19  A.   Yes, this is what I usually buy.
20       MS. SANCHEZ:  I'd like to offer into evidence
21  Exhibits 1 and 1(a).
22  BY MS. SANCHEZ:
23  Q.   Please go ahead.  What happened next?
24  A.   Okay.
25       So, I went back home, we put everything away.  And

BARBARA DACHMAN, RPR, OCR

## Beatriz Sifontes - Direct (Sanchez)  37

1 then the next morning when I wake up, my usual routine: I
2 take my coffee, I grab my sweetener, I pour it in the coffee
3 and I taste the coffee and I drink it.
4      And that's when I figured out that it wasn't Splenda,
5 when I took a sip out of the coffee.
6 Q.   So you had bought what you thought was Splenda at the
7 store --
8 A.   Exactly.
9 Q.   -- and when you got home, it wasn't Splenda.
10 A.   It wasn't.
11 Q.   What was it?
12 A.   It was Same.
13      MS. SANCHEZ:   And if I could approach again, your
14 Honor.
15      THE COURT:   Um-hmm.
16 BY MS. SANCHEZ:
17 Q.   I'd like to show you what has been marked for
18 identification as Plaintiffs' Identification 2.
19      MS. SANCHEZ:   I have one for the witness and one
20 for you.
21      And I also have as Exhibit 2(a) a color photocopy.
22 BY MS. SANCHEZ:
23 Q.   Miss Sifontes, is Plaintiffs' Exhibit 2 the Same
24 product that you bought?
25 A.   Yes.

BARBARA DACHMAN, RPR, OCR

## Beatriz Sifontes - Direct/Cross  38

1 Q.   And you confused this Same product for your usual
2 sweetener, which is Splenda.
3 A.   Yes, I did.
4      MR. LoCASCIO:   Objection, your Honor.  Leading the
5 witness.
6      THE COURT:   Can you rephrase that question?
7      MS. SANCHEZ:   I was just trying to wrap it up.
8 BY MS. SANCHEZ:
9 Q.   Why did you buy the yellow Same brand if your usual
10 brand is Splenda?
11 A.   Okay, I did that because I went through the aisle.  I
12 am very used to buying always the same products.  I -- it's
13 my routine at the supermarket.  And when I grabbed the box,
14 I was sure that I had the hold of Splenda.  I realized that
15 it was not Splenda the next day when I tasted the coffee,
16 and I realized it tasted like NutraSweet.
17      MS. SANCHEZ:   I have no further questions, your
18 Honor.
19      THE COURT:   Mr. LoCascio?
20      MR. LoCASCIO:   Thank you, your Honor.
21                    CROSS-EXAMINATION
22 BY MR. LoCASCIO:
23 Q.   Good morning.
24 A.   Good morning.
25 Q.   Is it Miss Fontes?

BARBARA DACHMAN, RPR, OCR

## Beatriz Sifontes - Cross (LoCascio)  39

1 A.   Miss Sifontes.
2 Q.   Sifontes.
3 A.   Yes.
4 Q.   Miss Sifontes, you indicated you work at the
5 McConnell, Valdes law firm; is that correct?
6 A.   Yes, I do.
7 Q.   That's the law firm that I will only call her Dora,
8 because I will get it wrong if I try to pronounce her last
9 name.  She's a lawyer for the plaintiffs in this case,
10 McNeil, correct?
11 A.   Yes, she is.
12 Q.   So you work for the law firm that the plaintiffs have
13 as their lawyers, correct?
14 A.   Exactly.
15 Q.   Okay.
16      In your declaration -- are you familiar with your
17 declaration in this case?
18 A.   Yes, I am.
19 Q.   You never mentioned you work for McConnell, Valdes in
20 your declaration, did you?
21 A.   No.
22 Q.   Did you write your declaration yourself?
23 A.   No.
24 Q.   The lawyers wrote it for you, correct?
25 A.   Yes.

BARBARA DACHMAN, RPR, OCR

## Beatriz Sifontes - Cross (LoCascio)  40

1 Q.   Let me talk about that a little bit, Miss Sifontes.
2      Am I correct that you went on your normal grocery
3 shopping trip, and that's when this alleged incident
4 happened?
5 A.   Yes.
6 Q.   Where do you go grocery shopping, normally?
7 A.   Pueblo Supermarket at Señorial.  Usually.  Sometimes I
8 go other places.
9 Q.   Your normal grocery store is the Pueblo in El
10 Señorial?
11 A.   (No response.)
12 Q.   And is that where you allegedly bought Same with sugar
13 instead of what you intended to buy, Splenda?
14 A.   That's where I think I did buy it.
15 Q.   Okay, fine.
16      You say in your affidavit that that's where you bought
17 it.  Is that where you bought it?
18 A.   I -- well, yeah.  I mean, I think that's where I
19 bought it.  This happened two months ago or so.  I don't
20 know, in January or so.
21 Q.   On your normal grocery trip.
22 A.   On my normal grocery trip.
23 Q.   So you go to the grocery store, and were you in a
24 hurry?
25 A.   A little bit, yes.

