### Page 149

Debra Sandler - Cross (LoCascio)

1  to what she just said.
2      MR. ZALESIN: Just when?
3      MR. LoCASCIO: Just now.
4      MR. ZALESIN: Can I see a copy?
5      MR. LoCASCIO: May I ask the question, your Honor?
6      MR. ZALESIN: May I see what it is before we
7  proceed?
8      THE COURT: Yes.
9      MR. ZALESIN: Your Honor, I don't think this is in
10 any way impeaching, but I will withdraw the objection.
11 That's fine.
12     THE COURT: Ask her if she recognizes her own
13 quote.
14 BY MR. LoCASCIO:
15 Q.  Miss Sandler, do you remember being in the *Ad Age 50*?
16 A.  I sure do.
17 Q.  It's an award, if you will.
18 A.  Um --
19 Q.  A recognition.
20 A.  An acknowledgment, yeah.
21 Q.  And you were quoted in the interview when this
22 piece -- before it came out.
23 A.  Um-hmm.
24 Q.  We have here -- it says the smaller budget at McNeil
25 for this product versus your work at PepsiCo --

BARBARA DACHMAN, RPR, OCR

### Page 150

Debra Sandler - Cross (LoCascio)

1  A.  Um-hmm.
2  Q.  -- necessitated you and your team develop an extremely
3  consistent message for the Splenda product and theme that
4  would be directed at a bull's-eye target.
5  A.  Yes.
6  Q.  It is that clarity that made the brand a phenomenal
7  success.
8  A.  Right.
9  Q.  The message: Splenda is made with sugar --
10 A.  Can I answer now?
11     MR. ZALESIN: Is that a quotation?
12 BY MR. LoCASCIO:
13 Q.  Miss Sandler --
14 A.  It's not a quotation.
15     MR. ZALESIN: Objection. That's not a quotation.
16 This is entirely improper. It is what *Ad Age* has to
17 say.
18     THE COURT: It's not a quotation because it's not
19 in quotes.
20     THE WITNESS: It's not in quotes. If you notice
21 what was in quotes, "bull's-eye target" and "phenomenal
22 success" were words that I specifically used.
23     THE COURT: It seems to be an interpretation by
24 the reporter, you know, of what she is saying there.
25     THE WITNESS: If I might mention --

BARBARA DACHMAN, RPR, OCR

### Page 151

Debra Sandler - Cross (LoCascio)

1      MR. LoCASCIO: I asked her if she can explain, and
2  that's fine, your Honor.
3  BY MR. LoCASCIO:
4  Q.  Miss Sandler, my question is, when you had the
5  conversation, did you say to the reporter "made with sugar"?
6  A.  Of course not.
7  Q.  If you had said that, that would be false.
8  A.  That would be false.
9  Q.  Okay. I appreciate it. We are all clear on that.
10     The reporter got it wrong, is what you are saying.
11 A.  That's correct.
12 Q.  Did you ever call anyone or say anything that this was
13 incorrectly cited or quoted?
14 A.  We did not write a letter to the reporter, no. I also
15 did not have an opportunity to see this before it was
16 printed. It was an award and I was grateful to have been
17 nominated.
18     However, one of the things is that, you know,
19 sometimes people, they are not as close to our category. I
20 say "made from," they say "made with." They may not have
21 picked up the important distinction. But I would never say
22 "made with sugar."
23 Q.  It's an important distinction.
24 A.  Made from versus made with.
25 Q.  The difference being one, made with, has sugar in the

BARBARA DACHMAN, RPR, OCR

### Page 152

Debra Sandler - Cross (LoCascio)

1  box -- correct?
2  A.  Well, the key thing is -- yeah, it is not made with
3  sugar. That's the primary reason. I wouldn't say "made
4  with sugar."
5  Q.  Because there is no sugar in the box.
6  A.  There is no sugar.
7  Q.  And Same with sugar says "made with sugar," right?
8  A.  That's correct.
9  Q.  Because there is sugar in the box.
10 A.  That's correct.
11 Q.  The reporter may have gotten it wrong, but am I
12 correct that the message you want to send with Splenda is a
13 close association between Splenda and sugar?
14 A.  Yeah. If you notice, everyone in the category
15 references sugar on their packaging. I think the Equal box
16 says "tastes just like sugar."
17     We are, in fact, "made from sugar and tastes like
18 sugar."
19     So, yeah, it's a sugar substitute.
20 Q.  And do you believe that the packaging, in particular
21 the yellow package of the Splenda brand, makes any
22 functional connection between sugar and the consumer?
23 A.  A functional connection? Can you -- I don't know what
24 you mean.
25 Q.  Sure.

BARBARA DACHMAN, RPR, OCR

**Debra Sandler - Cross (LoCascio)** 153

1  Earlier you testified that background colors had some
2  functional message to consumers. That's what I heard you
3  say.
4  A.  Well, yeah. They are soft, they are appealing, they
5  are -- you know, they are warm.
6  Q.  You said blue had an association that that was
7  aspartame.
8  A.  Yes.
9  Q.  And you said pink was Sweet'N Low.
10 A.  That's correct. But that's with saccharin.
11 Q.  Do you believe yellow has any association in
12 consumers' minds with sugar?
13 A.  With sugar? No. I think, as we showed in the survey,
14 pretty much everyone that got the survey was aware of sugar,
15 and less than -- I mean, seven percent associated that color
16 with sugar. Most consumers, again, think of sugar as white.
17 Q.  The product.
18 A.  Yeah, the product packaging. Again, it refers to how
19 they interact with it. Largely in food service, but the
20 packages are white.
21 Q.  When you buy at the store, you don't buy that little
22 packet like we talked about before. That's food service.
23 A.  Um-hmm.
24 Q.  You mentioned that you don't -- your view of the
25 competitive landscape doesn't include sugar; is that right?

BARBARA DACHMAN, RPR, OCR

**Debra Sandler - Cross (LoCascio)** 154

1  A.  Yeah, we tend to -- when we look at our market share,
2  we are looking at low-calorie sweeteners as a separate
3  entity.
4  Q.  So you don't consider sugar one of your main
5  competitors.
6  A.  A competitor -- we are all sugar substitutes, so there
7  is some interaction. But it's not the competitor. It's not
8  how we measure ourselves.
9  Q.  Let me just make sure I am clear.
10    Do you believe you are competing with sugar, with
11 Splenda, or not?
12 A.  No, I am competing with Equal and Sweet'N Low, and for
13 the most part the other store brands' no-calorie sweeteners.
14 Q.  Miss Sandler, you talked about this brand equity
15 study. You had two pages of it --
16 A.  Seven pages.
17 Q.  -- were put into evidence.
18    MR. LoCASCIO: This is something that we also got
19 when we got the documents from McNeil on Tuesday.
20    Your Honor, we had an agreement that some things would
21 not be shown to the other side's clients, so that's why I am
22 showing it to him privately.
23    Your Honor, this is another document we received from
24 McNeil. Two pages of this were relied upon by Miss Sandler.
25 There are several other pages we think are relevant to this

BARBARA DACHMAN, RPR, OCR

**Debra Sandler - Cross (LoCascio)** 155

1  case. I'd like to offer the whole document, move it into
2  evidence. I don't know that I have a particular concern one
3  way or the other as to if the other page is not used or seen
4  by anyone else, but to the extent this is the entire
5  document as we received it, I believe it should go into
6  evidence as an entire document.
7     I'm not sure, frankly, if anything in here is all that
8  confidential. That's not my plight. But I just want to
9  make sure that I have the opportunity to put this document
10 into evidence.
11    MR. ZALESIN: Let me explain the situation, your
12 Honor.
13    The segmentation study that we offered on
14 Miss Sandler's direct is an extremely voluminous study. You
15 saw how many questions were asked. We asked about one line
16 in that question.
17    In fact, the study itself -- the report is so
18 voluminous that there was no paper copy of the report. It
19 only existed on a CD ROM. It is a gigantic report.
20    We gave Mr. LoCascio, under an agreement that it would
21 be treated on an attorney's-eyes-only basis -- a copy of
22 that CD. I gather that this is one excerpt of the data from
23 that CD Rom.
24    MR. LoCASCIO: This is one Power Point file from
25 the collection of documents.

BARBARA DACHMAN, RPR, OCR

**Debra Sandler - Cross (LoCascio)** 156

1     MR. ZALESIN: I haven't had time to examine the
2  contents of this particular roughly two-inch thick document,
3  but the purpose of the agreement -- and we had a reciprocal
4  agreement with respect to certain documents provided to
5  McNeil by Merisant -- was that these contain confidential
6  trade secret information which is on the one hand not
7  relevant to these proceedings, don't go to the Splenda trade
8  dress issues, but on the other hand are proprietary and
9  could damage one side or the other in its business if its
10 competitor were to learn this information.
11    Again, quite frankly, I don't know what is in this
12 particular document. What I am suggesting at this point in
13 time is that we show the witness only the two particular
14 pages that Mr. LoCascio wants to examine her about -- I have
15 no problem with that -- and we deal later with whether they
16 go into the public record. But I see no reason to put the
17 entire two-inch document into the record if he is only going
18 to ask her about two pages of it.
19    MR. LoCASCIO: Your Honor, this is a document
20 produced by the witness' company, turned over to us Tuesday.
21 We have questions about it.
22    If the issue is whether it should be under seal,
23 that's one thing. And our agreement is confidential,
24 financial information, like Merisant's margins, McNeil's
25 margins, things that you would expect you don't want

BARBARA DACHMAN, RPR, OCR

Debra Sandler - Cross (LoCascio) 157

1  business people to have access to.
2      Some blanket prohibition on documents that talk about
3  their marketing campaign was not our agreement. We didn't
4  see it before we made the agreement, but certainly -- you
5  know, I am not sure of the measurement on the two inches,
6  but this is the document. It's from the files. We want to
7  question the witness about it. I think it would be highly
8  unusual to enter two pages into the record when it's a
9  McNeil Splenda Sweetener --
10     THE COURT: But that's not what he's saying. He's
11 saying that he hasn't had an opportunity to review the
12 entire agreement to make sure that there is no irrelevant
13 trade secret information going to the public record.
14     What he says is you are free now to question on those
15 two pages that are relevant to the issues before the Court.
16 He will review that and then I will decide, you know,
17 whether the whole thing goes into evidence or not.
18     MR. LoCASCIO: As long as we are clear it is what
19 is in the public record.
20     My concern is that I have to now separate the exhibits
21 to question the witness doesn't seem like it makes a lot of
22 sense to me.
23     THE COURT: Well, the thing is that you know what
24 you are going to be questioning the witness about.
25     MR. LoCASCIO: I have two or three ideas, correct,

BARBARA DACHMAN, RPR, OCR

Debra Sandler - Cross (LoCascio) 158

1  your Honor.
2      THE COURT: Well, then you question the witness
3  about those pages that you believe are relevant to the
4  issues in the case, and then afterwards we will decide
5  whether the whole thing goes into evidence or not.
6      MR. LoCASCIO: Logistically, do you want me to
7  give the Court the whole document for now, or just pull
8  pages out, your Honor?
9      THE COURT: Well, just pull out the two pages that
10 you are going to be asking the witness about.
11     MR. LoCASCIO: We will relabel that.
12     Pardon me, your Honor. This is just going to take a
13 second. There are no page numbers, your Honor. It makes it
14 a little trickier.
15     THE COURT: Do you want me to take a break now --
16     MR. LoCASCIO: I am on the last one, your Honor.
17 If you'd like, we can do this and then maybe take a break
18 and then clean up the mess we have just made?
19     MR. ZALESIN: I am ready to go.
20 BY MR. LoCASCIO:
21 Q.  Okay, thanks for your patience, Miss Sandler. One
22 second.
23     MR. LoCASCIO: I am going to hand up Exhibit WW,
24 which is now a cover page and three pages, your Honor, from
25 that presentation.

