February 27, 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

McNEIL-PPC., et al.
Plaintiffs,
vs.
MERISANT COMPANY, et al.
Defendant.

CV. 04-1090 (JAG)

FURTHER PRELIMINARY INJUNCTION

held before the HONORABLE JUDGE JAY A. GARCIA GREGORY on Friday, February 27, 2004, at 10:15 a.m.

FOR THE PLAINTIFFS:

STEVEN ZALESIN, ESQ.
KARLA SANCHEZ, ESQ.

FOR THE DEFENDANTS:

GREGG F. LOCASCIO, ESQ.
HERIBERTO BURGOS, ESQ.

THE COURT: Good morning. We'll hear your next witness.

MR. ZALESIN: Thank you, Your Honor.

McNeil calls Professor Michael Mazis.

Thereupon,

MICHAEL MAZIS

was called as a witness and, after having been first duly sworn, was examined and testified as follows:

MR. ZALESIN: May I proceed, Your Honor?

THE COURT: Yes.

DIRECT EXAMINATION

BY MR. ZALESIN:

Q. Good morning, Professor Mazis.

A. Good morning.

Q. What do you do for a living, sir?

A. I'm a professor of marketing in the School of Business at American University in Washington D. C.

Q. What kind of courses do you teach at American University?

A. I've taught courses in marketing research, consumer behavior, marketing management, principles of marketing, Internet marketing, and a couple of other courses.

Q. How long have you been at American University?

A. About 25 years.

Q. Can you give us a brief summary first of your educational background?

A. I have a B. S. in Economics from the Wharton School of the University of Pennsylvania; an M.B.A. degree from the Graduate School of Business at New York University; and a Ph.D. degree in Business Administration from Penn State, with a major in marketing and a minor in social psychology and statistics.

Q. Prior to going over to the American University in academia, what were you doing in your professional career?

A. I had taught previously at the University of Florida and taught there for five years. And that was my other academic position.

And I have also had positions in industry and government. I worked in marketing research for Warner-Lambert Pharmaceutical Company where I conducted surveys and did other work related to marketing.

I worked for three years at the Food and Drug Administration and Federal Trade Commission in Washington and conducted a lot of survey work for them.

And for about the last 15 or 20 years I've done a lot of consulting for the government. Up until even just recently I've worked a day a week at the

Federal Trade Commission.

And I've done work for the Food and Drug Administration; consumer Product Safety Commission; U.S. Mint; Bureau of Alcohol Tobacco and Firearms; State of California.

I've conducted surveys for all the those organizations.

Q. Can you just give one or two examples of the kind of work you have done for the last, say, five years for the Federal Trade Commission?

A. Well, right now, actually I have a study that's going to trial that involves a product called Abforce. It's one of these abdominal belts that you put around your abdomen and they vibrate and supposedly you will lose inches and lose weight as a result of using that. That's a false advertising case. So I conducted a survey for the F.T.C., and I'm going to be testifying on that shortly.

Q. Let me show you Plaintiff's Exhibit 55.

(Document handed to the witness.)

Is Exhibit 55 a copy of your curriculum vitae?

A. Yes.

Q. Let's talk about your work on this case. First, when were you first contacted about getting involved in any way in this proceeding?

A. It was Thursday, February 12th. It was about two weeks -- I guess that would be 15 days ago.

Q. Who contacted you?

A. Karla Sanchez from Patterson Belknap.

Q. So you can't blame me.

(Laughter.)

What were you asked to do? What did she ask you do?

A. She asked, first of all, if I had the time to work an a project that needed to be completed in a very short period of time. And I said I could move some things around and work on it. And she described it as a conducting a secondary meaning survey that involved the product called SPLENDA.

Q. Have you been involved in trademark cases before? Had you heard of secondary meaning?

A. Yes.

Q. What did you understand the objective of this kind of survey to be?

A. My understanding was it was, they wanted to conduct the survey among no- calorie sweetener purchasers in Puerto Rico. And the idea was that when people would view the trade dress of SPLENDA, whether people would know that the trade dress was associated with a single source or a single brand and whether that

brand was SPLENDA.

Q. Is there a standard methodology that's used to assess that?

A. There is, and it's been written about a lot. And Vincent Paladino is certainly one source of that.

Q. How generally is it done?

A. Well, generally the way the surveys are done is that you remove the identifying information that would describe the product. And so you show people, say, this package, and it only has the trade dress; it doesn't have the identifying information.

And then you see, you ask people if they know who put out this product and whether this product was put out by just a single company, a single source.

And then typically you would have a control product that you would use also that would have different trade dress to determine whether people might be guessing. Because in this case one issue is that SPLENDA is well known. So there is a certain percentage of people who could look at any package and just guess that it was SPLENDA just based on the fact that it's one of the market leaders. And that would just come at the top of their mind.

So the idea is you give people a more neutral stimulus that doesn't look like the SPLENDA box, and if

they say SPLENDA, then that's what you might consider the "noise rate."

Q. So if I understand correctly, in order to create this, a stimulus is the thing you showed to the people in the survey?

A. Yes.

Q. In order to create the stimulus you would start with the actual SPLENDA package that's in evidence, Plaintiff's Exhibit 1?

A. Yes.

Q. You have one of those in front of you.

And then the idea is to remove the brand name or the other text that identifies the product, just leaving the trade dress?

A. Right. And so what we did was we took the SPLENDA and left on the yellow and the cloud around the name, left on -- it was a no-calorie sweetener; left on the coffee cup with the packet and the iced tea, but delete everything else: deleted the name --

Q. Let me stop you for a second and let's move this into evidence, Plaintiff Exhibit 49 and 49A as a two-dimensional version of it. Maybe we could hand one of it up to the Court as you describe it.

MR. ZALESIN: Do you want to give one to Judge Garcia?

(A box and a document handed to the judge.)

You were describing the stimulus that was used?

A. Right. It's a very simple process. It's simple if you can have access to the boxes. But any way you just merely eliminate all the product identifying information, and you leave on the trade dress. And essentially if people look at this package and they identify whether this is identified with a single source or brand and what the brand is.

So this survey is very straight forward.

Q. You mentioned also a control package. Can you explain again what that's about?

A. Right. Well, as I mentioned before, we wanted to pick a stimulus that didn't look like SPLENDA to try to control for noise and in this case for guessing. So this was the package that was selected.

MR. ZALESIN: Let's put that in evidence, Plaintiff Exhibit 50.

(Document and box handed to the witness.)

Q. So before we get to Exhibit 50, you have in front of you Plaintiff's Exhibit 51, the red and white box that says SPLENDA on it?

A. Right.

Q. Can you explain what Exhibit 51 is? It's already in evidence.

A. Right. When I got involved in this study, one thing that I insist on is that we have some kind of control product, if that's at all possible. And I directed Johnson & Johnson to try to find me something. And they came up with this package that had been sold on the Internet. It wasn't sold in Puerto Rico. So this would be a package Puerto Rican no-calorie purchasers, they wouldn't be familiar with it, they wouldn't associate it with SPLENDA.

So the idea was to take this box, use this as a control. It obviously doesn't have the yellow and it doesn't have the cloud and it doesn't have the gradation in the blue that's in the name. It's totally different. And to give people this box, only delete the brand information and see how many people identified this as SPLENDA. So in that way we can see 'these people must be guessing.'

Q. Okay. And that's Plaintiff's Exhibit 50, that's the so-called "control stimulus" that was created?

A. Yes.

Q. How many people were interviewed in each group, the group that saw the yellow SPLENDA trade

dress and the group that saw the control trade dress?

A. About 200 saw what we call the "test product," the SPLENDA product at issue, the yellow box; and 100 were exposed to the control product, the red, white and blue product.

Q. Who prepared the questionnaire, the questions that is were asked of the people who participated in the survey?

A. I did.

Q. Let me show you first Plaintiff's Exhibit 57.

(Document handed to the witness.)

(Publishing on the monitor.)

Would you tell us what Exhibit 57 is?

