Q. You would agree with me -- putting aside whether it's accurate or not in this case -- if the tabulation is not accurate, the underlying data and then ultimate opinions that come from it isn't as accurate as it would be if it was done properly; right?

A. True.

Q. If people fill in the blanks wrong, that's error by a questioner, as opposed to error by the consumer; right?

A. Yes. You're talking about interviewer.

Q. Interviewer error.

A. Yes. That does happen sometimes.

Q. And you said before that sometimes something called "interviewer fraud" may even happen.

A. Yes.

Q. What is that?

A. Where the interviewers just fake the interviews.

Q. Because they want to get done and get their paycheck and go home?

A. Yes, that could be a reason.

Q. Sometimes you pay the participant in the survey; right?

A. Yes.

Q. Mr. Johnson surveyed 800 people. None of those were paid. The survey you did, every participant got paid money; correct?

A. No, they didn't, actually. I had set it up that way initially, because doing surveys in shopping malls, for example, especially if you're in a rush, it's a good way to get respondents in. And that's the way I had set it up, because we didn't have a lot of time here. But when it actually went to the field, they didn't feel it was necessary to pay people.

I mentioned there were some differences, the questionnaire I developed and when it went into the field, there were some minor differences. That was one of them. We didn't pay the respondents.

Q. So your respondents were not paid, either.

A. Correct.

Q. That might be something that would draw in fraud. But you also might have the interviewer just filling things out because 'It's 4:45. My surveys are due today. I only have 60; I need 100. Let me just pound a few others.' That could happen.

A. Definitely.

Q. Have you seen that happen?

A. Yes.

Q. What does that mean to you, when you've seen

it happen, about the underlying survey?

A. It's got problems.

Q. Okay. You talked about the geographic diversity. You only surveyed 100 people in the controls. So for some of the locations you might have asked 10 or 12 or 15 people to look at the control and some other places on the island; right?

A. Yeah. It lays that out in the Advanced Research Center report.

Q. You didn't tabulate the data. The Advanced Research sent a report that's been turned over and produced up here. That makes no distinction between the answers of people in San Juan proper, San Juan suburbs, or other parts of Puerto Rico, does it?

A. No, we don't usually break it down that way. I mean, you could, obviously; but we were interested in just representing the universe here.

Q. If you wanted to know if it made a difference what people in one part of Puerto Rico say versus people in another, you would look at that data; right?

A. You could.

Q. You've never done that.

A. No, I didn't think it was relevant.

Q. So when you just said there might be a difference between what people in one part of the

island say versus various locations in and around San Juan, you don't have any facts for that. That's just your guess. You haven't seen the data.

A. No, I wouldn't subscribe to that. It's really an issue of methodology. I mean, how do you set up the study?

You could potentially, obviously, when we have the time, could go back and see if it would have matters. But the idea was that the universe you're trying to project to is all of the island. And if you're just interviewing people in one part of the island, there is always the question of whether you're fully representing all the opinions in the island and whether you might have gotten differences.

I don't know whether we would have. I didn't analyze it, so I can't tell you. But the methodology is such that Mr. Johnson methodology is more limited in terms of what statements he could make about Puerto Rico.

He can really make statements about maybe San Juan. But I don't know that he could make any statements about the rest of the island, because he didn't interview anybody in the rest of the island.

Q. And you don't know what the impact of interviews on the rest of the island versus interviews

in San Juan, because you didn't tabulate the data nor have you seen that data; right?

A. That's correct.

Q. Dr. Mazis, you made a nice reference to row, row, row your boat on your direct. Do you remember that?

A. Yes.

Q. That the question had the word "or" in it, and you didn't like it. You thought people were going to be confused if you asked them "or" questions; right?

A. No, I didn't say that. I said when the question is very long and when you have "or" in there four different times, it just wasn't consumer friendly.

Q. The proper question to ask people when you're trying to find out if they know something is do you or don't you know; correct?

A. No, not necessarily. I have used that formulation sometimes, but not always sometimes, but not always. Sometimes it's just confusing to people.

You have to look at the question. And sometimes you just need to break it into smaller questions. Rather than have all those or's, maybe you want to have 1A, 1B, 1C. That might be easier. People could answer each one separately.

Q. You might want to have a two-part question

versus a one-part question.

A. Possibily. It would depend on the circumstances.

Q. You have before used the phrase "do you or don't you know." Right?

A. I have at times.

Q. And the reason you use that is to prevent what is called "yea-saying,"Because if you ask 'do you know," we both have a tendency -- it's human nature to say "Sure, I know."

People don't want to admit that they don't know something; right?

A. Sure. Sometimes it's useful if it doesn't get in the way of consumers' understanding.

Q. Because you might have people who don't really know answer yes just because the question was bias. The question is 'do you know that?'

You really want to know if they actually know; right?

A. Yes.

Q. You don't want to know if they are telling you they know if they don't.

A. True.

Q. So you ask the question in a way that gives them a choice. It's either 'do you know?' or 'don't

you know?' Right?

A. That's one formulation. I mean, you could take the Ever Ready formulation. And if you wanted to do that, it could be 'who puts out this product?' Or you could say 'or don't you know?' You could append that if you wanted to. It would with more user friendly, more consumer friendly.

I'm not saying there is one way to do these questions. There are obviously different ways. Different experts can disagree on how to formulate it.

But in this case anybody could look at this question and say 'this is a very complex question, very hard to answer.'

Q. We'll get to that in a second. You said on direct that when you formulated this survey you thought there were two versions, one in yellow and one in white; right?

A. Actually, they would be the exact same questionnaire. It's just I was going to call it Version 1 and 2. And...

Q. So your original plan was to have a version that -- same exact texts on those surveys.

A. Correct.

Q. And you would label one Version 1. Which would that have referred to? Your test?

A. Yes, that was going to be the test ad, because that was the yellow.

Q. And you were going to make the survey paper yellow.

A. Yes.

Q. And you would have a control. This is the white box.

A. Right.

Q. And you were going to make the survey paper for that white?

A. Yes. It prevents interviewers from picking up the wrong box.

Q. When you do these surveys and you have two choices, like Mr. Johnson's with the SAME product and the control the SUGAR TWIN, normal practice would be to rotate them. You have the first guy that comes in and does one. It's somewhat random. So you don't go 100 of these and then we'll pull out 100 of these; right?

A. Right, yes.

Q. You mix them up.

A. Right.

Q. When you did your test, was it done that way or did somebody go with the yellow forms to do the test first?

A. No. I don't think so. That's not my

understanding.

Q. You don't know. It could have happened.

A. I talked to the Auri Beltran. And my understanding is it was varied. Because I did ask about that. So that's all I can rely on is what she told me.

Q. Often the survey questionnaire has a little box. Did you show them a test, or did you show them a code where you don't tell the questioner which is test or which is the control, because then they might be biased. So you use some code; right?

A. I can't remember what was done in this case.

Q. That's normal practice.

A. Yes.

Q. And in this case your survey questionnaire has a code on it. Is this Version 1 of the survey or Version 2?

And just so I understand again, Version 1 is the test.

A. Yes, I believe so.

Q. And 2 is the control. So if they got Version 1, it's a yellow box.

A. I'm believe that's correct.

Q. And if they got Version 2, it's a white box, your control.

A. I believe so.

Q. So the questioner fills it out when somebody comes in and they pick the one they are going to use that time. They pick this one up, and then they go to the form and they write right on the form like this one 'Version 1." Then when somebody tabulates the data, they put in, okay, this interviewer showed this person the yellow box.

A. And it would be printed on the yellow paper.

Q. In this case you had a backup, a double check, of it's not only circled as Version 1, the questioner when they are standing there is writing on yellow paper.

A. Yes, because it's very easy for interviewers to make errors on these studies.

Q. That's why you have to find a firm that's accurate and reputable.

A. Well, it's helpful. But even finding accurate and reputable firms, the people out there interviewing they make errors, they just make a lot of errors.

So one way to avoid it is to try to use methods to cut down on errors.

Q. And they have a clipboard or some other pad or paper; and they have questionnaires like this sitting on top, and they are writing as the person is giving

them the answer.

A. Yes.

Q. So when your interviewees were looking at the SPLENDA box, right in front of them was a questioner holding a survey on yellow paper; right?

A. Yes.

Q. Is this normal for you that you would make the paper of the survey in the same background color of the box that you're trying to ask questions about?

