EQUAL didn't pop into my mind, because if you look at the EQUAL box and compare the two, one is a blue box, the other one is primarily white. But I could see now in retrospect that read, white, and blue is in EQUAL. So it's just one of those things that sometimes you're surprised at when you look at research findings.

Q. In your control, you would agree, because of those things you now know, biases people who said yes, that they'd recognize this box to say EQUAL; right? Because this isn't an EQUAL box. So people are saying that, you believe, because of the elements on it; right?

A. I won't say it's biasing. I would say they are more likely to make that association because of colors. But it isn't clear to me -- let's say you used a green box. It isn't clear to me that any more people would give you SPLENDA if it were a green box.

Q. Well, 24 -- let's look at your actual data here. Do you remember what the percent of people that identified this as coming from one source said it was from EQUAL? It's in your report. Do you remember that?

A. It might have been half, if I remember.

Q. Half of the people that saw this said it was EQUAL, and that's wrong; right? It's not EQUAL's box?

A. It's not EQUAL.

Q. So those people never had an opportunity to say whether they thought it was SPLENDA or something else, because they looked at what you gave them; they saw, 'Well, it's got a blue packet. It's got some strawberries. I'm guessing anyway. If I'm going to guess I'm probably going to guess EQUAL.' Right?

A. Certainly there are people who thought that.

Q. And those people are not in your SPLENDA control. You're not subtracting them out of SPLENDA because they got pushed into the EQUAL box.

A. Yeah, but the point here is -- let's say it was green, I mean is there any reason for people to guess -- any more reason for people to guess SPLENDA if this box were green?

Q. Dr. Mazis, you didn't use a green control. You used this control that has elements in common with EQUAL'S box; right?

A. It's does have some elements in common.

Q. And as a result you have half of the people, as you say, that saw this box and identified it, connected it with EQUAL, and as a result those people are listed in the EQUAL box and not on the SPLENDA box.

MR. ZALESIN: Objection, Your Honor. Mr. Locascio keeps saying half the people who saw this box.

100 people saw this box, 24 of them ultimately said it was EQUAL. That's not a half. It's at quarter.

MR. LOCASCIO: I believe I'm just repeating what he said, that I think we are all talking about the yea-sayers who said this box is a source.

BY MR. LOCASCIO:

Q. Did you say a moment ago, Dr. Mazis --

A. What I meant was is that half -- it's late in the day. Had me going there for a minute. What I meant to say was that 24 percent of the people that were shown the box said it was EQUAL.

Q. And that it was half of the people who said they had ever seen it before.

A. That's correct.

Q. Okay. If those people weren't in the EQUAL box because of the elements in common with EQUAL, under your view of yea-saying and market power, chance of those would have picked SPLENDA because that's a third of the market here in Puerto Rico.

A. Might have been a couple more.

Q. You don't know how many.

A. Don't know.

Q. You've got 4 people total using this control.

A. Yes.

Q. 24 or 24 percent of those people, 24 people,

and now those are all in the 63 or at least most of them, because we looked down at the miscoded ones and a lot of those people never got to answer that question. Right?

A. I'm not sure what that has to do with anything, because that's a different issue. You are bringing a different issue. I isn't relevant to the point you are talking about.

Q. You don't think it's relevant what the 37 people said?

A. No, I don't. You can get variation from group to group. No, I don't think it's relevant, because we basically demonstrated that what happened with those 37, these 37, they seem to be responding differently than the 63, but there is a lot of things that can just happen by chance.

Q. You can't explain it because you don't know. You weren't there and you didn't tabulate the data.

A. Right.

Q. You mentioned Vince Paladino. Do you know Mr. Paladino.

A. Not personally.

Q. He's a lawyer in New York. He is published on secondary meaning surveys. Is that what you're referring to?

A. Yes.
Q. The question you asked to determine secondary mean was, "Have you seen or purchased one brand or more than one brand that uses a box like this?" Right?
A. Or don't you know.
Q. That wasn't in the Granutech survey.
A. Correct.
Q. You added that because you thought maybe that question wasn't so hot.
A. I thought it could be improved.
Q. The question Paladino and others say is the secondary meaning question isn't 'have you seen or purchased a product.' Is it?
A. I don't recall, but obviously there is more than one way to ask these questions.
Q. One way 'seen or purchased' sends one message. And there is another way you can ask the question: Do you have a belief as to whether a package like this comes from comes from one company or more than one company or don't you know?
Isn't that the rule test for secondary meaning?
A. That would certainly be a way to ask the question.
Q. Because then you're finding out when you look

at a box like this, 'Do you believe it comes from only one company or it could come from multiple companies?'
That's the essence of secondary meaning; right?
A. Yes, and that's basically the question I asked.
Q. You asked them if they had seen or purchased one brand or more than one brand; right? That's your question.
A. Yes. "Have you seen or purchased only one brand or more than one brand of no-calorie sweetener that looks like the one I showed you or don't you know?"
Q. If I'm a purchaser of one brand and that brand is SPLENDA, do you think I'm inclined to answer your question that it all comes from one company more than I would be inclined to answer the question that's the Paladino and the accepted question for secondary meaning?
A. And how did you word that again?
Q. 'Do you have a belief as to whether a package like this comes from one company or more than one company or don't up know?'
A. I don't think the findings would be any different.

Q. But you don't know because you didn't run it with that question; you ran it with the seen or purchased question. Right?
A. Yes. As I said, there is more than one way to ask these questions.
MR. LOCASCIO: Thank you.
MR. ZALESIN: Just one brief follow up point.
FURTHER REDIRECT EXAMINATION
BY MR. ZALESIN:
Q. Mr. Locascio asked you whether you think consumers can tell a difference between SPLENDA and SUGAR TWIN. Do you remember that?
A. Yes.
Q. And I think you said if they presented side by side. Remember that?
A. Correct.
Q. In the survey that Mr. Johnson did, the confusion survey, were the products ever presented side by side?
A. No.
Q. How were they presented?
A. Just one at a time. Half the people got one box, half of the people got the other.
MR. ZALESIN: Nothing further.
THE COURT: I have one question.

THE WITNESS: Yes, sir.
THE COURT: Were I to discount the 37 of the control group as to the issues here with respect to how that was jotted down by the interviewers.
THE WITNESS: Right.
THE COURT: Would 63 still be an adequate control group for me to consider that survey to be valid?
THE WITNESS: I would say yes. I'm not going to say that that's a huge number. But I think the point here is that there is so few people that said SPLENDA. We are talking about only 4 percent. And if you had double or triple the sample, what's it going to increase to? I mean, it's not going to change that much. The fact that it's so small, that so many people are saying -- so few people are saying SPLENDA indicates that -- and when you think about it when you look at this box, this control box, I mean, it makes sense that not that many people are going to say SPLENDA. It doesn't look that much like the SPLENDA box. So there is a certain proportion of the people that are guessing. But I think it's likely to be very small.
So I don't think the number would change very much, based on my experience.

THE COURT: It would still meet the standards of what is an adequate survey for purposes of the issues we have here.

THE WITNESS: In my opinion, yes.

THE COURT: Do you have a question.

MR. LOCASCIO: I don't have a question for the question, Your Honor. I would like to move that Dr. Mazis' testimony be excluded because I don't think it has been shown to be reliable on several points, his testimony on this issue, whether it meets the Daubert standard or any other.

MR. ZALESIN: Do you want argument on that now, Your Honor?

THE COURT: Yes.

MR. ZALESIN: Your Honor, Professor Mazis is highly-qualified expert. I don't think there is any question about that. He has decades of experience in this field in both academia and in government and in business.

He has testified that in his opinion this survey meets all the prerequisite.

There has been one discrepancy pointed out that there are 37 interviews where for reasons that are quite understandable because the questionnaire said Version 1 across the top, the interviewer circled

Version 1, when it would have been more accurate to circle Version 2.

I don't think there is any question that based on the information that's been collected and that Dr. Mazis has testified to. In fact, all 100 survey responses that are on white paper were people who were shown the white box, not the yellow box, and data was entered for the white box.

Frankly, that is the only way you can wind up 200 yellow interviews and 100 hundred white interviews. I don't think there is any question about what happened here. It's unfortunate that somebody circled the wrong thing. But there was a double, there was a belt and suspenders approach here, and one of the two things worked. That's what happened.

To suggest that the entire piece of evidence should be excluded on Daubert basis, I don't think there is any currency in that argument whatsoever. Obviously, it's something can take into account in weighting the evidence, and I think you should do so, but certainly should not be excluded.