BARBARA DACHMAN, RPR, OCR

Beatriz Sifontes - Cross (LoCascio)

41

1  Q.   Do you normally pay attention to what you are buying
2  when you are at the grocery store?
3  A.   Well, I do, because I always buy the same stuff, so...
4  Q.   Which size Splenda box do you normally buy?  Fifty
5  packets, 100 packets or 200 packets?
6  A.   I really get -- grab whatever I can find at that
7  moment.
8        MR. LoCASCIO:   Can I approach, your Honor?
9        THE WITNESS:   I need to be honest.
10 BY MR. LoCASCIO:
11 Q.   Miss Sifontes, you have in front of you the 200 pack,
12 the 100 pack, and the 50 pack.  Do you know which is your
13 normal purchase?
14 A.   No, because I usually buy whatever is in the aisle at
15 that moment.
16 Q.   Okay.
17 A.   And it all depends on if I am going to Costco like
18 within a week.  I'll buy a smaller package, because it's
19 less expensive.
20 Q.   In the incident you talked about and you are here to
21 testify about, you claim you bought Same with sugar instead
22 of Splenda.  Which size box did you mistakenly confuse it
23 with?
24 A.   I do not recall.
25 Q.   Okay.

BARBARA DACHMAN, RPR, OCR

---

Beatriz Sifontes - Cross (LoCascio)

42

1      So you are in the aisle, and you grab a box; is that
2  correct?
3  A.   Yes.
4  Q.   And am I correct that you don't look at the name on
5  the box?
6  A.   I look at the light yellow color with the blue
7  letters.
8  Q.   When you allegedly grabbed the box of Same with sugar,
9  you didn't see that it had the word "Same" on it, did you?
10 A.   Probably not.  If I would have seen it, I would have
11 realized it was not Splenda.
12 Q.   If you would have read the box, you would not have
13 made the alleged mistake.
14 A.   Yes, because I usually do my shopping, grabbing the
15 yellow box with the blue letters.
16 Q.   Do you wear glasses?
17 A.   No.
18 Q.   Do you wear contacts?
19 A.   No.
20 Q.   Can you read the word "Same" on this box?
21 A.   Yes, I can.
22 Q.   From this distance.
23 A.   Yes, I can.
24 Q.   So you grabbed the box and you put it in your cart,
25 correct?  A cart or basket?

BARBARA DACHMAN, RPR, OCR

---

Beatriz Sifontes - Cross (LoCascio)

43

1  A.   No, a cart.
2  Q.   And when you put it in the cart, you didn't see the
3  name on the box, correct?
4  A.   I didn't look at it.
5  Q.   And then at some point you finished your shopping, and
6  the Pueblo has a conveyor belt at the register, right?
7  A.   Um-hmm.
8  Q.   And did you take it out yourself, or did someone do it
9  for you?
10 A.   I took it out myself.
11 Q.   And you didn't see that it was Same with sugar, as you
12 claim.
13 A.   I don't look at it.  I really do this very, very,
14 very, very routinely.  I just go (indicating).
15 Q.   Did you bag your own groceries, or does the Pueblo
16 have someone bag them for you?
17 A.   If there is someone to bag it for me, I'll let them
18 bag it for me, usually.  If it's a big -- if it's a big
19 purchase, then I'll claim for a bagger.
20 Q.   Do you remember if you bagged your groceries yourself
21 that day?
22 A.   No, I don't.  But probably I didn't.
23 Q.   And then when you got home, am I correct that you put
24 the box in a cupboard or in a cabinet somewhere?
25 A.   I didn't put it in myself.  The cleaning lady did.

BARBARA DACHMAN, RPR, OCR

---

Beatriz Sifontes - Cross (LoCascio)

44

1  Q.   So someone else unpacked your groceries for you, your
2  cleaning lady.
3  A.   Yes.  Yes.
4  Q.   But then in the morning you got up and you opened the
5  cabinet to where you normally keep the Splenda.
6  A.   Um-hmm.
7  Q.   And there was a box in the cabinet, right?
8  A.   There is a yellow box in the cabinet.
9  Q.   And you didn't look at what the box said, right?
10 A.   No.  The box is usually placed like this (indicating)
11 in front of me, and I -- it's in the upper left-hand corner,
12 so I don't really read it.  I just grab a hold of it like
13 that (indicating), open it, and pour it in the coffee.
14 Q.   You grabbed the box or the packet?
15 A.   No, the packet from inside the box.  And I try to open
16 the box right there.
17 Q.   You grabbed the packet from what you say was Same with
18 sugar, correct?
19 A.   Yes.
20 Q.   And you didn't read that the packet said "Same" on it;
21 is that right?
22 A.   Not at six o'clock in the morning, no.
23       MR. LoCASCIO:   May I approach?
24       May I ask you to hand that to the witness?
25