BARBARA DACHMAN, RPR, OCR

Debra Sandler - Cross (LoCascio) 159

1      They all look a lot alike.
2      This is Exhibit WW, your Honor.
3  BY MR. LoCASCIO:
4  Q.  Okay.
5      Miss Sandler, let me start off from scratch here.
6      We talked first about whether sugar is a competitor of
7  Splenda or not. Do you remember that?
8  A.  Um-hmm.
9  Q.  On the first page after the cover of Exhibit WW, I'd
10 like for you to read for me the three things listed under
11 "Key Competitive Brands."
12 A.  On what page? I am sorry.
13 Q.  It's the second page of the exhibit you have. There
14 is no bullet. It should say at the top -- here, I'll put it
15 up on the ELMO. This might make life a lot easier for all
16 of us.
17 A.  The four brands?
18 Q.  Yes.
19     It says, "Sugar, Sweet'N Low and Equal," correct?
20 A.  Yeah. In the study we asked people -- on the
21 questionnaire, we did ask about sugar.
22 Q.  And in this study, the McNeil brand is Splenda, and
23 the key competitive brands were listed on this document and
24 in this study as sugar, Sweet'N Low and Equal. Correct?
25 A.  Yeah. Again, it's a sweetness segmentation study.

BARBARA DACHMAN, RPR, OCR

Debra Sandler - Cross (LoCascio) 160

1  That's why.
2  Q.  You mentioned when we talked before -- it may have
3  been on direct -- about Sugar Twin, you said Sugar Twin has
4  no awareness. It's not competitive, et cetera; correct?
5  A.  That's correct.
6  Q.  I'd like you to turn to the next page of this study.
7      Do you see, Miss Sandler, where it says what the
8  awareness of respondents was to Equal, 99 percent; Sweet'N
9  Low, 96 percent; NutraSweet, 88 percent; Splenda,
10 66 percent; and then the next one is Sugar Twin, and it says
11 65 percent awareness.
12     Do you see that?
13 A.  Yes, I do.
14 Q.  So at least when this study was taken, someone did a
15 study of whether consumers were aware of particular brands,
16 and Sweet'N Low was 96, Equal 99, but Sugar Twin was
17 65 percent, Splenda was 66 percent. Correct?
18 A.  Um-hmm. Yes. That's correct.
19 Q.  And the last page of Exhibit WW, we will turn to that.
20     The upper left corner -- this is from the McNeil
21 study -- it talks about functional attributes of Splenda.
22 One of them is "like sugar."
23 A.  Um-hmm.
24 Q.  And we've got four bullets under that: Made from --
25 this is the last page in the upper left -- made from,

BARBARA DACHMAN, RPR, OCR

**Page 161**

Debra Sandler - Cross (LoCascio)

1 measures like, feels like, used like. And then we skip one
2 and we say "it tastes like sugar also." Do you see that?
3 A. Yes, I do.
4 Q. And then the only other thing listed here in this
5 McNeil study under functional attributes is yellow package,
6 correct?
7 A. Yes.
8 Q. Splenda is competing today in Puerto Rico with Same
9 with sugar, right?
10 A. That's correct.
11 Q. And as a result, Splenda is competing on price for a
12 product that either has sugar in the box, made with sugar,
13 or has an association made from sugar, which is on the
14 Splenda box; is that correct?
15 A. That's correct.
16 Q. So for consumers that have an interest in a sugar
17 substitute that has some tie to sugar -- made from, made
18 with -- right now there's a competitor to Splenda, Same with
19 sugar. Fair?
20 A. Yeah, I think so. If you want something that has some
21 closer sugar association, made with sugar.
22 Q. And until Same with sugar came out, there was no other
23 product here in Puerto Rico that tailored toward that
24 market, people with an interest in a sugar-like sweetener,
25 made from, made like, made with.

BARBARA DACHMAN, RPR, OCR

**Page 162**

Debra Sandler - Cross (LoCascio)

1 A. Right, except that everything else does say "tastes
2 like."
3 Q. And it's fair to say, in your understanding of this
4 marketplace, that people generally think sugar substitutes
5 try to taste like sugar -- that's the point --
6 A. Um-hmm.
7 Q. -- but they are interested in or are becoming more and
8 more interested in what it's made from. Fair?
9 A. I don't know that I could say that categorically.
10 Q. Do you believe that in today's market, people are
11 interested in a more healthy alternative to sugar
12 substitutes?
13 A. I think in general people are looking for healthy
14 alternatives, yes, that's correct.
15 Q. More natural alternatives.
16 A. Yep, some of them are.
17 Q. For those people, is it your understanding at Splenda
18 that they make an association between a healthier lifestyle
19 or a healthier product and the Splenda brand?
20 A. I think that people take sugar substitutes in general
21 as a healthier alternative to sugar, because there are no
22 calories in sugar substitutes. The difference is that
23 Splenda, because it's made from sugar, the key difference is
24 the usage property that you can now cook and bake with a
25 no-calorie sweetener, which you could not do before, and

BARBARA DACHMAN, RPR, OCR

**Page 163**

Debra Sandler - Cross (LoCascio)

1 that is, from a performance perspective, that's been the
2 news for Splenda, so that it does perform more like sugar.
3 Q. Miss Sandler, there have been -- there's been news
4 coverage and other press related to Splenda being a
5 healthier alternative inside the sugar substitute market
6 that you are aware of, right?
7 A. I am aware of that.
8 Q. And you have seen data that consumers belief Splenda,
9 because it's made from sugar, as it claims on the box, is
10 healthier than some other choices in this sweetener
11 marketplace. You've seen that data, correct?
12 A. I have seen that.
13  I will also tell you that I have seen data that
14 consumers are very clear that it's a sugar substitute. The
15 minute you tell them no calories, they know.
16 Q. Miss Sandler, your marketing campaign is to people
17 that Splenda is made from sugar, correct?
18 A. Made from sugar, so it tastes likes sugar.
19 Q. And you are targeting people that want a more natural
20 alternative, in some respects, of a product that comes from
21 sugar. Fair?
22 A. I think that's incorrect. I am not targeting people
23 that want it more natural. I want people who are in the
24 category who want to be able to use it more broadly, who are
25 looking for a different taste and they are looking to be

BARBARA DACHMAN, RPR, OCR

**Page 164**

Debra Sandler - Cross (LoCascio)

1 able to cook and bake. As I said, the cooking and baking
2 piece of our business is roughly 60 percent.
3 Q. Cooking and baking is a lot of your advertising and a
4 lot of your marketplace.
5 A. That's cor --
6 Q. That's not -- that's this box here, the granular box
7 with the pie and the cereal on it, right?
8 A. That's correct.
9 Q. That's not the box at issue in this case, right?
10 A. No, but you asked me about what I was marketing to, so
11 that is what I was responding.
12 Q. Just so I understand your position from McNeil, the
13 box that is the granular box with pie and cereal, that's not
14 a part of what you are asserting is your trade dress in this
15 case, right?
16 A. No. We are talking about the packets.
17 Q. Miss Sandler, you showed some TV ads before.
18 A. Um-hmm.
19 Q. You talked about all the money that Splenda had spent
20 on television ads. And I take it the reason for that was
21 that should somehow support the idea that Splenda has been
22 advertised a lot and that it should be subject or afforded
23 some rights here in this court. Fair?
24 A. Well, it was just a statement of fact, that I have
25 invested a lot to establish the brand.

BARBARA DACHMAN, RPR, OCR

## Page 165

Debra Sandler - Cross (LoCascio)

1  Q.   This is the first of those advertisements you showed,
2  Plaintiffs' Exhibit 35.
3  A.   Yeah, that's the launch.
4  Q.   If you could pull that up, I would appreciate it.
5  A.   Okay.
6  Q.   Plaintiffs' Exhibit 35, there is a name for this. Why
7  don't you tell me what it is, because I am sure I will get
8  it wrong. The idea of here's clips from a television
9  commercial with the test.
10 A.   It's called story board.
11 Q.   Story board.
12 A.   Um-hmm.
13 Q.   And what this shows is --
14 A.   It shows some of the key visuals from the commercial.
15 Q.   And the text. That's the words people are saying
16 while the commercial is running.
17 A.   Yes.
18 Q.   When you look at this, plaintiffs' Exhibit 35, at the
19 top we have got three images, outside scenes, and then we go
20 down a rung and we have inside scenes, and then we have what
21 looks to be -- this is the third row, farthest on the
22 left -- a restaurant sugar jar, a pourer -- is that what
23 that looks like to you?
24 A.   Yes.
25 Q.   And then a white streak going out, and then the last

BARBARA DACHMAN, RPR, OCR

## Page 166

Debra Sandler - Cross (LoCascio)

1  one, it appears to say "granulated sugar," with something
2  pouring on it. Is that what that is?
3  A.   Yes.
4  Q.   And then the bottom row has a box, and this is the
5  advertisement -- first TV, the launch ad --
6  A.   That's correct.
7  Q.   -- that's not the box in the case. That is not the
8  packet box.
9  A.   Yeah, we couldn't show both, so we showed the granular
10 box.
11 Q.   Okay.
12    So this is, I gather, suggesting that you replace your
13 sugar pourer with granular.
14 A.   Yes, um-hmm.
15 Q.   So this ad, Plaintiffs' 35, was not an ad for the
16 trade dress in this case. This was for the baking or
17 granular box.
18 A.   This was for the launch of the trademark. This was
19 for the launch of Splenda. This is when we first introduced
20 people to the concept to tell them who we are, what the
21 brand looks like, what to look for. It clearly says here,
22 "Introducing Splenda, no-calorie sweetener. It's made from
23 sugar so it tastes like sugar." But it's not sugar. It's
24 Splenda no-calorie sweetener.
25    So this was when we were introducing. It didn't show