A. Excuse me. I have three copies.

Q. Can we give some to the Court?

(Copy given to the Court.)

A. This is the screener.

Q. What is a screener?

A. A screener is a questionnaire that's developed in which you screen people to find people who are eligible to do the study, that they meet certain eligibility characteristics.

Q. And there are a series of questions in the A through E here on the screen. Can you just take us through them and explain what you're asking and why

you're asking it?

A. Right. Well, some of these are sort of standard questions that you ask in these screening questions. question A asks whether people work in certain occupations.

The idea here is to eliminate any people that might have some specialized knowledge, such as for example, if somebody worked at a store or a company that sells food products that might know more than the average person.

B, we want to get people who aren't professional marketing research survey participants. So we sort of eliminate those in B.

Q. So if people answer yes to those kinds of screening questions, they are automatically out of the survey?

A. Yes.

Q. And they wouldn't be included in the 200 that you mentioned earlier?

A. No.

Q. So let's go on to the next page, Question C.

A. Question C. indicates -- we are looking for people in certain age categories. And the idea is to look at the market for no-calorie sweetener purchasing and to try to match the demographic characteristics in

terms of the age and also gender to what the market is in Puerto Rico. So that's what that's used for.

Q. How about the next screening question, Question D?

A. Questions D and E, there are the most important questions, because here we are trying to come up with people who are regular purchasers of no-calorie sweeteners. That's the pertinent market here.

So D asks about products that you yourself have purchased in the past three months; and E, products that you expect to purchase in the next three months. And some of them would have to answer yes to the no- calorie sweetener part of that to qualify.

Q. Okay. And if they give the right responses to all of these five screening questions, that is, they are not employed by a food company and they buy no-calorie sweeteners on a regular basis, are they then invited to participate?

A. They are, with the exception of the last questions here.

Q. All right. Questions F through H. I'm sorry. So what are those about?

A. F and G is the eyeglasses and contact lenses. Obviously, if some person forgot to bring glasses, didn't have the glasses at the time and couldn't read

the package very clearly, then obviously we wouldn't want that person in the study.

Q. Okay. And then if the person passes through the screener and agrees to participate in the survey, they are then administered an additional questionnaire?

A. Yes, the main questionnaire in the study.

MR. ZALESIN: May I have Exhibit 59, please?

Q. Who prepared the main questionnaire in this survey?

A. I did.

(Document handed to the witness and to the Court.)

Q. So once again, Professor Mazis, would you just kind of briefly take us through this questionnaire, specifically the questions you're asking and the purpose of why you're asking them?

A. Okay. First, there is a brief introduction that says there are no right or wrong answers to my questions, I just wanted to know what you think and what your opinions are, and if you don't have an opinion or don't know an answer, please tell me.

These are basically the standard questions that you ask in any of these types of surveys.

Question 1 says -- you're in front of the respondent, and you say, "Here is a package of

no-calorie sweetener with the brand name removed. Please look at the package as you would if you saw it in the store."

And then the interviewer hands the package to the respondent. And it says, "Hand the package and permit him or her to handle and examine. After respondent has examined the package, remove from sight and continue."

Then the first question is asked, "Have you ever seen or purchased a no-calorie sweetener that looks like the one I showed you or don't you know?"

Q. Why do you want to ask that question?

A. If people are totally unfamiliar with this package, you want to try to reduce guessing. So this one way to do that.

Q. If they are not familiar, that's it, the survey is over?

A. It's over for them, yes.

Q. For those people who say they are familiar with it, what happens next?

A. Then the second question is asked.

Q. Let me stop there. There are actually four possible responses that are printed on the questionnaire in response to Question 1. There is "yes," there is "no," there is "don't know," or there

is "no opinion."

Among those, which people are invited to go further and which people are removed from the survey?

A. You can see to the left, next to each response. It indicates where the interviewer is supposed to go. It's kind of a direction to the interviewer. So it says, "If the person says yes, go to Question 1," which is the main follow up. And, "if the person answers no, don't know, or no opinion, then they go to Q5," which is basically the end. They are basically thanked and that's the end of it.

Q. So those people that answered yes to Question 1, what happens next?

A. Then they are asked Question 2, "Have you seen or purchased only one brand or more than one brand of no-calorie sweetener that looks like the one I showed you, or don't you know?"

Q. What is the purpose for that question?

A. That's one of the two key questions, because it's determined whether people identify the trade dress with a single source or multiple sources.

Q. And for those people who say "one brand," they go where? According to the instructions they go to Question 3?

A. Yes, they go to Question 3. And the people

that said "more than one brand," they go to Question 4, which is actually a similar question but it's slightly different wording to it.

And then Question 5 -- I mean, "don't know or no opinion," they go to Q5, which is they are out of the survey at that point because they don't know, they don't have an answer. So their answers are not pertinent at this point.

Q. Okay. Let's go on to Question 3. This is the one that's asked of people who say "one brand" in response to Question 2?

A. Right.

Q. What is Question 3?

A. Question 3A, it says, "What do you think is the brand name of the no-calorie sweetener that I showed you?"

And the interviewer is just supposed to record that. It's very straight forward; a very simple question.

And then "Why do you think that?" And people say things like "the color" or "the design of the package" or something like that.

And then it says, "After asking Questions 3A and 3B, go to 5." In other words, the person is finished, and that's it. It's a very simple survey.

Q. For those people who say "more than one brand" in response to Question 2, they get Question 4 instead of 3?
A. Yes. Question 4A is exactly the same as 3A, except it says "What do you think are the brand names?"
Q. So it's plural?
A. It's plural. That's the only difference.
Q. Okay. And the same thing, "Why do you think that?"
A. "Why do you think that?" That's question is the same.
Q. And then that's it, the survey is over?
A. That's it. That's the whole survey.
Q. I assume you prepared these questionnaires in English. Is that right?
A. Yes, I prepared them in English.
Q. Were they then translated into Spanish?
A. Yes.
MR. ZALESIN: May I have Exhibit 61, please?
(Documents handed to the witness and to the Court.
Q. Have you seen Exhibit 61 before?
A. Yes.
Q. Are these the Spanish versions of the questionnaire that were used in the survey?

A. Yes. It's essentially the same survey, although there were some minor changes that were made giving the field situation when Advanced Research, who was managing the survey, got the survey. There were certain adjustments made to the survey.
Q. Was the wording of the questions changed?
A. No, the wording of the questions wasn't changed. Just as an example, I originally -- if you notice, right in the center it says "Version 1." I originally envisioned that there would be a Version 1 and a Version 2, that they would be exactly the same; one would be yellow and one would be white.
They thought it would be better for the interviewer if they only used one version. So, actually, the only thing that was administered was Version 1. And then the interviewer checked off whether the yellow -- half of them were printed in yellow; 200 were printed in yellow and 100 were printed in white. So that identified which package people got.
So they made changes like that. And there were some other changes that were made, but none to the questions -- that I know of, anyway.
Q. Where was the interviewing in this survey conducted?
A. It was conducted in -- well, one thing, just

to explain here. We decided it would be quite useful to do an island-wide study. We didn't want to just talk to people in, say, just in San Juan. They might be more urbanized and might be different than people in other areas. So we decided to interview people in six different parts of the island. So we wanted to get that geographic diversity.
Q. And then in terms of where the interviews were carried out.
A. The interviews were carried out in 14 different locations in these six areas. In some of the cases -- about half of the cases that people were interviewed in shopping centers; and in the other cases they were interviewed in various public places in which the interviewers could intercept people and show them the box and administer the questionnaire to them.
Q. I assume you didn't personally conduct all these interviews; right?
A. No. There was a field service called "Conscious Marketing," and they did the interviewing and they had a lot of interviewers.
Q. I'm sorry. You were describing the field service and their work?
A. Auri Beltran is the person who runs Conscious Marketing, and she has this team of interviewers. She

trained them, and then they -- she actually had two different training sessions for the interviewers. And she deployed them and gave them all instructions, deployed them throughout the island. All the data were collected over a 3-day period.
Q. Let me show you Plaintiff's Exhibit 56.
(Documents handed to the witness and to the Court.)
Can you tell us what Exhibit 56 is?
A. 56 is the report that was issued by Advanced Research Center, with Leroy Lopez, the president, who had this prepared under his supervision.
Q. What is Advanced Search Center? What was their role in the survey?
A. They managed the survey. I think it says here in the second page. It says they performed the coding and tabulation of the questionnaires and the tables, and they were kind of the liaison with Conscious Marketing in terms of fielding this study.
Q. Now, these tables have been hand numbered in lower right-hand corner. Can you turn to page 8?
A. Yes.
Q. I'll let you tell us what this is.
A. Okay.
(Publishing.)