A. Yes. I think it's hard for people to ignore. I mean, people know it's a yellow box. It's not a great surprise here.

Q. And people are saying 'yellow,' when they look at this; right? People are indicating that's one thing they notice about the box.

A. Right.

Q. Don't you think it's a little funny to use a piece of paper that's yellow for those people as opposed to just white paper that we normally use?

A. Well, I mean, that's an interesting issue. I just think you have more interviewer errors if you did that. So you have to balance the issue. If you used all white paper, people would be picking up the wrong boxes all the time.

So you have to make some judgment about that.

I think, especially the way this study was fielded, in all these different locations, it is a situation where people could make a lot of errors. And so this was a way to reduce those errors.

Q. Because if people made those errors, that would question the accuracy of your survey.

A. Yes.

Q. Let me show you a couple of other things, Dr. Mazis. First, just so I'm clear, Version 1 is the yellow box, the test in this case; right?

A. That's my understanding.

Q. And questioners were supposed to fill those out on yellow paper; right?

A. Yes.

Q. Dr. Mazis, there were 37 surveys in your set of questionnaires that are done as Question 1, the test one, on white paper. Are you aware of that?

A. No, they might have run out of yellow paper. I've had that happen.

Q. There are no controls done on yellow paper.

A. Well, that makes sense, then.

Q. So you think maybe they ran out of yellow paper.

A. I've had that happen.

Q. Your surveyors were specifically instructed:

200 over here and 100 over here with the control.
Right?
A. Yes.
Q. When you count up the surveys that were handed over to us Wednesday day night, there are -- one is missing -- 200 on yellow paper. They all say Version 1.
Fair to say all those people if it was done right were shown the test.
A. Yes, it sounds right.
Q. There are 37 survey questionnaires on white paper that circle No. 1. And as you just said before, you think if it was done, if the interviewer did the right job and they just ran out of paper, those people also saw the rest; right? Correct?
A. That would be my understanding.
Q. If it was you tabulating, you would pay more attention to what the person circles which version is being shown than what the color of the paper is; correct?
A. I would think so. But I don't know what they did. It may be that they saw the white paper when they got back to the home office and they assumed that that was the control.
I can't tell you because I just don't know.

Q. So let's look into that. You said what may it happened.
If you were looking at surveys when you're in the back office and it comes in on white paper with 1 circled, which means white paper should mean it's the, 1 circled means it's this one; would you toss that one out because this is not something you could rely upon?
A. I don't know what Mr. Lopez did. I'd have to talk to him and determine exactly what he did in that situation.
Q. I'm asking you, in your experience, you want to have a reliable, accurate survey, which take those 37 that are either miscoded or in your system wrong paper, and toss them away and not include them in your total, or would you include them?
A. Well, I think what I would do is I would have the field person, Mr. Lopez, talk to the interviewers and determine.
If it were paper problem, he would have known that. So he might be able to figure out what the story was with those 37. I don't know.
Or, alternatively, you could throw them out.
I mean, those are the two options.
Q. It would certainly be more accurate to discard them than to try to glean after the fact what we think

happened with the survey; right?
A. That's certainly one option.
Q. That's the better option.
A. Not necessarily. If there is a good reason for what Mr. Lopez did, then I would go with that if he could explain it. But this is the first time I've heard about this, so...
Q. You had no idea about this.
A. No.
Q. Dr. Mazis, you might ask the person who did the survey question itself 'what happened when you filled this one out?' You wouldn't try to go through and look at the answers and then work backwards to figure out which one someone was shown. That would be wrong.
A. I don't think that would be the way to do it. That wouldn't be proper.
Q. Be wrong.
A. I think so.
Q. You don't know if these 37 are included in your test or your control; right?
A. I don't know, but it's something now that you're mentioning it. I'd like to know the reason. Maybe we need to retabulate, find out -- first of all, find out. One thing we could do is we could rerun the

data without the 37 and see if it matters.
Q. That's a great idea, Dr. Mazis.
(Publishing.)
This is your first question. "Have you ever seen or purchased a no-calorie sweetener that looks like the one I showed you or don't you know?"
See that?
A. Yes.
Q. You have at least two or's in that question; right?
A. Only two.
Q. Seen or purchased.
Let me digress for a second. Seen or purchased. If you purchased it, you had to have seen it; right?
I assume none of the survey participants couldn't see; thus, if you purchased it, you would have to have seen it; right?
A. Yes.
Q. So why would you ask that question? Doesn't it bias people toward 'this is a product that could actually have recently purchased?'
A. I don't see the question as biasing at all. And, actually, I took that question exactly from the Granutech study, the McNeil versus Granutech that you

referenced. It was the exact same question except they put the 'or don't you know' at the end of it.
Q. So when you said earlier that you wrote the questionnaire, you took it from an earlier questionnaire that McNeil had done; right?
A. No, I didn't do that. I referred to it. But as I said, I made certain changes in it. And adding the 'or don't you know,' was one of the changes I made.
Q. Because you thought it would be more accurate to put 'or don't you know,' because if asked it the way it was asked in the Granutech survey, that might be misleading; that might bias people.
A. It's possible.
Q. Did you come up with the idea to look at that McNeil survey or did the lawyers give that to you?
A. Well, they gave it to me, because it was mentioned in the Merisant's filings.
Q. What was listed in the papers was that McNeil should do a survey like they have done before of an Ever Ready type. And they did one in that case; not that that's the proper technique and questions to ask in a survey; correct?
MR. ZALESIN: Objection. I think it misstates what was said in the papers; and, second, the witness, I don't think, has ever seen the papers, and he should

simply be shown the paper before he comments on what it says.
MR. LOCASCIO: Then we can do that, Your Honor.
BY MR. LOCASCIO:
Q. Dr. Mazis, you just mentioned you used --
THE COURT: Are you going to show him that?
MR. LOCASCIO: I'm going to ask him the foundational questions to see if we need to do that, Your Honor.
BY MR. LOCASCIO:
Q. You mentioned a second ago that Merisant had said something and that's why you thought this was a good question to use.
You never read Merisant's filings in this case; right?
A. I don't think so.
Q. So you didn't think of your own, 'Well, I should use this former McNeil survey question because of something Merisant said.' You thought of that after you talked with the lawyers. Fair?
A. Right, yeah. They provided that with me and they said 'this is the survey that was accepted by the Court,' and it had been mentioned in the Mersant filings. So I thought, 'Well, okay, let me take a look

at it.'
And it's very similar to other secondary meaning surveys.
Hey, I'm willing to look at surveys and if the information is useful, then I'll take advantage of that.
Q. Let's come back to these 37 people who are questionable at best or miscoded.
A. Okay.
Q. This is your data.
A. Okay.
Q. You show the yellow box and you asked if you have ever seen or purchased it.
Of the 200 that are in your data, 174, 87 percent, said that they had seen this box or purchased this box; right?
A. Okay.
Q. 26 or 13 percent said they had seen or purchased this box, if you use the way it was tabulated in your report.
A. Okay.
Q. I'm sorry. They said they didn't know that.
When we go on the right column, the white box, 55 percent of the people who were shown the control said they had seen or purchased this box; right?

A. Yes.
Q. That's error, isn't it? Those people never saw or purchased this box.
A. Well, people are compliant. It's not error, it's that people are complying with the question.
Q. They are yea-saying.
A. They are definitely yea-saying.
Q. You went out of your way to find a control that was never in the marketplace at all; right?
A. Uh-huh (positive response.)
Q. In Puerto Rico there has never with a sale of this box.
A. Right.
Q. Even with the brand name on it.
A. Right.
Q. The box you chose is a control was never sold to anyone in Puerto Rico; right?
A. Yes.
Q. So no one who looked at your survey questionnaire could have ever seen this box or purchased it; right?
A. Right.
Q. So when 55 percent of the people you surveyed with your tabulation said 'I indeed have seen or purchased this box,' they are wrong.