I've had surveys admitted where the entire survey consisted of 53 people on a preliminary injunction. This is a fairly impressive piece of research on two-week's notice.

THE COURT: I'm not going to rule on your motion right now. But when I am making my findings in this case I make take it into account.

So I'm going to take it under advisement right now until I hear the whole on both sides.

In the course of my opinion writing I will make a ruling.

MR. ZALESIN: I think that's appropriate, Your Honor.

MR. LOCASCIO: Thank you, Your Honor.

THE COURT: Is that all of your witnesses?

MR. ZALESIN: Yes.

THE COURT: You are excused.

(The witness left the witness stand.)

MR. ZALESIN: The plaintiff rests, Your Honor.

THE COURT: Okay. We are going to take a short recess and we are going to start with your side of the case which I am sure you are eager to present.

(Break.)

THE COURT: You may be seated.

We will now take up your witnesses.

MR. LOCASCIO: Your Honor, both because I think it would be useful for the Court having followed plaintiff's expert on survey evidence and because we have two witnesses in the courtroom now, one, our

survey expert, Mr. Johnson, has a flight back and is trying to go back home to where he lives in Seattle for another matter, I'm not sure about his availability in scheduling.

We are going to put him on first, because I think that would be more convenient.

THE COURT: I have no problems with that.

Counsel, do you have any problems with that, listening to the expert now?

MR. ZALESIN: About changing the order of the witnesses, not at all, Your Honor.

THE COURT: Then we'll have him first.

Was he sworn him?

MR. LOCASCIO: I believe he was.

Merisant calls Mr. Johnson to the stand.

(The witness took the stand.)

THE COURT: I remind you you're under oath.

THE WTNESS: Thank you, Your Honor.

Thereupon,

PHILIP JOHNSON

was called as a witness and, after having been previously duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. LOCASCIO:

Q. Good afternoon, Mr. Johnson.
A. Good afternoon.
Q. Can you introduce yourself to the Court?
A. My name is Philip Johnson. I'm the chief executive officer at Leo J. Shapiro and Associates, which is a Chicogo based market research and consulting company.
Q. Do you live in Chicago?
A. I live in Seattle, actually, but I used to live in Chicago.
Q. What do you do for a living at Leo Shapiro?
A. Well, in addition to my administrative responsibility I'm also a project director. I other words, I design and conduct primary market research in consulting studies for various clients.
Q. And are you here today to tell us the results of the survey you did over the last two weeks relating to any likelihood of consumer confusion with respect to the SAME with sugar package?
A. Yes, I am.
Q. Before we get to that, go through your Education background for the Court.
A. Certainly. I have a B.S. degree in Psychology from Loyola University in Chicago, and I have a masters in Business Administration from the University of

Chicago Graduate School of Business.
Q. After completing you education, where did you work?
A. I started working at Leo Shapiro and Associates actually when I was in undergraduate. It's the first and only job I ever had. I got a part time job there while I was still in school, and what I did was coded surveys, which is, once they are filled out they had to be coded so you could make sense out of them. And I stayed there. It's the only place I have ever worked.
Q. How many years you have been there?
A. Thirty-three years.
Q. How many employees does Leo Shapiro have?
A. We have 100 employees, roughly.
Q. What positions have you held since you were the survey coder, if you will?
A. I started off coding and then I got a job there that was full time. And first I was an assistant, which means I actually did interviewing. Then later I learned how to design interviews. And I conducted them. I was a junior analyst for a while and a senior analyst and project director. Eventually I became vice president and subsequently president and C.E.O.

Q. How long have you been president and C.E.O. at Leo Shapiro?
A. I was president about ten years ago. I think I have been C.E.O. for the last four.
Q. In general terms, what does Leo Shapiro provide to its clients?
A. We conduct primary market research studies that focus on consumer behavior. Most of our clients are retailers and other people who want to know what consumers think of them, how they buy products and services from them in order that they can compete more effectively than their competitor.
And then personally I have for the last 15 years been involved. I spend about half my time in studies related to litigation, like the matter here.
Q. What types of surveys do you conduct?
A. We conduct personal interviews, we conduct telephone interviews, we conduct Internet interviews, focus groups. Every kind of traditional and some of the cutting edge survey techniques we use.
Q. What are these different types of surveys measure?
A. They all measure consumer beliefs or attitudes or behavior or all of the above.
Q. Can you ballpark for me how many surveys you

have worked on?
A. I've designed and conducted hundreds of surveys.
Q. Are there also surveys that you have supervised that you didn't design and conduct yourself?
A. A long time ago. But in the last twenty years the surveys that I am involved in are the ones that I designed.
Q. How many surveys have you prepared in the litigation context like this?
A. I have done a few hundred.
Q. How many times have you been certified to testify as an expert witness on surveys in federal or state court?
A. I believe about 70 times.
Q. Have you ever been prevented or excluded from testifying based on your credential in a courtroom?
A. No, I have not.
Q. Are marketing and consumer surveys that you might do for a brand awareness for a company different than litigation surveys?
A. Well, I think they are different. You saw examples of them and we all did yesterday. In one of the ways they are different is the complexity. As you saw, they had a 17-page questionnaire with literally

hundreds and hundreds of questions that a respondent could would down and fill out. Those are not used in litigation.

The kinds of surveys that the Dr. Mazis testified about earlier that he conducted and sort of I conducted are typically the kinds of surveys. They are done for a specific purpose with a very specific focus.

Q. What are the focuses or the areas of which you have done prior surveys for litigation, subject matters?

A. The subject matters generally have to do with intellectual property in Lanham Act issues, generally the issues like secondary meaning, likelihood of confusion, genericness; and then to a lesser extent, false advertising, different kinds of advertising claims: change of venue, unfair competition, and some lesser things.

Q. Does Leo Shapiro or you always have one side you represent in these sort of survey cases?

A. No. I have done about -- about half my work is for plaintiffs and about half for defendants.

Q. Did you prepare an expert report in connection with this case?

A. I prepared a declaration which summarizes the study that I conducted.

MR. LOCASCIO: I'm going to go ahead and hand you Defendant Exhibit MM, which has your C.V. at the back because your expert information is on the front.

(Document handed to defense, the witness, and the Court.)

BY MR. LOCASCIO:

Q. At the back of Defendant Exhibit MM, is that your C.V. and resume?

A. Yes, I have a C.V. and a case list that covers the more recent cases.

Q. Are you member of any professional organizations or association?

A. Yes, I am. I'm a member of the International Trademark Association, the American Marketing Association, the A.A.P.O.R., which the American Association of Public Opinion Researchers.

Q. Have you done any writing or lecturing?

A. I've given a number of lectures at different International Trademark Association functions, A.B.A. functions, some C.L.E. class on surveys.

MR. LOCASCIO: At this time, Your Honor, we tender Philip Johson as an expert on use of survey and research for consumer behavior opinion and state of mind.

MR. ZALESIN: No objection.

THE COURT: Very well. He seems to be a expert qualified.

BY MR. LOCASCIO:

Q. I'd like to talk to you, Mr. Johnson, about how you started being involved in this case. Why don't you tell me what you first heard about the case, who it was from, and some of that background.

A. Well, I guess it was about two weeks ago I received a call from one of your colleagues in Chicago, Russ Weisman. And I believe you joined him on the telephone during that conversation and explained to me that you had a situation here where you thought you should conduct a survey.

Q. Did anyone tell you what the goals of the survey were or what your were supposed to find during any of the conversations that you had?

A. Well, it was explained to me what the tissue was.

Q. What was that?

A. The issue, as I understood it is whether or not the use of the package on the new SAME with sugar product was likely to cause consumer confusion here in the marketplace in Puerto Rico such that people would believe it was SPLENDA or came from SPLENDA.

Q. Was this situation looking into the possible likelihood of confusion between two products something you have done before?

A. Yes, many times.

Q. Did you use that experience in preparing your survey in this case?

A. Yes, I have.

Q. I'd like to walk through the process of how you designed your survey questionnaire. Would it help you to have a questionnaire in front of you for this?

A. Yes it would.

MR. LOCASCIO: I'll go ahead and hand up to the witness what's been marked as Defendant's NN.

(Document handed to the witness and to the Court.)

Q. Mr. Johnson, the Exhibit NN. has got two parts. The first half is in English, the second half is in Spanish. Maybe you could tackle that first one and we'll know what we need to go through on this document. Can you explain that?