BARBARA DACHMAN, RPR, OCR

**Beatriz Sifontes - Cross (LoCascio)**                    45

1  BY MR. LoCASCIO:
2  Q.  This is a packet of Same with sugar.  Do you recognize
3  that?
4  A.  Well, I see it.  What do you mean if I recognize it?
5  Q.  Have you ever seen one before?
6  A.  Yes.  Yes.
7  Q.  Where had you seen it before?
8  A.  I am not sure.  Probably at home.
9  Q.  Well, Miss Sifontes, when you grabbed the packet to
10 put it in your coffee, did you look at it and see that it
11 says "Same" on it?
12 A.  No, I didn't.
13 Q.  That packet says "Same" on it, correct?
14 A.  This one says "Same" on it.
15 Q.  Not hard to see?
16 A.  No, not at all.  I don't look at the packets when I
17 open them.
18 Q.  So your testimony is that you opened that packet,
19 poured it into -- you drank coffee in the morning?
20 A.  Excuse me?
21 Q.  Was it coffee you were drinking?
22 A.  Yes.
23 Q.  So you poured it into your coffee.  Then what do you
24 do with the packet?  Do you throw it out?  Do you leave it
25 out for the cleaning lady?  What do you do with it?

BARBARA DACHMAN, RPR, OCR

**Beatriz Sifontes - Cross (LoCascio)**                    46

1  A.  If I have the wastebasket near me, I'll throw it out.
2  If I don't have the wastebasket near me, I leave it up
3  there, right there, and I kind of -- um --
4  Q.  Crumple.
5  A.  -- crumple it and then I wait for the cleaning lady to
6  pick it up.  It all depends.
7  Q.  In this instance, the time you say that -- we are
8  talking about here, do you remember if you threw out the
9  packet or not?
10 A.  No, I don't.
11 Q.  So you don't remember if you looked at it after you
12 poured it in the coffee.
13 A.  Oh, no, I would never look at it after I pour it in
14 the coffee because I crumple it.
15 Q.  How many packets did you put in the coffee?
16 A.  Usually two.
17 Q.  And your testimony is that you are a Splenda user, and
18 in this case you first noticed that you put Same with sugar
19 in your coffee from the taste; is that right?  In the
20 coffee.
21 A.  Yes.
22 Q.  Okay.
23 A.  Because Splenda, I put two Splendas in the coffee and
24 that's perfect.  But you put two Sames in the coffee and
25 it's too sweet.

BARBARA DACHMAN, RPR, OCR

**Beatriz Sifontes - Cross (LoCascio)**                    47

1  Q.  Miss Sifontes, are you absolutely sure you bought Same
2  with sugar in a yellow box?
3  A.  I am absolutely sure.
4  Q.  Miss Sifontes, I am going to show you pictures of your
5  grocery store.
6  A.  Um-hmm.
7  Q.  Same with sugar has never been sold in your grocery
8  store.  That's correct, right?
9  A.  No, I don't know if it's correct or not, but that's
10 why I told you that that's where I think I did my grocery
11 shopping, because sometimes I go to Grande, which is near my
12 mother's house.
13 Q.  But in this case you swore out a declaration, and you
14 just testified under oath that you shopped at the Pueblo in
15 El Señorial.  That's what it says right here in your
16 declaration.
17      MR. LoCASCIO:  Can you hand this to the witness?
18 BY MR. LoCASCIO:
19 Q.  You swore to this Court that you bought Same with
20 sugar at Pueblo, correct?
21 A.  Actually, yes.  Yes, that's what it says here and
22 that's what I -- and I signed it.  But it might -- it might
23 have been Grande from Señorial.  Not from Señorial, from San
24 Francisco.
25 Q.  So now you are not sure where you supposedly bought

BARBARA DACHMAN, RPR, OCR

**Beatriz Sifontes - Cross/Redirect**                    48

1  Same with sugar, since it's not the Pueblo, since they
2  didn't sell it when you went to buy it.
3  A.  It might have not been Pueblo, then.
4      MS. SANCHEZ:  Objection.
5      I am not really sure when Mr. LoCascio knows when -- he
6  can establish what dates it was sold there.
7      MR. LoCASCIO:  I think she answered the question.
8      THE COURT:  We need some foundation for that.
9      MR. LoCASCIO:  I can confirm it, your Honor.
10     We will put on a witness to tell you that Pueblo in El
11 Señorial has, up until this week, never told a single box of
12 Same with sugar, the one Miss Sifontes shopped at, nor any
13 others.
14     No further questions.
15     MS. SANCHEZ:  A few followups, your Honor.
16                  REDIRECT EXAMINATION
17 BY MS. SANCHEZ:
18 Q.  Miss Sifontes, do you usually come home with the wrong
19 brand of a product?
20 A.  No, I don't.
21 Q.  Let me ask you.  Does your position at McConnell,
22 Valdes have anything to do with the testimony that you have
23 given here today?
24 A.  Not at all.
25 Q.  And is the testimony that you gave here true and

BARBARA DACHMAN, RPR, OCR

Beatriz Sifontes - Redirect (Sanchez)                    49

1  correct?