BARBARA DACHMAN, RPR, OCR

## Page 167

Debra Sandler - Cross (LoCascio)

1  every single package that we have. We showed the granular.
2  As I said, that is the -- roughly 60 percent of the
3  business.
4  Q.   Miss Sandler, you understand you are here today trying
5  to enforce alleged rights in a particular package design,
6  correct?
7  A.   That's correct.
8  Q.   And it is, as you just said, not the granular design,
9  it's the packet box.
10 A.   Um-hmm.
11 Q.   Just so that we are clear, this advertisement never
12 shows an image to consumers of the box at issue in this
13 case.
14 A.   No.
15 Q.   And the other ad that you showed was Plaintiffs'
16 Exhibit 36. This is called "Anywhere You Use Sugar," is the
17 name of this ad.
18    Do you have it?
19 A.   Yep.
20 Q.   Okay, great.
21    We have got some scenes on top, a heart, people, a
22 child, and then we have the picture of the box. This is the
23 fourth frame.
24 A.   That's correct.
25 Q.   Again, that's not the box in the case. That's the

BARBARA DACHMAN, RPR, OCR

## Page 168

Debra Sandler - Cross (LoCascio)

1  food serv -- or pardon me, the granular box, which is pie
2  and cereal.
3  A.   Yeah.
4     It's also yellow with a white cloud around my logo,
5  graduated logo. The food, you are right, it's not the
6  packet box. The food is different. But it is the yellow
7  Splenda box with the blue logo and the white cloud.
8  Q.   This is the box that stands up, you called it
9  vertically, as opposed to the box that is at issue in this
10 case, which is horizontal.
11 A.   That's correct.
12 Q.   And then there is another picture of the box -- there
13 is actually three before this ad is over.
14 A.   Yes.
15 Q.   We have a small -- another small child.
16 A.   Yes.
17 Q.   Here again the ad shown -- the box shown in this ad is
18 not the box at issue in this case.
19 A.   That's correct.
20 Q.   It's the granular box.
21 A.   That's correct.
22 Q.   And then there is one more. You may have to squint a
23 little to see this one at the bottom, but the last frame of
24 the ad, "Think sugar, say Splenda," shows the box again,
25 granular, not the one at issue here.

BARBARA DACHMAN, RPR, OCR

**Page 169**

Debra Sandler - Cross (LoCascio)

1  A.   Yeah. That's correct.
2  Q.   The slogan, "Think sugar, say Splenda," it's fair to
3  say that's an interesting -- or it's designed to send a
4  message to consumers, instead of using sugar --
5  A.   Yeah. It's a sugar substitute. It's a sugar
6  substitute, yeah.
7  Q.   When you would normally think to put sugar in
8  something, put Splenda in there.
9  A.   Yeah, substitute the sugar with Splenda.
10 Q.   So you agree with my statement?
11 A.   Yes.
12 Q.   You talked about Plaintiffs' Exhibit 15, which is the
13 trade publication flier for the launch of Same with sugar.
14 A.   I have it.
15 Q.   Do you have it up?
16 A.   Yes.
17 Q.   Okay.
18      The first page is a picture of the box. It says,
19 "97 percent sugar."
20 A.   Yes.
21 Q.   And this is the one that has the translation that was
22 already attached for the plaintiffs on the back.
23      This is -- did you call it a sell sheet?
24 A.   Yes, we call these sell sheets. Basically it's what
25 is produced for the salesperson to talk about to the

BARBARA DACHMAN, RPR, OCR

**Page 170**

Debra Sandler - Cross (LoCascio)

1  retailer.
2  Q.   And on the back, in the middle, there is a section
3  that says, "Same with sugar," correct?
4  A.   Yes.
5  Q.   That's the brand name we are talking about, the
6  product, Same with sugar --
7  A.   Same. No, it's not called Same with sugar on the box,
8  but it's, yeah, Same. I assume that's meant to
9  differentiate it from the others.
10 Q.   It's -- the other one is a different product. This is
11 Same, has sugar in the box. We mentioned before, the front
12 of the box says, "Made with sugar."
13 A.   Yeah.
14 Q.   And in the trade flier, it says, "Same with sugar."
15 That's the words right there.
16 A.   Um-hmm.
17 Q.   And it has prices.
18 A.   Yes.
19 Q.   The 50 pack, the 100 pack, and the 200 pack.
20 A.   Yes.
21 Q.   The price on the left is the price of Same with sugar.
22 The price on the right says "competidor," or "competitor" in
23 the translation, and your testimony was that's the price
24 point for Splenda.
25 A.   Yes.

BARBARA DACHMAN, RPR, OCR

**Page 171**

Debra Sandler - Cross (LoCascio)

1  Q.   Is that the retail price or the wholesale price?
2  A.   That's the wholesale price.
3  Q.   So that price is not what it's sold to consumers for,
4  that's what it's sold to the Amigo or the Grande for.
5  A.   Um-hmm.
6  Q.   So do you know on the 50 pack what the price is to the
7  consumer at Grande or Amigo or Pueblo?
8  A.   Well, no, I don't, because the decision, the market
9  decision is a retailer's choice. Whether they take
10 20 percent, 30 percent, 50 percent, that's the retailer's
11 decision.
12 Q.   Okay.
13      There is some margin above and beyond that, multiplied
14 by that, a percentage, and that's what the retailer charges.
15 A.   Yes.
16 Q.   But on the wholesale price -- so this is less than
17 what the consumer would pay -- right now in the store, if I
18 were to buy Same with sugar, the retailer would have paid
19 15 percent less for the 200-pack box, 14 percent less for
20 the 50-pack box, and 13 percent less for the 100 box.
21      Is that what this indicates?
22 A.   Yes.
23 Q.   Okay.
24      Have you personally looked at the actual retail market
25 prices for these products here in Puerto Rico?

BARBARA DACHMAN, RPR, OCR

**Page 172**

Debra Sandler - Cross (LoCascio)

1  A.   I have not done a market tour, no.
2  Q.   Do you have any idea if those numbers are larger for
3  retail consumers, or smaller? The delta in price between
4  what people are having to pay for Splenda, what people are
5  paying for Same with sugar.
6  A.   I'm not sure I understand the question. Could you ask
7  it again? I am sorry. Are you asking about the retail
8  price to consumers?
9  Q.   I am.
10 A.   Okay.
11 Q.   Do you know if the difference is more or less --
12 A.   Than these percentages here.
13 Q.   Yes.
14 A.   I would guess that they are about the same, only
15 because the retailer for the category tends to take one
16 margin, and so more than likely this would probably be about
17 the same.
18 Q.   So the same margin or the same markup would mean that
19 the consumers are looking at the same price difference.
20 A.   Yes. Yes.
21 Q.   They go to the store and they see Splenda and they see
22 Same with sugar. The price marked underneath on the little
23 sticker on the shelf is going to be 15 percent less,
24 roughly, for Same with sugar than it would be for Splenda.
25 A.   That's correct.

BARBARA DACHMAN, RPR, OCR

Debra Sandler - Cross (LoCascio)

173

1  Q.   And for a product like the 200 pack, we are talking
2  about a dollar, or after the markup maybe closer to a dollar
3  and a quarter or so a box.
4  A.   I'd have to take your word for that. My math is not
5  that good.
6  Q.   Okay.
7       It's at least a dollar, the retail.
8  A.   Yes.
9  Q.   Miss Sandler, would you describe the granular box and
10 the packet box, and then maybe even the packet itself, as a
11 family of Splenda marks?
12 A.   The Splenda granular and the Splenda packet?
13 Q.   Yes.
14 A.   Yes.
15 Q.   They are related.
16 A.   Yes.
17 Q.   They have similar elements, but there are some things
18 that are different about them.
19 A.   Yes.
20 Q.   Do you understand in this case whether McNeil is
21 seeking protection for all of those marks or just the box
22 with the packets?
23 A.   It's my understanding what is at issue here is the
24 packet box.
25 Q.   You talked on your direct examination about PKU, which

BARBARA DACHMAN, RPR, OCR

Debra Sandler - Cross (LoCascio)

174

1  is a genetic disorder that a small percentage of the
2  population has.
3  A.   Yep.
4  Q.   And you described it in a way that said if people eat
5  particular products, they can be harmed quite significantly.
6  A.   Yes.
7  Q.   You didn't say what those products were, other than
8  aspartame, which is what is in Equal and in Same with sugar
9  and other sugar substitutes.
10      What causes people with PKU to have health problems is
11 protein, right?
12 A.   Okay.
13 Q.   You don't know?
14 A.   PK -- phenylalanine is a form of protein, yes.
15 Q.   Phenylalanine is a form of protein.
16 A.   Yes.
17 Q.   And if your body can't metabolize -- you don't have
18 the enzyme for phenylalanine, you have PKU, and as a result
19 you could suffer health consequences, and the FDA says any
20 product that has phenylalanine in it has to have a warning.
21 A.   That's correct.
22 Q.   So people -- this is a very small percent of the
23 population.
24 A.   I think I did state that.
25 Q.   It's one out of 15,000 people. Do you know that?

BARBARA DACHMAN, RPR, OCR

Debra Sandler - Cross (LoCascio)

175

1  A.   I know it's a very small percentage of the population.
2  Q.   In all of Puerto Rico, that would be about 267 people.
3  A.   Yes.
4       As I said, it's a small percentage. But it's
5  important enough that it is caused to be labeled.
6  Q.   Sure.
7       And it is labeled that way, and Same with sugar is
8  labeled in accordance with FDA requirements, correct?
9  A.   Absolutely.
10      If the consumer takes the time to read the package,
11 they will see it on there under the nutritional facts
12 statement.
13 Q.   And that's where you would expect it to be, correct?
14 A.   That's where it's supposed to be.
15 Q.   And that's exactly the text of what the FDA says
16 should be on the box, right?
17 A.   That's correct.
18      I think what I testified earlier, though, is that
19 given the fact that consumers are thinking that they are
20 picking up the Splenda, that they might not in fact take the
21 time to study. They might pick it up thinking this is what
22 this is.
23 Q.   Someone who doesn't read the label.
24 A.   Someone who is not taking the time to study, not
25 someone who is not reading the label. The fact that you are

BARBARA DACHMAN, RPR, OCR

Debra Sandler - Cross (LoCascio)

176

1  not taking the time -- you have done the homework here
2  because it was a new product that was introduced, but you
3  picked this up by accident.
4  Q.   Miss Sandler, if you pick it up by accident, that
5  means you didn't read the box, correct?
6  A.   That's correct. You picked it up because you thought
7  it was something else.
8  Q.   By not reading the box, right?
9  A.   That's correct.
10 Q.   People with PKU can't eat chicken, they can't eat
11 eggs, they can't eat cheese, they can't eat nuts, they can't
12 eat a lot of things. Right?
13 A.   That's correct.
14 Q.   It's a very unfortunate disorder.
15 A.   Yes.
16 Q.   Those people are particularly sensitive to what they
17 are buying, more so than the average consumer. Correct?
18 A.   I would say that's true.
19 Q.   You have several boxes up there. I think you have
20 also got some -- I don't know if you have got pictures.
21      You have Sugar Twin handy, right?
22 A.   Right here (indicating).
23 Q.   Okay.
24      Sugar Twin comes in a yellow box with white and blue
25 lettering, correct?