If you recall, the first question in the survey asked people, "Have you ever seen or purchased a no-calorie sweetener that looks like the one I showed you or don't you know?"

And it turned out when people were exposed to the yellow box, they -- this is the SPLENDA box -- 87 percent said yes, 13 percent said no.

So those 26 no people, they weren't asked any other questions. It's only the 174 that were carried forward.

Q. Let's first describe the results for the yellow and we'll go back and talk about and the other one, the white.

If you will turn to page 10 and tell us what that is?

A. Yes. Okay. The second question, which was the issue of whether there was a sole source. On the yellow box version, of 174 people that went forward because they said yes to the first question, 146 said that the yellow box, the SPLENDA box, was associated with one brand; 26 said more than one brand; 2 said don't know. The don't know people were eliminated at that point. And you see 26 said they had not seen or purchased one that looks like the one shown, those people had been already eliminated previously.

Q. So when you see that percentage to the right of that number, of the 146 people who said one brand, and then it says 73 percent, what does the 73 percent represent?

A. Well, if you look at the bottom, it shows it's of the 200 in the entire sample.

Q. So this is saying roughly three-quarters of these people who qualified for the survey because they are no-calorie sweetener purchasers in the Puerto Rico, recognize the SPLENDA trade dress as being only being one brand of no-calorie sweetener?

A. Yes.

Q. Let's go on to Question 3, which would be asked of those people who said only one brand, those 146 people or the 73 percent. I believe that's page 12 at the lower right-hand corner.

Can you tell us what page 12 reflects?

A. Page 12 is the Question 3 that asks people once they indicated -- this is for the single source people -- once they indicated that there was only one brand mentioned, they were asked, "What do you think is the brand name of the no-calorie sweetener that I showed you?"

And the vast majority of these people who were asked the question said SPLENDA. In other words, 125

said SPLENDA or 62.5 percent of the entire 200.

But if you wanted to just took at it as the percent of people who were just asked the question, you can see SPLENDA, 125, and the most prominent name was SAME; 8 people said SAME and 6 people said EQUAL and so on.

Q. If you look at the people who saw the white box, the control box, what does that show in terms of the number of people who mentioned SPLENDA there?

A. Here, if you remember, we are trying to get the guessing rate or the noise factor here. And even though this box, red, white and blue, it doesn't look anything like the SPLENDA box, actually 4 people answered SPLENDA or 4 percent, which I'm asserting that's the noise, the guessing rate that needs to be subtracted from the 62.5 SPLENDA number.

So if you net out 62.5 percent minus 4 percent, you get 58.5 percent as the net number that identifies SPLENDA net of control.

Q. So among no-calorie sweetener purchasers in Puerto Rico, 58-and-a-half percent recognized the SPLENDA box, recognize it to be only one brand and identify it as only SPLENDA?

A. Correct.

Q. Now, I notice also in the control results for

the white box, there were 24 people who said EQUAL?

A. Yes.

Q. Let me show you what's already in evidence as Plaintiff's Exhibit 4.

(Box handed to the witness.)

First of all, were you surprised by that result of 24?

A. Yes, even though it's not an extraordinarily high number, still, yes, I was surprised; because when we picked the control, we didn't think it looked anything like the EQUAL box. But, obviously, 24 percent of consumers did associate SPLENDA, did identify SPLENDA as the -- I mean EQUAL as the one brand. And their answers indicate it was mostly because of the red, white, and blue.

Q. So there are the colors that are showing on the screen, the EQUAL versus the control colors in common.

Are there any other common elements between the EQUAL and the control trade dress?

A. There is the strawberry. EQUAL has a big strawberry. The old Internet SPLENDA box has 3 strawberries. There are packets on there that are blue; it's a different color blue, but there are packets.

I can see why 24 percent said that. Again, compared to the number that identified SPLENDA in the SPLENDA box, 62-and-a-half percent, it's obviously much lower than that. But about a quarter of the people did wind up noting that EQUAL was the single source brand they identified.

Q. Does that detract from the conclusion, in your opinion, that net of the control about 58-and-a-half percent of these no-calorie sweetener purchasers in Puerto Rico identified the SPLENDA trade dress only with SPLENDA?

A. No, because the idea here is that you want to get a package that doesn't look like the SPLENDA package, and you want to see how many people are going to guess SPLENDA. And that's the noise control.

Q. Finally, with respect to your survey, would you go to page 14 of the report and explain what that is?

A. On page 14 people in 3B were asked, "Why do you think that?" And if you look at the yellow box mentions, it shows that the predominant answer was the color of the box.

Q. It's 110 in the first line?

A. Right, it's the 110. And all the others held by comparison: pictures on the box was the next

highest, 32 people said that; the design, 22 people said that; 17 said letters, color of letters; 20 people said "that is the brand I use/buy."

But clearly color was the dominant response.

MR. ZALESIN: Could I have Exhibit 7, please?

(Documents handed to the witness and to the Court.)

Q. Is Exhibit 73 a slide that you prepared?

A. Yes.

Q. And these are your collusions from the survey you just described?

A. Yes.

Q. Would you summarize them for us?

A. Yes. Conclusion 1, the SPLENDA trade dress is recognized by a high percentage: 87 percent of purchase of no-calorie sweeteners in Puerto Rico.

2, a high percentage of category purchasers associate the SPLENDA trade dress with only one brand of no-calorie sweeteners: 73 percent.

And 3rd, a substantial majority, 58.5 percent net of noise or net of the control, identify SPLENDA as the single brand or source associated with the SPLENDA trade dress.

Q. Now, Professor Mazis, when did you arrive in Puerto Rico for this experience?

A. Let me think now. It was Wednesday morning.

Q. And when you arrived on Wednesday morning did you learn that the defendant Merisant also had a survey that it had turned over the previous evening?

A. Yes.

Q. Since Wednesday morning have you had some time to review and analyze Merisant's survey?

A. I can't say I've had a lot of time, but I have looked at it and have some observations about it.

Q. Okay. Was that a secondary meaning survey or some other kind of survey?

A. No, it was a confusion survey.

Q. So designed to determine the level of confusion between SPLENDA and SAME?

A. Yes.

Q. Let me show you first Defendant's Exhibit NN, which I think you have a copy of it in front of you?

A. Yes, I do.

Q. Can you tell us what this is and also tell us generally had the defendant's survey was done?

A. Okay. Well, actually, there were a lot of similarities in terms of people were screened. And the first -- right on the first page are the screening questions.

He screened -- Mr. Johnson screened pretty

much the way I did. In the middle there, Roman numeral 4A, he said, "during the past 3 months have you purchased a sugar substitute product, either for yourself or someone else in your household?"

And then B, "Looking ahead in the coming 3 months, do you plan to purchase sugar substitutes again?"

That is virtuously the same question that I asked in the screener.

Going down, "Have you participated in any market research survey in the past 3 months?" He was trying to eliminate professional responders.

And then Question 6, VI, "Does any member of you family work for a marketing research firm," and so on.

Again, similar question to the one I asked.

So the screening in terms of his objective here was to screen people so that we had regular no-calorie sweetener purchasers.

Q. It's the same that you did?

A. Yes, this is fine.

Q. This was carried out in Puerto Rico like your survey?

A. Yes.

Q. Where in Puerto Rico were these interviews

conducted?