A. Well, survey researchers, we don't look at it as right or wrong. We look at it as that's an opinion that's being expressed. And, obviously, people are compliance. So as you called it "yea-saying," people, you show them a box that looks real, and, you know, okay, sure. People don't expect you're going to give them a fake box.
Q. You did give people a fake box and they said they had seen or used it; right?
A. Yes.
Q. And that's not -- you don't want to use the word "wrong," but those people are mistaken; right?
A. Yes, they are.
Q. They have made an error. They have not actually seen or purchased it, but they are saying they did. They are yea-saying.
A. Yes.
Q. Is 55 percent a little high for yea-saying?
A. It's higher than I would have expected.
Q. Indeed, it's quite high.
A. I've never done a survey in this area. I don't know whether this is common. I really don't know. But surveys that I have done, I usually don't get that high a figure.
Q. You have never done a secondary meaning

survey; is that what you mean?
A. No, I said I've never done any study in Puerto Rico before. Whether people in Puerto Rico comply more than other people, I don't know.
Q. You're saying that perhaps it's not the question or the control's fault that that number in so high, but it's people here in Puerto Rico just say yes when shown a box?
A. You know, I don't know. I really don't know. I don't know what the reason for it is.
Q. You have testified before about yea-saying; right?
A. Yes, I have.
Q. And you said that 17 and-a-half percent was ridiculously high.
You don't remember that? I can show you.
A. I'm sure you will. I haven't seen it. I don't remember.
Q. You don't remember?
A. No.
Q. Do you remember testifying in a case involving Ameritech?
A. Oh, yes.
Q. Do you remember that there was a survey put on. That was the other side.

A. Yes.
Q. And you came in and said, 'Well, this is ridiculous. They need a better control.'
A. They didn't have a control.
Q. There was no control. So you came up with a hypothetical control.
A. Correct.
Q. One that did not exist in the marketplace.
A. Right.
Q. And you asked people a question, if they believed that hypothetical product could have a certain function -- right? -- or feature.
A. It's been a long time. I don't remember the details of it.
Q. You asked them a question, and you got some yea-saying; right?
A. I just don't remember the details. It's been a long time.
Q. It was 1996; right?
A. My memory is fading as years go on. Yes. Eight years ago.
Q. The person on the other side was Ms. Parikh, P-a-r-i-k-h; right?
A. Yes.
Q. And she had testified -- pardon me. This is

the Northern District of Illinois opinion afterwards.
(Publishing.)
This is you, to test your theory that the Parikh study inadequately controlled for noise, you redid it. You used the questionnaire Ms. Parikh had done, but you added the control. And you came up with Ultra Tone. And Ultra Tone didn't really exist; right? It was the hypothetical?
A. Right.
Q. It was the made up control, like this box we used in your survey in this case; right?
A. Yes.
Q. And then later on it says you were telling the Court, 'If people responded that the question you asked, the people responded it applies to, it can be assumed they are guessing, because there is no such thing as the Ultra tone; right?
If someone said they had seen or purchased this before, they are guessing, because they had never seen or purchased it before; right? That would be yea-saying.
A. Right. But that's what we are trying to measure here, right.
Q. And you want to subtract out the yea-saying. That's what you are saying in this opinion.

A. Yes. The same thing as this M.C.I./Ameritech study.

Q. And in the M.C.I. case you said the people you asked, 17.4 percent of them yea-sayed.

A. Yes.

Q. And in your test in this case, 55 percent were yea-sayers; right?

A. On this question, yes.

Q. And then you go on to this. "Dr. Mazis indicated the level of noise, the percent of people who were willing to respond in a," quote, where you, I take it, "a ridiculous manner to a question that made not sense." Right?

A. Right.

Q. And then you subtracted out that yea-saying noise level, in this case, 17.4 percent, from the overall number for the test in order to determine what the accurate level was of confusion; right?

A. Yes. That was on the key claim. You have to remember that. That's what the subtraction was.

Q. But in this case, 17.4 percent of yea-sayers, you said those people were willing to respond in a ridiculous manner to a question that made no sense.

Right?

A. Yes.





Q. Let me come back to your questionnaires that are miscoded. Your data shows 87 percent recognized the SPLENDA test, this box; right?

A. Yes.

Q. And it shows 55 percent yea-sayed to this box, the control; right?

A. They said they had seen or purchased it.

Q. They said yes, and it was not right.

A. Right.

Q. And under your analysis in the Ameritech case, that's yea-saying, needs to be subtracted out; right?

A. No way.

Q. You didn't say in the Ameritech to subtract out the yea-sayers.

A. I did, but not on this type of question. It's later on it's subtracted. Just the way I did it.

Q. Well, let's look at this question. If you code them the way you say to code them -- I'm sorry. You don't even make that decision, because it's done by someone else.

If you take out yea-sayers who say, yes, they have seen a product no matter what it is, even if it doesn't exist, that's 55 percent. You obviously don't agree with me, but indulge me, the math who say if you have 87 percent with your test, some of those people





might be yea-sayers. Right?

A. I'm sorry. Who might be yea-sayers?

Q. If the test version under your view of maybe people here guess more or yea-say more, some of those 87 percent might be yea-sayers. Right?

A. Oh, that's what you're trying to find out is eventually -- not on this particular question. But later on you are trying to find out how many people are guessing SPLENDA. And that's the point of the whole study.

Q. If you subtract 55 from 87, I don't think we are going to have a lot of debate that that's 32 percent. Right?

A. I have to say it's not. I've never seen anybody do that before. I mean, I've seen people do the subtraction, but I've never seen anybody do it on this type of question.

Q. You have seen people subtract out the yea-saying from the people who saw the test. Indeed, that's what you did in Ameritech. Right?

A. Yes. But what you do is you do it on a key question. This type of analysis is just never done. It's just arithmetic, but it doesn't mean anything.

Q. In the versions you have, those 44 percent of people who don't say yes, they are excluded from the





survey all together. The control people who say they have never seen this made up product before, they are not asked any other questions. Right?

A. Right. And the same thing when we test on the same procedure.

Q. So you get don't get a lot of data about what people think about this box if they say no, because they are out of the survey. You don't ever ask them what they think about this box.

A. Yes, well, that makes sense.

Q. So the yea-sayers are the only people you are getting any data from on your control cell.

A. Right. That's the point.

Q. The point is to ask the yea-sayers who say yes to things they are not sure about, what they think later on. Fair?

A. Yes. That's what you do when you have a control cell you want to see when you give people the stimulus that they wouldn't have encountered before, you want to know how many people are going to guess SPLENDA. And that's what you do. That's the point of this control cell.

Q. Well, all things being equal, they might guess on market share. They might guess a-third, a-third, a-third, in Puerto Rico for SAME in a blue box, SPLENDA

in a yellow box, and EQUAL. Those are the three market leaders here. You know that; right?

A. Right.

Q. So if the control was equally different from all three of those boxes, you would get what you expect, guessing at a market share value. Right?

A. That makes sense as a theory.

Q. And if the control is closer to one of the market participants than another, you're probably going to steer people over to that when they guess at to what the control is. Right?

A. I think some of that happens.

(Publishing.)

Q. And in your survey, in your own report, you say in the control cell EQUAL was mentioned by 24 percent of the 100 respondents exposed to the white control package.

And then you speculate EQUAL was likely mentioned because it's more similar to the control than any of the other leading no-caloric sweetener brands on the market in Puerto Rico. Right?

A. Right. I mean, it wasn't by design. It just happened that that package we had available just didn't look similar to us. But it obviously to some consumers, it did.

Q. 24 percent of the people.

A. Right.

Q. And that 24 percent, that's 24 out of 100. That's not 24 out of the 55 people who were guessing; 45 of them you didn't ever ask the question what they thought it looked like.

A. Correct. That's the standard way of analyzing it.

Q. So it's basically half of the people you asked ever 'What do you associate with this box,' said EQUAL; because, as you said, it has blue packets on it, and there is strawberries on it. That's your guess as to why they said that.

A. Yes.

Q. So you're not really gaging with that control what people would guess based purely on market share, because they are making some assessment of the control's design.

A. They are always going to do that. There is no perfect control. Almost any box that could have been produced, there would have been more of some mentions than another.

This was a valiant attempt to come up with a control. I think it was reasonable.

But clearly there were more people that were

pushed to EQUAL as a result of this control than if we had, as I said, used green as a color.

Q. You could have made up one that was even further afield from everything else in the marketplace.

A. We could have, yes. We could have. And probably would have been better to make it green.

Q. Or accept the article you quoted before that we looked at said 'the expert should select a stimulus for the control that shares as many characteristics with the experimental stimulus, the test, as possible.'

Except for the characteristics whose influence is being assessed, that is what's at issue in this case. Right?

A. Right.

Q. So there is a 55 percent yea-sayers, if you do it with the surveys your company did. That included these 37 who were on white paper, which to you meant control. But when the person filled it out, they filled it out as if the person had seen the yellow box, the test. Okay?