A. The first part is the English version and the second part is the Spanish version. We prepared two versions, which I do whenever you deal in a marketplace where there is a language difference, and then we give respondents a choice of whether they would like to


conduct the survey in English or Spanish.

Q. And you have them translated?

A. I do.

Q. And you're comfortable that it's an accurate translation?

A. Yes.

(Publishing.)

Q. I'll put your survey up on the screen. I know you've got one. It's probably a little easier to read than the screen version.

Let's talk about who gets asked the survey.

Who do you look at when you design a survey like this? In this case, who was the universe of people you wanted to talk to?

A. Well, one of the things you do whenever you design a survey is you first think about who is the relevant universe. So the relevant universe, my understanding, are people here in Puerto Rico who purchase sugar substitutes for themselves or someone else in their household. So those would be the people you would want to conduct the interview with.

Q. You were here when Dr. Mazis talked about the screener question and things like that. Do you remember that?

A. I do.

Q. I don't think he indicated a big disagreement about that. Am I correct that you don't have a lot of disagreement about the need to screen out some people before you start the survey?

A. No, the screening approach and the approach to qualify the respondent, get the right person, is something that's fairly well accepted. And I think fairly what Dr. Mazis testified earlier, we both follow the similar pattern in terms of the screening and the qualifying question of having purchased a sugar substitute in the past 90 days and also planning to purchase.

Q. We can stop from the stop, the screening section of your survey. The first question, "What is your age?"

Why was that question in the survey?

A. Well, you set certain parameters when you're interviewing. In this case it was to deal with adults over 21, because my understanding of the sugar substitute market is that it's primarily an adult market.

We wanted residents of Puerto Rico, especially this time of the year, because my understanding and certainly from the hotels in town, there are a lot of tourists in town.

So when you're in shopping centers which if it's a rainy day you may well get other people like myself into the mall. I don't want to talk to them. I want to talk to people who live here.

So that's part of the screening. And we had a number of other questions which are similar to Dr. Mazis's.

Q. Okay. At some point it looks like Question 3 relates to what language you wanted to do the survey in?

A. That's correct. "Do you prefer to complete the survey in Spanish or English?"

And then we had the questions about purchasing.

And then we have what we call the "security screens" in terms of participating in market research surveys in the past three months, as well as members in your household.

And then finally whether or not they wear eye glasses or contact lenses and whether they have them, because otherwise we wouldn't want to show them something that required visual acuity.

Q. At the time you get through all of those screener questions, what happens then?

A. Well, then you tell the person you would like

to interview them and you take them usually to an area -- these are done in shopping centers. These were done in three shopping centers in the greater San Juan area where there is an interviewing area set aside so it's not so distracting, it's being in the flow of things.

So you take the person who qualified, you bring them into the interviewing area and then you conduct the interview with them.

Q. Can you tell me your involvement in the process of these interviews, arranging for them or otherwise finding out what was going on during that process?

A. Well, I have a field research organization called "Survey Center," which is part of my company. In other words Leo Shapiro and Associates, Survey Center is a wholly-owned subsidiary.

They are responsible for the field work. They contacted a local field organization called "C.R.C." Consumer Research Center. They in turn supplied the interviewers. They screen interviewers. They are a member of the Market Research Association. They are a reputable supplier of this kind of service. They do the actual conduct of the interviews. And it was done at 3 major shopping centers within the San Juan area.

Q. Was someone from your group involved in the process of actually training these people or working with them?
A. I had a liaison member from my many office come here and work with them, yes.
Q. What's the time period over which your survey was conducted?
A. Without the benefit of a calendar, it would have been the Monday to Friday of have last wreak.
Q. You mentioned the survey that you were setting out to do in this case to determine if there is a likelihood of confusion, and that confusion -- am I right -- is with the SPLENDA product that is the plaintiffs'?
A. That's what's alleged, yes.
Q. That's what you want to check, find out the answer to?
A. Yeah, that's the disagreement or the dispute.
Q. Because the survey is about confusion with SPLENDA, would you just use SPLENDA in the survey? Would you show people SPLENDA?
A. No.
Q. Why not?
A. Because there is no point in showing SPLENDA. The times you would show SPLENDA is if you

were doing a secondary meaning study, you would show some form of SPLENDA, in other words, the part of SPLENDA that you believe had secondary meaning.

But you wouldn't show it in a likelihood of confusion survey because it is the known brand, in other words, the one that would be in consumer's minds that would cause the confusion, because that's what they are thinking of. So you wouldn't show it to them, because that would prompt them or prime them before you would conduct the study.
Q. Can you explain to me if there are any particular types of survey techniques such as -- I take it that's not one you would to do. But are there appropriate types of ways to survey for confusion or secondary meaning?
A. There are general methodologies used in likelihood of confusion studies. The most prominent is based on what we call the "Ever Ready test, which is also described as monadic test.
Q. What does that mean?
A. "Monadic" means you're showing one stimulus to a respondent; ergo, monadic.

So an Every Ready test basically is designed to show the junior user or alleged infringer, or however you want to describe that. You show it to

someone and you take it away and you find out if they are confused about who put it out.
Q. After the survey is conducted, what happens next?
A. Well, you take the results of the survey. In this case you first translate them so they can be processed. You validate them by telephone, using telephone calls.

We had an organization in Texas who was bilingual who actually did the telephone calls, so you're working with a different group.

You never use the same group to check the work that you have do the work. So we had the validations done from Texas with the people here. They actually telephone the respondents in the survey, verify that they, in fact, participated in the survey. Then you go ahead and process the data by putting them into a computer and producing summary tables so that I can tell what we found out.
Q. Why do you use a different person to check whether the surveys were done than the person who conducted the surveys?
A. It's the standard practice, because when one group does something, you always have another group check their work. It's the intelligent, way to do

this.
Q. Did you call every one of the participants?
A. I think had we ended up actually reaching about 43 percent, which given the amount of time we had to do it is a very high number. Typically you would only contact 10 percent or less.
Q. When you do that, was there anyone in this survey that said that's not me, I didn't say it, something like when you called them up after you validated?
A. Yes, five interviews failed in the validation process out of the 827, because we did 827 respondents in three areas. Five did not acknowledge that they actually participated in the survey. So we removed those five from the data base.
Q. In your experience, is that a high number?
A. No, it's very normal. And it comes about because people don't want to be bothered again. They already participated in the survey one time. They are afraid you're trying to sell them something or do another survey with them.
Q. Then they say 'it wasn't me'?
A. Wasn't me.
Q. What else do you do when prepare the survey? Say you've got the screener questionnaire done. What

happens next?
A. In terms of designing the survey?
Q. Yes.
A. Well, I design the survey so that based on my understandings of the case so that it's consistent with my experience in whether Court's have suggested are the best practices.
We do what we call the "generally accepted practices," which are the waves that have evolved over the last 20 years.
I mean, the Every Ready test, for example, was ancient history. It was one of the original designs. So it inspired a certain technique. But it's by no means still accepted as current. For example, the language in it has been criticized many, many times for being leading and for being not balanced in terms of the form of the questions that were in that study.
So using what has been accepted most recently, these have evolved over time. And that's what I do.
Q. Let me bring your attention back to Defendant Exhibit NN, which this is now the survey part of the questionnaire. This is page 3.
Can you tell me happens when the survey participants shows up? They've gone through the screener and now its's time to start the survey. What

do they experience?
A. They are going to be handed a box. In this case, one of two boxes. It will either be in the test cell or the control cell. And we randomize that. In other words, the first person through the door will be test and the next person will be control and the next person is test. And in between them you hide the boxes so nobody can see anything to do with colors or anything to do with what you're showing them so that there is no information for them.
First, you hand them a box. The boxes would be marked either -- we always pick a marking that doesn't mean anything. In this case I believe they were DD or TT, which is --
Q. Would it help you to see the boxes for the survey?
A. Certainly.
MR. LOCASCIO: Can I approach, Your Honor?
(Two boxes were given to the witness)
A. So this box is marked on the end with a sticker that says "TT," and this box is marked with a sticker that says "DD." And the sticker is placed as best we can over an area of the box that doesn't cover anything, so we are not removing any information by putting a label on it.