2  A.      The testimony, yes, it is true and correct,

3  definitely.

4  Q.      And would you say that just because you are associated

5  with one of the law firms that's working on this case, that

6  doesn't mean that you can't be fair and honest, does it?

7  A.      No, it doesn't.  In fact, this is very difficult for

8  me because it's taking away a lot of my time from my

9  children and my job.

10  Q.     Thank you.

11  A.      So I am not here voluntarily because I -- because of

12  the law firm.

13  Q.     Thank you.  I have no further questions.

14          THE COURT:   Miss Sifontes, exactly where do you

15  live?

16          THE WITNESS:   I live in El Señorial, in Sierra del

17  Rio, "Urbanizacion" Sierra del Rio.

18          THE COURT:   And normally you do your shopping at

19  that Pueblo?

20          THE WITNESS:   At that Pueblo.  But I usually am

21  with kids and it might have been that I did that shopping at

22  Grande.

23          THE COURT:   But you said that Grande is in San

24  Francisco.

25          THE WITNESS:   The Grande in San Francisco, because

                    BARBARA DACHMAN, RPR, OCR

---

Beatriz Sifontes - Redirect (Sanchez)                    50

1  my mother lives there, so sometimes I just go there and that

2  way I go visit my mother.

3          THE COURT:   Is it normal for you to go visit your

4  mother after work hours?

5          THE WITNESS:   If I have to pick up the kids who

6  are sometimes there, because they are at "Academia" San

7  Ignacio, which is nearby her home.  I will just go pick them

8  up and then go to Grande.  Either that or just go to Grande

9  and then go pick them up at her house.

10          THE COURT:   Is there a fixed time in the week or a

11  fixed day in the week where you do your shopping?

12          THE WITNESS:   Not at all.  And sometimes a month

13  goes by and I don't go to the supermarket.  And sometimes

14  two weeks go by and I do go.  So I don't have a routine in

15  that case.  I don't.

16          THE COURT:   So you wouldn't be, you know -- you

17  wouldn't have a preference for a day in the week like

18  Saturday or Sunday to go to the supermarket.

19          THE WITNESS:   Exactly, I don't.  I don't.  I just

20  do it when there is milk missing or meat missing or the

21  cleaning lady tells me that there is something that needs to

22  be bought and I immediately go and I buy it.  And if there

23  is a very, very big purchase that I have to make, then I

24  will make it.

25          THE COURT:   Very well.

                    BARBARA DACHMAN, RPR, OCR

---

Debra Sandler - Direct (Zalesin)                    51

1          THE WITNESS:   It's very -- yeah, it's very erratic

2  how I deal with it.

3          THE COURT:   Any further questions?

4          MS. SANCHEZ:   No.

5          MR. ZALESIN:   No.

6          THE COURT:   So you are excused.

7          THE WITNESS:   Thank you.  Good day.

8          (The witness is excused.)

9          MR. ZALESIN:   May we call the next witness, your

10  Honor?

11          THE COURT:   Yes.

12          MR. ZALESIN:   McNeil calls Miss Debra Sandler.

13          May I proceed, your Honor?

14          THE COURT:   Yes.

15  Whereupon,

16              DEBRA SANDLER,

17  was called as a witness, and after having been previously

18  duly sworn, was examined and testified as follows:

19              DIRECT EXAMINATION

20  BY MR. ZALESIN:

21  Q.      Good morning, Miss Sandler.

22  A.      Good morning.

23  Q.      What do you do for a living?

24  A.      I am the worldwide vice-president of marketing for

25  McNeil Nutritionals.

                    BARBARA DACHMAN, RPR, OCR

---

Debra Sandler - Direct (Zalesin)                    52

1  Q.      What is McNeil Nutritionals?

2  A.      McNeil Nutritionals is a division of plaintiff

3  McNeil-PPC, Inc., and that division is a wholly owned

4  subsidiary of Johnson & Johnson.

5  Q.      Okay.

6          And what kind of business is McNeil Nutritionals in?

7  A.      We are a nutritionals company and we -- I market

8  Splenda, Lactaid, which is for dairy digestion, Viactiv,

9  which is a calcium supplement for women, and Benecol, which

10  is a -- for heart health.