BARBARA DACHMAN, RPR, OCR

Debra Sandler - Cross (LoCascio)          177

1   A.   Um-hmm.
2   Q.   Yes?
3   A.   Yes, that's correct.
4   Q.   And it has a white coffee cup on the front --
5   A.   Um-hmm.
6   Q.   -- and it has a yellow packet on the front, and the
7   yellow packet has blue lettering on the front.
8   A.   Correct.
9   Q.   And over in the corner, that looks like a glass of
10  iced tea, right?
11  A.   That is correct.
12  Q.   Do you have the Sweet'N Low box?
13  A.   Yes, I do.
14  Q.   Sweet'N Low's box has a cup of coffee on it, correct?
15  A.   Um-hmm.
16  Q.   It has a glass of iced tea, correct?
17  A.   Correct.
18  Q.   Does it also have a picture of the packet on it?
19  A.   Yes, it does.
20  Q.   Other than Equal's strawberry box, do all the other
21  boxes you are familiar with that sell packets have a cup of
22  coffee on them?
23  A.   Yeah, a lot of them do. It's the primary way the
24  packets are used.
25  Q.   In the U.S., a lot of other products have iced tea on

BARBARA DACHMAN, RPR, OCR

Debra Sandler - Cross (LoCascio)          178

1   them.
2   A.   Um-hmm.
3   Q.   Are you familiar with the market for Puerto Rico and
4   Latin America and whether or not any of the packets
5   specifically targeted for this market show iced tea?
6   A.   Well, you said that Sugar Twin is here, so, yes, it
7   has the iced tea there.
8   Q.   Same with sugar doesn't have an iced tea cup or glass
9   on the front of it, does it?
10  A.   No, I was guessing that that was orange juice. I am
11  not really sure.
12  Q.   If you look at that box closely right above the orange
13  juice, it says "serving suggestion," right? One side is in
14  English, one is in Spanish.
15  A.   Yes, yes, it does. I didn't notice that before.
16  Q.   In your experience, it's like a cereal box. A serving
17  suggestion means this is your healthy breakfast, this is how
18  you eat this product with other things.
19  A.   Yeah.
20  Q.   In this case, a cup of coffee for your Same with
21  sugar, a bowl of fruit, a glass of juice, healthy breakfast.
22  Fair?
23  A.   Okay. Yeah, okay.
24  Q.   So there is no iced tea on this.
25  A.   No.

BARBARA DACHMAN, RPR, OCR

Debra Sandler - Cross (LoCascio)          179

1   Q.   And there is no -- there is no -- the Splenda box has
2   a little stamp in the bottom left corner. You called it a
3   seal.
4   A.   Yeah.
5   Q.   Remember? It's a round logo.
6   A.   Yeah.
7   Q.   What color is that on the Splenda box?
8   A.   It's brown and white and blue.
9   Q.   Same with sugar, bottom left corner, it's a red flag
10  or banner, right?
11  A.   Um-hmm.
12  Q.   Yellow letters?
13  A.   Yes, the "sugar" is in yellow and the "made with" is
14  in red.
15  Q.   "Made with sugar."
16  A.   Um-hmm.
17  Q.   Because there is sugar in that box.
18  A.   Um-hmm.
19  Q.   When you look at the marketplace for the continental
20  United States, it doesn't include Same with sugar, right?
21  A.   I am sorry?
22  Q.   It doesn't include Same or Same with sugar.
23  A.   No, it does not.
24  Q.   And in this market, Puerto Rico, the product that
25  sells the most boxes of sugar substitute is Same. That's

BARBARA DACHMAN, RPR, OCR

Debra Sandler - Cross (LoCascio)          180

1   the brand name, right?
2   A.   That's correct.
3        MR. LoCASCIO: Give me one second, your Honor?
4   One last thing.
5   BY MR. LoCASCIO:
6   Q.   Your ads for Same -- I am sorry. You don't have ads
7   for Same with sugar, that's for sure.
8        Your ads for Splenda, they don't say, "Grab the yellow
9   package. Go for the yellow package," or anything that
10  specifically audibly tells people to associate yellow with
11  Splenda, do they?
12  A.   No.
13  Q.   You are familiar with Owens Corning, "put your house
14  in the pink," the pink fiberglass people?
15  A.   Yes.
16  Q.   That's an ad campaign that specifically targets the
17  color they are sending a message to their customers with, in
18  the ads.
19  A.   Um-hmm.
20  Q.   Splenda doesn't do that, specifically tying yellow to
21  their ad campaign, do they?
22  A.   No, we didn't specifically say ask for yellow.
23  Q.   Or anything like "grab the yellow box," or anything
24  like that.
25  A.   No.

BARBARA DACHMAN, RPR, OCR

**Page 181**

Debra Sandler - Redirect (Zalesin)

1  MR. LoCASCIO: No further questions, your Honor.
2  MR. ZALESIN: We have a brief redirect, your
3  Honor.
4  REDIRECT EXAMINATION
5  BY MR. ZALESIN:
6  Q. Do you have Exhibit 2, or any one of these Same yellow
7  boxes in front of you, Miss Sandler?
8  A. Yes.
9  Q. Mr. LoCascio refers to this product as "Same with
10 sugar" whenever he refers to it. What is the name of this
11 product?
12 A. Same.
13 Q. Does it say "Same with sugar" anywhere on the box?
14 A. No.
15 Q. It says down here -- well, the brand name, the part
16 you can read from 20 or 30 feet away, as Mr. LoCascio points
17 out, what is that?
18 A. "Same."
19 Q. And down here, in the lower left-hand corner, it says,
20 what? "Made with sugar"?
21 A. "Made with sugar."
22 Q. But the name of the product is?
23 A. Same.
24 Q. Now, what is your understanding of what the sugar in
25 yellow Same does, if anything?

BARBARA DACHMAN, RPR, OCR

**Page 182**

Debra Sandler - Redirect (Zalesin)

1  A. The sugar in yellow Same, it is my understanding, is
2  used primarily as a bulking agent. In this category we use
3  the sweetener ingredient, aspartame, sucralose or saccharin,
4  to sweeten, to convey the sweetness of the product, and then
5  we use other things to bulk it up, to give it some sense of
6  bulk.
7     In this case, it's my understanding that this sugar in
8  here is really the bulker. The sweetener, the taste, the
9  sweet taste comes really from the other ingredients, which
10 are aspartame and acesulfame potassium, but from not the
11 sugar.
12 Q. Okay.
13    So you can't taste the sugar from the new yellow Same?
14 A. Not really.
15 Q. The taste comes entirely from aspar --
16 A. Because the sweeteners are intensely sweet, they
17 overpower the taste of the sugar. So, yes, the taste of
18 this is coming from the aspartame and the acesulfame
19 potassium.
20 Q. In fact, there is a little sticker above the
21 informational banner on the box. Do you see that?
22 A. Yes.
23 Q. On the little clear sticker?
24 A. Yes.
25 Q. Can you read what that says?

BARBARA DACHMAN, RPR, OCR

**Page 183**

Debra Sandler - Redirect (Zalesin)

1  A. It seems it was stickered after the fact. It says,
2  "Sweetened with low-calorie sweeteners."
3  Q. So sweetened with low-calorie sweeteners, meaning
4  that's where you get the sweet taste from?
5  A. Yes.
6  Q. Okay.
7     Can you think of any performance advantage to putting
8  sugar in a product that's sweetened with low-calorie
9  sweeteners like aspartame?
10 A. No, I don't think it changes the way it functions,
11 really. It just bulks it. It's a bulker.
12 Q. I see.
13    Can you cook anymore readily with a product that's
14 been sweetened with aspartame if it's bulked with sugar
15 instead of some other ingredient?
16 A. Not to my knowledge. Certainly not at these levels.
17 This is still largely -- the sweetness is still largely
18 coming from the aspartame, so you will have the same issue
19 in terms of withstanding the heat.
20 Q. So you can't cook any better with it and it doesn't
21 make it taste any different or better, but you might be able
22 to refer to it as having sugar in it.
23 A. Yes.
24 Q. Now, Mr. LoCascio asked you some questions about the
25 segmentation study and specifically the survey questionnaire

BARBARA DACHMAN, RPR, OCR

**Page 184**

Debra Sandler - Redirect (Zalesin)

1  that was mailed out, and let's just be really clear about
2  this.
3     First of all, it would be really dumb, wouldn't it, if
4  you want to know if people recognized colors to put the
5  brand, logos, in the colors that you are asking about.
6  A. Yes, it would.
7  Q. Okay.
8     So when the survey was done back in 2002, did you
9  check about that, to make sure that --
10 A. Yes. Yes, we did.
11 Q. Okay.
12    And you assured yourself then that it was being done
13 in black and white.
14 A. Yes, we did.
15    MR. LoCASCIO: Objection, your Honor.
16    He's leading the witness every time.
17    THE COURT: It's overruled at this time.
18 BY MR. ZALESIN:
19 Q. In early February, you filed a declaration in this
20 case. Do you remember that?
21 A. Yes, I do.
22 Q. And you talked a little bit about the segmentation
23 study in that declaration?
24 A. Yes, I did.
25 Q. Did you check at that time, before signing your

BARBARA DACHMAN, RPR, OCR

## Page 185

Debra Sandler - Redirect (Zalesin)

1  declaration under oath, to make doubly sure that the survey
2  was done in black and white?
3  A.   You bet.
4  Q.   What did you find out?
5  A.   I found that it was done in black and white.
6  Q.   Okay.
7       And then you came here to get ready for your testimony
8  yesterday?
9  A.   Yes.
10 Q.   Okay.
11      And did you check a third time to make triply sure it
12 was done in black and white?
13 A.   Absolutely.
14 Q.   Was it done in color or in black and white?
15 A.   It was done in black and white.
16 Q.   Okay, thank you.
17      Mr. LoCascio asked you whether McNeil has ever
18 registered the trade dress for the Splenda package.
19      Do you recall that?
20 A.   Yes, I do.
21 Q.   Do you know as a policy matter whether McNeil ever
22 seeks to register its trade dresses as opposed to trademarks
23 or logos?
24 A.   To my knowledge, we just register the trademarks and
25 logos. We typically don't go forward with the trade dress.