A. My understanding it was in 3 shopping centers in the San Juan area.

Q. Only the San Juan and not island-wide like your survey?

A. Correct.

Q. Do you see any advantage to doing it one way or the other?

A. Well, I think geographic diversity, if one can obtain it, it's useful. It gives you a more representative sample.

Q. Will you explain the basic design of Mr. Johnson's survey, what respondents were shown?

A. I've got the two exhibits here.

Q. So they were shown either the yellow SAME box -- there should be an exhibit sticker. I think it's on the side panel.

A. Right. This is Plaintiff Exhibit 2. They were neither shown - half of the people were shown the SAME package, and half of the people were shown the SUGAR twin package.

Q. Plaintiff Exhibit 30?

A. Plaintiff Exhibit 30, which Mr. Johnson claims that the SUGAR TWIN product is the control product in this study.

Q. When you say they were shown, similar to your survey, they were given the package and given the chance to look at it as if they were considering it for purchase and then he takes it away?

A. Right, same thing. And the same as my study. Each group only gets one package.

Q. Let's just go through his questions quickly. We have retyped them here with the data just to make it more accessible. Can you explain what he does in Question 1A?

A. The first question says, "Based on what you just saw, do you or don't you know who or what brand or company makes or puts out the sugar substitute that I showed you?"

Q. And then the data reflected underneath for the people who saw the SAME box and the people who saw the SUGAR TWIN box, what do you see there?

A. You have to remember at this point, the person was just shown the box, and then it was taken away from the person. So the people were then asked "what company makes or puts out the sugar substitute that I showed you?"

Only 12 percent of the people identified that product that they had just seen, with SAME, where they identified that company as the -- no, I'm sorry. I'm

getting confused myself on this thing.

The first question is what we call a "filter question." The filter question is asked them, "Do who know who or what company puts out this product?"

And even though they have just seen the product, only 12 percent of the people exposed to SAME said they knew who or what company makes or puts out this product. It was 15.8 percent for SUGAR TWIN, which is saying 88 percent of the people had no idea who or what company puts or makes out the product they had just seen about 30 seconds ago.

Q. Or what brand?

A. Or what brand, yes.

Q. That's one of the things that's asked about?

A. Yes, who or what company or brand or company makes. Is they had just seen it, and 88 percent of the people had no idea what the brand is.

Q. Let's talk about Question 1B. What happens there?

A. At that point there aren't very many people left in the survey for this question, because there was only about 12 percent of the people, if you remember, who said, yes. And it says, "Who or what brand or company do you believe makes or puts out the sugar substitute that I showed you?"

Of the people left, 4.1 of the same group said SPLENDA; and the SUGAR TWIN group it was 2.2 percent answered SPLENDA. And you can see the other answers there: SAME is 2.4, and 2.4 in the SUGAR TWIN cell.

Q. Let me understand. There are shown a box of SAME and are given as much time as they want to examine and, and that box is the actual SAME box with the brand name on it?

A. Yes, it doesn't have anything deleted.

Q. So they look at the box and takes it away, and a few seconds later only 3 and-a-half percent, roughly, of the people can say what brand it is?

A. That's right.

Q. Let's go on to Question 2A and tell us what's happening there.

A. 2A asks -- now all the people get asked 2A. So if they got filtered out on 1A, they still got back into the survey again. And that's fine. There is nothing wrong the that.

"Do you believe that whoever makes or puts out the sugar substitute I showed you is or is not related to, sponsored by, or associated with any other brands or manufacturer?"

41 percent of the people said they did believe that there was some relationship or sponsorship or

association with some other brands or manufacturers; 41 percent, almost half of the same group people exposed to the SAME box said yes; and 45.9 percent of the people who were exposed to SUGAR TWIN, they said yes to that question.

Q. And the rest said no or no opinion?

A. Right. So a little more than -- between 50 and 60 percent said no or no opinion.

Q. For those who said yes, they are asked Question 2B?

A. Yes, that's the follow up question: "If yes, who would that be?" Then follow up on any others.

In the SAME group it was 22 percent of the same people exposed to SAME said that SPLENDA was the company that was -- or brand that was related to or associated and so on.

In the SUGAR TWIN group it was 19.2 percent. Mr. Johnson considers that to be the control. And so he nets out the difference between the control group, the test group, which is the SAME group, and what he calls the "control group," the SUGAR TWIN; and the difference between 22.0 and 19.8 is 2.8 -- according to higher math here -- 2.8 percent difference. So Mr. Johnson concludes there must not be confusion here because 2.8 percent is a pretty low confusion number.

Q. Does he also look at the net confusion based on the two questions, 1B and 2B?

A. Right. So he goes further and accumulates it, which is the proper thing to do.

So looking at then taking the answers from 1B and 2B, the SPLENDA number was 24.9; and for SUGAR TWIN the SPLENDA mentioned was 20.6; and the difference between the two is 4.3 percent. And that was Mr. Johnson's confusion rate, that he based it on that calculation.

Q. Okay.

A. And he concludes that's a low confusion number and there isn't much confusion here produced by the SAME package.

Q. Now, I know you have a number of thoughts about this survey, and we are going to go through them.

First of all, are you familiar with survey research that uses this basic design to show people the product, take it away, and then you ask them a series of these questions?

A. Yes. Standard procedure in survey research.

Q. Is there a name that's given to this particular kind of survey design in a trademark case?

A. In the confusion area, sort of the prototype that's talked about is the Ever Ready design, I guess

made famous in the Union Carbide case involving sort of an Ever Ready knock off.

Q. You're familiar with a reference called "McCarthy on Trademarks"?

A. Yes.

Q. It's one that both sides have cited in this case. I'm showing you an excerpt from McCarthy on Trademarks, Section 32.074, and he says, "Now standard survey format used to proved likely confusion in cases where plaintiff makes some products which defendant does not is the Ever Ready format."

That's the Union Carbide against Ever Ready case you were talking about?

A. Yes.

Q. He goes through here what the Ever Ready format is. Let's see how Mr. McCarthy describes it.

By the way, have you had an opportunity to review the actual case, the Ever Ready case?

A. I perused it, but I can't say I've studied the whole thing.

Q. Okay. Let's see how Mr. McCarthy describes an Ever Ready survey. First he starts with -- No. 1 starts the screening questions?

A. Right.

Q. And on the next page there are some additional

questions, 2, 3, and 4. Will you read those?

A. This Every Ready procedure is very simple. I mean, I will say, having conducted surveys for over 30 years, you have to make surveys simple so consumers can understand them. And this a very simple, understandable procedure. "Who do you think puts out the lamp shown here?"

Q. That case was about lamps, Ever Ready?

A. Yes.

Q. So, "Who do you think puts out the lamp shown here?" That's Question 2. And Question 3 is what?

A. "What makes you think so?"

Q. And Question 4?

A. "Please name any other products put out by the same concern which puts out the lamps shown here."

Q. And that's the whole survey.

A. Yes.

Q. Now, let's compare the survey that was done in the Every Ready case and described in McCarthy to what Mr. Johnson actually did.

A. Okay. If Mr. Johnson had used the Ever Ready format -- and I'm not maintaining here that this is the only format that one can use. Obviously, there are different ways to ask questions. But this provides sort of a good exemplar in comparing his questions to

the standard here.

When you look at the Ever Ready method, if he would have used that, it would be 'Who do you think puts out the sugar substitute shown here?'

Mr. Johnson uses a two-part question. And I will say, having been involved in some of these cases, if you wanted to design a question that would not show confusion, this would be a good method. And the reason is the questioning is so convoluted.

If you read the question, honestly, I had to read the thing over a couple of times to try to understand it. It says, "Based on what you just saw, do you or don't you know who or what brand or company makes or puts out the sugar substitute that I showed you?"

I counted four "or's" in that question. I was kind of thinking about rowing: or, or, or, or. It just keeps going with all these or's. It's very confusing.

And most people said no. They didn't pass through this question. Only 12 percent of the people actually answered affirmatively, which isn't to say that everyone has an opinion on this.