A. I don't know what happened with that.

Q. You suggested we do that math. Let's do it without those figures. If you don't count the 37 that are miscoded. And by "miscoded" I mean the person who did it filled out 'I showed them the yellow box.' But

then someone came along and said, 'Well, it's on white paper. We should put that in with the white questionnaires.'

If you just toss them aside and don't count them at all, your data on the left stays the same, because that yellow box shown, those were the 200 you had before in this column.

The white box of the first 63, the 63 done properly on white paper, and the person circled 2, which meant it was the control box, the numbers for that were quite higher, were they not?

A. It appears so.

Q. For the ones that were properly coded, 71 percent of people shown your control were yea-sayers. The first 63 people that the survey matches were supposed to have happened, 71 percent were yea-sayers. Right?

A. Yes.

Q. And then if you look at those people as yea-sayer, like you have previously said, that's noise, should be subtracted out; again, I'm sure you will disagree. But the math on that is pretty clear: 87 minus 71, 16 percent would be the amount in your view that is not noise. Right? That would the subtraction. We can probably agree on that.

A. I already stated my view on doing the subtraction, that's it's totally irrelevant. But I can agree with your arithmetic -- I mean, I can't disagree with your arithmetic.

Q. The 37 miscoded questionnaires all say -- there is no Question 2, which is the control on yellow paper. That didn't ever happen. But 37 times somebody filled it out. 'I'm going to ask the questions, showing box one. The version we get is on white paper.'

So then at some point they got put in with the whites instead of the yellows.

If these people properly filled out that circle, if these people had actually been shown the test box, which is what, according to the questioner is what happened here, because they circle 1. If they were accurate, it's the test box. Right?

A. Yeah, but, you know, at this point I don't think we can make those assumptions. Because we don't really know. We would have to investigate those 37 in some more detail. So we can just point up.

You can juggle numbers around and just speculate. But I don't think that's helpful to the Court. It's just pure speculation.

Q. Well, these 37 being included in your 100 for

the control, pure speculation, as fair as you're concerned.

A. I don't disagree with you the fact that there are 37. We need to investigate those to see if there are any issues with those, where they should be, or should they be eliminated. Maybe they should be dropped.

But I certainly wouldn't put them on the yellow box side. I mean, that's pure speculation. Why do that?

Q. Let me ask you this: When you tabulated it, you put them in on the white side because it was on white paper. Right? That's what is done in your survey.

A. I didn't tabulate it.

Q. You don't know.

A. I just know what Advanced Research gave me. I relied on them to do a good job. Obviously, I had a question about those 37. You know, hey, we need to talk to them about those 37 and try to understand. Should we eliminate them, or was is it just was it a paper issue?

But, certainly, I wouldn't re-juggle the figures on some hypothetical. You're sticking the 37 on the yellow when you have no idea if that's the right

thing to do.

Q. And when you put them in your expert report, and you just testified that they were counted in the white group, you have no idea.

A. I agree with you. I mean, at this point, I wouldn't include them at this point, at this will very moment.

But if I find out more, we'll decide what to do with them. But at this moment I don't know what to do with them.

As we sit here at this moment, I would exclude them.

Q. And if you found out that it was the paper that ran out, so it should have been on yellow but they used white questionnaires, you would go by what the person circled, because that's the best evidence of what happened here. Right?

A. I wouldn't do anything at this point, because I just don't know. Those are in question. And to speculate about pitting them in one cell or another, it's just not appropriate.

Q. The Advance Research people, when they had these filled out, these 37 are coded as seeing the test. If that's correct, there are 237 in your test and only 63 in your control --

A. Well --

Q. Let me finish. Then the number of people who said, yes, they've seen the test box, goes down. And, obviously, you think this is so -- for lack of a better word -- messed up, we should just put these off on the side.

A. Well, I'm saying for the moment. I mean, they were asked to do 200 and 100. So my assumption is that they did 200 and 100, and these questionnaires here that are in question, because they were white paper, I assume that people were shown the white box. But do I know for sure? No, absolutely I don't.

But I think it's highly unlikely that they were in the yellow box situation. But I don't know. I just don't know. And so why speculate about it? This is not helping the Court at all.

Q. But you have already offered your testimony to the Court that it included them in one of the data packages that you're relying on. Right? That's not helping the Court much, either, is it?

A. Hey, I say for the moment, let's remove them. I mean, at this very moment that's the best way to go.

Q. If you told the survey company 'I need 200 of the yellows and 100 of the whites,' let's be honest, when you got them back in the mail or however you got

them, 200 were in yellow and 100, except for the one we are missing are in white. So it seems like they got the message: 200 yellow and 100 white. Right?

A. At this point I couldn't say.

Q. And they've got 37 that show an actual interviewer circle 1, which means it was a test, a yellow box, yet it's on the white paper. And then when you match it up to the numbers you've got, those people are being counted in Version 2.

Doesn't that indicate to you that it's possible the people that did your study said, 'We've got 237 yellows. People circled Version 1. And we've got 67 people who circled Version 2. It's not going to be very popular when we send this over to Dr. Mazis. So we'll take these 37 and include them in the white box column.'

You don't think that's possible at all? We talked before about fraud. You don't think that's possible.

A. We could all play Perry Mason here and stand up and say what might have happened. But at this point I think that's just absolute speculation.

Q. Let me show you something else that you mentioned, this Perry Mason idea.

There was a survey that was missing a

questionnaire. And in light of some of the other irregularities, we looked through -- fortunately, you know, we've done 300. So we got them Wednesday night, or less than desirable, Wednesday evening later.

We knew what they all said. And we said, "There is no 258. No. 258, we don't have it."

"Can we have it?" We asked your lawyers. We said, "We need No. 258."

So last night -- or yesterday during court -- I apologize -- we get this. This is No. 258.

Well, okay. Maybe the person scribbled when they wrote it. So we then go back and figure out how does this play in with the other ones. And we thought something was a little unusual. We saw this as their answer.

(Publishing.)

This person, after showing them the yellow box, says they saw SPLENDA. And then their answer, I don't think you're going to be about to read. I'll take a crack at it and everyone in the room will tell me I don't know the Spanish since high school.

It's because the little box is yellow and someone -- maybe I should ask a little guidance on this.

THE COURT: The interpreter.

MR. LOCASCIO: Can you come over and look at the screen for one second?

THE COURT: We need your services.

MR. LOCASCIO: Everyone in the room except the witness and I understand this.

THE INTERPRETER: "It is the one that I buy, a small yellow box like that one."

MR. LOCASCIO: "Comprar." My teacher would be angry that I had forgotten that that's a verb.

BY MR. LOCASCIO:

Q. That's what 258 was when it was handed to us. And we said, "I have seen that before."

I don't think we need the translator to tell us that's the same answer. That's exactly the same answer. If we really wanted to we could zoom out and see that there is no question. It's not even just the same answer, it's the same writing.

And we looked at this one, and it's No. 259. So where we got the data there were some irregularities, some missing. We didn't have 258. And we said, "A lot of copying. Maybe just give us 258."

And what we got, you would agree, seems to be someone took 259 and rather inartfully tried to make the 9 into an 8. Right?

A. Yes.

Q. This isn't the sort of accurate, reliable survey data that you normally rely on. Is it?

A. No, it happens. But this is the only one, and it's not going to change anything that much.

But if had 50 of them like that, I would be really concerned.

Q. What might have happened is that 258 was lost or 258 wasn't copied for us, which is what we assumed. But you would expect someone to say that it was lost. You wouldn't expect someone to give you 258, 9 made into an 8.

THE COURT: Mr. Zalesin?

MR. ZALESIN: Your Honor, may I look at those, because the 258 and 259 we have don't look anything like what they are showing the witness.

MR. LOCASCIO: Then when we received 258 from your local counsel yesterday, I think we have other issues to deal with.

MR. ZALESIN: What you have is different from what we have.

THE COURT: We'll take this up on redirect.

MR. LOCASCIO: Your Honor, to the extent McNeil suggest -- can we have your 258?

MR. ZALESIN: Sure.

If I may, Your Honor. These had to be copied

and all of the respondent identifying information must be removed, redacted. That's a standard survey research requirement. So there was a fire drill on Wednesday to photocopy these 300 questionnaires, remove all the identifying information, which in our case was right on the questionnaire, put them back together and get them over to the other side.