But these numbers are picked at random to have no meaning. You use two letters because if you use something like A, B, C or 1, 2, 3, respondents attach some significance to that. So if they see it, they are going to say, 'Oh, this is product A and this a brand X.' It means something to them.
So you pick a way of labeling this so the interviewer can label what they are doing. 'I'm going to do this questionnaire with TT and I mark it.' And that's what I've done.
Q. And so with your survey the questioner checks off the letter code that matches the box they are handing a interviewee, if you will?
A. Right. And questionnaire is always the same. It will be marked either DD or TT.
Q. Is that how you tell which person is seeing which box?
A. That's correct.
Q. One box is the SAME with sugar box in yellow. Which size is that? There are three sizes of that box.
A. This is the one 100 packet size.
Q. And why did you choose had box as the as the test?
A. Well, it's my understanding that this is the most common size package sold. In other words, it's

the one with the most sales -- the most popular package size, which is typically what is used.
Q. And the SAME with sugar in the 200 pack is a bigger box that's actually different in size than SPLENDA, but you didn't choose that you; you chose the 100 box. Right?
A. That's correct. You want to pick what's the most normal thing for the consumer.
Q. And then the other you have, what's that?
A. This is the SUGAR TWIN box, which is also in the 100 count.
Q. What is that box? In the course of your survey, what does it do?
A. This is what we call a "control." So if this is the test product, the one I want to find out if this causes confusion. You need to pick a control product to decide whether or not you're really measuring confusion or if you're just measuring noise or error.
Q. Why did you use a box of SUGAR TWIN?
A. Well, SUGAR TWIN has a the attributes of a good control.
Q. What are those?
A. Well, first of all, it's a real product. It's not a made up thing. So it's always better to use something real, if you can. It's not well known, is my

understanding, at least here Puerto Rico. That's important because if you had a really well-known product and people recognized it, then it would have its own brand share mentioned.

So, pretty much, you're not going to have people recognizing it because it's popular, so you don't have a lot of brand share mentions to deal with.

And it has the same general elements as the test package, which is also important, because elements that are common to genre are important to represent in the control. So if many or all or some, like the coffee cup or a glass, as I understand it from looking at it and from the testimony yesterday and this morning, many of them do, then you would want that in the control.

And then finally it has a color that's not infringing, but it's not wildly different. Because if this is a color that's normal -- and, again, you saw it yesterday and today -- if DOMINO uses a color like this and SUGAR TWIN uses a color like this, and in the shelf pictures we see of a grocery store, you see colors like this typically on the shelf, then the control should have that because it sets sort of the base level that you want to know, well, if there is a little confusion out there and it's caused by color, and that's not at

issue, because that's what the market standard is, you want to know how much higher than that or lower this package would be.

So you need something that sets a bench mark when you pick a control.

Q. Did you create the questions and the instructions to the survey yourself?

A. Yes, I did.

Q. Did anybody from my firm of any other law firm tell you what those questions should say?

A. No.

Q. Let's start with the instructions that you're given in you service. It's on page 3. Can you tell me what the instructions and why those are important?

A. Well, you start by putting people into a buying frame of mind. So we hand them this product, and we tell them -- we also, by the way, we alternated on this product whether we handed it to them with the English side or the Spanish side on the made with sure, just so we randomized it.

So the first thing is you randomize how you hand it to someone. And the you tell them 'this is a sugar substitute package you might see if you were out shopping at a food store or some other place that sells this kind of product. And then, very importantly,

please take a look at this as if you were considering purchasing a sugar substitute like this and then let me know when you're finished.'

You always want to talk to people about purchasing, because you want them to be looking at it as though they were considering purchasing it. You don't want them to be an expert like you're an ad agency and you want them to have a comment on the colors or the design. It has to be in the frame of mind of the purchaser, because that's something in the Lanham Act that has to be specified.

Q. You mentioned you handed that sometimes facing one way and sometimes the other. What was the reason for that? How did you know which way to hand it to people?

A. We just ramdomized it. We just alternated, because its a variable. I mean, we bought these packages in Puerto Rico. So this is how they are really sold. So rather than always assume they stock the shelf exactly the same way, we just randomized how we did it so people could flip it around.

Q. How many boxes of product do you need to do one of these surveys?

A. I think we had about two dozen of each box, because they get handled. So you can't use them

infinitely.

Q. Were the SUGAR TWIN boxes bought in Puerto Rico, also?

A. Yes, they were purchased here.

Q. You have handed it to the interviewee and you've asked them to look at it as if they were considering a purchase. What happens next?

A. After they are done, they hand it back to you, and you put it away out of sight. And you do put it away out of sight so there are no visual cues left for the respondent to react to. So there is no color issue. You have a white questionnaire. There is nothing about the products that you have shown them that would give them any hints in terms of how they would answer subsequently.

Q. And then what do you ask? Let me actually take a step back. Are there any other instructions you give?

A. Yes. Then you give them the admonishment of 'If you don't know the answer to any of the questions, it is okay to say so.' And then we also instruct them 'Please do not guess.'

Q. Why do you include the please do not guess instruction?

A. Please do not guess is considered to be an

important instruction in a survey like this where the consumer is trying to be helpful. They are giving you their time to do the survey. They know it's important or you wouldn't be asking them the question. So they are going to have a tendency to be helpful and try to answer the question, which means often they will guess.

So you admonish them not to guess. But they still are going to have some guessing in the survey.

Q. I notice there is instruction before that that says 'If you don't know the answer, it's okay to say no.' But then you follow that up with 'please do not guess.'

Is that duplicative or is there a difference?

A. There is a difference between saying you don't know something and telling people not to guess. So they may not know the answer to a particular question. But the 'know not guess' is a different kind of instruction.

Q. In your experience, is that an important thing to include in the survey?

A. Yes.

Q. So then the first question of your survey, can you go through that and why you put that question in there?

A. This is the question that we typically refer





to as the 'source confusion question in an Ever Ready survey,' which is, "Based on what you just saw, do you or don't you know who or what brand or company makes or puts out the sugar substitute that I showed you?"

And then people can say, 'no, I do not,' or 'no, I don't,' or, 'yes, I do,' or they can say 'no opinion.'

And if they say yes, we ask them 'Who or what brand or company do you believe makes or puts out the sugar substitute that I showed you?'

And then we probe them any others. And then we ask, 'What makes you say that irrespectively?' So what makes you say that to the response they gave in 1B makes or puts out the sugar substitute that I showed you.

So we find out who they are thinking of and we find out why they are thinking. So it's all their words, not mine.

Q. We heard McNeil's expert talk about this question and say that it was not the appropriate sort of question to ask like in a confusion survey. Can you address that point?

A. Well, it is the exact question you're supposed to ask in a likelihood of confusion survey. And it's the wording -- if the wording is consumer unfriendly --





and there has been a lot of talk -- and you heard it this morning when Dr. Mazis talked about it. The Court's have insisted on the fairness overruling the unfriendliness.

So you try to make it as clear as you can and concise as you can. But in fairness, the reason for you say 'do you or don't you,' for example, is called a 'balanced question.' So it's not suggesting you must have a view. It's saying do you or don't you; otherwise, you're encouraging or leading the respondent.

The same way when you say you know who or what brand or company. If you just say who, they not know what you're talking about. If you just say what brand, they may think about as a company.

If you don't give them all of those choices, again, you're limiting some people's ability to respond.

When you say makes or puts out, it clarifies what you mean, because some people might understand manufacturing or just that you ship it or you pack it.

So these are changes to the original Ever Ready questions of 15 years ago that are the well-accepted changes that are very common and the ones I use and other people who practice this sort of survey





generally do use.

Q. According to Dr. Mais, you could have taken out perhaps something with an "or." So you might have what company but not what brand or company.

What impact would that have if you gave them less choices there but it might be able to short a question?

A. It would have been a shorter question, but it would have been more limited in what people would understand and what they would say.

Q. Why is that with respect to brand or company?

A. Well, some people know the brand of something but they don't know who makes it. Other people know who makes it. The brands run across things.

Q. In response to this question, there are three answers. And then if they say yes, you then follow up. Right?

A. Yes, you find out what they are thinking.

Q. This question is designed to focus on the focus of the product; correct?

It sounded like Dr. Mazis said, 'well, more people should have said SAME when you showed them this question.

Can you talk about that a little bit?

A. Well, I thought the results were quite

rational in the sense that they shouldn't really have been familiar with any either one of these packages.

My understanding was this was very new on the market here when we conducted the survey. And this, while it's being offered here for sale, only has -- what did they say -- 1 percent or one-tenth of a percent of the market here.

So they shouldn't necessarily be intimate with these products. You wouldn't them to react to that they actually know who makes these or puts them out.

Q. Why didn't you just ask people 'what did I just show you?'

You were here a moment ago with Dr. Mazis and it sounded like there was come commentary of 'How could people possibly forget what you showed them three seconds ago?'