11  Q.      Okay.

12          And you say that McNeil Nutritionals is a division of

13  McNeil-PPC.  What other world-known products does McNeil-PPC

14  sell?

15  A.      McNeil-PPC markets Tylenol.  That is perhaps our --

16  that division's single largest product.

17  Q.      Aside from your position as worldwide group

18  vice-president of marketing, do you have any other roles or

19  positions within McNeil?

20  A.      Yeah.  I am the worldwide group vice-president of

21  marketing.  I also am the chairperson for operating board.

22  Sort of function as the chief operating officer, if you

23  will, for McNeil Nutritionals.

24  Q.      Okay.

25          Can you give us a brief summary of your professional

                    BARBARA DACHMAN, RPR, OCR

Debra Sandler - Direct (Zalesin)                           53

1  career?
2  A.    Sure.
3        I have worked for approximately 20 years in consumer
4  packaged goods marketing.  The majority of my career I spent
5  at PepsiCo, about 13 -- about ten or 12 years in beverage
6  marketing for Pepsi Cola Company, and then for their
7  restaurant division, PepsiCo Restaurant Group, and then came
8  to Johnson & Johnson about five years ago.  And so I have
9  worked on a series of consumer products.
10 Q.    Have you been involved with the Splenda brand since it
11 was launched in the late nineties, 2000?
12 A.    Yeah.
13       I joined McNeil Nutritionals in 1999 -- 1998 -- I
14 apologize -- and worked on the launch of Splenda.
15 Q.    Can you give us a brief summary of your educational
16 background.
17 A.    Sure.
18       I hold an undergraduate degree in international trade
19 from Hofstra University in Long Island.  And I have --
20 that's a Bachelor of Business Administration.  And I hold a
21 Master of Business Administration from NYU Stern School of
22 Business.
23 Q.    Let's talk a little bit about the no-calorie sweetener
24 market.  First of all, what are no-calorie or artificial
25 sweeteners?

Debra Sandler - Direct (Zalesin)                           54

1  A.    They are basically sugar substitutes that are offered
2  for sale for consumers who choose to, for whatever reason,
3  to substitute for sugar.  The market size is approximately
4  just under 600 million, about 580 or so million dollars in
5  the U.S. --
6  Q.    When you say the market size, that's the annual sales
7  in that category?
8  A.    The annual sales, yes.
9  Q.    Okay.
10       And how are these products typically sold or
11 distributed?
12 A.    They are typically sold in a number of ways, but
13 primarily on supermarket shelves, and that is that sort of
14 $580 million figure.  But they are primarily sold in
15 supermarket shelves in the sweetener, cooking, or baking
16 aisle.
17 Q.    And what kind of packaging do they come in?
18 A.    They typically come in packets.  The category is
19 largely a packet category, and there is historically --
20 prior there must have been a very small percentage of
21 granular, but it's largely a packet category.  Consumers buy
22 the packet and they use them to sweeten, you know, coffee,
23 tea, beverages, and so forth.
24 Q.    What are the leading brands in the United States in
25 the no-calorie sweetener market?

Debra Sandler - Direct (Zalesin)                           55

1  A.    Today, Splenda actually is the leading retail brand in
2  the U.S. market.  The other two primary competitors are
3  Equal and Sweet'N Low.
4  Q.    Okay.
5        And do they contain the same ingredient or different
6  ingredients?
7  A.    No, actually each ingredient is quite different.  Each
8  product, each brand is quite different.
9        Actually, the very first product to be launched in the
10 market to really establish the sugar substitute category was
11 Sweet'N Low, and that was actually made from saccharin.
12 Q.    Okay.
13       Do you recall approximately when that took place?
14 A.    They are the oldest.  They have been -- I want to say
15 almost 50 years ago, maybe about 1957.
16 Q.    Okay, what came next?
17 A.    That was followed, almost 25 years later, about 1982,
18 Equal was launched, and then Splenda came, again, in 1999.
19 Q.    What is the ingredient in Equal?
20 A.    Equal, the primary ingredient there is aspartame.  So
21 the category is saccharin is Sweet'N Low, aspartame is
22 Equal, and then Splenda came later and that uses a unique
23 ingredient called sucralose.
24 Q.    Okay.
25       Now, you said that Sweet'N Low is the leading