BARBARA DACHMAN, RPR, OCR

## Page 186

Debra Sandler - Redirect (Zalesin)

1  Q.   You didn't make a special decision not to try to
2  register the Splenda trade dress here.
3  A.   That's correct.
4  Q.   Finally, Miss Sandler, Mr. LoCascio showed you some
5  excerpts from his own brief. It's a brief that was filed on
6  behalf of a McNeil consumer in the *Tylenol* case, and I want
7  to ask you about it.
8       It talks about generic manufacturers who make a
9  practice of utilizing colors of the branded product that
10 they are -- they want consumers to compare them to on the
11 basis of price. Do you see that?
12 A.   Yes, I do.
13 Q.   Now, is Same, the yellow Same, a generic version of
14 Splenda?
15 A.   No, it is not.
16 Q.   Does it contain the same ingredients as Splenda?
17 A.   No, it does not.
18 Q.   Does it have the same taste as Splenda?
19 A.   No, it does not.
20 Q.   Does it have the same properties as Splenda?
21 A.   No, it does not.
22 Q.   If consumers think that it's a generic version of
23 Splenda, are they misled?
24 A.   Absolutely.
25 Q.   By the way, I take it when you answered Mr. LoCascio's

BARBARA DACHMAN, RPR, OCR

## Page 187

Debra Sandler - Redirect/Recross

1  questions about this brief that was submitted to the Second
2  Circuit in 1992 about the protectability of color, you
3  didn't have in mind the fact that the United States Supreme
4  Court, in 1998, six years later, changed the law about the
5  protectability of colors? Would that be a fair statement?
6  A.   That's a fair statement.
7       MR. LoCASCIO: Objection, your Honor.
8       It's a misstatement. We will get to it in closing,
9  but that's not what happened with respect to this briefing
10 issue.
11      MR. ZALESIN: I have nothing else.
12      Thank you.
13      MR. LoCASCIO: One question, your Honor. I should
14 say one area. In case it doesn't come in in one, I don't
15 want to be held to that.
16              RECROSS-EXAMINATION
17 BY MR. LOCASCIO:
18 Q.   You just indicated that if some consumer thought
19 sucralose was in the Same with sugar box -- and that's what
20 Mr. Zalesin was talking about, whether a consumer thought
21 the same product was inside the Same with sugar box. Do you
22 remember that?
23 A.   We didn't talk about sucralose. I think the question
24 was do they think it's the same product.
25 Q.   Okay.

BARBARA DACHMAN, RPR, OCR

## Page 188

Debra Sandler - Recross (LoCascio)

1  The question was, do you think -- well, withdrawn.
2       If a consumer thought Splenda's product, i.e.
3  sucralose -- fair?
4  A.   Um-hmm.
5  Q.   That is Splenda's product.
6  A.   Yes.
7  Q.   That is what sweetens Splenda.
8  A.   Yeah, it's a sweetener.
9  Q.   Your concern that you are talking about there is that
10 if people buy Same with sugar, knowing it's not Splenda's
11 brand but thinking what's inside of it is the same compound,
12 if you will, as what is in Splenda -- that's what you were
13 just talking about, right?
14 A.   Um-hmm. Yes.
15 Q.   -- that's not confusion about the source of the goods.
16 That would be someone who is confused about what the product
17 is, not who makes the product. Correct?
18 A.   Yeah, I guess so, except I think what we are talking
19 about is just a general sense of -- an overall sense of
20 confusion based on the fact that there are so many things
21 that are similar.
22 Q.   That issue -- if they are confused about what is
23 inside the box -- I am not sure if you know -- that's not an
24 issue in this case. Confusion to source, whether who it
25 comes from, is the issue here.

BARBARA DACHMAN, RPR, OCR

## Page 189 — Debra Sandler - Recross (LoCascio)

1  Do you understand that?
2  A.  Yes, I do.
3       MR. LoCASCIO:  No further questions.
4       MR. ZALESIN:  Nothing further, your Honor.
5       THE COURT:  Very well.
6  So you are excused.
7       (The witness is excused.)
8       THE COURT:  We will take a break now and resume at
9  4:30.
10      (Whereupon, a short recess is taken.)
11      THE COURT:  This is off the record.
12      (Discussion off the record.)
13      THE COURT:  Okay, let's have, then, your next
14 witness.
15      MR. LoCASCIO:  One housekeeping matter.
16      THE COURT:  Yes.
17      MR. LoCASCIO:  Exhibit XX, which is the flip
18 chart, we didn't technically move in.  We have labeled it.
19 So I was just wondering if we could leave it on the chart,
20 take it off when we are done, or move it in right now.  If
21 you have a preference.
22      THE COURT CLERK:  Which one is that?
23      MR. LoCASCIO:  "XX."
24      THE COURT:  Well, if you want to leave it there
25 and then afterwards, you know, that's okay.

BARBARA DACHMAN, RPR, OCR

## Page 190 — Felix Muniz - Direct (Sanchez)

1       MR. LoCASCIO:  I will, after the day when
2  everything is done, I will tear it down.
3       THE COURT:  Very well.
4       MS. SANCHEZ:  The plaintiffs call Felix Muniz.
5       THE COURT:  Okay.  Very well.
6       MS. SANCHEZ:  And Mr. Muniz would like an
7  interpreter.
8       THE COURT:  He's already sworn in, so...
9  Okay, I remind the witness he's still under oath.
10 Whereupon,
11             FELIX MUNIZ,
12 was called as a witness, and after having been previously
13 duly sworn, was examined and, through the interpreter,
14 testified as follows:
15            DIRECT EXAMINATION
16 BY MS. SANCHEZ:
17 Q.  Would you please state your name.
18      THE INTERPRETER:  Your Honor, before we begin, the
19 interpreter would like to clarify that since we are breaking
20 new ground here with the private contracting of
21 interpreters, the understanding of the interpreter is that
22 the parties have reached a stipulation that this interpreter
23 will be working for both parties during the course of the
24 hearings today and tomorrow.
25      THE COURT:  There should be no problem.

BARBARA DACHMAN, RPR, OCR

## Page 191 — Felix Muniz - Direct (Sanchez)

1       MR. BURGOS:  The stipulation is correct, your
2  Honor.
3       MR. ZALESIN:  That's fine, your Honor.
4       THE COURT:  There should be no problem with that.
5  You know, this is not a Japanese litigation case.
6       In my days of prior practice, you know, I had to take
7  interpreters from both sides.
8       THE INTERPRETER:  And therefore, now that I am a
9  private contractor, I would need to take the oath.
10      (Whereupon, the interpreter is duly sworn by the
11 court clerk.)
12 BY MS. SANCHEZ:
13 Q.  Will you please state your name for the record.
14 A.  Felix Muniz.
15 Q.  Mr. Muniz, how are you employed?
16 A.  I work with Management Search and Supporting Services.
17 Q.  And what business is Managing Search Supporting
18 Services in?
19 A.  I provide services to Johnson & Johnson.
20 Q.  What kind of services?
21 A.  Services such as placement of merchandise from Johnson
22 & Johnson.
23 Q.  And placement of merchandise in stores?
24 A.  Yes, at supermarkets.
25 Q.  And what types of products do you stock on the shelves

BARBARA DACHMAN, RPR, OCR

## Page 192 — Felix Muniz - Direct (Sanchez)

1  in these stores?
2  A.  Splenda, Johnson Baby Wipes, Tylenol, et cetera.
3  Q.  Do you have a particular territory that you cover
4  within Puerto Rico?
5  A.  Yes, I cover between Arecibo and Santa Isabel.
6  Q.  And is one of the stores or supermarkets located in
7  your territory called Supermercado Hatillo Kash N' Karry?
8  A.  Yes.
9  Q.  And can you tell the Court what recently happened
10 while you were at Hatillo Kash N' Karry.
11 A.  Well, one day I was rendering my services, and a
12 client came over and approached me.
13 Q.  When you say "a client," what do you mean by that?
14 A.  Well, a client.  Just a customer, a person.
15 Q.  And then what happened?
16 A.  So I was stocking the Splenda and a lady came over and
17 asked me whether Splenda was on sale.  And I told her it was
18 not, that there was no sale.  But then she told me and she
19 insisted that it was.  And I told her no, and I didn't see
20 that it was on sale there.  And she told me that it was and
21 that it had come out in the shopper, in the fliers.  So I
22 told her, "Well, then let's look at the shopper."
23      And I went over and I looked for a shopper, a flier --
24 Q.  And let me stop you for a moment.
25      MS. SANCHEZ:  I would like to pass up to the