Q. But these are people who just looked at the box; right?

A. Right, they just looked at. And to say after you just looked at it, "Do you know what brand or company makes or puts out this product?" I mean, come on; you just saw the thing.

They might not know it's Merisant, for example, and a lot of people wouldn't. But certainly the brand is SAME. Why wouldn't they say that?

And then it says, "If yes, who or what brand or company do you believe makes or puts out the sugar substitute that I showed?"

There is nothing wrong with that question. It wasn't asked of very many people.

Q. So he has filtered out 88 percent of the people with that Question 1?

A. Right. If he wanted to design something to push down, to suppress the confusion rate, this would be a good approach, because it's just not a very understandable sequence to people.

Q. Let's go on. What happens as the survey progresses? Again, we have the Ever Ready design on the left, and Mr. Johnson's design on the right.

A. Then, "What makes you think so?" That's the Every Ready.

Mr. Johnson's question is fine. "What makes you say that?" And you fill in the answer they gave

you. "What makes you say that?" For example, you would put in SAME or, Merisant.

"What makes you say that SAME makes or puts out the sugar substitute that I showed you?" And they give an answer such as the package color or something like that.

Q. And then Mr. Johnson's Question 2, I guess, 2A, B, C, are on the right and the Ever Ready is on the left. Can you talk about that?

A. Yes. The Ever Ready question is just very, very simple. "Please name any other products put out by the same concern which puts out the sugar substitute shown here."

Obviously, they didn't use sugar substitute, but I'm filling that in, because that's the way you would phrase it.

Mr. Johnson's question was: "Do you believe that whoever makes or puts out the sugar substitute I showed you, is or is not related to or sponsored by or associated with any other brands or manufacturer?"

Again, I found four "or's" in there. It's just not a user friendly kind of question. And, again, "If yes, who would that be?" Any others; which is fine.

What else makes you say that? What else?

Those are fine.

Q. So we are clear, those two questions that you talked about with the four or's, Questions 1A and 2A. Question 1A, Mr. Johnson lost, what, 88 percent of the respondents?

A. Yes.

Q. And Question 2A, he lost about 57 percent?

A. Yes.

Q. Now, I'm also going to show you an excerpt from Mr. Johnson's declaration in this case.

You said that in your survey you used that red and white SPLENDA box, the so-called control stimulus to filter out noise. Do you recall that?

A. Yes.

Q. What is noise again?

A. Noise is external factors. You think of this as sometimes -- I think the term came up from electrical circuits, that somehow there is noise that interferes with the circuit, disrupts it, an outside factor. And in survey research it means that you can't rely on the conclusions because there could be some outside factor that could have caused the result that you observed.

So the types of issues that are usually thought about in outside factors are either people

guess the answer. In other words, because SPLENDA is a well known brand, they just guess SPLENDA. Or it could be produced by biases in the question wording. If you worded the question in a particular way that biased people, your result may be due not so much to what you found but may the due to the biasing nature of the question.

So usually guessing or sometimes called "pre-existing knowledge" and question wording are usually the two items that interfere with your being about to make a definitive statement about a certain study.

Q. And the purpose of the control is to assess the level of that kind of noise so you can subtract it out?

A. Yes, as best you can. It's not a perfect process, but in these studies you try to come up with some stimulus that's relatively neutral that doesn't share in the characteristics of the origin product to try to assess how many people, for example, would say SPLENDA.

Q. No matter what you showed them.

A. No matter what you showed them. It's basically a guessing rate.

Q. So in Mr. Johnson's declaration he has some

discussion of noise. Let me start first with paragraph 8 of his declaration. He says, "It is also the generally accepted practice to include such a control group to account for whatever proportion of the relevant universe might guess or plausibly name a product brand or manufacturer as a source simply because it is a popular product in the same genre of products."

Is that essentially what you just said?

A. Well, it's certainly a big source of noise. As I said, the other issue has to do with question wording. You get a bias in the question. He doesn't mention that.

Q. This is one type of noise?

A. Yes.

Q. Let's look at the preceding paragraph, paragraph 7. He says in that paragraph, "Such a control is essential to measure the general noise level caused by popularity or market share."

Do you have any disagreement with that?

A. No.

Q. Then he goes on to say, "Such a control is necessary to measure as well as similarities in the common attributes of packaging, like colors which are used on products, as well as graphics which show how

such products are used or may appear."

Is that consistent with the definition of noise as you have always used it in your career?

A. No. I've been doing this research for over 30 years. I've never seen anybody define noise that way or even close to that.

Q. So is it appropriate in a survey to use a control to so-called filter out that kind of noise, the noise I have highlighted in blue from Mr. Johnson's declaration?

A. No, it's not noise.

Q. What is it?

A. Well, it's another factor that you might want to study, but it isn't noise. It's not guessing or question wording. It's totally something else. It's just not relevant.

Q. So let's understand. Mr. Johnson showed half of his respondents the SAME package. That's the one that is at issue in this case; right?

A. Right.

Q. And the other half he showed the SUGAR TWIN package?

A. Yes.

Q. He subtracted from the people who mentioned SPLENDA when they saw the SAME package the number of

people who mentioned SPLENDA when they saw the SUGAR TWIN package.

A. Yes.

Q. So he treated all of the people who mentioned SPLENDA when exposed to SUGAR TWIN as "noise."

A. That's his theory.

Q. When you're doing one of these studies it is important to choose an appropriate control as an important research element?

A. I believe so.

Q. Why?

A. Well, I mean, there are two reasons. One is you don't know whether people are just guessing the answer; and the second reason is if you have some bias questions, the bias questions may be causing the results. So you don't really know.

The idea is to eliminate guessing and bias questions as a possible reason for the answers you got.

Q. So you definitely want to have a control. Is what you're saying?

A. In just about all cases it's appropriate to have a control.

Q. How do you go about choosing a control? How do you decide what is an appropriate control?

A. Well, I guess I would say it's sort of more

art than science really. I mean, certainly different people could come up with different controls that they might use. But the essential notion of the control in this case is we have a SAME package that's yellow and has blue writing on it, and we have the SUGAR TWIN package that's yellow. And so you've got an overlap of yellow in these two products. So when you compare SAME to SUGAR TWIN you're not getting the guessing rate because the results could be due to guessing, but they could be due to the similarity in the packages. That could be producing your result.

The idea here is you want to take the SAME responses and you want to adjust them in some way, because people may be guessing SPLENDA, as an example. Or maybe you questions have bias them so that they say SPLENDA.

You want to use some neutral stimulus so that you get the distinct that the SPLENDA mentions and it's solely based on this guessing rate.

And this doesn't do that, because we don't know what produced the responses to the SUGAR TWIN. It may have been guessing, and probably likely it's just yellow.

I've never seen this as a control. I've been doing this as a long time. It's not a noise control.





Q. Let's me show you Plaintiff's Exhibit 74.

(Documents handed to the witness and to the Court.)

What is Exhibit 74?

A. It's the reference guide on survey research put out by the Federal Judicial Center. It's a very authoritative source that is referred to very often in these survey cases.

Q. So if we look at the top of page 2, the second page of the document, this comes out of the reference manual on scientific evidence?

A. Yes, it does.

Q. The author, Shari Diamond, do you know her?

A. Not personally. I know of her.

Q. Are you familiar with this particular reference?

A. Oh, yes. I've used it many times in these survey cases.

Q. This is well respected by experts such as yourself?

A. Yes.

Q. Let me direct your attention to page 256 of this document. There is a section here, section F. If the survey was designed to test a causal proposition, did the survey include an appropriate control group of





questions?

This is a section that deals with the issue of control of the noise that we have been discussing?

A. Yes. It goes on for three or four pages, I think. But that's an important section in discussing appropriate controls.

Q. So let's just go through a couple of excerpts from this. You talked about the kind of noise that would be causing by people guessing, say, SPLENDA just because it's a very popular brand name.

Is that referred to here by Professor Diamond?