These are the originals with the identifying information -- we can't put that into evidence.

It appears that at point they got misstapled and a copy of the response to 259 was stapled onto 258.

Maybe we can take a brief recess and I can you show it to Mr. Locascio so we don't waste a lot more time.

MR. LOCASCIO: Your Honor, I would suggest what the witness said. We might want to do this with you here, because I have an honest concern. We were handed not only the different cover sheet; we were handed one that the 259 now was changed to 258. And I think that's a different issue than what the underlying pages say to the actual 258.

MR. ZALESIN: Well, you could have asked. But anyway, I suggest a brief recess.

THE COURT: Okay. Very well.

MR. ZALESIN: Do you want to over this?

MR. LOCASCIO: I do.

THE COURT: We are going to recess, but we are going to recess for lunch anyhow, because it's almost 1, and I have to think about something personal. So we'll be back at 2:15. Is that okay?

MR. ZALESIN: Thank you, Your Honor.

(Lunch break.)

(Bench conference off the record.)

THE COURT: We shall resume with your cross-examination.

I remind the witness he is under oath.

CROSS EXAMINATION

BY MR. LOCASCIO:

Q. Good afternoon, Dr. Mazis.

A. Good afternoon.

Q. Before lunch I asked you about these 37 mismarked surveys. Remember that?

A. Yes.

Q. And whether they were on the wrong paper or mismarked or mistabulated, at some point you said the safest bet is to not consider them because they weren't reliable because you didn't know what happened with those surveys. Do you remember that?

A. That's what I said at that time.

Q. Have you looked at those over lunch?

A. I have and I -- I haven't physically looked at them, but I have considered the issue.

Q. I asked if you looked at the surveys, and you said you didn't physically look at the surveys. Did you actually view the questionnaires that have the test case circled but are on white paper? Did you see them?

A. I did see some of them. I'd didn't look through each and every one of them. But I understood what the issue is.

Q. Did you talk to the people at the Research Center about the issue?

A. Yes.

Q. What did they say?

A. I made two phone calls; one, I talked to Mr. Lopez from Advanced Research Center, and he the actually went back and checked with the person who did the data entry. And he said the decision rule in all cases, if it was a white questionnaire they considered that as a Version 2, and if it was yellow they would consider it Version 1.

Then I went and I talked to Auri Beltran from Conscious Research so I could understand what happened here, because obviously what was happening was some of the interviews, these 37 interviews, the interviewer had circled the wrong number. In other words, if it

was on white paper and the interviewer should have used the white box and the interviewer was circling No. 1, which signified yellow, that's the circumstance we are talking about.

So what I did was I talked to her and I said "What was happening here?"

And she said two things: One, that the white paper and the white box always went together. So anybody who had white questionnaires always got the white box.

And then I said, "Well, what about these ones that were the 37 where the interviewer circled the wrong number?"

And what she said was that what may have happened in some cases is that the questionnaire always said Version 1. And there was supposed to be a Version 1 and a 2, if you remember, and because they should have just taken out, the Version 1, and just eliminated it, because it was irrelevant. But what appears to have happened is -- and most of those cases were the single interviewer. One interviewer seems to have always done this. And the person saw Version 1. I think it was 35 out of 37. At least that's my understanding. But any way, that Version 1 was on the questionnaire. So some people inadvertently circled

Version 1, when in fact they should have circled Version 2.

But they were call given, if it was a white paper, they got a white box. That's the way it was data entered. That's the way it was entered at Advanced Research. And, therefore, I stand by my original tabulations. They are correct based on what I have confirmed today.

Q. Based on what you were just told at lunch.

A. Exactly.

Q. And they told you 35 of the 37 were one of the interviewer?

A. Actually, they didn't tell me that. One of the attorneys had gone through them, and that's what she told me.

Q. Did she tell you or he tell you who the person was made the mistake?

A. I think it was -- I'm going to say Lopez, but I'm not certain. I can't remember the name.

Q. Rosa Torres?

A. Rosa Torres. That was it.

Q. Did they also tell you that Moncita Troche has at least a dozen, that that person allegedly circled the wrong box?

A. It certainly could have been more than one.





But what I verified is -- you can understand the confusion when it said Version 1 on the questionnaire. People were circling Version 1 when in fact they shouldn't have circled Version 1.

But the white box went with the white questionnaire. That's what I've been told, and that makes all the sense in the world to me.

Q. So you are testifying that the people who actually know the answer -- maybe the questioner or the person above them -- they told you this, and that's what you're now basing your expert testimony on.

A. Exactly.

Q. Did they tell you whether it was all in one of the locations or if it happened in multiple locations?

A. I didn't ask. But my understanding from talking with the attorneys is that it was in more than one location.

Q. Ponce?

A. That, I don't know.

Q. Arecibo?

A. I don't know.

Q. And Mayaguez?

A. I don't know what the locations were.

Q. Well, let me ask you this: If you put Version 1 on top and now you're suggesting that that's why





people circled the wrong box, you would agree that was probably a mistake in the overall presentation of that the survey. Fair?

A. Yeah. As I said, originally I had a Version 1 and 2, and they only decided to use one of the versions. But they should have deleted Version 1 so they wouldn't create that confusion.

So it was a simple administrative oversight.

Q. You mentioned the surveying was done over the weekend. I apologize. It seems like it must have been 11 o'clock. It was the 20th and the 21st or the 19th and 20th?

A. I believe -- at least in this report here by Advanced Research, it says the 20th and 21st.

Q. These are the people whose recollection of these events you are relying on for your data; right? You're relying on what they said there?

A. Yeah, for sure, whether it might have started -- I mean, I had thought that it started on the 19th. I thought it was the 19th, 20th, and 21st. But it says here 20th and 21st. But it was in that approximate period.

Q. Have you ever experienced a situation where you've got a questioner or more than one questioner and time is running out and they just start circling things





because they need to get them in for either a quota or for some arrangement or deadline you might have or us? Have you ever seen that?

A. Not that I'm aware of. I mean, if there is fraud -- I have had two instances where I detected fraud, but you I don't know why they did it.

Q. Would it surprise you that some of the questionnaires that are marked wrong are being filled out and the questionnaires say they were done on the 23rd of February?

A. I can't account for that. Maybe the person put the wrong date. I really don't know. I don't think it could have been the 24rd, because I don't think they could have been tabulated. So maybe the person had the wrong date. I just don't know.

Q. Well, the briefs in this case and all the evidence to be disclosed were due on the 24th. Do you remember that?

A. I don't recall the exact date.

Q. Did you have any conversations about getting your survey in time for those briefs to be filed?

A. No.

Q. Did you know there was a deadline for when the results had to be in? Did the lawyers talk to you about that?

A. Yes. The expert report had to be in -- I think it was on -- I don't remember the date, but I think it was on a Tuesday, the expert report was supposed to be in. That's when we issued the interim report. And then the report was finalized on Wednesday when I was able to finally connect and get it to San Juan.

Q. So the briefs and then your report. But it was unsigned because you got stuck in the states, was due on the 24th, which was this past Tuesday. And you got in and signed it, and on the 25th we got that; right?

A. Right.

Q. Do you remember when you got to San Juan all the questionnaires weren't even there yet. They were still coming in; right?

A. That, I don't remember.

MR. ZALESIN: Objection. Can we clarify what you mean by they weren't there yet, they were still coming in? They weren't where?

MR. LOCASCIO: He doesn't know. I'll ask another question.

BY MR. LOCASCIO:

Q. Dr. Mazis, when you got to San Juan and went to your lawyer's offices, were the questionnaires

there?

A. I don't know.

Q. When did you first see any of the questionnaires that have been sent out for survey?

A. I don't recall.

Q. After you got here, obviously.

A. Yes, obviously.

Q. After you signed your expert report?

A. I would say probably yes.

Q. Was it before we came to court yesterday?

A. Yes.

Q. There are questionnaires dated the 23rd and even some questionnaires dated the 24th.

Based on the information you have, is it your understanding that the surveys were all done, as it says in that data report, over the weekend? Or some were still getting done up until the last minute on the 23rd and 24th when the briefs and your report had to be disclosed?

A. I don't know. I can't answer that question.

Q. I put this up before.

(Publishing.)