Why don't you just ask the people 'What did I just show you?

A. Well, if you ask them 'What was the brand,' for example, if we did it, as you did from the stand of reading this, if I get people merely to read me back what I showed them, which is SAME, and they say that, what it causes is what we call a "funneling or tunneling effect". Then to get them to say anything else, like SPLENDA, is going to be greatly diminished,

because you have focused them on the brand and not on who makes it or whether they make other products that you know of.

Q. The next question of your survey is on page 4, and what is that question and what is the purpose of it?

A. Well, first of all, it's important that this sort of question is asked of everybody. Okay? I didn't filter people out of the survey with my first question. The first question has two parts, which is correct, it's called a "filter" question to qualify people so you don't force people to guess.

But the second question is asked of everybody. It's not only asked of people who said yes to the first question.

Q. So when Mr. Zalesin was talking to Dr. Mazis and suggested that people who said they didn't know the brand or company in the first question weren't ever going to be asked anything else, that's not what the survey does. Right?

A. No. The survey asks everybody the question 'Do you believe that whoever,' -- even if they don't know, -- 'whoever makes or puts out the sugar substitute I showed you is or is not related to, sponsored by, or associated with any other brands or

manufacturer.'

Q. That language 'related to, sponsored by, or associated with' seems like -- couldn't you just tighten that up and make it a little shorter?

A. No. Again, this is the problem with the Lanham Act, again, and what Courts have asked you to say, is consumers, again, if you do one of those three, you're limiting their choices.

By saying 'related to, sponsored by, or associated with,' if they believe this is a line extension of SPLENDA, for example, they would answer that it's SPLENDA. If they believe SUGAR TWIN is a line extension of SPLENDA or SPLENDA is a line extension of SUGAR TWIN, they would give that kind of an answer. Then they would say yes to this kind of question worded this way. But then they don't have to know the exact relationship.

Q. And then you probe to find out why people gave those answers?

A. Yes. We want to know who first, who is it that they are thinking of; and then what, what makes them say that.

Q. When you determine the percentage of people that associate the box in the survey with a particular other company or brand, how do you calculate that based

on these two questions?

A. Well, I take what we call the "net," which is either question. In other words, you don't limit them. You take, do they mention, for example, SPLENDA to Question 1, A, B, C, or do they mention it to Question 2, A, B, C.

So they have been asked twice. Everybody gets asked twice. And it they said it in either place, you count them as confused or not confused, depending on what you are doing with it. But you collate or consider the responses to both questions.

Q. I'm going to put on the screen. That's the first. For your survey data did you compile the information that you got?

A. Yes, I did.

Q. And after you get to the first question which is 'Do you know who makes or puts out the product?' You follow that up with who the source is. Right?

A. Yes.

Q. And then did you compile that into a chart where you know who said SPLENDA and why?

A. Yes.

Q. Can you go ahead now and fill in these numbers for me from your expert report, or from your memory, if you know.

A. Actually, first, to get to the why he said SPLENDA, you need the other chart. In other words, this is the Question 1C, which comes after 1A and B.

Q. I'll show you that since that's probably the way they saw it when you do the survey.

A. Yes, they saw it when they did the survey. That's the way it works if you were doing the survey.

Q. Okay. So these are the questions they are asked. Right?

A. That's correct.

Q. And then resulting from these questions, people either say they know or don't know and then what the brand is. Correct?

A. That's correct.

Q. Can you walk through the data you got during your survey?

A. Yes. So in terms of Question 1, A, B, the number of people who said, 'Yes, I have a belief,' and also said SPLENDA when they were shown a package of SAME with sugar, was 4.1 percent.

In the control cell to the right of that, among the people who saw this package of SUGAR TWIN and asked 'Do you have a belief,' 2.2 percent reported that it was or came from SPLENDA.

Q. And then there is a column after called

'Difference between test and control.' Can you explain to me what that is?

A. Well, the reason for doing a control is it establishes a baseline; so we always subtract it from the test. That's the reason they call it a test and a control. It's a requirement when you do a study like this. So you subtract, for example, from 4.1 you would subtract you would subtract 2.2, which is something like 1.9.

Q. What does that one 1.9 percent represent?

A. Well, that would be for that question, the finding. In other words, you would assume that the source confusion is about 2 percent.

Q. And that's based on the question you asked 'How many people think SAME with sugar comes from the same source as SPLENDA'?

A. Correct.

Q. The next line is 'relationship, sponsors or association.' Can you tell me the data your survey showed for that?

A. Yes. There in response to that in the test sell, 22 percent named SPLENDA; and in the control cell, I believe, 19.2 percent named SPLENDA.

So the difference there is about 2.8 percent.

Q. And then there is another column that says

"net." What is that?

A. The net is when you look at them both; because some people would have said the same thing. In other words, you could have said SPLENDA to Question 1 and you could have also said it again to Question 2. And some people in fact did.

So when you take the net of saying it either place, you end up with a total of 24.9 percent who named SPLENDA is either a source or associated or related or sponsored or is in way related to the SAME with sugar package.

MR. LOCASCIO: My math is really off, Your Honor. I'm going to rewrite it out.

I apologize, Mr. Johnson. That's why I'm the lawyer in the room and not the survey expert.

Q. When you add them?

A. 24.9 is the net. You were right.

THE COURT: You were right.

MR. LOCASCIO: We'll just go right back to that one, shall we?

BY MR. LOCASCIO:

Q. How about when we net SUGAR TWIN in the control cell?

A. That would be 20.6.

Q. Thank you.

A. And the difference would be 4.3, and that we can subtract directly.

Q. Thank you for the math assistance. I appreciate that.

And can you tell me what that means?

A. That means that when we consider the questions about source and we also consider the questions about relationships, sponsorship, or association, when we compare the test with the control product and we use the control for a baseline, you would conclude that about 4 percent confusion would exist in the marketplace, if anything. The 4 percent is close enough to zero, so for most parts we consider it to be diminimous or zero.

Q. Let me ask you this: If two products that one has one particular look and one has another, and then you get 24.9 percent for the test cell, why isn't that the amount of confusion?

I think in opening statements -- I'm not sure if you were here -- I think you were -- Mr. Zalesin says you survey shows 24.9 percent or 25 percent of the people are confused. And I would like for you to address, that please.

A. Well, that isn't a measure of confusion. Remember, what we are dealing with here in both Mr.

Mazis' survey and mine, is a market research survey. And you've got to remember that surveys are not -- we are not witnessing purchasing where people are taking things and being confused. They're a simulation. And we put them together to try to make an accurate a measurement as we can of what confusion exists.

So we are asking people questions that may never occurred to them normally. And we are also putting them in a situation where they are an expert and they are trying to guess the question. And we know there is a certain baseline. People do pick up their own products, for example, just to get that clear. It may not be because it's particularly confusing, but it's that the average woman, for example, or a man, who goes to a grocery store can pick up about 50 items in about 20 minutes out of 24,000 S.K.U.'s in that grocery store.

And they do it. It's a remarkable thing to watch and to study, because they do it through a process of first de-selecting and then selecting within products. And they are very, very good at it.

But still in all, people make mistakes. So there is a certain amount of mistakes made. And between that and the way questions are asked and the fact that you have people in a survey situation, which

is artificial, you always expect there is going to be some error.

What you do when you design the survey in a test and control is you use something real that exists that is not infringing, and you say, 'Well, this is a baseline for measuring error; so what I want to know is how different is this.'

Q. There is also a fair amount debate in this case as to whether that baseline is the right baseline. I would like for you to explain why you believe that in this case that's the appropriate control to subtract out from your figure.

A. Well, as I said before, you want to pick something that is as close to the product at issue, and the product at issue in this case is --

Q. You don't need a SPLENDA box?

A. Is the SPLENDA box. In other words you want something that's going to be in the market, sold along side of this, 100 packets, and be non-infringing.

This is our base level. Whatever amount of confusion you get for this in a survey is okay; it's okay because the consumer experiences this every week when they go into the grocery store. And it's not prohibited by the Lanham Act. It's not prohibited.

I heard testimony yesterday this package is

not infringing and they sought nothing to prevent this.

So if this is the base level, then I want to know how different is this?

Q. When you said you heard testimony, were you referring to Ms. Sandler saying that SUGAR TWIN looked and felt different than the SPLENDA package?

A. Yes.

Q. And she didn't believe that it was infringing.

A. Yes, that's correct.

(Publishing.)