Debra Sandler - Direct (Zalesin)                           56

1  saccharin brand.  Are there other brands of saccharin
2  marketed?
3  A.    Yeah.  Like any other industry, there are a series of
4  sort of private label store brands.  Nothing -- no, nothing
5  major.  No other leading brand.
6  Q.    Okay.
7  A.    The saccharin brand in the category is Sweet'N Low.
8  Q.    And how about with respect to aspartame that you told
9  us that Equal is the leading brand?  Are there other
10 aspartame products that compete?
11 A.    Yes, there are other aspartame products that compete,
12 but again, the sales are predominantly led by Equal.  But
13 there are some other smaller brands, some owned by Merisant,
14 or other store brands.
15 Q.    Okay.
16       Why don't you tell us a little bit about Splenda.
17 Does that have either saccharin or aspartame in it?
18 A.    It's completely different.  In much the same way that
19 aspartame is different to saccharin, sucralose in Splenda is
20 different to the two previous products on the market.
21 Q.    So the ingredient in Splenda is sucralose?
22 A.    Sucralose.
23 Q.    What is that?
24 A.    Sucralose is an ingredient that is a uniquely patented
25 product that is derived from sugar.  And through a patented

## Page 57

Debra Sandler - Direct (Zalesin)

1  process that McNeil and Tate & Lyle had invested many years
2  and many dollars, we came up with a patented process to
3  create a product that is made from sugar, and that is called
4  sucralose, and that is the primary ingredient in Splenda.
5  Q.    Okay.
6        What are the differences, if any, between sucralose
7  and the other no-calorie sweeteners, aspartame and
8  saccharin?
9  A.    There is in fact a different taste -- I mean, there
10  are a number of differences. I will tell you the two
11  primary differences.
12        There is a difference in taste, obviously. But the
13  most important is there is a difference in functionality.
14        Sucralose is heat stable, and this was the news, if
15  you will, that we brought to the industry, that now you had
16  a sweetener, a no-calorie sweetener that was heat stable but
17  would allow you to cook and bake with a no-calorie
18  sweetener, which heretofore had been very, very difficult,
19  because the prior two ingredients, aspartame and saccharin,
20  were not heat stable at very high levels of heat.
21  Q.    I think you mentioned before that the other products,
22  the Sweet'N Low, saccharin type products and the Equal or
23  aspartame products, are sold primarily in little paper
24  packets.
25  A.    Yes, they are sold primarily in packets. I don't have

BARBARA DACHMAN, RPR, OCR

## Page 58

Debra Sandler - Direct (Zalesin)

1  the exact numbers, but I think if you looked at the sales of
2  Equal, you will find that most of it is packet sales.
3  Q.    How does that break out for Splenda?
4  A.    Splenda is actually more like 60-40, sixty percent
5  packets. But 40 percent of the business is what we call the
6  granular business, which is a bit more -- something that we
7  advise people to sort of use it to cook and bake because you
8  don't have to worry about opening little packets. You can
9  just sort of scoop it out or pour it out.
10  Q.    Okay.
11        Tell us a little bit about the history of Splenda.
12  When was it first introduced into the worldwide market?
13  A.    Okay.
14        Splenda was first introduced in 1991 in Canada, so it
15  is still relatively new. It was introduced in Canada first.
16  It is sold in approximately 12 countries around the world,
17  and it was introduced in the U.S. market in 1999, September.
18  Q.    Are there any other retail brands anywhere in the
19  world that contain the ingredient sucralose that is found in
20  Splenda?
21  A.    No. It is a product -- it is a product that we -- an
22  ingredient that we invested in and that we own uniquely,
23  exclusively.
24  Q.    Now, to introduce sucralose and Splenda into the U.S.
25  market, did McNeil have to get any government or regulatory

BARBARA DACHMAN, RPR, OCR

## Page 59

Debra Sandler - Direct (Zalesin)

1  approval?
2  A.    Yes, it was FDA approved the year before we launched
3  in 1998, and then we launched it into the U.S. market in
4  1999.
5  Q.    And when you launched in 1999, via what distribution
6  channels did you first offer it for sale?
7  A.    We launched in supermarkets. Again, that's the
8  primary means of sale to consumers.
9  Q.    In 1999?
10  A.    Actually, in 19 -- 1999 we launched in stores. In
11  1998, prior to going with what we call our retail launch, we
12  sold the product on the Internet by way of -- through a
13  portal at our sister company LifeScan.
14  Q.    Okay.
15  A.    So we offered some of the products that had been
16  selling in Canada and other markets for sale in the U.S.
17  that way.
18  Q.    Okay.
19        And did you have a package that you shipped when
20  somebody ordered it over the Internet?
21  A.    Yeah, it was a small, sort of back-house operation.
22  We shipped ourselves to some markets, primarily in the U.S.
23  Q.    Let me show you Plaintiffs' Exhibit 51 and also 51(a).
24  A.    Yes.
25  Q.    Can you tell us what that is?