BARBARA DACHMAN, RPR, OCR

```
                Felix Muniz - Direct (Sanchez)                193
 1  witness what has been marked as Plaintiffs' Exhibit 32.
 2  BY MS. SANCHEZ:
 3  Q.   Let me just ask you this: Is this the shopper that
 4  you saw that day over at Hatillo Kash N' Karry?
 5  A.   Yes, this is it.
 6  Q.   So once you got the shopper, what did you do next?
 7  A.   We checked in the shopper. And I opened it up, and
 8  when I saw it, it said, "Same."
 9  Q.   In what page are you looking at?
10  A.   It's page 2.
11  Q.   And when you saw the product Same, what did you think
12  about that?
13  A.   At that moment I saw it and I thought that it might be
14  a mistake. I was surprised because I had never seen it
15  before.
16  Q.   Why did you think it was a mistake?
17  A.   Well, because I had never seen this packaging like
18  that, and I had always known Same from the blue packaging.
19       And I thought that this was a mistake, and at that
20  moment I called my supervisor, and then I told him what was
21  happening, and he told me that none of this was a mistake,
22  or, rather-- excuse me, that this was the packaging for
23  Same.
24       So after that I explained to the customer that this
25  was not Splenda packaging, that this was the new package for
                     BARBARA DACHMAN, RPR, OCR
```

```
                Felix Muniz - Direct (Sanchez)                194
 1  Same.
 2       So after that the client did not take the Splenda
 3  package and she left upset because she thought that it was
 4  Splenda, and she just left. She didn't buy it.
 5  Q.   During your employment with MSSS merchandising Splenda
 6  and other products, have you seen any other instances of
 7  confusion with the Splenda and the Same brands?
 8  A.   Yes, it has happened with other customers, that as I
 9  am placing the merchandise, suddenly a person is there, you
10  know, talking to some other person, and this person tells
11  the other, "Pick up the Splenda." And I hear them say it,
12  and when I look at what they are picking up, they are
13  picking up Same.
14  Q.   And then do you do anything or say anything?
15  A.   Well, yes. I tell them that this is not Splenda, that
16  that is Same. And then I give them the right one.
17  Q.   Do you recall where this happened?
18  A.   It's happened once or twice. You know, like that.
19  Q.   Have you witnessed any times where store employees
20  have been confused between the yellow Same and the Splenda?
21  A.   Yes, it has also happened, that as I am there, you
22  know, providing the service, and when I get there, you know,
23  I am going and they say, you know, "The Splenda just
24  arrived," and when I look, it's not Splenda, it's Same.
25       And I tell them, "That is not Splenda. That's Same."
                     BARBARA DACHMAN, RPR, OCR
```

```
                Felix Muniz - Direct/Cross                    195
 1  Q.   And how does the yellow Splenda arrive in the store?
 2  Is it in a brown box, or in -- how can you see it?
 3  A.   Splenda arrives in a brown box and Same arrives with a
 4  plastic wrapping.
 5  Q.   In any of your work for Johnson & Johnson, have you
 6  ever seen the yellow Same product put on the shelf where the
 7  Splenda goes?
 8  A.   Yes, I have seen it.
 9  Q.   Can you remember where that is?
10  A.   Yes.
11       One time I went to provide service at Mr. Special in
12  Aguada, and then when I went to my area for Splenda, they
13  had filled the area with Same, thinking that it was Splenda,
14  the employees from the store.
15       MS. SANCHEZ: I have nothing further.
16                       CROSS-EXAMINATION
17  BY MR. LOCASCIO:
18  Q.   Good afternoon.
19       Is it Muniz or Muñiz?
20  A.   Muniz.
21  Q.   Muniz.
22       Mr. Muniz, you work for a company that distributes
23  only Johnson & Johnson products, correct?
24  A.   Yes.
25  Q.   And the company you work for makes money selling
                     BARBARA DACHMAN, RPR, OCR
```

```
                Felix Muniz - Cross (LoCascio)                196
 1  Johnson & Johnson products, true?
 2  A.   Yes.
 3  Q.   If Johnson & Johnson sells more products, your company
 4  makes more money. Fair?
 5  A.   Yes.
 6  Q.   And if Splenda loses customers because competition
 7  takes away those customers, your company would make less
 8  money because you distribute less Splenda. Fair?
 9  A.   Well, I know that Splenda sells, because, I mean, it
10  sells. But I don't know how the numbers go because I don't
11  pay attention to those numbers. I don't know about numbers.
12  Q.   Are you paid a fixed amount, or are you paid an amount
13  that changes depending on how much sells?
14  A.   No, I get paid weekly, you know, a fixed salary.
15  Q.   A fixed salary. Okay.
16       You submitted a declaration in this case, correct?
17  A.   Yes.
18  Q.   Did you draft your declaration by yourself?
19  A.   No.
20  Q.   Did you write one in Spanish?
21  A.   No.
22  Q.   You didn't write one in English?
23  A.   No. No, I gave a statement out loud, and it was
24  written down in English for me.
25  Q.   By your lawyers?
                     BARBARA DACHMAN, RPR, OCR
```

**Page 197**

Felix Muniz - Cross (LoCascio)

1  A.   It was to my supervisor. The supervisor wrote it
2  down, and he gave it to the attorneys.
3  Q.   So in your declaration when it says that you heard a
4  particular person say something, you heard it, you told your
5  supervisor, and your supervisor passed that information to
6  the lawyers, who put it down on the paper. Is that right?
7  A.   I understand that that was how it happened, because I
8  called my salesperson, the salesperson called the
9  supervisor, and that's how it got rolling.
10 Q.   Okay.
11      At any point did you change the language in your
12 declaration, or did you just sign what the lawyers gave you
13 to sign?
14 A.   Just as it was.
15 Q.   You have the monitor in front of you?
16 A.   Yes.
17 Q.   Am I correct that this is the circular you testified
18 about a moment ago?
19 A.   Yes.
20 Q.   And this is what I have heard referred to as a shopper
21 that goes out Wednesday or Thursday here in Puerto Rico to
22 people with the newspaper?
23 A.   Yes.
24 Q.   Is this how people advertise products in the grocery
25 business?

BARBARA DACHMAN, RPR, OCR

**Page 198**

Felix Muniz - Cross (LoCascio)

1  A.   That's my understanding of it. The specials, at
2  least, the sales.
3  Q.   And in this circular or special shopper, the brand
4  Same in the yellow box was on sale, correct?
5  A.   Yes, but at that moment it had not arrived at the
6  store. I mean, it was on sale. It was advertised on sale,
7  but it had not arrived. It wasn't on the shelves, neither
8  had it arrived yet.
9  Q.   Did you ask the manager if it was in the back and had
10 yet to be put on the shelf?
11 A.   No.
12 Q.   So you don't know whether it was waiting to be put on
13 the shelf or not. Fair?
14 A.   Well, I went over there to check whether this was
15 there, and there was not.
16 Q.   You didn't see any on the shelves.
17 A.   No, there was none.
18 Q.   Okay.
19      People could have bought it all and it wasn't on the
20 shelf, or it wasn't ever there in the first place.
21 A.   Well, to my understanding, it had never been there.
22 You know, it had not arrived up until that moment.
23 Q.   You don't work at the supermarket. You work for the
24 company that sells Johnson & Johnson's products, correct?
25 A.   Yes, exactly.

BARBARA DACHMAN, RPR, OCR

**Page 199**

Felix Muniz - Cross (LoCascio)

1  Q.   The first incident you talked about where a woman came
2  to you with the shopper and said, "I want the product that's
3  on sale," and thought it was Splenda -- do you remember
4  that?
5  A.   Yes.
6  Q.   -- did you tell her that you worked for the company
7  that sells Splenda?
8  A.   I didn't tell her, but she asked me because she saw me
9  placing the Splenda.
10 Q.   You put the product on the shelves in the stores for
11 the store.
12 A.   Yes.
13 Q.   In your declaration you said, "A customer approached
14 me and asked me to hand her a box of the Splenda product
15 that was on sale."
16      Do you see that?
17 A.   Yes.
18 Q.   Do you specifically remember if she called it a box of
19 the Splenda product, or you are not sure exactly what her
20 words were?
21 A.   No. That was exactly it. She asked me whether the
22 Splenda 100 box was on sale.
23 Q.   Okay.
24      She asked you whether Splenda 100 was on sale, and you
25 said no.

BARBARA DACHMAN, RPR, OCR

**Page 200**

Felix Muniz - Cross (LoCascio)

1  A.   Exactly.
2  Q.   Has Splenda been on sale in that store?
3  A.   On other occasions, yes.
4  Q.   But not on that day.
5  A.   No.
6  Q.   When you saw the shopper, you immediately saw the Same
7  brand name, correct?
8  A.   Yes, because at that moment it was supposed to say
9  "Splenda," and what I thought was that it was a mistake.
10 Q.   Oh. You thought it was going to say "Splenda" because
11 of what this woman told you, but it said "Same," and you
12 recognized "Same," that that was the word on the box.
13 A.   Yes, because it says "Same," but I thought it was a
14 mistake, because I had never seen it before.
15 Q.   And you said you thought it was a mistake because you
16 had only been familiar with the older box of the regular
17 Same product that comes in blue.
18 A.   Yes.
19 Q.   And this was a new product, that Same with sugar in
20 the box, and you hadn't seen that before.
21 A.   I had never seen it before.
22 Q.   When you have seen Same with sugar -- let me start
23 over. Withdrawn.
24      Have you ever seen Same with sugar in the store?
25      THE INTERPRETER:  "Have you ever seen"?

BARBARA DACHMAN, RPR, OCR

**Page 201**

Felix Muniz - Cross (LoCascio)

1    MR. LoCASCIO: Have. Have.
2    THE WITNESS: Yes.
3    MR. BURGOS: "Had seen."
4    MR. LoCASCIO: No, "have." It was "have."
5    BY MR. LoCASCIO:
6    Q.   At that point you had not seen it when you first saw
7    the shopper.
8    A.   No, this Same like that, no, I had not seen that one
9    before.
10   Q.   And now you have seen a box of Same with sugar in a
11   yellow package on a store shelf.
12   A.   Yes.
13   Q.   It looks like this, right (indicating)?
14   A.   Yes.
15   Q.   And you don't wear glasses, do you?
16   A.   No.
17   Q.   From where you are sitting, can you tell it says
18   "Same" on the box?
19   A.   Yes.
20   Q.   And when you are in the store, you are much closer
21   than we are, because the aisle is not this wide, correct?
22   A.   Well, I mean, I can see it because I already know it
23   now.
24   Q.   But am I correct that when you first looked at the
25   picture, you also saw "Same," and that's why you thought it

BARBARA DACHMAN, RPR, OCR

**Page 202**

Felix Muniz - Cross (LoCascio)

1    was a mistake?
2    A.   Yes.
3        MR. LoCASCIO: No further questions.
4    Thank you.
5        MS. SANCHEZ: No further questions.
6        THE COURT: You don't have any further questions?
7        MS. SANCHEZ: No, your Honor.
8        THE COURT: I do have a question.
9        Mr. Muniz, when did this take place? You know, the
10   time framework.
11       THE WITNESS: That was in December.
12       THE COURT: Are we talking December 2003?
13       THE WITNESS: Yes, last year.
14       THE COURT: And when you say that you saw the Same
15   box -- the Same box in the shopper and you said that you
16   thought it was a mistake, what do you mean by that?
17       THE WITNESS: Well, that I had never seen it
18   before and the one that I had always seen was Splenda. And
19   at that moment I thought that this had been a mistake by the
20   store, that they had put "Same" there.
21       THE COURT: And that -- but that they had intended
22   to put "Splenda"?
23       THE WITNESS: Yes.
24       THE COURT: Okay.
25       Are there any questions?