A. Yes. She gives us example of a secondary meaning survey. It's right above the highlighted portion. It says, "In a trademark survey attempting to show secondary meaning, for example, respondents were shown a picture of the stripes on MENNEN stick deodorant, the trade dress, and asked "Which brand would you say uses these stripes on the package?"

The Court recognized that the high percentage of respondents selecting MENNEN from an array of brand names may have represented "merely a playback of brand share." That is, respondents asked to give a brand name may guess the one that is most familiar, generally the brand with the largest market share.

Q. So that's the phenomenon you were talking





about. You don't want people just saying SPLENDA because SPLENDA IS the market leader in Puerto Rico.

A. Right.

Q. And you want a control for that; is that correct?

A. Yes.

Q. Let's go on. It talks about the purpose of the control group and what happens if you don't have one. Will you comment on page 257?

A. Yes. On the highlight, of course, she gives us an example. Toward the end of it she says, "Without the control group it is not possible to determine how much of the 40 percent that is due to respondents pre-existing beliefs or other background noise such as respondents misunderstanding the question or misstate their responses.

When she is talking about pre-existing beliefs here, this is really the guessing phenomenon here that based on your knowledge that MENNEN is the market leader and you have that belief when and supply that information.

So she says then, "Both pre-existing beliefs, such as your knowledge of SPLENDA or MENNEN, and other background noise should have produced similar response levels in the experimental and control groups.

Q. And is that consistent with the kind of noise that you have been talking about?

A. Yes.

Q. Does she anywhere in this article talk about the kind of noise that Mr. Johnson refers to in the second half of that sentence I showed you in paragraph 7 of his declaration, similarities and common attributes of packaging like colors, et cetera? Does she ever refer to that as noise?

A. No, nothing like that.

Q. Finally, with respect to Professor Diamond in the reference manual on survey and scientific evidence, I highlighted a section also on page 258. Can you comment on that?

A. Here she says "If, for example, the control stimulus in a case of alleged trademark infringement is in itself a likely source of consumer confusion, reactions to the experimental or control stimuli may not differ, because both cause respondents to express the same level of confusion.

Q. Does that have any application in this case of trademark or trade dress infringement?

A. I believe it does because, as we mentioned, SUGAR TWIN is yellow, and to the extend that people misidentify the maker or the brand and identify it as

SPLENDA, that may be due to the overlap because it's yellow. It's likely there is some confusion with SUGAR TWIN. We don't know how much because -- well, all we know is that it's not a good control.

Q. Do you accept Mr. Johnson's conclusion that only about 4 percent of consumers mistakenly associate the SAME trade dress at issue in this case with SPLENDA?

A. Not based on what I've seen here. A, he doesn't have an appropriate control, so we don't have any kind of noise adjustment here; and, secondly, there is likely some understatement. How much, I don't know. Because hardly any of those 24.9 percent SAME people were -- well, none of that came from that first question. And so it only came from the second question. So if the first question were asked properly in the Every Ready format, you might have gotten a higher number.

Q. So you think he may have gotten more than 25 percent if he had asked proper questions?

A. I think it's likely, but I can't prove that. I think the questions basically suppress the number of people who could be asked the question; and, therefore, if more people were asked the question, probably more would have said SPLENDA in response to that first

question.

It's just the first question so few people got asked the key question that the numbers are lot lower than they probably should be. You have to do another study the right questions to know what the real number really should be.

Q. Just one other question, Mr. Locascio suggested in his opening statement yesterday that obviously what must have happened here is that McNeil must have conducted its on confusion study, got bad results and then ditched it.

Did you have anything to do with any survey other than the secondary meaning survey that you conducted?

A. No, I didn't.

MR. ZALESIN: No further questions. Thank you.

THE COURT: I think I'll have a recess now.

(After break.)

THE COURT: I remind the witness he is under oath.

MR. LOCASCIO: May I proceed, Your Honor?

THE COURT: Yes.

CROSS-EXAMINATION

BY MR. LOCASCIO:

Q. Dr. Mazis, you were in the courtroom all day yesterday; right?

A. Yes.

Q. So you saw opening statements, you saw Ms. Sandler testify and the other witness. Is that right?

A. Yes.

Q. And you understand that this is a case about the trade dress of the SPLENDA package, in particular this package; correct?

A. Yes.

Q. This is not a case about the trademark in the color yellow. It's an overall trade dress case; correct?

A. Right.

Q. So you understand it's the overall impression of the package right?

A. Yes.

Q. And you remember there was some discussion during opening statements that my client Merisant believed that perhaps McNeil had not specifically identified what they were asserting was the trade dress in this case.

And Mr. Zalesin said, "Yes, we have; it's in our papers."

Do you remember that?

A. Not really.
Q. Let me ask you this question: Fair to say the biggest difference between your view of your survey and your view of Mr. Johnson's survey is whether the control should be yellow. Is that fair?
A. Could you repeat that?
Q. Sure. Your control in your survey is white; correct?
A. Yes.
Q. And Mr. Johnson used a control the SUGAR TWIN box, which has a yellow color on it; correct?
A. Yes.
Q. And you believe you believe that the use of the yellow box by Mr. Johnson was inappropriate. Fair?
A. Yes.
Q. And you think that lead to a lot of the data here that you think is misleading about Mr. Johnson's survey. Is that right?
A. That's part of it. That is an issue.
Q. Let me show you what McNeil is contending is the trade dress at issue in this case.
They listed specific elements. Have you seen this sort of thing before in a trade dress case? These are the elements we are seeking to protect.
A. Yes.

Q. You're familiar with that.
A. Yes.
Q. That's something that should and has to be done to know what's being protected.
A. I suppose so. I'm not an attorney. It sounds right.
Q. This first thing in the brief -- and this is their list of what they are protecting -- is a distinctive pastel yellow background; correct?
A. Yes.
Q. You saw Ms. Sandler testify that the color on SUGAR TWIN and DOMINO was a neon yellow and not a pastel yellow; correct?
A. Yes.
Q. And the second thing they are protecting is a brand name lettering that gradually dims from lighter to darker blue. That's the second element. Do you see that?
A. Yes.
Q. The SPLENDA box has that sort of lettering. It's light at the top and dark at the bottom; correct?
A. Yes.
Q. The SUGAR TWIN box, the lettering is not gradually dimming from lighter to dark. It's solid blue; correct?

A. Yes.
Q. And McNeil is not saying any brand name in blue. They are saying it has to gradually dim from lighter to darker; correct?
A. Yes.
Q. The next one says "a white cloud surrounding the brand name." That's the third component of the trade dress issue in this case.
Does the SUGAR TWIN box have a white cloud surrounding the brand name?
A. No.
Q. The fourth element being protected in this case, "a full coffee cup and saucer in the foreground on the right side of the package's front panel."
Dr. Mazis, the SUGAR TWIN box doesn't have a coffee cup with a saucer on the right side in the foreground, does it?
A. No.
Q. The fifth element. "The sweetener package resting on the saucer in the foreground."
Again, the SUGAR TWIN box does not have the sweetener package resting on the saucer on the foreground, does it?
It doesn't even have a saucer, so that seems like an easy one.

A. Right.
Q. The sixth element. "Yellow coloring and blue letter on the sweetener packets."
The SUGAR TWIN box has one packet and it has blue letters on yellow; correct?
A. Yes.
Q. So that's the only one so far that's even close to what McNeil has listed here; right?
A. Okay.
Q. The seventh element. "A glass with a cold beverage in the foreground on the left side of the package's front panel and the presence of fruit on the left side of the package's front panel."
Dr. Mazis, the SUGAR TWIN box does not have a cold beverage in the foreground on the left side and the presence of fruit on the left side of the package's front panel, does it?
A. I'm sorry. Which one were you reading to me?
Q. The seventh element of McNeil's trade dress issue in this case is not present in the SUGAR TWIN box; correct?
A. Holds a glass with a cold beverage in the foreground, left side of the front panel, presence of fruit.
No, it just has the cold beverage and the

fruit.