When you said 'maybe we should just discount these 37 because we can't really with any level of scientific certainty rely on those --

A. Well, I have obviously changed my view on it.

Q. Obviously.

We have these numbers. Right here, if you look there, we have -- you changed your view from when you testified before after you met with your lawyers at lunch and talked with the people at the Research Center. Now your view is keep them in; right? That's what you're saying

A. My opinion is solely based on talking with these two individuals. It has nothing to do with talking to the attorneys.

Q. The first 63 that aren't mistaken, that are labeled properly, 45 of 63 or 71 percent --

MR. ZALESIN: Objection. We have been through these very numbers before, Your Honor. It's just repetitious.

THE COURT: This is something I would like to explore. Okay?

BY MR. LOCASCIO:

Q. 45 of the 63 that were properly coded, 71 percent said yes. Those are the yea-sayers, as we talking about before; 18 or 29 percent said no.

Now, the 37 that remain, 27 of those 37 people --

A. I'm sorry. What?

Q. I'm telling you something, and then I'll ask you a question.

THE COURT: It's not there.

MR. LOCASCIO: It's not on the sheet.

May I approached the flip chart, Your Honor?

THE COURT: Yes.

(Mr. Locascio is writing on the flip chart.)

BY MR. LOCASCIO:

Q. The first 63 people. So this was the total. These are properly coded. And this is Mazis' survey data. Properly coded we have yes or yea-sayers in the test. This is in the control only.

MR. ZALESIN: I think it's 45.

THE WITNESS: 45.

BY MR. LOCASCIO:

Q. We have 45. And can you tell me how many no's we have?

A. 18.

Q. And the percentages?

A. 71 percent and 29 percent.

Q. So for the people we know it's coded right, that's our yes-sayer and that's our no.

Let's look at the 37, because there is a question as to how they fit into the scheme of things.

SPLENDA we have 37 miscoded. Yes. Yea-say, I'll put sayers. And we have no. And the numbers are -- there is one person that says don't know. It's the one person in your entire study that says don't know and it's in this box. On Question 1 the only person that said here is a box we have seen or purchased, don't know.

Yea-sayers, 26. Let me get this right. That's no. 26 no's. One don't know.

And now some basic math and we have 10 yes's.

Here we have 18 out of 63, 29 percent no. These people never take the survey anymore -- right? They are done.

A. Right.

Q. And you never find out what they think about the control, so you can't be sure if they would associate it with SPLENDA or if they would associate it with EQUAL or what they know. Right? Once you get to this point you're out of the survey on the control.

A. That's right. They say that they haven't seen or purchased a no-caloric sweetener like the one we showed them.

Q. So these no's -- and they are miscoded -- once they have no marked, we are never going to know what they thought because you can't tell from the written

comments.

A. Right.

Q. 26 over 37. And the don't know, is he out of survey, also?

A. Yes.

Q. So 27 of these people we are never going to be able to tell.

A. Right.

Q. 27 out of 37, 73 percent.

You've got a statistics degree?

A. Minor in statistics.

Q. If you had 63 people and you surveyed them and you've got 29 percent no, and then you get the last 37 that come in the door on the miscoded ones, and 27 of those people are now out of the survey by saying no or don't know, the chances of those 37 people saying that at 73 percent after you had 29 percent in the first 63 is roughly 1 in 300,000 is the changes of that happening. Correct?

A. I don't know.

Q. Can you tell me the formula to do that or do we need to take a little longer than we've got here?

A. I'd have to look it up. I don't have it memorized. The key point is, though, there were only four people I believe who said SPLENDA in the whole

business. So it isn't clear to me how that changes it that much.

Q. That was, we don't know what these people said, these 73 percent.

A. Right.

Q. Because you never asked them.

A. Right.

Q. And so we don't know if -- it's hard to say if we know which group these people were supposed to be in, except they said SPLENDA; you might be able to glean something from that. Right?

A. They answered no or don't know, so they were in the group that they were supposed to be.

Q. They weren't guessing. They weren't yea-saying.

A. Correct.

Q. And by including these people, this 73 percent of that, those 37 miscoded forms in with the control group, if that reduced the amount of information you knew about the people in the control group, because they were never asked 'what does this look like,' 'what do you think this is.' Right?

A. They certainly weren't asked, that's true.

MR. LOCASCIO: No further questions.

Let me mark this as an exhibit, Your Honor.

THE COURT: Yes.

MR. LOCASCIO: It's YY.

THE COURT: Redirect.

REDIRECT EXAMINATION

BY MR. ZALESIN:

Q. Let's see if we can understand, Professor Mazis, this business about the Version 1 and the white and the yellow.

As you originally prepared the survey was there supposed to be two different questionnaires, one of which would actually say Version 1 at the top and the other which would say Version 2 at the top?

A. Yes.

Q. And the Version 1's were supposed to be on yellow paper and the Version 2's on white paper.

A. Yes.

Q. Here are the Spanish questionnaires, Plaintiff Exhibit 61 that's already in evidence. The yellow says Version 1 on the top. Do you see that?

A. Yes.

Q. And the white says Version 1 on the top.

A. Yes.

Q. And that's not the way it was supposed to be, but that's what happened.

A. Right.

Q. So instead of having two different ways of distinguishing between the people who saw the yellow and the people who saw the white, you had only one way; right?
A. Yes.
Q. And the check-off box, which is actually on the screening questionnaire in the upper right-hand corner, you prepared that on the assumption that there would be two different questionnaires, one of which said Version 1 and the other which said Version 2 at the top. Is that right?
MR. LOCASCIO: Objection the leading witness.
BY MR. ZALESIN:
Q. What was your thinking when you prepared that check-off box?
A. Yes, that was the way I had it. I'm looking at the screener that I originally prepared, and that was the way I had it. Just wanted to double check on that. Actually, they changed a little, but I had Version 1 as a code 1 and they changed it to 1A. And Version 2, I just had as a 2 and they had as a 2B.
Q. Okay. So looking at them side by side, these Versions 1's and Version 2's were prepared by you on the assumption that the questionnaires would say different things on the top.

MR. LOCASCIO: Objection. Leading
MR. ZALESIN: I'm on redirect, Your Honor. I'm just trying to clarify things.
MR. LOCASCIO: Same objection, Your Honor. The witness, if he can explain, he should. He shouldn't be testifying for the witness.
THE COURT: Can you rephrase?
MR. ZALESIN: Sure.
BY MR. ZALESIN:
Q. Can you explain again what you had in mind when you prepared these check-off boxes that say Version 1 and Version 2 on them?
A. That there would be two different versions, that there would be a Version 1 and a Version 2; and the people that would do the yellow questionnaire, Version 1 would be circled there.
And this is really for the coding purposes. It really didn't have anything to do with the interviewer. And Version 2, that would be the white version.
Q. Okay. And what happened is that -- what does did white version say on the top?
A. Version 1.
Q. And 37 people, according to Mr. Locascio, who 37 of the interviewers who filled out the white

questionnaire circled Version 1, which is what it says on the top?
A. 37 respondents. I don't know how many interviewers, but it 37 respondents.
Q. Okay. Now, when the questionnaires came back, how many yellow questionnaires came back?
A. 200.
Q. How many white questionnaires came back?
A. 100.
Q. 63 plus 37 equals 100.
A. Right. And I have no reason to believe anything but that everything was okay.
Q. And if, as you have learned the field service, if a person had a white questionnaire they always had a white box. Is there any other way that you could wind up with 100 white questionnaires?
A. No.
Q. When Mr. Locascio prepared this Exhibit YY he used the phrase properly coded and miscoded.
Do you understand that he is referring only to whether they circled Version 1 or Version 2?
A. Yes.
Q. Do you understand that there is any error in how the data from the answers to the questions were tabulated in any of those interviews?

A. To my knowledge there was no error in the way it was tabulated.
Q. Has any error been brought to your attention?
A. No.
Q. By the way, can you vouch for these numbers, the ones that Mr. Locascio wrote on Exhibit YY, the 10, 26, and 1 for the 37?
A. I hadn't done those calculations.
Q. Okay. So you're just accepting his representation.
A. Yes.
Q. Mr. Locascio asked you some questions about the Granutech survey report that was sent to you. Do you remember that?
A. Yes.
Q. There was some question about the brief that Merisant had filed and I suggested that it be showed to you but it wasn't. Do you remember that?
A. Yes.
MR. LOCASCIO: Objection, as the witness had never seen it before, foundation. He said he had never seen it. He's going now to put it into evidence. I'm not sure why he would do that.
MR. ZALESIN: Okay.
(Publishing.)