Q. Let me show you what we put on the screen before -- what will probably when I return to Washington be less than popular -- the highlighting in the Federal Judiciary Center's Reference Manual on Scientific Evidence, that gives an instruction as to how to perform a control group.

Was your control consistent with that language?

"In designing a control group study the expert should select a stimulus for the control group that shares as many characteristics with the experimental stimulus as possible with the key exception of the characteristic whose influence is being assessed."

A. I believe that it is. That's what I attempt to do, yes.

Q. And in this instance, as you understand this case, what is the characteristic whose influence is being assessed?

A. What's the difference is between SPLENDA that are set out -- and I believe you read them earlier -- that are set out as having or believed to be having trademark significance. Which, again, you went through this with Dr. Mazis and I don't think we have to go through it again. But you point by point, they are not present on the SUGAR TWIN box.

Q. When you got the data for SPLENDA that we saw on this chart, the people who said SPLENDA to either the test cells, SAME with sugar, or the control cell. You then followed up with them by asking why they are saying that. Right?

A. That's Correct.

Q. Can you go through the data for that?

A. I believe that in here, again, color is important of those who named SPLENDA in the test cell. It's really 15.1 percent named SPLENDA and said the reason or one of the reasons -- because they could give multiple reasons -- it was an open-ended question -- was color.

Q. Okay. 15.1?

A. 15.1, yes. 10.7 percent said it had something

to do with the appearance of the box; 2.4 percent reported it was because of the lettering or the graphics or type style; and 8 percent said something about familiarity with the product or the genre or 'it's the one I buy' or things like that.

Q. Anything else? Are there people who said 'other'?

A. There were a few mentions of 'other' and 'don't know,' but I don't know what those were offhand.

Q. I have those from your report. I believe.

A. Okay.

Q. How about when people saw the SUGAR TWIN box?

A. In the SUGAR TWIN cell you had 11.2 percent who named SPLENDA and said it was because of the color of the SUGAR TWIN box; and 6.1 percent that it was because of the appearance of the SUGAR TWIN box; and 3.2 percent because of the lettering or type style or graphics; and 4.9 percent because of their familiarity.

Q. From your data, 1.7 were 'other,' and .5 were 'don't know.'

What does that data mean to you when you compare the control cell results with the test cell?

A. First, you can see from the relative number of mentions as well as sort of the order of magnitude mentions, the reasons they said this box came from

SPLENDA were identical to the reasons they said this box came from SPLENDA.

Q. And what were those?

A. Primarily the color, more than anything, and then the packaging, the graphics, familiarity.

Q. Does the second category 'packaging of box,' which you do notice a higher number in the test cell than the control cell, what does that indicate to you?

A. Well, remember, we had a 4 percent difference between the test and the control cell. So you have about a 4 percent difference in color; you have about a 4 percent difference in packaging; no difference in lettering and graphics; and you have about a 3 percent difference in familiarity. So they are in line with one another.

Q. Based on data from your survey, do you have an opinion as to the issue of likelihood of confusion between SAME with sugar and SPLENDA?

A. Yes.

Q. What is that opinion?

A. Well, according to the survey, the results are very clear that there is no likelihood of confusion for this package in terms of being likely to be confused with SPLENDA, any more than you would expect, just based on the baseline in the marketplace.

Q. There is a little bit higher number; correct? it's not the same?

A. 4 percent. When you figure whether something is significant, we generally think of it in terms of the standard error or the confidence level. It's like when you do an opinion pole or, let's say, voting for president. What you're doing is you do a poll and you say that the results are 90 percent plus or minus 5. That's the confidence level.

The confidence level for data like this is going to be 6 percent or above. In other words, the error rate you would expect based on chance tends to be 6 percent or more for most of the data we are looking at.

So this 4 percent would be lower than that, which means for all practical purposes you treat it as zero.

Q. Are there any other conclusions that you have based on your work in this case?

A. I think it also means that when you look at this turned around, it means that there is no secondary meaning for the color yellow in terms of the marketplace. In other words when a color tends to identify exclusively one manufacturer, you don't get the kind of mentions that you get in a survey like

this.

This suggests that color is not-- the maybe that this is yellow and SPLENDA is yellow and people know that, but it doesn't mean that everything yellow is SPLENDA or is SAME or is SUGAR TWIN.

Q. And in this marketplace with the did market share that SPLENDA has, am I correct that people may be familiar with SPLENDA's yellow product, but that doesn't equal secondary meaning?

A. That's correct.

Q. Let me just ask you briefly if you have any views or thoughts or opinions about the work Dr. Mazis did in respect to the accuracy of his survey or the validity of it.

A. I do have some opinions, yes.

Q. What are those?

A. I think the first thing that strikes you is that instead of doing what one would normally do would when you're doing a -- let's talk about design for a second.

A design that has secondary meaning, which is if we want to do sort of, let's say, the Paladino approach, the difference between a Paladino and non-Paladino secondary meaning survey is primarily whether we attempt to ascertain whether a particular

company owns the thing or whether it's one company or more than company.

In other words, Mr. Paladino takes the position that one company and more than a company is sufficient. Others have said, 'Well, one company or more than one company is the primary inquiry, but we may also want to know who that is.

Q. So these are back to the questions that we saw with Dr. Mazis is the second question you just talked about. He asked that; right?

A. Those are the questions of secondary meaning. What he did on his survey is a, quote, first question, the one that eliminated what -- half of the people in the control group and some of the people in the test group, is not found in secondary meaning surveys.

Q. What do you mean?

A. Well, it makes no sense to set up, for example, a control in a secondary meaning survey that doesn't exist.

Q. Would it help if you have these? I don't know if you already do. It looks like you might.

A. I think I do.

Q. These are Plaintiff Exhibit 50, the white control box; and Plaintiff 49 is the test box from Dr. Mazis survey.





A. The reason for a control in any survey is to measure error and noise for guessing. So if I know this doesn't exist, why would I disqualify people in the first question by showing them something that doesn't exist, and then if they say it doesn't exist -- which is true -- I throw them all out of the survey and don't ask them anything and don't count their answer?

Which is essentially what he did.

So when you're doing a secondary meaning study, the question is 'does this or does this not signify.' The primary significance of this is to tell people who makes it and that it comes from a single source. In other words, 'one person makes a box that looks like this, and I know it's SPLENDA because of this look.'

That's secondary meaning.

Q. Is that what Dr. Mazis did?

A. Well, no, because first he screened out everybody, and then you haven't even asked people that inquiry, which is: Boxes like this, are they put out by only one manufacturer or more than one manufacturer?

Instead, he had a question that had something to do with, 'Have you seen or purchased,' which is never seen before. And again their redundant. You're either familiar with this or you're not. And that's





the point of second secondary meaning. You don't have to have bought it, for example, for something to have secondary meaning. You could have seen it somewhere. You may not even know where you have seen it. But you have a belief or you don't have a belief.

Q. Do you have any other comments on the test product or test package used by Dr. Mazis as to whether or not it's appropriate?

A. Well, again, when you do -- it's very difficult, first of all, to make a test package for packaging that you use in a secondary meaning survey, because you have to eliminate everything on here that is not -- you have to keep the trade dress you want to check, but you want to remove all the brand references.

So, for example, if this large X with the serifs, the Roman feet, there is a type style to this that mimics this with SPLENDA; which is you have the large and then the small. It's the same type face. And it has these little serifs on it, and then it has this swirl, like the NIKE swoosh.

And so we have this XXX with the swirl, and an analyst is saying, 'well, can you guess what's in there?'

That's really what you're asking the person who is looking at it: Can you guess what name goes





there?

And that's not secondary meaning if I leave the swoosh. And you have to decide what you're going to leave on a package and what you're going to remove.

But they leave the slogan no-calorie sweetener -- it's a slogan or the swoosh, the type font, the positioning -- they have this little seal.

So it becomes difficult to say. But you certainly have a lot on the package that's on this package.

Q. No-calorie sweetener, that's one way you can describe what the products in this market are, as sugar substitutes; right?

A. Yes. I think there is calorie-free sweetener, zero-calorie sweetener, no-calorie sweetener.

So SPLENDA says no-calorie sweetener.

Q. And they use what they have on their actual package.

A. Yes.

Q. Down in the corner there is that -- I think Ms. Sandler called it a "seal." Looking at the box that's handed to consumers or the survey participants, can you see anything there in that X if you were to look at this box, or is that wiped out of the source information?

A. I don't know if this is exactly what the respondent saw, but you can see something in here. You can see the blue where it says "made from." I can't read -- tastes like. But you can see there is writing under there. But I don't know if that's this copy or of all copies.