BARBARA DACHMAN, RPR, OCR

## Page 60

Debra Sandler - Direct (Zalesin)

1  A.    This looks like our Internet package. This is what we
2  originally sold in the U.S. market. They were shipped from
3  our plant to consumers who ordered the product on the
4  Internet.
5  Q.    Okay.
6        You sold that in the continental United States?
7  A.    Continental U.S.
8  Q.    Was it available outside the continental U.S.?
9  A.    It was not available anyplace else. Really, it was
10  primarily the continental U.S. As I mentioned, we had small
11  product supply. It was just an opportunity to get some
12  experience with consumers immediately following the FDA
13  approval. It was never shipped to Puerto Rico.
14  Q.    Okay.
15        Let me --
16        MR. ZALESIN:   May I have Plaintiffs' Exhibit 71,
17  please.
18  BY MR. ZALESIN:
19  Q.    I will talk a little bit about the history of Splenda.
20        MR. LoCASCIO:   Your Honor, just before this goes
21  to the witness, to the extent I'm not sure it's summarizing,
22  I think it might be testimony she hasn't given yet.
23        MR. ZALESIN:   This is just -- these are just
24  bullet points. All these figures I believe are in her
25  declaration, your Honor. This was, frankly, so she wouldn't

BARBARA DACHMAN, RPR, OCR

have to remember these exact percentages on the witness stand. It's just a demonstrative exhibit. There shouldn't be any doubt about these percentages. This is her testimony.

MR. LoCASCIO: I don't know whether they are accurate or not. The question is --

MR. ZALESIN: Well, we can ask the witness.

MR. LoCASCIO: The question is, the witness should be asked without having information in front of her that she can read, your Honor.

There are some issues, obviously, the one she has testified to, but if we have got handouts for the witness for the things that she's about to testify on -- we can ask any question we want, but in essence we are leading the witness.

MR. ZALESIN: Your Honor, this is the kind of thing that we do all the time in court. This is just a demonstrative. This is really, simply, again, to help the witness remember. This is a slide that she helped create of bullet points that are part of her testimony.

If you want her to try it from memory first, that's fine with me, but I think it's, frankly, just disrupting the examination.

THE COURT: This was prepared by this witness?

MR. ZALESIN: Well, we can ask.

BY MR. ZALESIN:

Q. Did you ask that this slide be prepared?

A. Yes.

In fact, we get our data from a source -- everyone gets their data -- or most people get their data from a source called IRI, Information Resources Incorporated. It's generally accepted in the industry. It's to read the market share. And this data is from IRI, and I asked my marketing department to give me the latest figures in terms of share from IRI.

MR. ZALESIN: May I proceed, your Honor?

THE COURT: Yes, okay.

MR. ZALESIN: Your Honor, actually, before I go further, would it be all right if we had an understanding that exhibits that are shown to the witness without objection are automatically in evidence, as opposed to moving each exhibit into evidence sequentially, or would you prefer that we move them as they are presented?

THE COURT: Well, they have been exchanged before this hearing.

MR. ZALESIN: Yes.

MR. LoCASCIO: They have been exchanged, your Honor, and it's obviously whatever your practice or preference is. But to the extent it's often just a housekeeping matter after the witnesses come off to make

sure they are in, I have no problem with things we have shown the witnesses and neither side objects to that are factual evidence in this case. With the demonstrative it might be a different issue; we will see how it comes out. But as a general matter, if things are going to the witness and neither side is objecting, I think it is easier for everyone to work it out.

THE COURT: They will be forming part of the record automatically, unless an objection is raised.

MR. ZALESIN: Thank you, your Honor.

THE COURT CLERK: I don't have a list.

MR. ZALESIN: Oh, we have an exhibit list.

THE COURT CLERK: No, I do have the defendants'. I don't have plaintiffs'.

THE COURT: So she can keep control, you know. (Handing.)

THE COURT CLERK: Thank you.

MR. ZALESIN: So with the first witness, Exhibits 1 and 2 were used?

MS. SANCHEZ: 1, 2, 1(a), 2(a), and 51, 5 1(a).

BY MR. ZALESIN:

Q. All right.

So tell us a little bit about the sales history of your product.

A. Okay.

The product was launched in the U.S. market, as I said, initially on the Internet. The retail launch of the product was in September of 1999.

Q. Nineteen ninety-nine or 2000?

A. I am sorry, 2000. I am getting the years confused. Please forgive me. September 2000.

And within the first 12 months we grew to a 14 percent share of the retail market.

In January of 2004, Splenda was at 45.2 share of the market. That actually is greater, as it says here, than both Equal and Sweet'N Low combined.

Q. I think you said this earlier, but is Splenda now the market leader in the United States?

A. Splenda is in fact the market leader, the retail market leader in the United States market.

Q. Okay.

And there is a bullet there about weekly share. What does that refer to?

A. Well, we look at our sales on a week-to-week basis to see how the product is performing. The last data that we got was for the week of February 8th, and we ran up to a 46.7 share, so the product continues to do well in the market.

From an overall perspective, I mean, it was launched, and we got about $32 million in sales in 2001 in the U.S.