BARBARA DACHMAN, RPR, OCR

**Page 203**

Angel Mundo - Direct (Sanchez)

1        Okay, you are excused.
2        (The witness is excused.)
3        MS. SANCHEZ: The plaintiff calls Angel Mundo.
4    And Mr. Mundo would also like the assistance of the
5    translator.
6        THE COURT: And I remind the witness he's under
7    oath, okay?
8    Whereupon,
9                ANGEL MUNDO,
10   was called as a witness, and after having been previously
11   duly sworn, was examined and, through the interpreter,
12   testified as follows:
13              DIRECT EXAMINATION
14   BY MS. SANCHEZ:
15   Q.   Please state your name.
16   A.   Angel Mundo.
17   Q.   Mr. Mundo, for whom do you work?
18   A.   I work for the Management Search and Supporting
19   Services, which is ascribed or connected with Johnson &
20   Johnson.
21   Q.   Do they have any other clients?
22   A.   Pfizer and Clorox, among others.
23   Q.   And what is your position at MSSS?
24   A.   I am a sales representative.
25   Q.   And as a sales representative, what are your

BARBARA DACHMAN, RPR, OCR

**Page 204**

Angel Mundo - Direct (Sanchez)

1    responsibilities?
2    A.   Well, as -- among my responsibilities, I have to
3    arrive, as usual, at stores, and I have to check the areas
4    of work where we work to check whether there is merchandise
5    that is missing or out of stock, and then I proceed as usual
6    to draft an order.
7    Q.   Is there anything else that is encompassed by your
8    responsibilities?
9    A.   Well, I also have the responsibility of providing
10   credit to the store for any merchandise that is broken or
11   damaged.
12   Q.   Do you have a specific territory within Puerto Rico in
13   which you work?
14   A.   Well, right now it comprises the areas of Fajardo up
15   to Cayey.
16   Q.   And has that always been your territory?
17   A.   Yes.
18   Q.   About how many stores or supermarkets are in your
19   territory?
20   A.   I have between 25 and 30 clients.
21   Q.   Is one of your responsibilities to make sure that the
22   particular products which you take care of are located in
23   the specific spots in the store shelves?
24   A.   Yes, that's correct.
25   Q.   And do those specific spots on the shelves have a name

BARBARA DACHMAN, RPR, OCR

Angel Mundo - Direct (Sanchez) 205

1 that you use to refer to them?
2 A. Well, they have the name of the brand of the product.
3 What I am referring to is the label.
4 Q. And have you ever in any of your stores seen that the
5 yellow Same product was shelved where the Splenda goes?
6 A. Yes, that was a case that happened at the Grande
7 Supermarket in Humacao.
8 Q. Okay, can you tell me what happened when you arrived
9 at the Grande in Humacao?
10 A. When I arrived at the store, I was heading towards the
11 area where the brands Splenda, Equal and Same are located,
12 and I noticed the situation that the yellow Same had been
13 placed in the Splenda area.
14 Q. And when you saw that --
15   THE COURT: Excuse me.
16   Could you ask him when was this?
17   MS. SANCHEZ: Sure.
18 BY MS. SANCHEZ:
19 Q. Do you remember when this was that you saw this?
20 A. I don't remember the exact date. I know that it was
21 in the month of January.
22 Q. When you saw the yellow Same in the Splenda setting,
23 what did you do next, if anything?
24 A. I proceeded to take the necessary steps within the
25 store. I first checked with the person in charge of the

BARBARA DACHMAN, RPR, OCR

Angel Mundo - Direct (Sanchez) 206

1 shelves for the store. So I called him over for a moment so
2 that he could see what had happened on the shelf, which was
3 that the yellow Same had been placed in the Splenda area.
4   And when he noticed what I was telling him, he picked
5 up both boxes and he looked at them and said, "Well, this is
6 the same box. You know, it's the same."
7   MR. LoCASCIO: Objection. Hearsay.
8   It's also not -- it's not in the affidavit, but that's
9 less of an issue than the fact that it's hearsay and he's
10 putting it in for the truth of the matter asserted.
11   THE COURT: I will admit it only for the purpose
12 of what he heard the employee say.
13   MS. SANCHEZ: That's fine.
14 BY MS. SANCHEZ:
15 Q. What happened after the -- well, who was this person
16 that you were talking to?
17 A. He was an employee of Grande Supermarket.
18 Q. And after he mentioned that the two products were the
19 same, what did you do next?
20 A. What we did was that we proceeded to remove that
21 product from the Splenda shelf area and place it in the area
22 for Same products.
23 Q. In any of your trips to any other stores in your
24 territory, have you ever seen the yellow Same and Splenda
25 set next to each other?

BARBARA DACHMAN, RPR, OCR

Angel Mundo - Direct (Sanchez) 207

1 A. At Pitusa Hypermercados Humacao and Supermercados
2 Econo in Naguabo.
3 Q. When you have seen the yellow Same and Splenda next to
4 each other, do you take any pictures?
5 A. A picture was taken at the Grande Supermarket in Villa
6 Blanca in Caguas.
7   MS. SANCHEZ: If I may, I'd like to show the
8 witness what has been marked as Plaintiffs' Exhibit 34.
9 BY MS. SANCHEZ:
10 Q. Did you take this picture?
11 A. Yes.
12 Q. And this picture was taken in the Supermercado Grande
13 in Caguas?
14 A. The Villa Blanca store, yes.
15 Q. Do you recall when you took the picture?
16 A. That was in late January, more or less.
17 Q. You submitted a declaration in this case, correct?
18 A. Yes.
19 Q. And was everything in the declaration true and
20 correct?
21 A. It is correct.
22 Q. Okay.
23   MS. SANCHEZ: No further questions.
24
25

BARBARA DACHMAN, RPR, OCR

Angel Mundo - Cross (LoCascio) 208

1   CROSS-EXAMINATION
2 BY MR. LOCASCIO:
3 Q. Good afternoon, "Señor" Mundo.
4 A. Good afternoon.
5 Q. Let me start with where your lawyer just finished.
6 Let me show you this picture.
7   This is the photo that you took at the Grande in
8 January, correct?
9 A. Um-hmm. Yes, that's correct.
10 Q. When you gave this photo to the lawyers, you gave them
11 the entire photo. You didn't only give them a cropped
12 portion of the photo, did you?
13 A. No, it was the full picture, yes.
14 Q. So in January, when you gave the lawyers the photo, it
15 was the whole photo.
16 A. Yes.
17 Q. You testified a moment ago that you walked into the
18 Grande in Humacao -- is that right?
19 A. That's correct.
20 Q. -- and you saw Same with sugar on the shelf where you
21 thought Splenda should be, so you went and found someone to
22 talk to about this. Is that what you said?
23 A. Yes, it was in the space in the area that was labeled
24 and corresponded to the Splenda boxes. The Same was there.
25 Q. Okay. Let me step back.

BARBARA DACHMAN, RPR, OCR

## Page 209

Angel Mundo - Cross (LoCascio)

1  I don't know as much about stocking groceries and
2  paying for shelf space, but am I right that the companies
3  like Splenda reserve certain areas of the shelf and pay a
4  stocking fee to have that area be where you put Splenda? Is
5  that right?
6  A.   Yes, that's correct.
7  Q.   There are better spots and worse spots, maybe. Is
8  that right?
9  A.   That's correct.
10 Q.   And it is part of your job for MSSS to make sure that
11 the store clerks put the product where they have been paid
12 to put the product, the good spots.
13 A.   Well, at least in our case, we have our merchandisers.
14 Q.   If -- as part of your job -- withdrawn.
15     Is it part of MSSS's job to make sure it's in the
16 right place?
17 A.   That's correct.
18 Q.   And if the product is not in the right place, MSSS or
19 McNeil would be unhappy. Fair?
20 A.   Well, yes.
21 Q.   When you go to the store, the clerk who puts boxes on
22 the shelf -- let me back up.
23     You don't put the boxes on the shelf, right?
24 A.   Well, my job as such is a sales representative, but in
25 those cases when the merchandiser does not arrive on time or

BARBARA DACHMAN, RPR, OCR

## Page 210

Angel Mundo - Cross (LoCascio)

1  he has not been there, if I find the merchandise in the
2  stock room, I take it and I can place it.
3  Q.   But most times you come in the store and someone has
4  already put it on the shelf.
5  A.   That's correct.
6  Q.   And again, if you see it's in the wrong place, you
7  tell the clerk or you tell the clerk's boss that he didn't
8  do his job right. It didn't go where it was supposed to go.
9  Fair?
10 A.   That's correct.
11 Q.   So when your affidavit -- withdrawn.
12     You testified on the stand here that you came into the
13 store -- this is the Grande incident -- and it was already
14 stocked, Same with sugar, the yellow box, in the area where
15 Splenda is supposed to be stocked, and you went then to find
16 the manager or someone you could talk to about this.
17 A.   That's correct.
18 Q.   In your affidavit, you said -- this is the paragraph
19 2 -- "As I entered the store, I noticed the store clerk was
20 stocking the yellow Same brand on the shelf area where
21 Splenda was stocked."
22     Well, that's not true, is it? Wasn't it already on
23 the shelf?
24 A.   It was placed because he had already finished placing
25 it. He had the boxes there next to him. You know, he was

BARBARA DACHMAN, RPR, OCR

## Page 211

Angel Mundo - Cross (LoCascio)

1  getting ready to throw them out.
2  Q.   So he had already put it all on the shelf.
3  A.   That's correct.
4  Q.   So when you state in your affidavit he was stocking at
5  the time you walked in, he was done stocking but he was
6  still standing there. Is that what you meant?
7  A.   Yes, exactly.
8  Q.   You didn't see him take them out and put them in the
9  wrong place?
10 A.   No, I only saw him when he was finished and he was
11 standing next to the shelf.
12 Q.   So when you said a moment ago that you went to look
13 for someone to talk to about this, the person was already
14 there, right? You didn't have to go looking for anyone.
15 They were standing right there.
16 A.   Yes. I mean, he was off to the side, and I brought
17 him over to the shelf area where the Splenda was supposed to
18 be, and I showed him that the yellow Same had been placed in
19 the Splenda area. He saw what had happened and he took
20 the -- he proceeded to take the yellow Same boxes and place
21 them in the area for Same products.
22 Q.   There is a different area on the shelf for Same with
23 sugar, the yellow box, correct?
24 A.   It's on the same side. I mean, it's on the same side
25 as the Splenda. But what happened was that since the box

BARBARA DACHMAN, RPR, OCR

## Page 212

Angel Mundo - Cross (LoCascio)

1  changed to yellow and the box used to be blue, there was a
2  distinguishing color.
3  Q.   Mr. Mundo, the box didn't change. You know that there
4  is still a blue box sold by Same. It's still in the store
5  when you go to the store to check, right?
6  A.   Yes, that's correct.
7  Q.   The yellow box is a different product from Same. It's
8  Same with sugar, correct?
9  A.   That's correct.
10 Q.   And you talk about, it's sometimes stocked next to
11 Splenda, right?
12 A.   That's correct.
13 Q.   There is nothing wrong with that. That's competition
14 in the sweetener aisle, correct?
15 A.   Well, it's competition, but in the case of a customer
16 as such, selecting products like this, it becomes quite
17 difficult.
18 Q.   Is it difficult to read the word "Same," Mr. Mundo?
19 A.   Well, it's not difficult to read as such, but the
20 yellow color attracts. You know, it looks a lot like the
21 Splenda.
22 Q.   When you look at the box in the store, you know which
23 one is Same and which one is Splenda, right?
24 A.   In my case I do, yes.
25 Q.   And you can't say of a single person that you know in

BARBARA DACHMAN, RPR, OCR

**Page 213**

Angel Mundo - Cross (LoCascio)

1  your work at MSSS who's bought the wrong product when they
2  meant to buy Splenda. You don't testify about any of those
3  people, right?
4  A.  No.
5  Q.  And the store clerk told you, according to your
6  affidavit, it was a mistake he made because he assumed the
7  product was Splenda.
8       Do you see that?
9  A.  Yes, that's correct.
10 Q.  Sometimes the store clerk might put things in a
11 different manufacturer's area because they want to sell more
12 product. Fair?
13 A.  Well, I don't agree.
14 Q.  It's your job to make sure they don't do that, right?
15 A.  That's correct.
16 Q.  And if this store clerk had put it in the wrong place
17 intentionally, he wouldn't have told you that. He would
18 have told you it was a mistake, right?
19 A.  Well, that was what he let me know, you know? He told
20 me that this box was yellow and that he thought that it was
21 Splenda.
22 Q.  If he had told you, "I knew it was Same with sugar,
23 but I put it there intentionally," you would have told his
24 boss, correct?
25 A.  Could you repeat your question?