Q. And it's indeed actually behind the cup of coffee. So it's not in the foreground; right?

A. Right.

Q. The eighth element being asserted as the trade dress trade in this case is an informational banner in the lower-left corner of the front panel with a reference to sugar.

The lower-left corner of the SUGAR TWIN box has no mention, much less a reference to sugar on the banner; right?

A. Right.

Q. The ninth element and the last thing of this being the trade dress side at issue in this case is the dimensions and orientation of the package. That's this package, the SPLENDA package; correct?

A. Correct.

Q. The SUGAR TWIN box does not share the dimensions and orientation of that package, does it?

A. It doesn't share dimensions, but I think it shares the orientation, doesn't it? Isn't it horizontal?

Q. So one half of that element, being a box that's on a landscape or horizontal arrangement. But it's not the size or dimensions of this box.

A. The size is a little different, yes.

Q. Mr. Zalesin showed you a few pages from Ms. Diamond's commentary that's the reference guide on survey research; right?

A. Yes.

Q. That's respected. It's something you have used before.

A. Absolutely.

Q. Indeed it's in the Federal Judiciary Center's reference manual on scientific evidence; correct?

A. Yes.

Q. He cited something from the very top of this page up here. That was the carry over sentence.

Do you remember that?

A. Yes.

Q. And then there is something else down below. But let me show you what it says right in the middle.

And I'm sure my library staff will appreciate this.

(Highlighting in document on the monitor.)

It says quite clearly, "In designing a control group study the expert should select a stimulus for the control group that shares as many characteristics with the experimental stimulus."

That's what you're testing -- right? -- in this case the SPLENDA box.

A. Right.

Q. And for Mr. Johnson's survey, the SAME box.

A. Right.

Q. As possible, with one exception, you should exclude the characteristic whose influence is being assessed. And in this case that's the trade dress at issue, the list of things we just went through; right?

A. Right.

Q. So the Federal Judiciary Center's book, which you were talking about a minute is well respected -- it's Ms. Diamond's commentary -- makes clear the control used in the study should share as much as possible with the box being tested but exclude the specific elements being asserted by the plaintiff a the trade dress. Right?

A. Yes.

Q. And SUGAR TWIN box, you said, shares a lot of things with the SPLENDA box, and maybe that's why people associate it and perhaps it's a color yellow; it's a particular shade of yellow; or it's got a glass of iced tea on it.

But it does not share the same characteristics being asserted in this case, the list we just went

through from the SPLENDA box; right?

A. That's right. But it doesn't share the essential characteristic, which is color. That's the essential element here.

My survey shows how many people mentioned color. And Mr. Johnson's survey shows color is what is the primary identifier. That's what people are coming up with. That's what they are mentioning.

So color is the key characteristic. You can't have color overlap; otherwise, wise it's not a good control.

Q. So the value of your survey is based on the fact that the color of a yellow box is associated with SPLENDA, any color yellow.

A. I never said that.

Q. You're asserting that the color is the key part of your survey results; fair?

A. I'm talking bout in terms of what people are associating. What they're using to make the association is color. Half of the people said that.

Do other elements come up? Yes. They mentioned other elements; not that these other elements are irrelevant. They are relevant. But color was the thing they mentioned most often.

Q. Dr. Mazis, this case is not about the color

yellow; it's about the trade dress at issue; correct?

A. Yes.

Q. And the trade dress at issue specifically says "a distinctive pastel yellow background," as well as the other eight factors we looked at; right?

A. Right.

Q. Do you think this is a distinctive pastel yellow?

A. It isn't, but it's fairly close. It is yellow.

Q. Ms. Sandler said that it's neon yellow. Do you remember that?

A. I don't.

Q. You don't remember when she was on the witness stand you were over there and she said DOMINO and SUGAR TWIN were neon yellow; SPLENDA, SAME with sugar, pastel yellow. You don't remember that.

A. I don't remember, but I'll accept that she said that.

Q. Isn't it true that a non-infringing or product with a different overall impression is an appropriate control?

A. Could you repeat that?

Q. Sure. A control that is non-infringing or not causing confusion is appropriate; right?

A. That would be one of the elements.

Q. You want to look for when you're considering the control if the product is also confusingly similar, and, thus, infringing. That's not a very good control.

A. Correct. I'll say that's one of the elements. I agree.

Q. If the product has a different overall look and feel in the trade dress case, that might be a better control; fair?

A. Yes, you would want something that looks substantially different as a control.

Q. Ms. Sandler, in addition to testifying about the color being different, swore out an affidavit in this case. She's is McNeil's corporate representative.

And you remember there is issue as to SUGAR TWIN: Does it have anything to do with this case in response to McNeil's demands that they had rights in a box that was yellow?

And Merisant said 'SUGAR TWIN is out there and so is DOMINO. They were there before you. They used yellow. What gives?

McNeil and then Ms. Sandler in her declaration say -- and although SUGAR TWIN says --

THE COURT: I think it's the next page.

MR. LOCASCIO: Now I've got both. It's a

carry over. Thank you, Your Honor.

Q. "And although SUGAR TWIN uses yellow and blue colors in its trade dress, the overall look and feel of the -- " now, when she signed it the pagination didn't lay out the same way. It was a printout.

So the overall look and feel -- yet again, the Court is always right -- of the SUGAR TWIN package is very different from that of SPLENDA.

So McNeil's asserted trade dress in this case is not all yellow box. It's not even all yellow blue and white box. It's: Does it have those nine elements?

Right?

And Ms. Sandler says, "The overall look and feel, i.e., overall impression of this box is indeed very different than that of SPLENDA."

Right?

A. That's what she asserts.

Q. Well, you're not today on the witness stand saying that McNeil's position in this case is those nine elements, but I don't agree with that; I think they have rights in just a yellow box?

A. No, but Ms. Sandler is not a researcher. She is marketing vice president. She is a marketing

manager.

From a research point of view, there is no way that you would want to select a control that was yellow, because you don't know if the responses that people were giving to the so-called "control" are really controlling for guessing or is it just because there is some level of confusion because of the SUGAR TWIN box.

You can't sort that out. Why not use another box in a different color? It would be easy.

Q. Indeed if you use one that's different, people wouldn't connect it as closely to SPLENDA.

Your control had strawberries on it, which is on EQUAL's box; right?

A. Well, if you want --

Q. Dr. Mazis, on redirect you can say what you want. I'd like you to answer my question I ask it, please.

A. Could you repeat it?

Q. Sure. Your control had strawberries on it; correct?

A. Yes.

Q. And EQUAL has strawberries on it; right?

A. Yes.

Q. And did you notice a high correlation between

your control and EQUAL even though it had those three little strawberries on it?

A. wouldn't say it's a high correlation. Only 24 percent of the people said that.

Q. 24 percent of the people said that.

A. Much less than said SPLENDA to the SPLENDA box. But it certainly was higher than I would want to see.

Q. It wasn't a very good control. You would like to do it over?

A. No, I didn't say it wasn't a good control. I thought the control was fine. It's just sometimes in retrospect you go, 'Well, rather than red, white, and blue, maybe it should have been green or something.' Maybe that would have been a little better, but I think the control worked well.

Q. If there are multiple products in the marketplace that are yellow and one is the dominant -- has the largest market share -- and people see a yellow box, they might guess SPLENDA, because that's the one on top of their mind. Right?

A. Correct.

Q. And if they guessing SPLENDA because of yellow -- not because of the overall impression -- that's noise, because they are not making a connection

with the overall package. They are making a connection to the fact that's in a yellow box. Correct?

A. We don't know why they are doing it. You just don't know if people when SUGAR TWIN is shown to them there is two possibilities. One is they could just be guess SPLENDA. There may be the guessing rate. The other is they may be confused. They may actually associate or think that SPLENDA is somehow conducted with SUGAR TWIN.

The problem is you don't know which caused what. So it's not a true noise control, because you can't isolate what the rate of guessing is.

Q. So they are either looking at this and guessing. Because it's as if they are guessing in a room with the lights off. They just yell out a sweetener no matter what you show them.

That's one type of guessing.