BY MR. ZALESIN:
Q. Do you remember being provided with that?
THE COURT: Overruled.
MR. ZALESIN: I represent that this is Merisant's brief, Your Honor. McNeil well knows that the traditional way to prove secondary meaning is to provide and Every Ready design survey, as McNeil has done in prior litigation. See McNeil versus Granutech.
BY MR. ZALESIN:
Q. Do you remember see?
A. Yes.
MR. ZALESIN: May I have Plaintiff Exhibit 45?
(Documents handed to the witness and to the court.)
MR. LOCASCIO: Your Honor, object to this being put into evidence. It's a survey from another case that Patterson Belknap and McNeil has done, that whether the witness has seen it or not, to the extent that this survey is going come in and, I guess, be some claim that this is a proper to do a survey, neither does the McNeil/Granutech case analyze the survey and say this is the right way questions nor has Merisant taken that position.
And we oppose it being put into evidence. It has nothing to do with this case.

MR. ZALESIN: Mr. Locascio examined Professor Mazis whatever it is he reviewed. I want the Court to see what it is he reviewed. And I would disagree with Mr. Locascio's characterization of what they have said in the brief. But that's neither here nor there. I just want to put in evidence what it is the witness reviewed since it was gone into on his cross-examination.
THE COURT: This has to do with that prior case?
MR. ZALESIN: This is the --
MR. LOCASCIO: It's not from Bristol Meyers/McNeil, Your Honor.
MR. ZALESIN: This is the survey that was done in the case that Merisant cited, and it's to briefed Your Honor when the day before the initial conference on February 10th they told the Court that McNeil has failed to do a survey like the one they did in the Granutech case.
What happened next, as Professor Mazis has testified, is a couple of days later Professor was retained and I think probably the only thing he was sent, other than some of the legal papers, was this Granutech survey report. He reviewed it. It just want to put the report into evidence as part of what he

reviewed and let him comment on what use if any he made of the report.
MR. LOCASCIO: Two points in response, Your Honor. First of all, an expert can review whatever he wants; it doesn't mean it now admissible in court. It's still hearsay and other things will come into play. He can review it and he can say he relied on it. It doesn't mean it's admissible.
The point clearly in the brief language is McNeil should do a survey, and they know they need to do a survey. They have done it before. The language certainly does not say the Granutech survey, which if you read the case, Mr. Zalesin hasn't let us have the pleasure of seeing the survey until Tuesday. The case doesn't talk about the questions asked in the survey, nor does it say it's the right way to ask those questions. And we certainly aren't saying that in this brief. We are saying they filed cases before; you serve his. They should come to Your Honor with a survey.
THE COURT: Let's go ahead. You'll have an opportunity to ask him in redirect.
BY MR. ZALESIN:
Q. Again, did you receive this report?
A. Yes.

Q. What use if any did you make of it in preparing the questionnaire in this case?
A. I looked at it and it was similar to other secondary meaning surveys that I have been involved with. And it was one piece of information that I used in formulating my survey.
Q. Did you copy the questions verbatim out of the Granutech survey?
A. No.
Q. Mr. Locascio asked you some questions about how to go about choosing a control for a trademark survey such as this. Do you recall that?
A. Yes.
Q. I think he asked you and you agreed whether the fact that the trade dress of the control product is not infringing should be one of the elements that goes into the selection of a control stimulus. Do you remember that?
A. Yes.
Q. Is that the only element that should go into that decision?
A. No.
Q. What other thing should you think about?
A. Well, one other thing is the idea here is that you don't want the stimuli to be overlapping, is that,

if you have a yellow SAME box and you use a yellow SUGAR TWIN box as the supposed control, then it's not controlling what you want to control, which is guessing, because people also could be confused by the SUGAR TWIN box.

So it's basically -- in research we call that a confound. You confounding the issue of guessing with the issue of potential confusion resulting from the SUGAR TWIN box. So it's just not an appropriate control, at least not a control for noise.

Q. Mr. Locascio asked you some questions about whether you have had the experience in prior surveys you have been involved with where interviewers have simply faked or created fraudulent interview. Do you remember that?

A. Yes.

Q. And you said it's happened to you twice in your career.

A. Twice.

Q. Have you seen any evidence in this case that any of the interviews that were conducted for this survey were faked?

A. No.

Q. Are you concerned about the integrity of the data in this case?

A. No.

Q. Mr. Locascio asked you some questions about the testimony you gave in the Ameritech case. Do you remember that?

A. Yes.

Q. That was a case about telephone equipment; is that right?

A. Yes, I think it was Ameritech and M.C.I.

Q. So the portion that Mr. Locascio highlighted, respondents are being asked whether they agree that a certain attribute, the so-called always lower claim. Was that what that case was about, the always lower claim?

A. Yes, that was the key claim in the case.

Q. So they are being asked whether the always lower claim is an advertising case?

A. Yes.

Q. Whether the always lower claim applies to Ameritech Ultra Tone, and that's the control you made up?

A. Yes.

Q. And when you did the control research, what happened? That is 17.4 percent.

A. That's for the control cell. That's to assess the amount of guessing. I mean, when you come down to

it it's almost the ultimate control, because it's a product that doesn't exist on the market. And to the extent that people say that Ultra Tone is always lower -- I think it was a price claim, I think. That is my recollection.

To the extent that people agree with that, then it's clear that there are obviously guessing.

Q. Okay.

A. But the key point is if the subtraction that occurs is always on is the key question that you're interested in. Here, this is on the key question; it's not on questions that occur earlier in the questionnaire, as was suggested in some of Mr. Locascio's questions.

Q. That's what I want to get to.

So you subtracted when you were doing a control survey, and you were testifying for the defendant with respect to this advertising claim?

A. Yes.

Q. So you subtracted 17.4 percent because that's the amount of people who said always lower?

A. Yes.

Q. In this case what percentage of people exposed to the control stimulus said SPLENDA?

A. Before control, 62.5 percent.

Q. Before control. But how many people when they saw the control?

A. In the control, 4 percent.

Q. Did you subtract that 4 percent from the people who said SPLENDA in the test group?

A. Yes.

Q. Is that same thing you did in the Ameritech case?

A. Yes.

Q. Is that the right way to do a control?

A. That's the way I always do it.

Q. Would it be right to subtract anybody who said that they recognize this box regardless of what response they gave after that?

A. That's not the proper way.

Q. Mr. Locascio asked you some questions about the color of the paper that was used for the two interviews. Do you remember that?

A. Yes.

Q. And he suggested that wasn't proper to use yellow paper for the test cell and white paper for the control cell. Do you remember that?

A. Yes.

Q. First of all, is it common in survey research to use different colored paper for different groups of

people who are shown different stimuli?

A. Yes.

Q. Why do you do that?

A. Well, it's really to avoid error. If you have a particular stimulus and you can tie it to a particular paper color, then there are going to be fewer errors.

For example, if you used in this case blue and pink paper, then certainly there would probably be more error, because the people who were supposed to the get the yellow box have the pink paper, for example. So it's kind of confusing to them.

Q. Is yellow paper something out of the ordinary in your experience?

A. No.

Q. Have you seen pads of paper, yellow legal pads throughout your lifetime?

A. Yes.

Q. Do you have any reason to think that the use of yellow paper by the interviews bias the responses in this survey?

A. No, I don't.

Q. Finally, I just want to go back to the issue of appropriate selection of a control.

Mr. Locascio began his cross-examination by

showing you a list of all the different elements of the SPLENDA trade dress and comparing them to the SUGAR TWIN package. Do you recall that?

A. Yes.

Q. And I think he got you to agree that many of them are not on the SUGAR TWIN package. Right?

A. Yes.

Q. But some of them are. Is that right?

A. Yes.

Q. And which one if any is important in your opinion?

A. Well, clearly the color is by far the most important.

Q. Why do you say that?

A. Well, when you look at the open ended responses when the people are asked why they selected SPLENDA as an example in my survey, the overwhelming number of responses was the color.

Q. Let's just review that. That's page 14 in the data table, which is Plaintiff Exhibit 56. Do you still have that?

A. Yes.

Q. Can you go through this and explain why you're saying that the color yellow is very important in this instance?

A. Well, just look at dimensions. 110 people volunteered color as the reason why they chose to associate SPLENDA with the yellow box. And that was far higher than any other number.