Q. It looks like something is covered up there.

A. Yes.

Q. Anything else about the look of this product or package, the test, versus the look of the control that you think was inappropriate in the design of the two packages?

A. Okay. Well, we just talked about the test package so far. And like I say, that's a difficult call because you have to decide whether things like the swoosh should be on this package or not when you're testing for secondary meaning; because if this is part of the registered logo, for example, which I believe yesterday it is, then it really shouldn't be here if it's part of the registration, because then it's part of the brand name.

This is difficult to deal with, because this is a fictional product, for all intents and purposes; but it has characteristics that are not found in the marketplace for this sweetener. It has characteristics

that tend to be shared by this sweetener rather than this one.

Q. And your point, so the transcript is better on that, it's more related to the EQUAL box than the SPLENDA box?

A. That's correct.

Q. Is there anything else about Dr. Mazis's testimony or opinions that you take issue with?

A. Well, the notion of error in what he did and the notion that he should only subtract 4 percent, for example, the 4 percent SPLENDA that you get to this package. I don't know why anybody would say SPLENDA to this package, other than what we call sort of "random guessing."

In other words, there are times you can hold up three fingers and ask people and they will say you've one up. That's the sort of guessing you measure with a package like this. It does not measure noise when you're trying to figure out what do people or consumers believe in the marketplace.

Q. Dr. Mazis testified that that was all the control was supposed to do. Is that your understanding and you opinion, as well?

A. No, it's not. My understanding is a control is supposed to take into account what is happening in

the marketplace in terms of what the common characteristics are without having the infringing.

Q. One or two other questions.

Based on what you saw today about some of the data compilations and some of the document survey collection over recordation techniques used in Dr. Mazis's survey, do you have any opinion as to whether that's something you would rely upon or not?

A. Well, I heard, I think what we all heard, this morning. But typically in Dr. Mazis -- before the lunch break he did say what I think would say. For example, I took the five interviews that didn't validate. Even though I think they are legitimate interviews, I didn't use them in the survey, because I wouldn't want to report them to the party. Which is what he said he should have done with the 37. Because if have doubts about it, you just don't report them. You don't assume something. So I would assume that you wouldn't count them.

Q. So in your view they should be excluded from the survey data?

A. In a sense you have them. They are marked one way. Either you believe the marking or you believe the color of the paper. And you've got to make a decision. Or you can just get rid of them and then you wouldn't

be wrong. So the prudent thing to do is just not to consider them.

Q. Looking at the screen, this is the chart I showed Dr. Mazis. If the data for those miscoded surveys is excluded, what does that do to Dr. Mazis's results?

A. Well, first, it affects only the control results, because it's only in the control cell. And control results just show that what you have is in the control cell for the white box you get about 71 percent of the people guessing, even though they couldn't have seen it, if they had seen it or purchased this product. Which just says the error rate in this survey is higher than 50 percent, which is extraordinarily high. And usually a survey with an error that high, as he testified in, I believe, the Ameritech case, you wouldn't credit at all.

Q. And if those were coded properly and they were really yellow boxes that were shown, the test case, and it just happened to be put on white because, as you remember, Dr. Mazis said maybe just the paper color versions ran out, what would that do to his data?

A. It would just show that if you took out from the test in the control all the people that were guessing, you would have virtually no one left.

MR. LOCASCIO: I'll go ahead and sticker that as Exhibit AAA, and I'll hand those up to the courtroom clerk.

BY MR. LOCASCIO:

Q. Mr. Johnson, just to conclude, based upon your work in this case and the testimony you have heard in over the past two days, what is your opinion as to whether or not SAME with sugar is a likelihood of confusion between that and SPLENDA?

A. I don't believe that there is.

Q. Based on what you have heard do you have any opinion as to whether or not the SPLENDA trade dress at issue in this case has secondary meaning?

A. I have an opinion, yes.

Q. What is that?

A. I believe it does not. In other words, I believe what we are seeing is what you would expect, that something with a 30-something percent market share, if you show someone in sort of a yellow box with lots of hints on it, people can correctly say that SPLENDA comes in a box that looks something like that, as you would expect.

That is not a measure of secondary meaning.

Q. Even if secondary meaning had been shown in some consumers because they are that familiar with the

SPLENDA box and do believe it's only from one source, how much of that do you understand in your opinion and expertise is needed to actually show secondary meaning under the Lanham Act?

A. In the situations I've been involved in were surveys I've done --

MR. ZALESIN: Objection, Your Honor, this is a illegal conclusion about the percentage that's required to show secondary meaning under the Lanham Act. I don't think we need testimony from Mr. Johnson on this.

MR. LOCASCIO: Well, the question is in his experience what has he found and opine that it is secondary meaning.

Dr. Mazis says a certain percentage he found is secondary meaning. It would be interesting to know what Mr. Johnson says about, particularly in light that some of the issues as to whether his data is really as high as it is claimed to be.

THE COURT: I think it's a factor, and he has had the experience necessary.

A. In my experience, when it comes to color the bar is set very high.

I've had a couple of cases I've been involved in -- in fact, one is from McDonald's where we were dealing with the golden arch where we had about 90

percent of the people who said 'I know that's McDonald's because it's gold.'

And another with DeWalt, the maker of power tools, who makes yellow and black power tools, where it was 70, 80, 90 percent of the people in different -- I did secondary meaning, likelihood of confusion, post sale confusion. In a lot of different circumstances they had extraordinarily high measures of people who say 'just because of that I know it is the DeWalt product.'

In my experience you need these very high levels when it comes to color.

MR. LOCASCIO: No further questions, Your Honor.

MR. ZALESIN: Your Honor, I am happy to proceed. I would say in candor I probably have over an hour of cross for Mr. Johnson. So its entirely up to the Court.

THE COURT: Just go ahead.

MR. ZALESIN: Thank you.

CROSS-EXAMINATION

BY MR. ZALESIN:

Q. Good afternoon, Mr. Johnson.

A. Good afternoon.

Q. So we are clear, if you have no experience in

academia. Is that right?

A. That's correct.

Q. And you have never worked for the Federal Trade Commission. Is that correct?

A. I've conducted surveys that were used by the Federal Trade Commission on a number of occasions.

Q. Where you were retained by the Federal Trade Commission, or you have offered surveys in evidence before the Federal Trade Commission?

A. Where I have offered surveys in evidence.

Q. I see. Have you ever been retained by or employed by the Federal Trade Commission?

A. No, I have not.

Q. Have you ever worked for any other branch of government?

A. Yes.

Q. What you done mostly in your career, Mr. Johnson, is you have been an expert in litigation; is that correct?

A. No, it's not.

Q. Do you agree with your own resume that's attached to your expert report that your area of expertise is the use of survey research as a tool in litigation? Is that your area of expertise, sir?

A. That is an area of expertise yes.

Q. That's the one you chose to highlight on your curriculum vitae; is that right?
A. That is correct.
Q. In fact, according to your curriculum vitae you have offered testimony regarding survey evidence on over 50 occasions in both federal and state courts; is that correct?
A. That is correct.
Q. And it says here, as you mention a moment ago, you've offered survey evidence to the Federal Trade Commission but not for the Federal Trade Commission; correct?
A. I believe that's what I said.
Q. And I think if we count out the list in just the last few years where you have testified, page 3 here, I came up with about 35 cases in which you have testified just in the last few years. Does that sound about right to you?
A. That sounds about right.
Q. And in addition to the 35 you have testified in, I gather there are many, many more that you have worked on where you haven't actually gotten to give testimony; is that correct?
A. There are a number of them like that, yes.
Q. So when it comes to the use of survey research

as a tool in litigation and testifying, you're a pro at it; correct?
A. I am an expert witness on the matter of survey research, yes.
Q. Did you personally conduct the interviews in the survey that you commissioned or you supervised in this case?
A. No, I do not personally conduct the interviews in these cases.
Q. You hired a field service to do it for you; correct?
A. That is correct.
Q. Can you personally vouch for the work of every single interviewer?
A. I believe that the work was correctly done. I cannot vouch for them in the sense that I witnessed what they did.
Q. Just like Professor Mazis can't vouch for the work that the survey interviewers did in his survey?
A. I believe that's true, yes.
Q. You said that you had five interviews that you had to pull out due to validation problems, that is, the interview didn't validate; is that right?
A. That's correct.
Q. And all your interviews, all your