Debra Sandler - Direct (Zalesin)                    65

1   and over 200 million at the end of last year, in retail
2   sales.
3   Q.     Are you satisfied with the sales performance of
4   Splenda?
5   A.     We are quite pleased with the performance, yes.
6   Q.     Now, that's the U.S. market as a whole?
7   A.     That's the U.S. market.
8   Q.     Let's talk about Puerto Rico specifically a little
9   bit.
10          Are you familiar with Exhibit 72 and the information
11  in it?
12  A.     Yes, I am.
13  Q.     Okay.
14          So tell us a little bit about the launch and sales
15  history of Splenda in Puerto Rico, please.
16  A.     Puerto Rico actually launched immediately after the
17  U.S. launch.  They launched in November of 2000.  They are
18  also the cur -- in this market, the market leader.  They
19  have a 35.1 percent market share, dollar share.  And they
20  also have seen a really sharp rise in sales since launch.
21  It was a $1.7 million business, which is about 30,000 cases,
22  in 2001, and almost five million dollars in 2003, which is
23  over 200,000 cases.  So it's grown quite well.
24  Q.     Are you familiar with the defendant in this case,
25  Merisant?

BARBARA DACHMAN, RPR, OCR

Debra Sandler - Direct (Zalesin)                    66

1   A.     Yes, I am.
2   Q.     Tell us about their business and specifically what
3   products they sell in Puerto Rico.
4   A.     It's my understanding that in the Puerto Rican market,
5   they market Equal and NutraSweet, both products containing
6   aspartame --
7   Q.     And do they also --
8   A.     -- sweetened with aspartame.
9   Q.     Do they have a --
10  A.     And they also market today a product called Same in a
11  blue package, and now as well in a yellow package.  The blue
12  package is similar in terms of sweetener to Equal and
13  NutraSweet, whereas Same has some of those products but also
14  has sugar.
15  Q.     And do you know how long the blue Same product has
16  been sold?
17  A.     I believe the blue Same product in fact was the market
18  leader prior to the launch of Splenda.  In terms of when it
19  was actually launched, I don't recall, but I do know that
20  the blue Same and the blue Equal were market leaders prior
21  to our launch.
22  Q.     All right.
23          And you said that the blue Same has the same
24  sweetening ingredient, aspartame, as Equal?
25  A.     The blue Same -- often in this category what you have

BARBARA DACHMAN, RPR, OCR

Debra Sandler - Direct (Zalesin)                    67

1   are some products with similar ingredients operating, and
2   blue Same is a value-priced version of Equal.  It is a
3   cheaper product as Same, if you will, ingredient, but
4   offered at a value price for the consumer.
5   Q.     Okay.
6          And just very generally, as your sales have risen in
7   the Puerto Rico market, your sales of Splenda as reflected
8   on Plaintiffs' Exhibit 72, what has happened to the share of
9   Merisant's various sweetener products in Puerto Rico?
10  A.     Well, as you might imagine -- I mean, as our share of
11  the market has grown, their share of the market has declined
12  really considerably as well.
13  Q.     Let's talk about the trade dress of these various
14  sweetener products.
15  A.     Sure.
16  Q.     Can you tell us about the packaging for the leading
17  sweetener brands?
18  A.     Okay.
19          Would you like me to start in any particular order?
20  Q.     Sure.  Why don't you start with the first one, the
21  Sweet'N Low.
22  A.     Okay.
23          Sweet'N Low -- Sweet'N Low has, as I said, been on the
24  market the longest of all the sweeteners.  It comes in a
25  primarily sort of pink and red box.  It's identified because

BARBARA DACHMAN, RPR, OCR

Debra Sandler - Direct (Zalesin)                    68

1   of the musical notes on it.  It's got a sort of treble clef
2   and staff on there --
3   Q.     Let me stop you there for one moment and distribute
4   Plaintiffs' 6.
5          So 6 and 6(a).
6          Is this the box for Sweet'N Low?
7   A.     Yes, this is.
8          As you see, it's got the, you know, pink packet on
9   there.  It's got a glass of iced tea and the Sweet'N Low
10  logo on the top with the musical treble clef.  This
11  particular box is 50 packets, called a granulated sugar
12  substitute.
13  Q.     And let me also show you Plaintiffs' Exhibits 26 and
14  26(a).
15          Can you tell us what that is?
16  A.     Yeah.
17          This is the packet that's located inside of the box of
18  Sweet'N Low (indicating).  Primary coloring is pink and red
19  with blue lettering.
20  Q.     Okay.
21          Now, you mentioned Equal is the leading brand of
22  aspartame.
23  A.     Aspartame, yes.
24          MR. ZALESIN:  Can I have Exhibits 10 and 10(a),
25  please.

BARBARA DACHMAN, RPR, OCR