BARBARA DACHMAN, RPR, OCR

**Page 214**

Angel Mundo - Cross (LoCascio)

1  Q.  Yes.
2       If the store clerk told you, "I put Same with sugar
3  where you pay me to put Splenda and I knew I did that," you
4  would have told his boss that he wasn't doing what he was
5  supposed to do at work, right?
6  A.  That's correct.
7  Q.  Which shelf in the Grande was the Same with sugar put
8  on where it should not have been? If you can identify it on
9  the picture, that would be helpful.
10      THE INTERPRETER:  Could you repeat your question,
11 counsel? Sorry.
12 BY MR. LoCASCIO:
13 Q.  Can you show me on this picture of the Grande where
14 the Same with sugar box was misplaced, in your testimony?
15      MS. SANCHEZ:  I just want to object because this
16 picture is from El Grande in Caguas, and his situation is
17 the Grande in Humacao.
18 BY MR. LoCASCIO:
19 Q.  Before I thought I asked you if this picture was from
20 the Grande you had testified about with the clerk. Is that
21 wrong? This picture is from a different Grande?
22 A.  This is another store, a different store.
23 Q.  A different Grande.
24 A.  Yes. It's another town.
25 Q.  The Splenda is on -- it looks like three shelves here.

BARBARA DACHMAN, RPR, OCR

**Page 215**

Angel Mundo - Cross/Redirect

1       There is this shelf here (indicating). Do you see
2  that?
3  A.  Yes, that's correct.
4  Q.  Is one of the shelves you pay for placement on near
5  the sugar products at the Grande?
6  A.  How is that again?
7  Q.  This shelf that I have circled, that shelf has Domino
8  sugar on it, correct?
9  A.  That's correct.
10 Q.  And Dixie Crystals and other sugars.
11 A.  Yes, that's correct.
12 Q.  In your job, is one of the places you choose to place
13 Splenda the shelf that has sugar on it?
14 A.  That is correct.
15      MR. LoCASCIO:  No other questions, your Honor.
16      MS. SANCHEZ:  I just have a few more questions.
17           REDIRECT EXAMINATION
18 BY MS. SANCHEZ:
19 Q.  You were just looking at Plaintiffs' Exhibit 34.
20      What type of Splenda is this (indicating)?
21 A.  That's the granular Splenda, 1.9 pounds.
22 Q.  And is that used for baking?
23 A.  That's correct.
24 Q.  And what is over here in the corner (indicating)?
25 A.  That's Sweet'N Low.

BARBARA DACHMAN, RPR, OCR

**Page 216**

Angel Mundo - Redirect (Sanchez)

1  Q.  Is Sweet'N Low sugar or an artificial sweetener?
2  A.  It's an artificial sweetener.
3  Q.  Do you recall when you gave this picture to the
4  lawyers?
5  A.  That's correct.
6  Q.  Was it in January that you gave the picture to the
7  lawyers?
8  A.  That's correct.
9  Q.  I would like to show you an exhibit called Plaintiffs'
10 Exhibit 16. This is the alleged cropped photo.
11      Did you take this picture?
12 A.  Yes, that is correct.
13 Q.  You took this picture at the same time you took the
14 other picture?
15 A.  No, I am sorry. It was the other one only.
16 Q.  Let me start from the beginning.
17      You took Plaintiffs' Exhibit 34, this picture
18 (indicating).
19 A.  That's correct.
20 Q.  But you did not take picture -- the picture in
21 Plaintiffs' Exhibit 16.
22 A.  No, not this one.
23 Q.  Would you agree with me that in your picture -- I am
24 going to try and show you this -- there are three Splenda
25 boxes here sticking out (indicating), one, two, three? Do

BARBARA DACHMAN, RPR, OCR

```
                                                   217
   Angel Mundo - Redirect (Sanchez)
 1  you see them?
 2  A.   That's correct.
 3  Q.   And in Plaintiffs' Exhibit 16, you will see that there
 4  are only two?
 5  A.   Yes, that's correct.
 6  Q.   And would you agree that Plaintiffs' Exhibit 16, the
 7  angle of the camera is right in front of the shelves?
 8  A.   That's correct.
 9  Q.   Is that where you stood when you took the picture in
10  Plaintiffs' Exhibit 34?
11  A.   Yes, that is correct.
12  Q.   You stood right in front of the spatulas here
13  (indicating)?
14  A.   I was a little over towards the left side.
15  Q.   Mr. LoCascio asked you a bunch of questions about the
16  store clerk who had stocked the yellow Same in the Grande
17  store in Humacao. Do you remember that?
18  A.   Yes, that's correct.
19  Q.   Do you know of any reason why a store clerk would
20  intentionally put the yellow Same brand in Splenda's
21  setting?
22  A.   Only by mistake, based on the color, the color of the
23  new packaging for Same.
24       MS. SANCHEZ: I have nothing further.
25       THE COURT: Okay. So you are excused.

                BARBARA DACHMAN, RPR, OCR
```

```
                                                   218
 1       (The witness is excused.)
 2       MS. SANCHEZ: Your Honor, we have three other
 3  declarations that we would like to submit for your review.
 4  They have been marked as Plaintiffs' Exhibits 65, 66 and 67.
 5       MR. LoCASCIO: Your Honor, obviously those
 6  witnesses have not come forward to testify. We believe --
 7  we are not sure what is in those declarations. I think I
 8  have seen all of them, though. I just don't know which
 9  she's referring to.
10       They are hearsay. To the extent they can attach them
11  to their briefs for your consideration -- obviously this we
12  don't think should be treated any differently. But
13  obviously the weight to be afforded to those would be less
14  than if they had come in.
15       THE COURT: Are they cumulative in the sense that
16  it is more or less the same testimony that we have heard
17  here?
18       MS. SANCHEZ: More or less the same testimony, but
19  there are other stories of confusion. And they were given a
20  couple of days ago to the defendant.
21       And I will be clear, so that not just referring to
22  them by exhibit number. They are the declarations of Rosa
23  Garcia, Mabel Sanchez and Priscilla Garcia, and they are
24  just more evidence for your consideration.
25       MR. LoCASCIO: We have a strong view, at least as

                BARBARA DACHMAN, RPR, OCR
```

```
                                                   219
 1  to some of these. I would like them to be here, frankly,
 2  because two of them are food service references and we heard
 3  that they are not in food service here, and in one of those
 4  instances, as we understand it, the person saying they saw a
 5  packet -- not a box, the actual packet -- and they were
 6  handed it and they said, "This isn't what I asked for. Can
 7  I have Splenda."
 8       I think to the extent they are evidence, they show
 9  people who aren't confused. So if you think it is worth
10  considering, your Honor, by all means, don't let me stop
11  you.
12       THE COURT: Is there any problem with their coming
13  here to testify?
14       MS. SANCHEZ: There is not a problem. It's just
15  the time --
16       MR. BURGOS: One is a McConnell employee and it's
17  not here.
18       MS. SANCHEZ: There is not any problem with --
19       THE COURT: Well, we already had another McConnell
20  employee this morning, so...
21       MS. SANCHEZ: There is not a problem with their
22  coming, your Honor. There is just a matter of time. We
23  were given two days and we decided which witnesses to
24  present.
25       And as the point was made earlier, the fact that they

                BARBARA DACHMAN, RPR, OCR
```

```
                                                   220
 1  are a McConnell, Valdes employee doesn't necessarily mean
 2  they are lying in their declaration.
 3       MR. BURGOS: Maybe we will call Rafael
 4  Vizcarrondo, your Honor.
 5       THE COURT: It's quite different. Okay? It's
 6  quite different.
 7       But still, I think, you know -- if I take those
 8  declarations, what weight am I going to give those
 9  declarations if they don't have the opportunity to
10  cross-examine those witnesses? I mean, you can submit your
11  declaration as if it were their direct, and they can come
12  here only for a brief cross-examination, and that way we can
13  cut it down.
14       MS. SANCHEZ: We would suggest, your Honor, that
15  you take the declarations and give them whatever weight you
16  think is appropriate.
17       THE COURT: I am not willing to do that unless
18  they have the opportunity to cross-examine those witnesses.
19       MS. SANCHEZ: Okay.
20       THE COURT: Can they come in, let's say, tomorrow
21  morning briefly and can be cross-examined, or are you going
22  to submit those declarations?
23       MR. ZALESIN: We can withdraw the declarations,
24  your Honor. I don't know if they are available or not to
25  testify, quite honestly.

                BARBARA DACHMAN, RPR, OCR
```

221

1  But Miss Sanchez is correct. We were given two days
2  and, frankly, we are concerned we are not going to finish in
3  two days, given that we didn't even complete the plaintiffs'
4  direct case today, and we were trying to pare it down. I
5  don't think they are going to make or break the case one way
6  or the other.
7  　　　To simplify matters, why don't we just withdraw them.
8  　　　THE COURT:  Very well. Okay.
9  　　　So tomorrow you will have one of the experts, or --
10 　　　MR. ZALESIN:  Yes. The expert -- the only witness
11 that McNeil has left is its expert witness, Professor Mazis,
12 and then we will move to defendants' case.
13 　　　THE COURT:  And then we will hear from defendants.
14 　　　MR. LoCASCIO:  Yes.
15 　　　THE COURT:  Very well.
16 　　　So we will start, then, tomorrow morning around 9:15,
17 if that is okay with you?
18 　　　MR. ZALESIN:  Very well, your Honor.
19 　　　THE COURT:  So we will recess until tomorrow.
20 　　　(Whereupon, at 5:50 p.m. court is adjourned.)
21
22
23
24
25

BARBARA DACHMAN, RPR, OCR

222

REPORTER'S CERTIFICATE

I, BARBARA DACHMAN, Official Court Reporter in the United States District Court for the District of Puerto Rico, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the within entitled and numbered cause on the date hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared under my direction.

_____
BARBARA DACHMAN