A. I don't think I said that.

Q. Well, there are people who guess no matter what it looks like -- right? -- because of the sweetener they know.

A. Certainly there are people that do that.

Q. And then there are people who try to figure out the answer. They look at it and say, 'Well, I know another yellow product, so I'll guess SPLENDA.'

Correct?

A. Could be, yes.

Q. And those people are guessing; right?

A. Sure.

Q. And guessing is noise; right?

A. Right.

Q. Dr. Mazis, let me back up a step for you. We'll come back to this control issue.

Your report that you filed in this case was called "Interim Expert Report."

What does that mean?

A. What it meant was when it was initially filed, it wasn't complete. And when it was eventually filed --

Q. You mean sent us. Because it was never filed with the Court.

A. Right. We forgot to take off the "Interim." So it was an oversight.

Q. Basically, that meant "draft"?

A. Yes.

Q. And the version that has been turned over and was introduced here, that's the final version.

A. Yes.

MR. ZALESIN: Objection. Nothing has been introduced yet.

MR. LOCASCIO: Let's go ahead and look at that.

BY MR. LOCASCIO:

Q. You're not planning over the next week or two to supplement your report or any more research, are you?

A. I hope not.

Q. While we are getting the report out, you mentioned when you were initially contacted, you were asked to do a secondary meaning survey; right?

A. Right.

Q. You testified in other cases. You have done other surveys for people?

A. Yes.

Q. And you have done confusion surveys; right?

A. Yes.

Q. You were never asked to do a likelihood of confusion survey?

A. No.

Q. Did you suggest to them: Do you want me to also do a likelihood of confusion survey?

A. In the time allotted there is no way I could have done a second survey.

Q. So you had time to do one and just one.

A. I had barely enough time to do one, yes.

Q. You said you were contacted on the 12th; correct?
A. Yes.
Q. And your survey, I think you said, was done over a 3-day period; right?
A. Yes.
Q. Do you know what days that was?
A. Yes. It says in the Advance Research Report it was the weekend of the 20th and the 21st.
Q. Well, let me back up. You didn't ask the questions; right? You had people do that for you.
A. Yes, of course.
Q. And you actually had two steps removed. Sometimes you have a company you work with that they ask the questions; and then sometimes there is a company under them, that they tabulate the data; the people at the bottom of the chain ask the questions. Right?
A. Yes, usually I do it that way.
Q. That's your situation.
A. Yes.
Q. You never even talked to the people out there who were asking the questions.
A. No.
Q. I assume you talked to the people who

tabulated the data for you.
A. Yes.
Q. How do you know what date these questions were asked? What's the basis of that?
A. What date they were asked.
Q. Uh-huh.
A. I'm just taking the word of Advanced Research, the managers of the survey.
Q. Would it surprise you to know that some of the questionnaires -- let me put a little context on this.
There is an actual questionnaire filed out for each survey participant; right?
A. Yes.
Q. And you code them in some way. You put a number on them so you can say, 'What did participant 81 say about an issue?'
A. Correct.
Q. And then from that, you tabulate all answers; fair?
A. Yes.
Q. And Advanced Research Center did that for you.
A. Yes.
Q. Did you ever check whether the surveys, the questionnaires themselves, matched what the tabulations you got from Advanced Research Center?

A. You mean did I actually do my own independent tabulations?
Q. Yes.
A. No, there is no way I had time to do that.
Q. Even a cursory look of, 'Well, where is No. 82? Which box did that go in?'
A. No.
Q. So you don't know as you sit here today whether they were done right or wrong.
A. I don't have any reason to believe they were done incorrectly.
Q. Have you worked with them before?
A. No.
Q. But it's your understanding is they are reputable and did it right. That's the basis for your testimony.
A. Well, that's my understanding. I mean I have looked through some of the questionnaires. I had seen studies where there is definitely going on. I didn't see that here. But, I mean, I haven't examined every single questionnaire and looked through every one. So I'm not sure. It's the best I can do.
Q. You've got 200 questionnaires that looked at your test in the secondary meaning survey; this box, right?

A. Yes.
Q. That's Plaintiff's 49; 200 people looked at that in your survey.
A. Yes.
Q. And 100 people, not 200, looked at Plaintiff's Exhibit 50, your control.
A. Yes.
Q. Do you normally use less in the control than you do in the test group?
A. Sometimes. It depends. First of all, we didn't have a lot of time to do this survey. We thought it would even be a struggle to get 300 done.
On balance it seemed more important to get responses to the test product, the SPLENDA product, than to the control.
I was not expecting a very high number of SPLENDA mentions to the control; and, therefore, I just didn't think I needed that big of a cell.
Q. Going into the study, after you put this control together, you assumed not a lot of the people were going to say SPLENDA when they see this; not to be a lot of noise for this.
A. I didn't think so. In most cases -- it depends on the study. But in this type of study I wasn't expecting a big number. Sometimes if I do an

advertising study, sometimes I do get a very big number on the control side; but not in this study.

Q. When you use 100 as the number of survey participants as opposed to 200 -- and it's 400, like Mr. Johnson did for each group -- the data is not as accurate.

Is that fair?

A. No.

Q. It's not fair?

A. No.

Q. The data is as accurate for 100 people or 400 people.

A. If the data was carefully done and it was proper, they are equally accurate.

Q. Dr. Mazis, you talked about all the college degrees you have in statistics and things like. If I survey four people or I survey 400 people, which am I going to have a better idea of what the overall people in Puerto Rico think? Which is going to be more accurate?

A. Well, let me frame it.

Q. Could you answer my question? Which is more accurate, less people or more people?

A. In general it's always better to have more than less.

Q. Thank you. And you have, as you tabulated them, 100 people in the control; right?

A. Yes.

Q. And Mr. Johnson had 400 people look at his test cell; right?

A. Yes.

Q. 400 people his control cell; correct?

A. Yes.

Q. I'm sure you've got other reasons; you think they are all different. But on the numbers alone, you would agree with me all other things being equal, looking at 100 people or maybe less, depends, in the control cell is not as accurate as looking at 400 people in a control cell -- correct? -- all other things being equal, Dr. Mazis.

A. Well, no, I don't agree with it because of the term "accurate" that you're using. You could have a very accurate survey and get a very good estimate with 100 people.

Q. I could find 100 people who most accurately depict the entire 4,000,000 person population, or I could pick 100 people who all happened to be in one camp, and it would be less accurate for those.

Fair?

A. Yeah -- I mean, the difficulty is it depends

how it was done. Mr. Johnson did them all in one in San Juan. I did them around whole the whole island. So which is more accurate? It's a question.

So the sample size isn't the only issue.

Q. I didn't say it was, either. We'll get to the other issues.

You mentioned you didn't look at the studies, the questionnaires themselves. You mentioned, though, you may have looked at a few.

Can you ballpark that? 10, 50, 150? How many did you personally look at?

A. I'd say about 50.

Q. Do you speak Spanish?

A. No.

Q. Your survey questions that were sent out to people were in Spanish; right?

A. Yes.

Q. And the ones that were filled out were in Spanish.

A. Right.

Q. The answers where people said what you associate it with and why, those were in Spanish, because the people who took it and filled it out did it in Spanish?

A. Right.

Q. Were all the questionnaires translated for you to look at?

A. The ones I looked at were translated.

Q. You had a translation of the questionnaires.

A. Right.

Q. You know in this case we exchanged questionnaires on Tuesday evening. We sent 800 questionnaires over to the lawyers for McNeil. On Wednesday we finally got the questionnaires from McNeil, and they were only in Spanish.

Do you know if right now there are English translations of those that were not turned over?

A. I don't know. What I looked at was in English. That's my recollection.

Q. And you looked at them here in San Juan.

A. Right.

Q. You said, I apologize, about how many did you look at again?

A. I thought about 50. That's my recollection.

Q. Did you ever check to see that those 50 were properly recorded? What I mean, somebody said they didn't know, and then when you looked at the data compilation, didn't know, it was filled in.

Did you check that?

A. No. I don't ordinarily do that.