The next one was pictures, 32, and the design had 22, and color of letters, 17, and so on. So color was by far the dominant cue here.

Q. So Mr. Locascio asked you, for example, the SPLENDA trade dress has as cup of coffee in the lower right-hand corner, whereas SUGAR TWIN trade dress has a cup of coffee in the center on the bottom. Do you remember that?

A. Yes.

Q. Is that an important distinguishing factor in your opinion?

A. I don't think so. I think when consumers look at these boxes they don't remember whether the coffee cup is in the center or on the right.

Q. And he also asked you about whether there is fruit in the iced tea glass, which is on the left side of the SPLENDA package, but there is no fruit in the ice tea glass on the left side of the SUGAR TWIN package. Do you remember that?

A. Right.

Q. Again, from your survey, is that the way

people identify the SPLENDA box?

A. No, they clearly form an overall impression. But the key element in forming that overall impression is the color of the box. I'm not saying the other elements don't play a role, but the color of the box is really -- you know, they mentioned the lettering and some other features, but the color of the box is really what most people are saying.

Q. And if the color of the box is the key thing that enables most people to tell even when the brand name is removed that this is a box of SPLENDA, is it appropriate to use a yellow box as the control?

A. Not in my opinion.

MR. ZALESIN: Nothing further.

THE COURT: Recross.

RECROSS EXAMINATION

BY MR. LOCASCIO:

Q. Can you tell there is a different shade of yellow between the SUGAR TWIN and SPLENDA? Can you make that distinction?

A. Yes.

Q. You understand that there are different shades of colors; right?

A. Yes, I do.

Q. Do you think consumers can make those

distinctions here in Puerto Rico?
A. I think if you put them side by side, yes.
Q. When you set up your study, people, as you just said, the predominant reason anybody associated this test box with SPLENDA is the color yellow correct?
A. Yes.
Q. And for your control it's just white, stark white; right?
A. Yes.
Q. Do you think SPLENDA has a protectable interest in a yellow box of this shade period?
MR. ZALESIN: Objection. It calls for a legal conclusion, Your Honor. That's for the Court to determine.
MR. LOCASCIO: This is my reason I'm asking this question, Your Honor. If the plaintiffs are again contending that it's for the Court to determine if there is a protectable interest in every yellow box, then I think we are back at the same impasse of what is the trade dress at issue. And that's why these questions could directly or whether Dr. Mazis's report says anything about the whole trade dress issue.
THE COURT: The issue as I see it is whether there is a predominant element. And that should be taken into account by this Court in determining what

the trade dress is. Or you have to take into account the combination elements. And perhaps there is a dominant one, but that doesn't detract from the rest. And I think I have to make that determination.
We have here the expert testifying with respect to consumers perceptions. I don't think he would be qualified to make that ultimate conclusion.
Your objection is sustained.
BY MR. LOCASCIO:
Q. Dr. Mazis, Your survey shows more about alleged secondary meaning in a yellow box than it does in a box that has this particular design; correct?
A. No.
Q. Let's look at how many people talked about the overall design of your test box. 11 percent; right?
A. That's one design element.
Q. Dr. Mazis, I asked you how many people talked about the overall design. We can talk about the elements all you want. But answer my question about the design. How many said it's the design of the box?
A. 22.
Q. 11 percent.
A. Yes.
Q. How many people are over there in your control, the white box? It's on the screen also.

A. 3 people.
Q. 3 percent?
A. 3 percent.
Q. So the amount of recognition or secondary meaning of the design between the yellow box and the control using your control, when these people are talking about the design of the box is 8 percent.
MR. ZALESIN: Objection to the form of the question.
A. No. You're doing arithmetic here.
THE COURT: Overruled.
A. I mean, if you want to focus on that, you've got to remember the way this coding works. I mean, for example, some people said packaging, paper packet. Well, that's a design element.
Pictures on the box, that's a design element.
The design, that's obviously design element.
Color of the paper packet, that's a design element.
Q. Are you ready to start?
A. Yes.
Q. Sure. We have paper packet. Your test box has a paper packet on it. How many people associate that packet with one company, in this case SPLENDA? 3 people, 1 and-a-half percent.

A. Right.
Q. How many people over here look at this control box and talk about the packet? One person, 1 percent. Not a lot there that's specific to the test package; right?
A. Okay. I'm not sure what that means, but go ahead.
Q. Pictures on the box. What do you take the pictures on the box to mean from this, your test? What are those?
A. Pictures on the box, well, we don't know exactly. People don't often articulate exactly what they mean. It could have been the iced tea, it could have been the coffee cup. We just don't know. That's what people say.
Q. Well, people put verbatim descriptions in on the questionnaires, but you have never seen most of those. So you're going on how someone quantified them, they put them in categories. In this case pictures on the box; right?
A. Right, but I have seen enough consumers surveys to know often people aren't that specific about the different elements. People just don't usually give that much information. They don't say, 'well, it was the iced tea on the box and it was the fruit in the

iced tee picture.' They just don't do that. They use kind of short cuts, just the way they usually think of things in a more general way.

Q. What do you consider when you have a category in your report pictures on the box to be the pictures on the test box?

A. Yes, that's the yellow box cell.

Q. The pictures on the box in this breakdown are the cup of coffee and the ice tea glass and picture and the packet. Nothing else in the picture on this box, is it?

A. No, I agree.

Q. So If people said some of those things or all of those, pictures on the box, cup of coffee, you think it would be categorized in that one; right?

A. Probably.

Q. For your test box, you've got 32 people, 16 percent; right?

A. Right.

Q. Control box, it's like 18 people, 18 percent; right?

A. Okay, yes.

Q. So there is less percent of people in the control in the test cell associating these pictures on the box in your version of the study than there are

associating it on the test box -- right? -- I mean the control. I mean that's less.

A. Yeah, but that's not a fair comparison, because if you're looking at design elements there is all these other design elements.

The way I would do it is I would lump all the designs elements together, and you probably have probably maybe 30 percent of the people that are mentioning design elements. I haven't actually calculated, but it's a pretty number of them mentioning design elements.

Color is 55. But there is a lot of design elements that get a lot of mention. It's kind of what Your Honor said, it's not just the color, though color may be predominant; there are all these elements that people are mentioning as well. It's not just color.

Q. If McNeil doesn't have a right to all yellow boxes and that's not a protectable interest, then that part of your survey really doesn't matter in this case; right? The color only answers.

A. You're asking me a legal question. I can't answer a legal question.

Q. In your opinion having testified about survey evidence indicating secondary meaning in a box, do you think your survey evidence, these 55 percent of people

are imparting secondary meaning to any yellow box?

A. That, I can't answer.

Q. You don't know.

A. I can only answer that those are the people who responded to this box, the SPLENDA box with no identification. That's the only way I can answer it.

Q. The way you say we should determine the noise, to subtract out the controls, how many people who saw the control box said SPLENDA, not how many yea-sayed or guessed or made up anything. It's only the people who saw this box and said SPLENDA. That's the only group you subtract out; correct?

A. That's the way this research is done. Everybody I know that does research like this, that's the way they do it. That's accepted standard. You can do all kinds of subtractions you want. Lawyers can jungle around figures. But people who do survey research only do it the way I said, in my opinion.

Q. They don't always listen to you. You think they do it the way you do it.

A. You know, my opinion. You might get somebody who might disagree. But in general this is the standard way to do this type of research.

Q. Do all did other people that do surveys, in your view, put elements on the control box that steer

people away from the product at issue, such as a blue packet or strawberries or red, white, and blue box? Is that also customary as you see the survey world?

A. No, not particularly, but it's not easy to come with a control that's perfect. All controls are imperfect in some way.

Whatever color you use, it might steer a person one way or the other.

Clearly, in this case, there wasn't any intention to do that, because this was the box that was available, this Internet box that we had available and that's what we used. It was the best thing at the time. It is it a perfect control? I don't think it's perfect. But is it satisfactory? Yes, I think it is.

Q. You didn't pick what the control was going to look like; right? Johnson & Johnson sent you a control. Is that what you said earlier this morning?

A. They sent me the Internet box and they said, "This is what we have available."

And I said, "Okay. Let's go with it."

Q. You didn't suggest I'd like it to be this color, I'd like it to have these elements on it. You said send me something and I'll either give it thumbs up or thumbs down.

A. Right. I looked at it and, as I said, the