questionnaires are numbered sequentially; is that right? In other words, there is a number assigned to each of the 800 or so questionnaires; right?
A. I don't know if it's sequential, but we have a number assigned to each one, yes.
Q. So there should be five missing; right?
A. There are five missing, right.
Q. Do you have any explanation why in fact there are 15 missing?
A. No, except that, as I said, there is not a sequence where every one -- there are numbered 001 through 8 something.
Q. And so some numbers are just randomly skipped over? That's your testimony?
A. Some numbers are skipped over because they are numbered as they come in. They are numbered in batches.
Q. Did you personally number these, sir?
A. No, I did not.
Q. Again, you hired somebody else to do that for you; right?
A. We have people who do that, yes.
Q. And you can't vouch for what they did.
A. I did not witness what they did.
Q. Now, let's talk about the questionnaire that

you used for your survey. You said that your confusion survey is a classic Every Ready design survey; is that correct?
A. I said it's based on the classic Ever Ready design, but it is modified and updated based on the generally accepted practices used today.
Q. New and improved; right?
A. It's what is currently used by myself and other people.
Q. You're someone who does a lot of this work for litigation. You're quite familiar with the Every Ready methodology; is that correct?
A. Yes, I am.
Q. And I take it you're familiary with a treatise on trademark law called McCarthy? Would that be correct?
A. That would be correct.
Q. And you would agree with Mr. McCarthy that a now standard format used to prove likely confusion in cases where plaintiff makes some products which defendant does not is the Ever Ready format. We agree with that; right?
A. Yes, we saw this earlier.
Q. And you would agree that these questions which are set out in the McCarthy treatise are the ones that

were used in the Every Ready case; right?

A. I would agree that that was what was used there, yes.

Q. And we saw this before, but actually before we get to the specific questions, let's just talk a little bit about the introduction that you gave respondents.

You testified about this on direct. You said you told them if you don't know the answer that that's okay, don't guess, et cetera. Do you remember that testimony?

A. I do.

Q. So for example, in Professor Mazis's survey, Professor Mazis said to the respondent: There are no right or wrong answers to my questions. I just want to know what you think and what opinion you might have. If you don't have opinion or don't know an answer, please just tell me. Your responses will be completely confidential. So please just tell me what you think.

Do you have any problem with that?

A. In what sense?

Q. You think that's a fair set of instructions to give to your respondents in a survey at the beginning of a survey?

A. It's a reasonable instruction, but it doesn't say anything about guessing.

Q. Well, it says: If you don't have an opinion or if you don't know, just tell me.

But it doesn't mention guessing. That's your point?

A. Well, my point is it doesn't say anything about guessing.

Q. And he gives this set of instruction before he shows the package to the respondent. Do you see that? So after he gives that instruction, then he says here is a package of no-calorie sweetener, et cetera. Do you see that?

A. I see that.

Q. And that's pretty standard; right?

A. Yes.

Q. In your survey you gave the respondents the package first; right? 'This is a sugar substitute that you might see if you were out shopping at food stores, et cetera. Please look at it as if you were considering it for purchase.' Right? That's what you did.

A. Yes.

Q. And then you took it away from them; right?

A. That's correct.

Q. And then after showing them the product but before asking them the first question, you told them

'If you don't know the answer to any of the questions, it is okay to say so. Please do not guess.' Right?

A. That's correct.

Q. So that's the very last thing the respondent hears before they hear the first question from your interviewer; correct?

A. That's correct.

Q. Which is the inverse of what Dr. Mazis's did; right?

A. Well, you want to show me?

Q. Dr. Mazis gave them the instruction first, then showed them the product, then asked the question.

You showed the product first and then instructed them about 'if you don't know, don't guess,' and then asked the question; correct?

A. That's correct; yes.

Q. Now, again, we saw this before with Dr. Mazis, but so we are clear, you told them 'if you don't know the answer, it's okay to say so.' Right?

A. Yes.

Q. And then the question you asked is 'Do you or don't you know who or what brand or company makes or puts out the sugar substitute that I showed you.' Correct?

A. That's correct.

Q. You're asking them 'do you know.' Right?

A. That's correct.

Q. Immediately after telling them if you don't know, don't guess; right?

A. That's correct.

Q. And that isn't quite the questions of Union Carbide versus Ever Ready, which are, 'Who do you think puts out the sugar substitute shown here?' That's how it was done in the Ever Ready; right?

A. That's what the McCarthy treatise lists as the traditional Ever Ready language.

Q. Have you looked at the Every Ready case itself?

A. I have.

Q. And does McCarthy get it right?

A. Well, I assume Tom got it right, but I never compared the language in the original to his treatise.

Q. Will you accept my representation that I did it last night and he's got it word for word?

A. I would very much like to, yes.

Q. Okay. So whereas, in the Ever Ready test the person is just shown the product and said 'Who do you think puts this out?' You show them the product, you instruct them 'If you don't know, tell me you don't know, don't guess.' And you ask them 'Do you know or


don't you know who puts this out?' Correct?

A. Yes, that's correct.

Q. Now let me just ask you -- Mr. Locascio has been doing this for the last day and a half, and I've been dying to do this. Can you read the brand name on this product from where you are?

A. Actually, yes.

Q. You can see that it's SAME.

A. I can see that it's SAME.

Q. And, by the way, you said something about this being a pretty new product in the market. But you know from at the least the last day or so sitting in this court room that the brand SAME isn't at all new in the Puerto Rican no-calorie sweetener market, is it?

A. No, it is not.

Q. In fact, it is the market leader based on volume in the no-calorie sweetener market in Puerto Rico; correct?

A. It's the testimony I heard. SAME with sugar is the product that's new.

Q. SAME in a blue box has been sold for ten years. Consumers in Puerto Rico are very familiar with the SAME brand name.

That's Merisant's principal defense on confusion; right? People aren't going to mix up SAME

with SPLENDA. They know SAME; right?

A. They know SAME, yes.

Q. So you can read it from where you're sitting; right?

A. Yes, I can.

Q. I'll walk back here. Can you still read it?

A. I'm going to have to get my glasses out. I can, but at this point part of it is because I know what it says.

Q. How about way back here?

A. I'm going to need my glasses, though.

Q. Go ahead and put them on.

(The witness put on his eyeglasses.)

A. Okay. I can see it, yes.

Q. So it's not hard to see the brand name SAME, is it?

A. No, it is not.

Q. Nevertheless somehow in response to your question, 'Do you know what brand puts out the sugar substitute that I showed you,' 88 percent of Puerto Rican consumers in a market where SAME is the brand leader by volume, had no idea and had to say, 'No, I don't know.' Is that correct?

A. Well, that's not how I interpret it, no.

Q. Well, is it a fact, Mr. Johnson, that 88

percent of the people in your survey who were shown the SAME with sugar product, if that's what you guys want to call it, when it was taken away from them could not answer yes to the question, 'Do you know what brand I just showed you?'

A. Well, the question said, 'What brand or company makes or puts out the sugar substitute that I showed you.'

Q. Okay. So if they know what brand puts it out, they should say SAME; right? That's the brand that puts out that product, isn't it?

A. Generally consumers don't repeat the name on the front of the box. When you ask them this question, they tell you who makes the product in the box or they tell you the sister product of the box. But generally they tell you who makes it.

Q. Well, when you asked this question, 'Do you know what brand or company makes or puts out the sugar substitute,' that's your testimony that people don't just play back the brand of what they just saw; right?

A. Generally speaking they don't just parrot the brand.

Q. So they don't know that Merisant makes SAME; correct? Hardly anyone knows that. Would you agree with me?

A. They don't know that EQUAL makes SAME or Merisant or SPLENDA or...

Q. Sure. Just like they don't know that McNeil makes SPLENDA; right?

A. Perhaps.

Q. Same idea. They know it comes from some anonymous source; they can't necessarily name what that source is. They don't know that 7Up comes from Pepsi, or whatever it is; they know it's a brand that they are familiar with. That's how consumers think about products in these categories. Isn't that right?

A. I think the answer to that is yes, but that was a long question.

Q. Sure. Consumers know the difference between a brand of diet soda like Diet Pepsi and a genre of products like Diet Cola; right? They know Pepsi is a brand. If it comes from one place -- I know if I get Pepsi I'm assured of a certain quality or a certain taste, et cetera. Whereas if it just says 'Diet Cola,' I don't know exactly what I'm getting. That's what a brand is all about; right?

A. Yes.

Q. And I'm sure as an expert in litigation you know that the United States Supreme Court considers a brand to be synonymous with a single source; correct?