IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

MCNEIL-PPC, INC., ET AL.,     \*  CIVIL 04-1090 (JAG)
                             \*
        Plaintiffs,        \*
        vs.               \*  San Juan, Puerto Rico
                             \*  March 3, 2004
MERISANT COMPANY, ET AL.,     \*  10:15 a.m.
                             \*
        Defendants.       \*
-------------------------------- \*

FURTHER PRELIMINARY INJUNCTION HEARING

BEFORE THE HONORABLE **JAY A. GARCIA-GREGORY**,
UNITED STATES DISTRICT COURT JUDGE

**BARBARA DACHMAN, RPR, OCR**
**(787) 722-0132**
**barbarad@prtc.net**

APPEARANCES

COUNSEL FOR PLAINTIFFS

STEVEN A. ZALESIN, ESQ.
DORA PEÑAGARICANO, ESQ.

COUNSEL FOR DEFENDANTS

GREGG F. LoCASCIO, ESQ.
HERIBERTO BURGOS, ESQ.

2

```
         IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF PUERTO RICO


MCNEIL-PPC, INC., ET AL.,        *   CIVIL 04-1990 (JAG)

        Plaintiffs,              *
        vs.                      *   San Juan, Puerto Rico
                                 *   March 3, 2004
MERISANT COMPANY, ET AL.,        *   10:15 a.m.

        Defendants.              *
------------------------         *   ---   ---


        FURTHER PRELIMINARY INJUNCTION HEARING

   BEFORE THE HONORABLE JAY A. GARCIA-GREGORY,
       UNITED STATES DISTRICT COURT JUDGE
```

```
             BARBARA DACHMAN, RPR, OCR
                  (787) 722-0132
                barbarad@prtc.net
```

APPEARANCES

COUNSEL FOR PLAINTIFFS

STEVEN A. ZALESIN, ESQ.
DORA PEÑAGARICANO, ESQ.

COUNSEL FOR DEFENDANTS

GREGG F. LoCASCIO, ESQ.
HERIBERTO BURGOS, ESQ.

---

Plaintiffs' Closing Argument - (Zalesin)    3

1   THE COURT:   Okay, so I will be hearing oral
2   arguments.
3       How much time do you need for your presentation?
4       MR. ZALESIN:   Your Honor, I think, when we
5   discussed this briefly last week, your Honor suggested
6   something along the order of an hour per side. And I would
7   suggest that that's probably a little bit more than, but in
8   the vicinity of, what I intend to offer.
9       THE COURT:   Well, try to make it 45 per minutes
10  per side, because we are already short for closing the court
11  at twelve. Okay?
12      MR. ZALESIN:   Okay. Very good.
13      Well, good morning, your Honor.
14      You know, I was thinking this morning, it's only been
15  three and a half weeks since this case was filed, and
16  yesterday I guess was three weeks since we first appeared
17  before you on an Initial Scheduling Conference. It's
18  amazing what's taken place in that short span of time.
19      I would venture to say that there are probably cases
20  that are tried on the merits with a less voluminous and less
21  complete record than what I hope we have developed for you
22  over the last few weeks on this preliminary injunction
23  motion, and I hope your Honor is satisfied that you have
24  before you all the proof that you need to decide at this
25  point.

BARBARA DACHMAN, RPR, OCR

---

Plaintiffs' Closing Argument - (Zalesin)    4

1   I want to say, before I begin on the merits, that it's
2   been a privilege to appear in this court. I want to thank
3   your Honor for devoting so much time and attention on such
4   short notice on behalf of the client and my entire team.
5   And I am sure I speak for Merisant as well.
6       Of course, now the heavy work falls on your Honor
7   because you have to decide whether McNeil has carried its
8   burden of showing that it is entitled to the preliminary
9   injunctive relief that it seeks and, of course, the standard
10  is well known. We have to show a substantial likelihood of
11  success on the merits.
12      In his opening statement Mr. LoCascio made much of the
13  word "substantial." He said that means clear and convincing
14  evidence, 75 percent. He didn't cite any cases that say
15  that; I don't think there are any. But in any event, we are
16  going to carry our burden, I guarantee you, however you
17  interpret the word "substantial."
18      We have to prove that we will suffer irreparable harm
19  without preliminary relief. We have to show that the
20  balance of hardships tips in our favor and, of course, we
21  have to address the public interest in granting preliminary
22  injunctive relief. Let me take each one of these in turn.
23      We believe, your Honor, that the record before you
24  clearly shows that McNeil is not only likely but highly
25  likely to succeed on the merits of its trade dress

BARBARA DACHMAN, RPR, OCR

**Page 5**

Plaintiffs' Closing Argument - (Zalesin)

1  infringement claim by proving the two elements that are
2  necessary for such a claim: First, that the Splenda package
3  is entitled to trade dress protection; and second, that the
4  Same package, the one that we are challenging, the yellow
5  Same package, is likely to confuse consumers.
6        Let me see if we can focus this a little better.
7        With respect to the issue of protectability, it is our
8  contention, as you know, that the overall design of the
9  Splenda package is inherently distinctive and therefore
10  entitled to protection without any further showing of
11  secondary meaning.  And what do I mean by "the overall
12  design"?  I mean, as the courts have repeatedly said, the
13  overall look and appearance of the Splenda package, taking
14  into account all of the elements that you see.
15        The color scheme.  Of course that's important.  But
16  not just the color scheme.  The size and orientation and
17  shape of the package.  The coloring of the lettering, which
18  fades from light blue to dark blue.  The pastel; the fading
19  in and out of the yellow and white in the background.  The
20  oval-shaped white cloud around the Splenda name.  The cup of
21  coffee, and not just any cup of coffee, but the particular
22  white cup of coffee of a particular size and in a particular
23  location on the Splenda package.  The Splenda "made with
24  sugar tastes like sugar" -- "made from sugar" -- excuse
25  me -- "tastes like sugar" logo in the bottom left-hand

BARBARA DACHMAN, RPR, OCR

**Page 6**

Plaintiffs' Closing Argument - (Zalesin)

1  corner.
2        All of these things and others that we've identified
3  in our papers together create an inherently distinctive
4  package.
5        And, your Honor, you have seen this quote before, but
6  here is what the United States Supreme Court has to say
7  about product packaging in the recent -- fairly recent case
8  of Wal-Mart.  They say, "The very purpose of attaching a
9  particular word to a product or encasing it in a distinctive
10  packaging is most often to identify the source of the
11  product.  Although the words and packaging can serve
12  subsidiary functions, their predominant function remains
13  source identification.  Consumers are therefore predisposed
14  to regard those symbols as an indication of the producer,
15  which is why such symbols almost automatically tell a
16  consumer that they refer to a brand and immediately signal a
17  brand or a product source."
18        THE COURT:  It's the customer.
19        MR. ZALESIN:  It's the customer.
20        And what are we talking about?  We are talking about
21  when you or Mrs. Sifontes or I or anybody else goes to the
22  store and they go down the aisle, they know that, okay, you
23  know, this is NutraSweet, that's one brand, and this one is
24  NatraTaste, and that's a different brand, and here's
25  Splenda, that's a brand.

BARBARA DACHMAN, RPR, OCR

**Page 7**

Plaintiffs' Closing Argument - (Zalesin)

1  I know that when I go to buy Splenda, I am buying a
2  particular brand.  It's not just any sugar substitute, not
3  just any no-calorie sweetener.
4        That's the purpose for having distinctive packaging
5  with artwork and colors that are distinctive and different
6  from the others in the market, and that's why the Supreme
7  Court says that these things almost automatically tell a
8  consumer that this product comes from a particular source.
9  It's inherently distinctive.
10        We have war, your Honor, in the very category that is
11  at issue in this case, in the sugar substitute category.
12  This is the Cumberland case.  You have seen this again.  The
13  approach that Merisant has taken, for the most part, has
14  been to break the Splenda trade dress down into different
15  pieces.  Well, you know, there are others that have a coffee
16  cup and a glass of iced tea and a packet resting on a
17  saucer.  There is nothing particularly distinctive about
18  that.  We agree.  We don't own the right to use those
19  particular elements.
20        But what did the Court in the Cumberland case say?
21  "Both the NatraTaste and Sweet'N Low boxes have elements
22  that are generic when viewed in isolation.  Sweeteners
23  commonly feature on their boxes images of a cup of coffee
24  (sic), a glass of iced tea," et cetera.  "Viewed as discrete
25  elements, these do not help distinguish plaintiff's

BARBARA DACHMAN, RPR, OCR

**Page 8**

Plaintiffs' Closing Argument - (Zalesin)

1  products.  But the combination of the elements in
2  plaintiff's trade dress creates a suggestive package capable
3  of identifying each product with a particular source."
4        Again, it may be that a cup of coffee is common, but
5  when you go down the aisle and you see the overall
6  combination, you can tell one product from the other.
7  That's why the trade dress is distinctive.  And they go on
8  that the trade name, of course, has a role in this.  "The
9  presence of the NatraTaste and Sweet'N Low trademarks
10  prominently displayed as an integral part of the respective
11  trade dresses is a significant indication of their
12  distinctiveness."  That's part of it.  But it's not the only
13  part.  It's the overall combination of elements that makes
14  up a distinctive package.
15        There is one case, your Honor, that Merisant relies
16  upon, and that is the Yankee Candle case from the First
17  Circuit, in which the Court denied trade dress protection to
18  the detachable labels on a line of candles.  And I know your
19  Honor is familiar with this case.  What you have is various
20  different candles which have various fragrances: gardenia
21  and mandarin orange and a variety of others.  And they have
22  detachable stick-on labels which have artwork that is
23  suggestive of the fragrance.  If it's an orange scent, there
24  is an orange design on the label.
25        And what Yankee, the plaintiff, tried to do in that

BARBARA DACHMAN, RPR, OCR

Plaintiffs' Closing Argument - (Zalesin)                    9

1    case is protect the entire line of labels, the concept of
2    having a distinctive line of products with labels that share
3    some characteristics in common, but each one, of course, was
4    distinct from the next.  And what the First Circuit said in
5    that case is that they carried a particularly heavy burden.
6    "Yankee seeks to protect features that are common to a set
7    of labels as opposed to a specific label common to a host of
8    Yankee goods.  A trade dress plaintiff seeking to protect a
9    series or a line of products faces a particularly difficult
10   challenge, as it must show that the appearance of several
11   products is sufficiently distinctive and unique to merit
12   protection."
13          And they go on to cite a policy concern, "Trade dress
14   claims across a line of products presents special concerns
15   in their ability to artificially limit competition, as such
16   claims generally are broader in scope than claims relating
17   to an individual item."
18          So this is a very different set of facts than the
19   facts that your Honor is confronted with here.
20          We have one package, the Splenda package, for its
21   no-calorie sweetener packets, for which McNeil is seeking
22   protection in this case because there is one package, the
23   Same with sugar package, that is so closely and confusingly
24   similar, which we will get to in a moment.  The only thing
25   you have to decide is whether this individual package is

BARBARA DACHMAN, RPR, OCR

Plaintiffs' Closing Argument - (Zalesin)                    10

1    protectable, and on the basis of inherent distinctiveness,
2    we say that it is.
3          Now, are the colors alone of the trade dress, the
4    pastel yellow, the white, the blue, are they entitled to
5    separate protection?  Mr. LoCascio asked McNeil's witness,
6    Miss Sandler, "Do you think you own the color yellow in the
7    no-calorie sweetener market?"
8          She said, "Quite frankly, I think I do.  I think, by
9    virtue of the hundred million dollars in advertising
10   expenditures, the more than $200 million in annual sales,
11   that consumers have come to associate the color yellow
12   uniquely with Splenda in the no-calorie sweetener market."
13          And, of course, there is nothing wrong with that.  As
14   of 1995, at least, the Supreme Court told us that colors
15   alone can be protectable.  "We cannot find, in the basic
16   objectives of trademark law, any obvious theoretical
17   objection to the use of color as a trademark, where that
18   color has attained secondary meaning and therefore
19   identifies and distinguishes a particular brand and thus
20   indicates its source."
21          That was a change in the law in many circuits
22   beginning in 1995.  There were several courts, including the
23   Seventh Circuit and the Second Circuit, that had previously
24   held that color alone could never be protectable.  And it's
25   an interesting background, your Honor, because that is why,

BARBARA DACHMAN, RPR, OCR

Plaintiffs' Closing Argument - (Zalesin)                    11

1    because of that preexisting law before this case, the
2    Qualitex case came up to the Supreme Court; that is why you
3    have all these different blue packets and boxes for
4    aspartame sweeteners.  The manufacturer of Equal, Monsanto,
5    tried to protect blue for aspartame, but the Seventh Circuit
6    said, "Sorry.  You can't own a particular color."
7          I don't think the manufacturer of Sweet'N Low ever
8    even tried to protect pink.  The law in those days was that
9    no one could own a color, even if that color was uniquely
10   associated with a particular brand.
11          The Supreme Court has changed that now, and that's why
12   those cases from pre-1995 aren't really applicable in this
13   case.
14          But -- and here's the important thing to keep in
15   mind -- you don't have to decide that in connection with
16   this motion.  Because we are not saying that any no-calorie
17   sweetener that comes in a yellow box infringes the McNeil --
18   or excuse me, the Splenda trade dress.  We don't have to go
19   that far on this motion.  We are simply saying two things:
20   That the overall combination of elements on the Splenda box
21   is protectable, and there are so many of them taken from and
22   incorporated into the defendants' Same package that they are
23   confusingly similar.
24          This is a simple case, your Honor.  If we were
25   challenging a box that looked like Sugar Twin or any other

BARBARA DACHMAN, RPR, OCR

Plaintiffs' Closing Argument - (Zalesin)                    12

1    pastel yellow box that was otherwise, if it stood upright
2    like this (indicating) and it had different pictures and it
3    didn't have any other resemblance, I think we'd have a much
4    tougher case.  But here you have a very straightforward case
5    in which the -- virtually the entire trade dress of the
6    defendants' product has been co-opted from the plaintiffs'.
7          So is color protectable?  Maybe.  But unnecessary for
8    you to decide whether color alone is protectable in this
9    case.
10          THE COURT:  Do you consider that pastel yellow and
11   yellow are two different colors or the same or shades of the
12   same color?
13          MR. ZALESIN:  They are certainly -- they are
14   certainly different, your Honor.  For example, yesterday you
15   asked Merisant's witness whether he would agree that the
16   pastel yellow that's used in the Same and Splenda boxes is
17   different from the -- I think your Honor used the term "deep
18   yellow," I think McNeil's witness Miss Sandler used the
19   word "neon yellow" to refer to the yellow in Domino's and
20   the yellow in Sugar Twin, and they certainly are different.
21   And the more different they are, the easier it is for the
22   consumer to tell them apart.
23          This, incidentally, was part of the philosophy of the
24   Seventh Circuit, if you go back to the days when colors were
25   not protectable.  They said, "Oh, you know, if we allow

BARBARA DACHMAN, RPR, OCR

1  color protection, we are going to allow courtroom
2  proceedings to degenerate into cases of shade confusion.
3  How is a court ever going to decide whether one particular
4  shade of yellow is confusingly similar to a different
5  shade?"
6          And the Supreme Court, in the *Qualitex* case, said, "Go
7  ahead and do it."
8          We do this all the time in word marks, that they have
9  to decide whether changing just a few letters is sufficient
10 to make the products not confusingly similar.  We do this
11 with respect to shapes of packaging and bottles, and what
12 have you.  And yes, the shading is an element that your
13 Honor needs to consider, and the shading of these, for
14 example, these Domino's and Sugar Twin packages, are
15 certainly a very different shade of yellow than the Same and
16 Splenda packages.
17          THE COURT:   I am asking you this because the only
18 two pastel yellow boxes are Same and Splenda.
19          MR. ZALESIN:   That's exactly right, your Honor.
20          So again, you don't even have to decide that Splenda
21 is the only no-calorie sweetener that is permitted to use
22 pastel yellow to decide this motion.  But it certainly is
23 possible that that could be, in a future proceeding, an
24 outcome, particularly if the product continues to do as well
25 and consumers continue to associate that coloring

1  exclusively with the Splenda trade dress.
2          THE COURT:   Well, I'm not saying that, you know, I
3  would be taking only the color into consideration.  Of
4  course, you know, the color is one component of the other
5  elements that are found on the box.  You see?
6          MR. ZALESIN:   That's right, it is one component.
7  And we saw in the data in the surveys on both sides that
8  it's a very important element.  We are not saying it's
9  unimportant.  It is the thing that consumers tend to
10 identify when asked why is it that you think one looks like
11 the other, or why is it that you think this box
12 (indicating), even though it doesn't have a brand name on
13 it, is Splenda.  The first thing they point to is, "Oh, I
14 recognize the color."  So yes, color is very important, but
15 it is not the only element, as your Honor has pointed out.
16 Okay.
17          So, we think the trade dress is protectable because it
18 is inherently distinctive.  But what if it's not?  What if
19 your Honor determines that it isn't inherently distinctive?
20 Do we lose?  No.  Because alternatively the trade dress is
21 protectable because it has achieved secondary meaning in the
22 marketplace.
23          Secondary meaning is a concept that has existed for a
24 long time in trademark law.  It started off with word marks;
25 it was later applied to trade dress and other types of

1  marks.  It means that even something which is ordinarily
2  just descriptive can, over time, take on a unique
3  association with a particular source or a particular brand.
4  And we have evidence of that in this case.  Let me review it
5  quickly for you.
6          First, of course, we have the survey conducted by
7  Professor Mazis in which 58 and a half percent of consumers
8  who were shown this box (indicating) with the Splenda trade
9  name removed -- you see, all you have left is the trade
10 dress, the design elements -- 58 and a half percent --
11 that's taking out the noise, the control -- and I'll get to
12 that in a moment -- of the no-calorie sweetener purchasers
13 in Puerto Rico recognized that trade dress as being
14 associated with only one brand, Splenda.
15          And let me review for you explicitly the findings of
16 that survey.
17          Remember he asked them a series of questions, and the
18 percentages get smaller as the questions proceed, because
19 some people say no or give different responses as you
20 progress through the survey.
21          So first he asked them, "Have you ever seen or
22 purchased a no-calorie sweetener that looks like the one I
23 showed you" -- this one (indicating) -- and 87 percent said,
24 "Yes, I have."
25          Then he went on: "Have you purchased only one brand

1  or more than one brand that looks like the one I showed
2  you?"  And 73 percent said, "One brand."  And that's
3  73 percent of everyone, not of the 87 percent who said yes.
4          All these percentages are against the entire 200
5  people shown this box, which is representative of all
6  no-calorie sweetener purchasers in Puerto Rico.
7          Then he asks, "What do you think is the name of the
8  no-calorie sweetener that I showed you?"  And 58 and a half
9  percent say Splenda, and that number is composed of --
10 actually 62.5 percent say Splenda when shown this box
11 (indicating).  But he did a control to make sure people
12 aren't just guessing Splenda because it's the first thing
13 that comes to mind and it's so popular.  He showed them a
14 different box that actually was a Splenda box but no one in
15 Puerto Rico has ever seen this one, and only four percent
16 said that was Splenda.  That's the noise.
17          So when you subtract four percent from 62 and a half,
18 you get 58.5 percent of people saying that they recognize
19 this box (indicating) without the brand name as being the
20 trade dress of Splenda.  That is well above the bench mark
21 of 50 percent that courts have typically used, and we have
22 cited some cases for you in our papers to that effect.
23          The other issue here, of course, is the reason why,
24 and as we were discussing a moment ago, most people point to
25 the color as the first reason why they recognize the box.

Plaintiffs' Closing Argument - (Zalesin)    17

1    But it's not the only reason. As you recall, there were
2    other -- "that's the one I buy, I recognize the pictures,"
3    et cetera, et cetera. The yellow and blue lettering --
4    excuse me, the light and dark blue lettering. All of them
5    are cited in varying percentages, but color is the most
6    predominant response.
7        Now, your Honor, a question has been raised about this
8    survey because there were, according to Merisant, there were
9    37 of the control interviews, not the Merisant -- excuse me,
10   not the test interviews on this box (indicating) but the
11   control interviews, in which the version one was circled
12   when it should have been circled version two. And let's
13   review what happened here.
14       The yellow -- the interviews that were conducted using
15   the yellow box were all printed on yellow paper. There were
16   200 of that. When you count them up, there were 200 that
17   came back. The interviews that were conducted on the white
18   box were printed on white paper. We were supposed to
19   conduct a hundred of those; when you count them up, they got
20   a hundred back.
21       The interviewers have said that the yellow forms were
22   always used with the yellow package, the white forms were
23   always used with the white package. Those were the
24   instructions they were given; that's how they were trained,
25   that's what they did.

BARBARA DACHMAN, RPR, OCR

Plaintiffs' Closing Argument - (Zalesin)    18

1        When the data was tabulated and entered, the yellow
2    forms were assumed to connote that the respondent was shown
3    a yellow package, and the white forms were assumed to
4    connote that the respondent was shown a white package.
5        The version, version one/version two information that
6    was preprinted on each form was ignored because, as you will
7    recall, there was a mistake in the preparation of the
8    questionnaires. They all said version one, even the white
9    ones. There was no version two ever printed. So the
10   interviewers ignored that information and the company that
11   tabulated the results ignored it.
12       You can't get to 200 yellow and 100 white any other
13   way. There is no question that the yellow forms were used
14   with yellow boxes and the white forms were used with white
15   boxes.
16       I know that a big fuss has been made about it in the
17   case. I think that when your Honor reflects on it, you will
18   see that there were two ways of identifying the
19   questionnaires: One, the color of the paper, the other the
20   version number. They wound up not using the version number,
21   and there is no question that the right versions were used.
22       If Merisant's theory were right, we'd have 237
23   potentially yellow interviews and only 63 white interviews.
24   That isn't what happened.
25       So I don't think there is any real doubt about how the

BARBARA DACHMAN, RPR, OCR

Plaintiffs' Closing Argument - (Zalesin)    19

1    results of this survey were tabulated.
2        But, of course, that's not the only evidence that
3    McNeil relies on for secondary meaning. There is other
4    survey data in the record. The segmentation study that
5    Miss Sandler told you about in which 60 percent of the
6    consumers aware of Splenda and 79 percent of those who had
7    used it in the past month said that it comes in yellow
8    packaging. That was the most dominant attribute that anyone
9    could associate with Splenda. Even more people than said it
10   has no calories said it comes in a yellow package. That's
11   the first thing that stuck in everyone's mind.
12       You also have evidence in the record of extremely high
13   advertising expenditures and extremely high sales numbers.
14   Now, why does that matter? It matters because one of the
15   elements for consideration, when you are assessing secondary
16   meaning, is so-called pervasiveness of the trade dress. If
17   you have an obscure little brand like Sugar Twin, they may
18   have spent some money on advertising, but it's not in many
19   stores, they haven't sold many boxes, they don't have a high
20   awareness level. So the fact that it's been on the market
21   even for decades doesn't necessarily mean that a high
22   percentage of consumers will recognize this box as being
23   Sugar Twin. Let's face it, most people have never seen this
24   box before.
25       Conversely, when you have millions of people buying

BARBARA DACHMAN, RPR, OCR

Plaintiffs' Closing Argument - (Zalesin)    20

1    Splenda every year and hundreds of millions of dollars worth
2    of Splenda being sold, and you go into every store -- and we
3    have seen these photographs, pictures and pictures of aisles
4    of shelf facings after shelf facing of Splenda -- presumably
5    consumers, when they buy this much of it, get to know what
6    the product looks like. That's why these data are relevant,
7    your Honor. And in our papers we have shown you cases in
8    which far less impressive sales and advertising numbers have
9    been deemed supportive of a finding of secondary meaning.
10       Those numbers, of course, are national numbers. We
11   have broken them out in Puerto Rico because that's the
12   market at issue here. We have spent -- McNeil has spent
13   approximately three million dollars in advertising over the
14   three and a half years they've been in the market, and they
15   sell five million dollars annually worth of Splenda. Which,
16   by the way, I was doing some rough calculations in my head
17   the other night. That's a remarkable percentage. If they
18   sell 200 million nationally and five million is just in
19   Puerto Rico, they are doing very, very well down here. And
20   you can go into just about any restaurant, and what have
21   you. Splenda is everywhere in Puerto Rico, and, that, I
22   think, is a testament to the successful and expensive
23   marketing efforts that McNeil has put into developing this
24   explicit market.
25       There is also evidence in the record, your Honor --

BARBARA DACHMAN, RPR, OCR

21

Plaintiffs' Closing Argument - (Zalesin)

1  and I'm not going to discuss it in great detail right now,
2  but just by looking at the two boxes, I think there is
3  certainly an inference that Merisant copied the Splenda
4  trade dress.
5      I would say that it's virtually impossible you can
6  wind up with two things looking so similar by mere
7  coincidence. None of the other packages that Mr. Cuervo
8  showed us from his various other markets in Latin America
9  look even close to this similar to Splenda as this new
10  yellow Same package. And copying has been held to be
11  evidence of secondary meaning, because, after all, why would
12  a defendant copy a trade dress that has no recognition with
13  consumers?
14      And finally, we have evidence, which is another
15  factor, that consumers are actually confused by the Splenda
16  trade dress, and I will get to that in a moment when I
17  discuss the likelihood of confusion. But that is another
18  factor that you can take into account in the secondary
19  meaning analysis in order to judge whether in fact McNeil
20  has a protectable trade dress in Splenda.
21      So to sum up on protectability, it's inherently
22  distinctive because it is different enough and distinct
23  enough that when you walk down the aisle, you know that this
24  is the Splenda brand. It's not one of these other
25  no-calorie sweeteners. And the evidence unequivocally shows

22

Plaintiffs' Closing Argument - (Zalesin)

1  that there is secondary meaning in that trade dress.
2      There is one other issue on protectability. That is
3  the doctrine of functionality. I'll go over that just
4  briefly because Merisant has raised it.
5      In order for a trade dress to be protected, it has to
6  be not functional. What does "functional" mean? It means,
7  as the Supreme Court has told us, essential to the use or
8  purpose of the item, in this case a no-calorie sweetener,
9  and it has to affect its cost or quality. They can't
10  possibly meet that test for the trade dress we are trying to
11  protect, your Honor.
12      They say that yellow is functional for no-calorie
13  sweeteners; that is to say, it's essential to have yellow if
14  you want to sell a no-calorie sweetener, and if you don't
15  have yellow you are going to have to charge more or it's
16  going to reduce the quality of the article. That's
17  ridiculous. Look at all these no-calorie sweeteners that
18  are sold in packaging that isn't yellow. No way is this a
19  functional trade dress.
20      And although Mr. Cuervo testified yesterday, without
21  any evidentiary foundation, that consumers associate yellow,
22  the color yellow, with sugar and that's why he wanted to use
23  yellow in the new Same packaging, because there is sugar in
24  the product, the data, the only data that are before you
25  actually show otherwise.

23

Plaintiffs' Closing Argument - (Zalesin)

1      In the McNeil segmentation study, you recall that
2  60 percent of people aware of Splenda said that comes in a
3  yellow package.
4      Can I have Plaintiffs' Exhibit 18, please? I just
5  want to show this to you, your Honor.
6      This is Plaintiffs' 18, the results of the
7  segmentation study. So we have the attribute "comes in a
8  yellow package," and among people -- please remember, these
9  are people who are aware of these various brands or
10  products -- among people aware of Splenda, 60 percent say,
11  "Yep, that's right, it comes in a yellow package."
12      You slide over here to the right and you have people
13  who are aware of sugar -- remember, there were about 1100
14  people in the survey, so you got 1,075, almost everyone
15  is aware of sugar. What percentage say "comes in a yellow
16  package"? Seven percent.
17      By contrast -- we have had some testimony about
18  noise -- two percent of the people aware of sugar think it
19  has no calories.
20      So these are very, very low numbers. There is no
21  empirical evidence that consumers associate sugar with the
22  color yellow. And why is that? Have you been to a
23  restaurant lately, your Honor? Have you seen the packets of
24  sugar? They are all white. They are all white. They are
25  white. (Indicating). White is the color of sugar, not

24

Plaintiffs' Closing Argument - (Zalesin)

1  yellow. There is one brand, Domino's, and that's it.
2      THE COURT:  I really haven't noticed, because I
3  take my coffee without any sugar or sweeteners.
4      MR. ZALESIN:  I guarantee if you go to the
5  cafeteria and you take a look at the sugar bowl, you are
6  going to find white packets, not yellow ones.
7      Okay. So it's not functional, and for the reasons I
8  have already described, it's protectable.
9      So, if it's protectable, we are halfway home. We
10  still, though, have to prove that it is likely to cause
11  confusion; that is to say, that the new yellow Same package
12  is likely to cause confusion among consumers as to whether
13  there is some association or connection, or they think it's
14  the same brand or they mix the products up. Confusion of
15  that sort. Confusion in the marketplace.
16      And let's review the evidence on confusion.
17      We start with the fact that the products are
18  remarkably similar. Now, what do I mean by that? We have
19  heard a lot of testimony about the similarities and
20  differences between these products.
21      Take a look, for example, at where the name is
22  positioned and the shape of the white cloud around the two
23  names. Both of them are oval-shaped clouds in the center
24  top area of the box.
25      Take a look at the lettering and the way it's depicted

25

1   or displayed on the package. It starts from light blue and
2   it fades to dark blue.
3        Take a look at the coffee cup. Yeah, it's not the
4   exact same cup of coffee, and I think Mr. Cuervo pointed out
5   yesterday, "Well, the coffee in Splenda, it looks like
6   American coffee. The coffee in Same looks like Puerto Rican
7   coffee."
8        I tend to agree with that, and after two weeks of
9   drinking Puerto Rican coffee, I may never go back.
10       But nevertheless, when you look at these -- if you are
11  walking down the aisle of a grocery store, these are two
12  white coffee cups shot from the same angle, in the same
13  position on the box.
14       Remember what Mr. Cuervo said yesterday? He said that
15  the right side of any package is the dominant side. That
16  is, by the way, if you pick up a newspaper and you want to
17  see what the headline is, the big story of the day, it's
18  always to the right side. That's where the human eye goes
19  first. That's what Mr. Cuervo was talking about.
20       They look the same. These two packages are remarkably
21  similar. Do you know what it's like, Judge?
22       May I have the law book, please?
23       It's like the famous case from 40 years ago in Puerto
24  Rico of *Cooperativa de Cafeteros de Puerto Rico v. F. Colon*
25  *Colon*, the famous coffee bag case. And this is one of the

26

1   few cases -- and I want to thank your Supreme Court for
2   actually putting a picture right into the opinion. Okay?
3        So you've got two red coffee bags with the word "Rico"
4   a prominent part of it, and they say, "Well, yeah, they are
5   different. Look, you know, this has got a thicker black
6   band on the bottom, and, you know, here there is a black bar
7   at the top and on the other one it's a third of the way
8   down, and, you know, one says the abbreviation 'PTO' for
9   'Puerto Rico' and the other one doesn't have it there, and
10  the words aren't exactly the same," and you could go and
11  create a list of differences.
12       But the reality is, when the consumer walks down the
13  aisle and is looking for their brand, the one that they want
14  to buy, there is an unfortunate likelihood that when you put
15  something in a package that is this close to the dominant
16  brand, the popular brand in the market that you are trying
17  to imitate and trying to compete with, that consumers are
18  going to mix them up.
19       That is the kind of -- and this was held to be
20  confusingly similar and therefore enjoined in the Puerto
21  Rico case. And there are some interesting things about that
22  case because the evidence there was kind of similar to what
23  we've got going here.
24       What did the Court in that case cite? This was 40
25  years ago. The game hasn't changed that much, Judge.

27

1        "Photographs contained in the record of the shelves,
2   in which the coffee bags of both parties appear mixed with
3   each other, either by the consumers or by the store
4   employees, who, undoubtedly, did not realize, in the
5   ordinary course of their activities, the existing
6   differences between both wrappings, and, on the contrary,
7   must have been confused by the similarity between the bags."
8        Remember the actual confusion witnesses who came to
9   testify that they saw that the store personnel were putting
10  the new Same box where the Splenda belongs and didn't even
11  realize it?
12       The case law says that store personnel are presumed to
13  be more careful than the ordinary consumer. If they mix
14  them up, just imagine what the average grocery shopper is
15  going to do.
16       And there is talk in this case from 40 years ago about
17  how the defendant changed its trade dress, its long-standing
18  trade dress, like the old blue Same box, to get closer to
19  the market leader Splenda. So you start off with an old
20  familiar trade dress, and they say, "Our examination of the
21  documentary evidence admitted in this case leads us to the
22  conclusion that appellee changed the label on its bags for
23  the purpose of increasing its sales, which had been
24  decreasing during the years prior to 1958, and for said
25  purpose, in making the word 'Rico' prominent within a design

28

1   very similar to appellant's, evidently he tried to take
2   advantage of appellant's good will."
3        Remember the testimony Miss Sandler gave at the
4   beginning of her examination, your Honor, about how, as
5   McNeil's market share has skyrocketed in Puerto Rico in
6   three short years, Merisant shares have been sinking and
7   sinking, and they had obviously an incentive to try to fight
8   back? This is the way they chose to do it, just like the
9   defendant in the Puerto Rico coffee case.
10       So we have evidence of consumers and store personnel
11  mixing up the boxes. What else do we have? We have survey
12  evidence. We have evidence that 25 percent -- or
13  24.9 percent of the people in Merisant's survey, when shown
14  the Same package -- this is the slide that Dr. Mazis used --
15  24.9 percent, when you combine -- remember, you had two
16  questions. You had question 1(b), "Who do you think" -- or,
17  excuse me. "Who or what brand or company do you believe
18  makes or puts out the sugar substitute that I showed you?"
19  When they see the Same box, 4.1 percent answer that question
20  "Splenda."
21       And then question 2(b) -- 2(a) and (b), "Do you
22  believe whoever makes or puts out the sugar substitute I
23  showed you is or is not related to, sponsored by, or
24  associated with any other brands or manufacturer,"
25  41 percent say "yes," and of the entire base, 22 percent

Plaintiffs' Closing Argument - (Zalesin)   29

1  say, "Yeah, I think Splenda is associated with whoever puts
2  out Same." And when you combine those numbers, because
3  there is some repetition, 24.9 percent of the people in
4  Merisant's survey who saw the Same box said they think it's
5  associated with Splenda.
6      What a shock. They look almost exactly alike.
7      And contrast that with the people who identified it as
8  Same. Only 3.4 percent.
9      "Do you know what brand puts out the sugar substitute
10  that I showed you?" Not a lot of people know. 3.4 percent
11  know think that it's Same. More people think that it's
12  Splenda than think it's Same. You can do that even in the
13  final responses when you add them all up.
14      "Who do you think puts out or" -- again, what's the
15  question. "Do you believe that whoever makes or puts out
16  the sugar substitute that I showed you is or is not related
17  to, sponsored by, or associated with any other brands or
18  manufacturer?"
19      Now, if they think that this is the same manufacturer
20  as the blue Same (indicating), they ought to say, "Yeah,
21  Same." What do they say? 22 percent say Splenda, 3.7
22  percent say -- I am sorry, your Honor. 22 percent say
23  Splenda, 3.7 percent say it's Same.
24      And so when you look at the final numbers in their
25  survey, almost a quarter of the people associate the yellow

BARBARA DACHMAN, RPR, OCR

---

Plaintiffs' Closing Argument - (Zalesin)   30

1  Same box with Splenda -- and this is with the name on it,
2  not with the name off -- and 6.6 percent associate it with
3  Same. That's remarkable evidence.
4      Now, they say, "Well, whoa, wait a second. You can't
5  look at it that way because you have got to include the
6  control."
7      Sugar Twin, when you show people a Sugar Twin box --
8  and, of course, consumers in Puerto Rico aren't familiar
9  with Sugar Twin -- you get a similar number, 20.6 percent of
10  people say that Sugar Twin comes from Splenda. So you have
11  got to subtract that from the 25 percent who think that Same
12  is Splenda and you have got a phenomenal confusion rate.
13      Well, let's talk about Sugar Twin. The evidence in
14  this case, your Honor, is undisputed that Sugar Twin is a
15  fledgling little brand with minimal, if any, recognition in
16  Puerto Rico.
17      How do we know that? Yesterday Mr. Escalona -- excuse
18  me, Mr. Cuervo was here. He showed us this survey data,
19  which is an ordinary-course-of-business document from
20  Merisant, Defendants' Exhibit V. "No-Calorie Sweeteners,
21  Unaided Brand Awareness."
22      This is he asked people tell me all the no-calorie
23  sweeteners you are familiar with, and these are Puerto Rico
24  consumers. Not one person, according to this, mentions
25  Sugar Twin.

BARBARA DACHMAN, RPR, OCR

---

Plaintiffs' Closing Argument - (Zalesin)   31

1      It has a market share of one tenth of one percent, and
2  it's not sold in most stores. And it was chosen by
3  Merisant's expert as the control, and I put the word
4  "control" in quotes. He chose it, he said, because it has
5  little or no recognition in Puerto Rico.
6      So what is going on? People in Puerto Rico don't know
7  Sugar Twin. They are in a survey, trying to be cooperative.
8  You show them this box (indicating). It's yellow. It's got
9  some similarity to Splenda. You don't show it to them side
10  by side. You just say, "Here's the box. Do you think
11  whoever puts this out puts out any other products?" And
12  people unfamiliar with Sugar Twin, and the only yellow
13  no-calorie sweetener they have ever seen or heard of is
14  Splenda, one in five people say, "Yeah, I guess Splenda."
15  Not very surprising, but also not very relevant.
16      You can't consider Sugar Twin a control because Sugar
17  Twin shares too many of the elements of the trade dress that
18  McNeil is seeking to protect in this case. That's what
19  Professor Mazis explained. If you choose a control that
20  looks too much like the test package, you wind up with
21  similar data in the two cells. That's a stunt that doesn't
22  prove anything.
23      Now, is this fair? Is it fair for McNeil to be able
24  to protect a trade dress against Same, even though a certain
25  percentage of consumers at this point think that Sugar Twin

BARBARA DACHMAN, RPR, OCR

---

Plaintiffs' Closing Argument - (Zalesin)   32

1  is somehow associated with Splenda? Well, let's look at
2  that question.
3      When McNeil chose the Splenda trade dress, it wasn't
4  trying to capitalize on the good will of Sugar Twin. That's
5  what Miss Sandler told you, and, of course, that's the case.
6  No one ever heard of Sugar Twin, or hardly anyone. It
7  didn't have any good will to capitalize on.
8      In this case, what is going on here -- Mr. Cuervo all
9  but admitted yesterday that the only purpose for choosing a
10  yellow pastel color was to compete better with Splenda.
11      What does that really mean? He is saying he wants
12  people to link these two products together; they are both
13  natural, they are both sugar substitutes, they both have
14  some connection with sugar. He is trying, Merisant is
15  trying to capitalize on the good will of Splenda that is
16  built up in this trade dress in order to boost sales of
17  Same. It's a very, very different situation.
18      And the bottom line here, Judge, is yes, it is true
19  that Sugar Twin is a non-infringing trade dress. This is
20  what you are going to hear Mr. LoCascio say. This is
21  non-infringing. Why? Because it came first. It was sold
22  before Splenda was sold; therefore, it can never be deemed
23  infringing. McNeil could never sue Sugar Twin for having a
24  trade dress in the no-calorie sweetener market that looks
25  like this.

BARBARA DACHMAN, RPR, OCR

1   But that is a very different thing from saying that
2   somebody today could come into the market, a new competitor,
3   like yellow Same, with a trade dress that looks remarkably
4   similar to Splenda and defend it on the ground that, "Well,
5   Sugar Twin is not infringing. That was here before. It's
6   still hanging on. It's got a one tenth of one percent
7   market share. Therefore, I am allowed to come at least as
8   close, and indeed much closer, when you look at them side by
9   side (indicating) -- I am allowed to cause at least as much,
10   and maybe even more confusion, than Sugar Twin causes."
11   That's Merisant's defense. I don't think you are
12   going to find any legal authority for it, your Honor.
13   Finally, on the issue of secondary -- excuse me, on
14   the issue of likely confusion, you are going to hear a lot
15   about the Tylenol PM case, *Bristol-Myers against McNeil*.
16   They cite it for a variety of propositions. Let me explain
17   to you why that case doesn't carry the day.
18   First, the packaging in that case that was at issue --
19   and as your Honor knows, my law firm handled this case for
20   McNeil -- the packaging in that case was, as the Second
21   Circuit said, ordinary blue boxes -- I am sorry. Ordinary
22   blue boxes (indicating) plus the trade name. And
23   specifically what did they say? "In this case" -- this is
24   the Second Circuit in the *Bristol-Myers* case -- "In this
25   case, by far the most prominent feature of the Excedrin PM

1   trade dress is the trade name Excedrin. At least as
2   prominent on the Tylenol PM packaging is the trade name
3   Tylenol. These trade names are the major features of
4   otherwise ordinary boxes." They are just blue boxes. "The
5   Tylenol trade name is displayed in the same typeface used on
6   other Tylenol products. In fact, except for the color of
7   the box and the presence of the 'PM,' the Tylenol PM trade
8   dress is extremely similar to the trade dress of the other
9   Tylenol analgesic products."
10   Now, let's pause there for a second. What was the
11   Court talking about? If you took a preexisting Tylenol box,
12   which is typically yellow and red, and you turned it into --
13   you wanted to turn it into a nighttime product -- and the
14   evidence in that case showed that these are nighttime pain
15   relievers and they have a sleep aid in them -- all the
16   nighttime products in the drugstore are dark blue, because
17   that's the color of night. If you wanted to turn a Tylenol
18   box into a nighttime box, you would use the Tylenol design
19   and turn it blue.
20   That's what they did here. That's a far cry -- that's
21   what McNeil did in that case. That's a far cry from what
22   Merisant did in this case. They didn't take the existing
23   Same trade dress and make it yellow, as they could have.
24   They took the Splenda trade dress, essentially, and put the
25   Same name on it.

1   So, what does the Second Circuit say? It says that
2   the differences between the two trade dresses are therefore
3   significant. All you've got going here is a plain old blue
4   box with a big name on it, "Tylenol" or "Excedrin" -- two,
5   by the way, of the most well-recognized trade names,
6   probably, in the United States economy in consumer products,
7   certainly in the case of Tylenol.
8   And the Second Circuit, in rejecting the claim that
9   these two products would be confused with each other simply
10   because they came in blue boxes, went out of its way to
11   distinguish cases just like this one. "We do not mean to
12   intimate that the distinctive elements of any trade dress
13   may be freely appropriated, as long as the junior user
14   clearly identifies the source of the goods."
15   So you can't just take the Splenda trade dress, slap
16   the Same name on it, and say, "Well, you know, it says
17   'Same,' therefore no infringement."
18   "In many cases, the distinctive elements of a trade
19   dress may themselves be eligible for trademark protection,"
20   unlike the background color blue of these boxes -- which, by
21   the way, in 1991, when this case was tried, the law in the
22   Second Circuit said you could never protect blue. And even
23   if the law were otherwise, blue is the color of all
24   nighttime products.
25   So here you have all sorts of distinctive elements,

1   the design, the packaging -- we've gone over them -- versus
2   in the Tylenol case, basically we are talking about a square
3   blue box, a rectangular blue box with a trade name on it.
4   The Second Circuit goes on: "In other cases, the
5   trade name may be a less dominant feature of the entire
6   trade dress, and thus have less force in countering other
7   similarities between the two trade dresses."
8   That's our case. People in the Merisant survey look
9   at their product, they don't even know what it is. They
10   think it's Splenda, they don't even know it's Same.
11   "Also the junior user's trade name may less strongly
12   identify a particular source than the Tylenol name at issue
13   here." I would say to you, your Honor, that the Second
14   Circuit had a case exactly like this one in mind when it
15   wrote this section of its opinion. You can't simply take
16   somebody else's trade dress, put your name on it, your
17   product name, Same, and say, "Well, consumers will never be
18   confused because it's got my name on it." That's not the
19   way it works.
20   There is also an argument in this case that there is
21   judicial estoppel; that McNeil took a position in the
22   Tylenol PM case that is contrary to the position it is
23   taking here, and therefore its arguments in this case ought
24   to be rejected out of hand.
25   And Merisant has cited to you one case, the *Patriot*

1  Cinemas case from the First Circuit, on that issue.
2      Let me show you some more recent law on judicial
3  estoppel, your Honor.  This is the case of Unum v. The
4  United States of America.  This happens to be the District
5  of Maine from 1995, a number of years after Patriot Cinemas.
6      And first let's start off, what is judicial estoppel?
7  It is a doctrine that is designed to prevent a party from
8  abusing the judicial process through cynical gamesmanship
9  and to bar a litigant from playing fast and loose with the
10  courts.  That's what we are talking about.
11      Now, with respect to Patriot Cinemas, the Court
12  discusses a number of things, and it says down here at the
13  bottom, "Although the First Circuit initially" -- excuse
14  me -- "the First Circuit had initially embraced the doctrine
15  of judicial estoppel with enthusiasm in Patriot Cinemas, it
16  has since imposed many requirements on a party seeking
17  estoppel before a court may take the extraordinary step of
18  rejecting a litigant's entire argument without any
19  consideration of its merits."
20      And what are those requirements?  Essentially, "to
21  apply the doctrine, the Court must determine that a
22  litigant, as an initial matter, must in effect have made a
23  bargain with the tribunal of the first proceeding by making
24  certain representations to the tribunal in order to obtain a
25  particular benefit.  And additionally, the position taken in

1  the second litigation must be inconsistent with one
2  successfully and unequivocally asserted by that same party
3  in a prior proceeding."
4      Those are the requirements of judicial estoppel.
5      Now, Mr. LoCascio showed you on his opening -- and I
6  suspect he'll show you again -- some quotations from
7  McNeil's papers, in which it said, in the Tylenol PM case,
8  that McNeil typically doesn't challenge color schemes used
9  by companies that are seeking to compete with McNeil's
10  goods.
11      Of course, at the time, the Second Circuit and the
12  Seventh and several others held that colors were not
13  protectable -- and this is before the Supreme Court's ruling
14  in Qualitex in 1995, which changed the law -- and McNeil
15  didn't prevail on those arguments.  The reason McNeil
16  prevailed in the Tylenol PM case was because the two
17  products are not confusingly similar when viewed in total
18  context.  They are just ordinary blue boxes with two
19  different trade names on them.
20      The Court actually held, the Second Circuit held in
21  the Excedrin PM case that even this Excedrin trade dress was
22  protectable.  They could protect the entire trade dress, all
23  of its elements together.  They just couldn't show it was
24  confusingly similar to Tylenol.
25      So these arguments that McNeil made about what is

1  protectable and what is not were not a holding -- or were
2  not essential to or were not part of the holding of the
3  Tylenol PM case.  The case was decided on the basis of
4  confusion, not protectability.
5      And finally, the very argument that Merisant is making
6  here about estoppel in a color protection case based upon
7  the position McNeil took in Bristol-Myers, the Tylenol PM
8  case, has been rejected by another court.  This is a
9  decision from the Granutec case.  Your Honor may recall
10  that.  There was a survey done in Granutec -- there was a
11  survey done in Granutec, and there has been some dispute
12  about whether the design of the survey in this case should
13  be accepted, in part because it was the same as the design
14  in the Granutec case.  In any event, judicial estoppel.
15      "Granutec asserts that McNeil should be prohibited
16  from arguing in this action that the Lanham Act's trade
17  dress protection attaches to the color scheme of an
18  over-the-counter pharmaceutical product because McNeil
19  allegedly asserted the opposite position in a prior action
20  with similar if not identical issues, Bristol-Myers."  The
21  same issue here.  "The Court finds that McNeil is not
22  irrevocably committed to a certain legal position simply
23  because it utilized that position in a prior unrelated
24  action."
25      Why?  "Upon review of the matters, the Court finds

1  that Bristol-Myers in this action had distinctly different
2  facts, and the Court finds that McNeil did not state that
3  the law prohibits one from bringing a claim for infringement
4  of color scheme.  Rather, McNeil merely stated that it
5  generally did not challenge such use of its colors."
6      There is no basis in this case, your Honor, for
7  finding, I would say not even for charging, as Merisant has
8  done, that McNeil is playing fast and loose with the courts
9  or is abusing the judicial process through cynical
10  gamesmanship.  The law was what it was in 1991 about color,
11  it's different now, and McNeil's positions were not
12  inconsistent, in any event, between the two cases.
13      Indeed, your Honor, unfortunately we've had a lot of
14  accusations in this case that have turned out to be
15  completely unproved.
16      In his opening, Mr. LoCascio said, "I'll bet you,
17  Judge, that McNeil conducted a likelihood of confusion study
18  and then hid the results from the Court and from Merisant."
19  And that was debunked by Professor Mazis during the course
20  of this, and it was utterly without foundation when it was
21  said.
22      Merisant also charged in this proceeding that McNeil
23  cropped the photograph.  Remember that?  That they
24  deliberately excluded part of it?  And then it turned out
25  that they are two different photographs shot from two

Plaintiffs' Closing Argument - (Zalesin)   41

1  different angles. It couldn't have been cropped. And there
2  was never any intention to suggest that Sugar Twin isn't
3  sold in this market. That's what all the evidence shows,
4  that it's sold, but not very often.
5       They said that McNeil withheld one of the
6  questionnaires in this study and then substituted a
7  duplicate copy in an effort somehow to cover up something,
8  and that turned out to be a completely empty allegation.
9       They said that McNeil's witness Miss Sandler had given
10 false testimony before your Honor about a prior statement,
11 and then when they tried to impeach her -- remember this? --
12 it turned out to be a statement by a reporter, not by her,
13 that she was being impeached with.
14      They said that McNeil sent out in the segmentation
15 study, the one that shows that yellow is associated with
16 Splenda and only Splenda, that they sent out the
17 questionnaire in color because then people would know that,
18 "Oh, yeah, I see it's yellow, so I'll check off yellow."
19 And that was completely unfounded, as all the evidence
20 showed.
21      And they said that McNeil has sponsored false or
22 perjured testimony by these actual confusion witnesses like
23 Miss Sifontes, who -- poor Miss Sifontes made an honest
24 mistake. She said, because she usually shops in the
25 Pueblo -- recalling this incident from January -- that she

BARBARA DACHMAN, RPR, OCR

Plaintiffs' Closing Argument - (Zalesin)   42

1  went to the Pueblo, like she always does, and she bought
2  what she thought was Splenda and got it home and tasted it
3  and then looked at the box and realized that it wasn't
4  Splenda, it was Same. And then she's accused of lying, of
5  fabricating the entire thing, because it turns out that she
6  probably bought it at the Grande near where her mother
7  lives, because at that point in time it wasn't yet on sale
8  at the Pueblo close to where she usually shops.
9       There is -- Miss Sifontes runs the translations
10 department for the largest law firm in Puerto Rico. She's
11 in the honesty and truth business. So knows what an oath
12 is, your Honor. She made an honest mistake about where the
13 incident took place. She did not fabricate the entire
14 incident.
15      And even after all of that, Merisant came back
16 yesterday and had Mr. Cuervo testify extensively about when
17 yellow Same went on sale in Pueblo, just to prove that
18 Miss Sifontes is a liar.
19      A lot of accusations for a company that put out a
20 product that looks an awful like like Splenda (indicating).
21      I would say to you, there is no legitimate question
22 that there is likely to be confusion in this case.
23      The other elements of McNeil's burden I will go
24 through quickly because I think they are very
25 straightforward.

BARBARA DACHMAN, RPR, OCR

Plaintiffs' Closing Argument - (Zalesin)   43

1       We have to show, in addition to likely success on the
2  merits, that we face irreparable harm if an injunction isn't
3  issued.
4       Miss Sandler told you about three types of harm that
5  are going to occur. We are going to lose sales, and we
6  don't know how much. That is the typical irreparable harm
7  in any case, and certainly any trademark case.
8       In this case Merisant says that 60 percent -- this is
9  yesterday, Defendants' Exhibit X. "Their goal for new
10 yellow Same is to get a five-percent market share over a
11 one-year period, which will derive from 60 percent Splenda
12 users." Although Mr. Cuervo was quick to caution, "That's
13 just an educated guess. We don't really know how much that
14 is."
15      We will never know the financial injury that we are
16 suffering right now and will continue to suffer if an
17 injunction isn't issued in this case.
18      The second kind of harm Miss Sandler told you about is
19 she loses control over the good will associated with her
20 mark. People go to the store, they think they are buying
21 Splenda, they buy Same instead, and like Miss Sifontes, they
22 taste it and they say, "Well, whoa, this doesn't taste like
23 Splenda. This is not the positive experience that I
24 expected and I'm used to having with the brand that I want
25 to purchase."

BARBARA DACHMAN, RPR, OCR

Plaintiffs' Closing Argument - (Zalesin)   44

1       Now, Miss Sifontes went back, looked and saw that it
2  was something different, and she realized that she had made
3  a mistake. Not everyone might do that. That's what is so
4  important here, your Honor. People may think that they are
5  trying Splenda, get Same instead, not like the taste, never
6  try it again, and we will never get that consumer back.
7       And the third type of harm is Merisant is getting a
8  free ride. They are capitalizing on the good will of the
9  Splenda box and the Splenda trade dress by having a trade
10 dress which calls consumers' attention to it, attracts
11 consumers, because it looks so much like Splenda.
12      These are the classic types of irreparable harm that
13 any trademark plaintiff will suffer if an injunction isn't
14 issued, and they are present in this case.
15      We also have to show that the balance of hardships
16 favors McNeil and not Merisant. That's the third element of
17 the preliminary injunction standard.
18      And, your Honor, the investment that McNeil has made,
19 nationally and in Puerto Rico, in the yellow -- in the
20 Splenda trade dress, dwarfs the investment that Merisant has
21 made in the few months that it has been marketing, since
22 December, Same in Puerto Rico. I think they testified a
23 couple hundred thousand dollars, and they have a total of a
24 million dollars at stake. McNeil has a 200 million-dollar
25 brand at stake, and growing. If other people can co-opt its

BARBARA DACHMAN, RPR, OCR

1  trade dress, it's no longer going to be a 200 million-dollar
2  brand.
3       And what is the harm to Merisant?  They can continue
4  to compete.  They've got blue Same.  They've got Equal, the
5  biggest aspartame product.  We are not saying they can't
6  compete.  They can even repackage yellow Same and put it in
7  a different box.  They just can't sell it in a box that is
8  so confusingly similar to Splenda.
9       And, as your Honor I am sure is aware, whatever injury
10  Merisant is going to suffer, they brought it on themselves.
11  The cases say -- the courts are very unsympathetic when you
12  have a defendant that has -- it's the so-called
13  self-inflicted injury rule.  They chose a trade dress --
14  despite their duty to steer clear, they chose a trade dress
15  that came as close to the line as they thought they could
16  get.  And guess what?  They stepped over the line.  If they
17  have to pull the product now and they have to eat their
18  investment, a self-inflicted injury.  It's barely even
19  worthy of consideration.
20       Finally, there is the public interest to consider.
21  And where does the public interest lie in this case?  Well,
22  obviously there is a public interest in preventing consumer
23  confusion.  But there is more at stake here.  There are
24  important economic principles at stake, as the Supreme Court
25  described in Qualitex.

1       They said that "trademark law, by preventing others
2  from copying a source-identifying mark, reduces the
3  customer's costs of shopping and making purchasing
4  decisions, for it quickly and easily assures a potential
5  customer that this item -- the item with this mark -- is
6  made by the same producer as other similarly marked items
7  that he or she liked or disliked in the past."
8       This is important stuff.  When people go to the store,
9  they should know what they are buying.  That's why trademark
10  law exists, to protect consumers from situations like this.
11       "At the same time, the law helps assure a producer
12  that it and not an imitating competitor will reap the
13  financial, reputation-related rewards associated with a
14  desirable product.  The law thereby encourages the
15  production of quality products, and simultaneously
16  discourages those who help to sell inferior products by
17  capitalizing on a consumer's inability quickly to evaluate
18  the quality of an item offered for sale."
19       That's what trademark and trade dress law is all
20  about.  That's the -- those are the public interest issues
21  at issue in this case.
22       And there is one more thing, your Honor.  When you
23  think about whether you should grant this injunction, what's
24  in the public interest, we had in this courtroom yesterday
25  what is to my mind absolutely astonishing testimony by

1  Merisant's witness Mr. Cuervo, who essentially admitted that
2  the entire premise of the new Same product, Same with sugar,
3  is to defraud consumers.  It's unbelievable.  This is their
4  marketing strategy.
5       Defendants' Exhibit W.  "Position Same with sugar
6  directly against other products that claim to be made from
7  sugar."  Well, what's that?  There is exactly one product
8  that claims to be made from sugar.  It's Splenda.  It's made
9  by a patented process.  Only McNeil can do it.
10       So "position it directly against other products that
11  claim to be made from sugar, and differentiate in being a
12  better value without sacrificing quality or flavor.  A
13  positioning statement that reflects a more natural image
14  will be developed based on the fact that the formula is 97
15  and a half percent sugar, but costs less than similar
16  products."  So more natural, kind of like Splenda, and they
17  compete with other products that are made from sugar, but
18  we've actually got sugar so we cost less.
19       Well, as all the evidence shows, and as even
20  Merisant's witness admitted yesterday, the sugar in Same has
21  no benefit at all.  You can't taste it.  It's just a filler.
22  It's just a filler.  It doesn't make the product more
23  natural.  It's still an artificial sweetener.  It's
24  sweetened with aspartame and Ace-K, and I won't even try to
25  pronounce it the right why.  That's where the taste comes

1  from.  The sugar doesn't affect the taste, it doesn't affect
2  how the product functions.  You can't cook with it any
3  better.  It doesn't more natural.
4       The only purpose, your Honor, for sticking sugar in
5  new Same is to enable them to get people to think that it's
6  more natural and it's more like Splenda.  Splenda is made
7  from sugar, they are made with sugar.  That's the only
8  purpose for putting sugar in this new product, and it's, I
9  would say, the exact same purpose they had in mind when they
10  chose a trade dress that is so much like Splenda.
11       The way they intend to market this is a sham.  There
12  is no public interest in keeping a product like that on the
13  market.
14       So, in sum, I would say that McNeil has shown you that
15  all of the elements of the preliminary injunction standard
16  are met, and certainly granting an injunction in this case
17  would be in the public interest, and for those reasons we
18  ask that your Honor grant McNeil's motion.
19       Thank you.
20       I know I took an hour and five minutes.  I apologize,
21  but it always takes longer than you anticipate that it will.
22       THE COURT:   Very well.
23       Off the record.
24       (Discussion off the record.)
25       MR. LOCASCIO:   Let me also first again, on behalf

---

1   of my client Merisant, as well as all of my team, thank the
2   Court.  In particular, the staff have been extraordinary in
3   terms of making sure everything we need has been taken care
4   of, and the accommodations extended so I can be at another
5   matter on Monday are certainly appreciated, your Honor.
6          As Mr. Zalesin said, there is not much debate that
7   McNeil has a burden, and it's not a small one.  McNeil has
8   to prove four things:  First, that it is substantially
9   likely to succeed on the merits of its claims; second,
10  absent the injunction, there is a significant risk of
11  irreparable harm to McNeil; that the balance of hardships
12  weighs in its favor, and that an injunction will not harm
13  the public interest.
14         What is "substantial"?  I am sure you will get cases
15  with conclusions of law on what this is.  Here in Puerto
16  Rico, in the *Gonzalez v. Chasen* case, a substantial
17  likelihood, that burden is quantified as requiring a strong
18  probability of success on the merits.  It's not a          *Mistake*
19  possibility of success on the merits, it's not even just a
20  probability of success on the merits.  It is a strong
21  probability of success on the merits.  And as we go through
22  the evidence, I think it will show they haven't met that
23  burden.
24         The first thing.  You will remember this from the
25  briefs, you will remember it from opening.  Clearly defined

---

1   trade dress.  The First Circuit says McNeil has to do that.
2   It's got to clearly identify what they are asserting in this
3   case.  They filed a complaint; they had to take positions.
4   They filed a motion for a preliminary injunction; they also
5   took positions.  That's what Merisant came here to defend.
6   That's the trade dress at issue in this case.
7          There is a reason it needs to be defined, and that's
8   in the *Central Tools* case, the bottom of the screen.  McNeil
9   has a duty to define its trade dress carefully, in order to
10  avoid an overly broad application of the Lanham Act and the
11  danger of uncertainty among present and future competitors.
12         If it's not clearly defined, well, then it's not fair
13  to Merisant, because then what are you defending against?
14  Are you defending against all of the Splenda packages, or
15  are you defending against only the one that Mr. Zalesin
16  shows, the 50 pack -- we will get to that in a second -- or
17  are we looking at is it the pack, is it the color yellow?
18         The *Planet Hollywood* case.  "Imprecision and vagueness
19  in the trade dress asserted is unfair to the party accused
20  of infringement because it is forced to defend against an
21  amorphous claim of exclusivity which is of uncertain and
22  indeterminate dimensions."
23         So we got what we asked for.  We said, "What is it?"
24  They gave us a list.
25         This is the trade dress at issue.  These are the

---

1   points.  This is what they say should be in their test
2   package shown for secondary meaning.  Every decision that
3   happens after this:  What is the proper test for secondary
4   meaning?  What is the proper test and control for likelihood
5   of confusion?  Is white a proper control?  All of those
6   issues are impacted by this decision.
7          McNeil doesn't come in and say anybody in pastel
8   yellow is off limits.  McNeil said, "We have a trade dress
9   in this case.  That's what we are asserting.  These are the
10  specific elements," the elements they were required to
11  identify by the First Circuit.
12         Despite the claims, much of the evidence, including
13  the survey they put on and others we will look at, is geared
14  not toward the overall trade dress.  It's geared toward the
15  color yellow.  Their own witnesses suggest an intent to
16  preclude their competitors from using yellow.
17         "Miss Sandler, do you think you own yellow?"
18         "Actually, yes, I do."
19         Had Same done this launch with a green box or an
20  orange box, we wouldn't be here today.
21         McNeil has no trademark rights in the color yellow or
22  the pastel yellow or Pantone 602.  Whatever their shade of
23  yellow is, they have no trademark rights in that color
24  alone.  They have never sought federal trademark protection.
25  As Mr. Zalesin indicates, you can do that now.  The

---

1   trademark office says, "Send in your paperwork, send in a
2   sample of the color.  You can have protection for that."
3   Never been done.  The reason it's never been done is because
4   just like there is in this case, if they are trying to say
5   they get all boxes in pastel yellow, that's not an easy
6   standard.
7          The PTO, the Manual for Examining Trademark, says,
8   "The burden of proving that a color mark has acquired
9   distinctiveness is substantial."
10         And as *Qualitex*, the Supreme Court case says, it can
11  never be inherently distinctive.  The only thing you can
12  ever do is show secondary meaning in a color alone, and that
13  burden is substantial.
14         McNeil hasn't sought those rights.  What they attempt
15  to do here is through the back door suggest by this case,
16  pastel yellow boxes can't have it, because that's what the
17  confusion they allege shows, that's what the secondary
18  meaning they allege shows.  It's all back to yellow.  It's
19  not the overall trade dress at issue.
20         Let's look at the marketplace.  Colors in the sugar
21  substitute market.  Pink.  Sweet'N Low is the leader in the
22  pink category.  Been on the market since 1957.  McNeil's own
23  data.  96 percent of the people recognize the brand name
24  Sweet'N Low.  85 percent of the people surveyed who were
25  familiar with sweeteners can identify that it comes in a

1  pink box. They are not saying secondary meaning in pink.
2  These people are not saying only one source comes in pink or
3  only one source comes in yellow.
4      McNeil's segmentation study is a recognition test.
5  "Hey, do you know what color Splenda comes in?" That's a
6  far cry from the secondary meaning, do all packages
7  that come in yellow come from one source, and what is that
8  source?
9      They don't have exclusive rights. Other companies --
10  we saw all the boxes around the courtroom -- come in pink
11  boxes, pink packets.
12      Blue. Equal comes out first in 1982. McNeil's own
13  data. 99 percent of the people know the brand name Equal.
14  80 percent can identify -- again, not saying they are
15  exclusive -- 80 percent can identify, if you tell me Equal,
16  it comes in a blue box.
17      They don't have exclusive rights in blue. Other
18  companies, the people who make Sweet'N Low, for instance.
19  They make this box (indicating), NatraTaste. It comes in
20  blue. Not made by the people who make Equal or NutraSweet,
21  but they don't have the right, they can't prevent someone
22  else from selling that box. Not just because the overall
23  impression is blue, but because even when you look at it in
24  the context of the overall impression of the box, whether
25  it's with NutraSweet, whether it's with Equal, you can't

1  judge confusion on the background color alone. The
2  background color is not what's being protected. When you
3  bring a trade dress case, it's the overall impression, so we
4  can't now focus people in on only one element. We have to
5  focus people in on what is the overall impression. Is that
6  protectable, or are people being confused by it?
7      Yellow. The first product in the marketplace with
8  yellow in sugar substitutes is Sugar Twin. McNeil's own
9  data. There is a lot of talk that it's a fledgling brand,
10  they are lucky to still be in business. Okay.
11      Sugar Twin was recognized, in their own study, the
12  brand name. "Do you know this sweetener?" 65 percent. One
13  percent less than Splenda in the document.
14      Moreover, Miss Sandler went out of her way to say,
15  "It's not really a big player in the U.S." U.S., U.S., U.S.
16  I asked her, "Where did you launch Splenda at first?"
17      "Canada. We launched in Canada first. We designed a
18  package and it was in Canada."
19      "What's the market leader in sugar substitutes in
20  Canada?"
21      "Sugar Twin." Okay? It's not dying, it's not
22  fledgling. Whether they have one percent, one tenth of a
23  percent, or fifty percent of the sales here in Puerto Rico,
24  they are a senior user. So to the extent you are going to
25  say, "We now are going to spend enough money to take over

1  yellow," you can't do that, because somebody was there
2  before you. Whether you are going to say, "It's unique to
3  us," well, you can't say that, because someone was there
4  before you.
5      Splenda comes out in 2000 in yellow. 66 percent, in
6  their own data, say, "I know the brand Splenda."
7      32 percent, the numbers you saw from Mr. Zalesin, are
8  people who use Splenda, not sugar substitute users, which
9  everybody recognizes is the proper market, the proper group
10  of people to survey, whether it's for secondary meaning or
11  whether it's for confusion.
12      And I did this with Miss Sandler. I said, "If you run
13  those numbers over the right denominator, the denominator of
14  people who looked at your survey who knew of a sugar
15  substitute" -- that was 1207 people. It's 32 percent of the
16  people. Their own survey, they showed -- they sent a form
17  to -- "Do you know Splenda comes in yellow?" They got
18  32 percent, and that's not even "is it the only thing that
19  comes in yellow." That's "do you even know what color that
20  package is."
21      The Cumberland cases. If -- I am absolutely sure that
22  over the next however many weeks, a lot of cases are going
23  to get read here. If any cases really weigh in on this
24  issue, two or three are of particular importance: One,
25  Yankee Candle. Mr. Zalesin says, "Don't worry about that

1  First Circuit decision in Yankee Candle."
2      The Supreme Court's Wal-Mart case predates Yankee
3  Candle. So Yankee Candle isn't bad law. Yankee Candle
4  isn't now supplanted by what the Supreme Court did in
5  Wal-Mart. Yankee Candle cites Wal-Mart and says, "We are
6  taking that into account and here is what the law is in the
7  First Circuit."
8      Cumberland v. Monsanto. Two different opinions.
9  Eastern District of New York, relating to pink versus pink
10  and blue versus blue. It was -- pre-Splenda, I guess, wore
11  the titles. You had people who make Equal over here, and
12  they had a blue package, and they also had a pink package
13  because they were competing with Sweet'N Low.
14      The people who make Sweet'N Low had their pink
15  package, but they also had a blue box, NatraTaste, to
16  compete with Equal. That's this box (indicating). The
17  people who made Sweet'N Low came out with this (indicating).
18  At the time this was the box at issue that was blue
19  (indicating).
20      In that case, the Court said, "Furthermore, in this
21  industry consumers associate the color blue with aspartame,
22  the color pink or red with saccharin sweeteners. The
23  dominant coloring of the boxes" -- this is, again, a trade
24  dress case. This is both Cumberland cases. We are going to
25  look at the overall impression, and that's what the courts

1  did. They said, "This isn't a battle over whether you have
2  blue or not. This is 1999. This isn't pre-*Qualitex*, when
3  you couldn't get rights if you wanted them and you spent the
4  time and effort in color. This is after that."
5       "The dominant coloring of the boxes serve a functional
6  purpose and does not differentiate them from other
7  products."
8       Well, what about yellow? Does yellow have any
9  functionality?
10      We haven't gotten discovery. There have been no
11  document requests. We said, "We have a week and a half.
12  Let's get our ducks in a row. Get surveys, if you can get
13  them, and then turn over anything you are going to use."
14      We got this (indicating) from McNeil. It's a
15  presentation from McNeil. Some pages were used with
16  Miss Sandler.
17      When McNeil put their case on, we said, "Let's put the
18  whole thing in." You remember the whole back and forth,
19  "Let's take out a couple of pages, we won't put the whole
20  document in."
21      This is one of those pages (indicating). This is
22  McNeil's own document. What are the functional attributes
23  of the Splenda brand? A lot of things about sugar. What's
24  the message here? It's the closest thing you can get. It's
25  made from, measures like, feels like, used like, tastes like

1  sugar, and a yellow package. Not a yellow package that "we
2  are the only people that ever came up with it." It has no
3  meaning to consumers in any functional way. It's a
4  functional attribute, along with a long list of sugar.
5       The idea that the only way you can prove functionality
6  is the jug handle, as Mr. Zalesin suggests, is wrong.
7       Again, go to the Patent Office, Trademark Office. You
8  can say, "Hey, I want a trademark in something, particularly
9  in color." There is a rule for that. The people at the
10  Trademark Office have to have some standards.
11      "The doctrine of aesthetic functionality may apply in
12  some cases where the evidence indicates that the color at
13  issue provides specific competitive advantages that, while
14  not necessarily categorized as purely utilitarian in
15  nature" -- i.e. saves money, i.e. jug handle --
16  "nevertheless dictate that color should remain in the public
17  domain."
18      *Yankee Candle*, after *Qualitex*, after *Wal-Mart* looks
19  at the law when they are not analyzing labels and says --
20  they cite another case. Gold coloring. That's a prime
21  example of aesthetic functionality because it has some
22  message it sends consumers. In this case, connotes
23  opulence.
24      We will look at the judicial estoppel point because I
25  think we have a very different view. The *Granutec*

1  reference, interestingly not pointed out when -- that's
2  cases from the Fourth Circuit. The Fourth Circuit -- I
3  think it was even on the slide there -- says it's got to be
4  the same case. It's got to be the same -- "if it's in the
5  same matter or the same parties on both sides, well, that's
6  our standard for judicial estoppel."
7       We are not in North Carolina. We are in Puerto Rico
8  in the First Circuit. Your Honor knows all, I am sure, well
9  enough, the *Patriot Cinemas* standard and what the law is
10  here in the First Circuit. It does not need to be in the
11  same matter. It needs to be a successful representation by
12  a party in another matter.
13      This is what McNeil talked about. Even if your Honor
14  doesn't find judicial estoppel, to the extent McNeil, out of
15  seven to eight points that are at issue in this case, set
16  forth what the law is in their case, the briefs
17  *Bristol-Myers v. McNeil*, the fact that they are now saying
18  exactly the opposite should be of some guidance when trying
19  to figure out what the right law is to control.
20      Different categories take on different colors.
21  Whether or not that was true in 1992, it's certainly true
22  today, because Miss Sandler said so on the stand. Showed
23  her other boxes. "Yeah, all my Q-Tips, they are all blue.
24  Doesn't mean any of them stop the other." That's what
25  people, for whatever reason -- I don't know what the

1  connection that started that is, but that is the way it
2  works. Everybody is using that now.
3       These are an accepted part of marketing. Generic
4  manufacturers, for instance. They make a practice of
5  packaging their products in colors used by the market
6  leader, because they want to communicate the same type of
7  product. Is the generic Q-Tip manufactured exactly the same
8  way as the J&J one? Probably not. It probably bends,
9  probably doesn't work as well. The cotton is not as --
10  probably not as absorbent, or whatever the right thing that
11  makes Q-Tips better than the other one. But it is in the
12  same category. It is a substitute someone could use. You
13  might say, "I don't want to pay as much as you pay for that
14  one. I will take the lower-priced alternative." That
15  happens all the time.
16      THE COURT: Let me ask you something.
17      What you are doing here is, you are taking color as
18  the dominant element of the trade dress, and I believe that
19  the position of McNeil is that you have to take all the
20  elements in conjunction, you know, for the trade dress to
21  exist and that the definition of trade dress is all those
22  elements.
23      But what you are doing is impeaching McNeil's argument
24  by saying that their witness from their corporation actually
25  zeroed in on color more than anything else?

Defendants' Closing Argument (LoCascio)                    61

```
1        MR. LOCASCIO:   I apologize. The last sentence of
2   that I couldn't hear, your Honor.
3        THE COURT:   No, what I am saying is that, you
4   know, the officer from McNeil --
5        MR. LOCASCIO:   Yes, Miss Sandler.
6        THE COURT:   -- actually emphasized color more than
7   any of the other elements, and therefore that should be like
8   an indicator that color should be the predominant element in
9   the trade dress?  Is that what you are saying?
10       MR. LOCASCIO:   I am not saying that just because
11  she said that.  I think we have to look at what is the
12  evidence in the record, and the evidence in the record is
13  what has attained secondary meaning.  And we will get to
14  this in the Cumberland case.  What has attained allegedly --
15  or what shows a likelihood of confusion.  Is that analysis
16  being done on the trade dress at issue, or is it really
17  being done on yellow?
18       And I think that's, from a marketing standpoint,
19  Miss Sandler's candid comments that she wants to own yellow.
20  They are probably true.  I don't know that she legally
21  should be entitled to.  But stepping back even in the
22  context, as McNeil would have it, of we are asserting an
23  overall trade dress, when that measurement, that assessment
24  is being done, it needs to be done on the overall trade
25  dress.  You need to distinguish the trade dress at issue
```

BARBARA DACHMAN, RPR, OCR

Defendants' Closing Argument (LoCascio)                    62

```
1   from a control that is, we will see, should have as many
2   characteristics as possible in common, but not share what is
3   being measured.  And what is being measured is not yellow,
4   as you point out.  What is being measured is the overall
5   impression.
6        Because, as you said, when pushed, McNeil knows they
7   can't -- they can't get that.  This case is not about
8   whether they are the only one that can even be in a pastel
9   yellow box.
10       Their witnesses say, "I am not saying nobody else can
11  use yellow."  I assume somewhere in the world of, either
12  because you have the pleadings, she is prepared, or all of
13  the above, she knew that, okay, it's overall impression.
14  Every witness you brought in for any side comes into this
15  case, this is the trade dress, overall impression.
16       Dr. Mazis, despite that way he did the survey, which
17  we will get to, he recognizes this case is about the trade
18  dress of the whole package.  In particular, the package
19  containing -- we are talking about this one (indicating),
20  the one with the packets.  We are not talking about this one
21  (indicating), the baking one.
22       Let me, while I am on that, step back to this idea
23  that Yankee Candle is a little different because there is
24  more than one scent or flavor of candle.  Well, we are not
25  only talking about -- Mr. Zalesin likes to show these two
```

BARBARA DACHMAN, RPR, OCR

Defendants' Closing Argument (LoCascio)                    63

```
1   (indicating).  He likes to show the 50 and the 50.  And as
2   you heard Mr. Cuervo say, if you take the 50 pack of
3   Sucaryl, which is made in the same machine as this
4   (indicating), it's the exact same box size, everything about
5   it.  That's why this is this shape and size.  This is the
6   comparison he wants to do.  Well, that's not the only thing
7   they are seeking to protect.  This is one product.  We have
8   also got the 100 pack.  You've seen that.  And then we have
9   the 200 pack that nobody on that side ever wants to talk
10  about.
11       Miss Sandler measured two boxes, told you what the
12  measurements were.  They were really close.  Never measured
13  this box (indicating), because it's different.  Perhaps the
14  size of this box makes a difference to consumers.
15       They are seeking to protect a line of products.  Three
16  different packages, different sizes, in terms of the size of
17  the attributes and how they interact from a confusion
18  standpoint.  But it's not just these three.  If you look at
19  their requested injunctive relief, they seek to enjoin
20  Merisant employees, agents, everything you see in those,
21  from selling a no-calorie sweetener with packaging that is
22  confusingly similar in appearance to any packaging utilized
23  by plaintiffs for its Splenda product.
24       Well, that's this (indicating).  This is the one that
25  is also -- this is the Splenda product in a package.  We
```

BARBARA DACHMAN, RPR, OCR

Defendants' Closing Argument (LoCascio)                    64

```
1   have got bigger issues with what is the proper thing to be
2   testing consumers on.  What is the trade dress at issue.
3   There is no cup of coffee, there is no iced tea.  Pretty
4   much now we are talking about a yellow box with blue writing
5   with a white cloud, because that's the only common element
6   between them.
7        Somebody said, I think it was Miss~Sandler, of the
8   packet, the yellows are actually even more different, if you
9   look back at the record as to what the packet color is.
10       The requested relief is not one specific box versus
11  one specific box.  It is a collection of things.  That's
12  fine.  The burden gets higher as that goes on.  As they said
13  in Yankee Candle, if it's a line of products, baking
14  included, the burden is only that much harder for them and
15  they are not going to be able to meet it.
16       So McNeil has to be held to what its definition of its
17  trade dress is.  Everywhere we go from this point on,
18  secondary meaning, likelihood of confusion, we have to come
19  back to this.
20       Again, for the package itself, again, McNeil could
21  have sought trademark protection and chose not to.  If you
22  have that, you get a presumption.  You don't have to worry
23  about this protectability issue because you show the
24  Trademark Office you can meet these standards.  It's either
25  distinctive enough, or it has secondary meaning.  You will
```

BARBARA DACHMAN, RPR, OCR

Defendants' Closing Argument (LoCascio)                                65

1   move right through this. You will do what Mr. Zalesin
2   suggested on opening, "we will just deem the box protectable
3   and move on."
4          Instead, they must demonstrate, again, substantial
5   likelihood of success on the merits. It's either inherently
6   distinctive, or has acquired secondary meaning.
7          Let's look at inherent distinctiveness. The First
8   Circuit, *Yankee Candle*. The law here is not law on
9   packaging or on product configuration. The law on
10  packaging, it's the law in this circuit, it's after the
11  *Wal-Mart* case they are talking about. It is specific to the
12  labels on the candles. "The question is whether the trade
13  dress is so unique, unusual or unexpected in this market
14  that it will automatically be perceived by customers as an
15  indicator of origin." That's the test for inherent
16  distinctiveness.
17         I don't think there is a lot of debate on these
18  issues. There are certainly common elements in this
19  industry that are used. All three happen to be on the
20  Splenda box, the Splenda trade dress being asserted: iced
21  tea, packets, coffee cups.
22         The *Cumberland* case. Again, there is one in 1999,
23  there is one in 2001. The 1999 decision says, with regard
24  to this box (indicating), NatraTaste, "Both NatraTaste and
25  Sweet'N Low have elements that are generic when viewed in

BARBARA DACHMAN, RPR, OCR

---

Defendants' Closing Argument (LoCascio)                                66

1   isolation. Sweeteners commonly feature on their boxes
2   images of a coffee cup, glass of iced tea, or individually
3   wrapped paper packets. Viewed as discrete elements, these
4   do not help distinguish plaintiff's products."
5          Mr. Zalesin also showed this and then said, "What the
6   Court found overall, that is inherently distinctive." If you
7   read the opinion, we will show that the reason the Court
8   found that is because it had a trade name on it. It was
9   just slapped on the front, "NatraTaste." Okay. When I look
10  at that, that is certainly inherently distinctive, because
11  they are the only people putting out a product with the name
12  NatraTaste on it.
13         *Yankee Candle*. "The label is essentially a
14  combination of functional and common features. Although
15  such a combination may be entitled to protection if you show
16  secondary meaning, it is less likely to qualify as
17  inherently distinctive. While the particular combination of
18  common features may be arbitrary" -- move the cup around to
19  wherever you want, put the packet over here, put the packet
20  over there -- "we do not think any reasonable juror could
21  conclude that these elements are so unique and unusual that
22  they are source-indicative in the absence of secondary
23  meaning." That's the First Circuit in *Yankee Candle*.
24         Some parts of the trade dress issue and some types of
25  trademarks can never be inherently distinctive. You have to

BARBARA DACHMAN, RPR, OCR

---

Defendants' Closing Argument (LoCascio)                                67

1   automatically go to secondary meaning. And color is one of
2   those. And this is after *Qualitex*. The Supreme Court said
3   color alone is now protectable. You can come in -- the
4   classic example is Owens Corning. Fiberglass, it's pink.
5   Their entire ad campaign is "put your house in the pink,
6   wrap it in the pink." The Pink Panther, I am sure they had
7   to pay some money to get him to show up in the commercials.
8   That's their campaign. Their campaign isn't "we are going
9   to happen to show some pink insulation in the back of the
10  video shot." Their campaign is focused on pink. Even in
11  those instances, you have to go to secondary meaning.
12         McNeil wants to say their package is inherently
13  distinctive. To do that, they talk about their well-known
14  Splenda brand name and logo. And that's what, in the
15  *Cumberland* case -- this is the second part of Mr. Zalesin's
16  quote -- "The presence of the NatraTaste and Sweet'N Low
17  trademarks prominently displayed as an integral part of the
18  respective trade dresses is a significant indication of
19  their distinctiveness."
20         So the Court looked at this collection of common and
21  generic elements and said all of that stuff is in the
22  marketplace. But once you put your name on it, yeah, sure,
23  okay, if that's the case, then it's inherently distinctive.
24         But McNeil doesn't include its brand name or logo in
25  its definition of the trade dress at issue in this case. So

BARBARA DACHMAN, RPR, OCR

---

Defendants' Closing Argument (LoCascio)                                68

1   it can't meet the inherent distinctiveness standard. We are
2   talking about a collection of elements, individually or as a
3   whole, that are not so unique and unusual as to
4   automatically be afforded distinctiveness, and it requires a
5   showing of secondary meaning.
6          There has been a lot of argument about this. But
7   there has been no evidence. We had -- two, three weeks ago
8   we had argument and some briefing. We now have had three
9   days of witness testimony. No witness for McNeil ever came
10  up and said this trade dress is so unique, unusual or
11  unexpected that it's perceived by customers as an indicator
12  of origin.
13         They can't meet the inherent distinctiveness standard,
14  and they certainly haven't met their burden of putting
15  evidence on in this case to show it. Rather, everything you
16  look at, every box admitted in evidence, shows the elements
17  are descriptive, common, or not inherently distinctive.
18         So we are on to secondary meaning.
19         To meet its burden, they must show, again, substantial
20  likelihood to prove secondary meaning in the trade dress at
21  issue. This burden isn't -- is the heaviest of the lot for
22  them. The First Circuit, the *Boston Beer* case, and others.
23  McNeil's burden is vigorous evidentiary requirements are
24  necessary. That's the burden on a party to prove secondary
25  meaning. Here, that's a trial, the vigorous evidentiary

BARBARA DACHMAN, RPR, OCR

1   requirements. They have got to show a substantial
2   likelihood of meeting that burden.
3       We have heard a lot of talk about this -- I think both
4   experts agreed on this -- what is secondary meaning. That
5   is that consumers associate the trade dress at issue with
6   one and only one source. It's not that they recognize that
7   a particular product comes in a particular package. That's
8   a recognition test. It's not a secondary meaning test.
9       Secondary meaning is, I think that all the products
10  that come in that package come from one source. And then
11  the follow-up question is what source, and that's how you
12  determine how many people who view a box think it's got
13  secondary meaning. It comes from one source, and that
14  source in this case would be Splenda.
15      So they must show consumers associate the trade dress
16  at issue, and in their own control or their test -- that's
17  this box (indicating). This is what they said was the trade
18  dress at issue. This is what they went and showed consumers
19  to allegedly determine if there was secondary meaning.
20      The First Circuit -- this again, it doesn't matter if
21  they say candles aren't the same as sugar substitutes; that
22  there was a line of candles. If they don't think they have
23  a line here...
24      This is the law in the First Circuit, *Boston Beer* and
25  other cases. The only direct evidence probative of

BARBARA DACHMAN, RPR, OCR

1   secondary meaning are consumer surveys and testimony by
2   individual consumers. They have go some circumstantial
3   evidence -- we will get to that -- but the First Circuit is
4   clear. Two types of direct evidence.
5       Let's look at the first. Survey evidence. Does it
6   satisfy the vigorous evidentiary requirements? I think not.
7   They have got two, quote, unquote, surveys. The in-house
8   consumer segmentation study and Dr. Mazis'. Both failed to
9   actually show secondary meaning in the trade dress at issue,
10  but they are also both flawed and unreliable.
11      This is the in-house, multiple choice, check-box study
12  you saw. First, did it ever ask about or show anyone the
13  trade dress at issue in this case? No. It asked a simple
14  question: "Can you tell me" -- the language was "comes in a
15  yellow package," the question being, "Here's four choices.
16  Tell me if you think any of them come in a yellow package."
17      That is not secondary meaning. It didn't ask them if
18  they -- it only asked them if they recognized it came in
19  yellow. It didn't ask them the question that matters, does
20  only Splenda come in a yellow package. That would be the
21  test for secondary meaning.
22      We looked at this with Miss~Sandler. "Could you have
23  done it better?"
24      "Sure I could have done it better. I could have had
25  different versions, but we already -- we didn't want to

BARBARA DACHMAN, RPR, OCR

1   confuse the issue."
2       They did it in an order: "Do you know which product
3   comes in pink? Any packages come in pink?"
4       "Well, I'll check Sweet'N Low."
5       "Any packages come in blue?"
6       "I'll check Equal."
7       There is only one other product name identified in the
8   choices.
9       And then I get to the next question: "Comes in
10  yellow." Even if the question was right, that is not a
11  proper survey technique.
12      And then when you even look at the data -- Miss
13  Sandler, "Let's get the right denominator. People who know
14  sweeteners." It shows 32 percent can identify Splenda comes
15  in yellow. A far cry from meeting their burden on secondary
16  meaning.
17      What does Dr. Mazis' testimony and survey show? The
18  proper survey looks at the overall impression of the Splenda
19  trade dress.
20      What is being asserted in this case? And as the
21  Federal Judiciary Center's "Reference Manual on Scientific
22  Evidence" -- both sides have put it in. Obviously,
23  everybody thinks this isn't something we are going to doubt
24  its reliability. It says, "In designing a control group
25  study, the expert should select a stimulus for the control

BARBARA DACHMAN, RPR, OCR

1   group" -- that was, in their survey, this box
2   (indicating) -- "that shares as many characteristics with
3   the experimental stimulus as possible, with the key
4   exception of the characteristic whose influence is being
5   assessed." That's the trade dress at issue. That's not
6   secondary meaning in yellow. That's not the exercise here.
7       We go back to what they originally were required to do
8   by the First Circuit in their complaint, in their papers.
9   That's what controls throughout the case. A secondary
10  meaning survey and a likelihood of confusion survey. The
11  control should share as many characteristics with the test
12  case as possible, with the exception being the overall
13  impression of the trade dress at issue, which is what we saw
14  in that list.
15      Only confusion caused by the similarities between the
16  trade dress being asserted and the accused package is
17  legally meaningful confusion. Otherwise it is noise. It is
18  to be subtracted. That's the purpose of the control.
19  Associations between packages solely based on package color.
20  That's not the trade dress at issue. That's background
21  noise.
22      I suggest the control should be pastel yellow, if you
23  try to screen that out, but it seems like everybody in the
24  room thinks this (indicating) and the Sugar Twin box
25  (indicating) -- it's deep yellow, it's neon yellow, whatever

BARBARA DACHMAN, RPR, OCR

1   you want to call it -- if it's not what Splenda's package
2   is, well, that's even more reason that it's a proper
3   control.
4        I can see someone saying it's the same shade of yellow
5   and then it can't be a proper control to assess the
6   secondary meaning or the likelihood of confusion. I think
7   that might still be wrong, but that's not the issue about
8   what control was used by Dr. Mazis. His wasn't any shade of
9   yellow, it was white. And that's not the question as to
10  what was done by Merisant's expert, because he used Sugar
11  Twin. It's a deep yellow, it's a neon yellow. If there is
12  confusion or some association between this shade
13  (indicating), well, that's certainly not part of the trade
14  dress at issue. That's as close -- it's a characteristic
15  they share, they are in the spectrum of yellow, but it is
16  not what is being measured in this case. It is not the
17  trade dress at issue, nor is it even the same shade of color
18  being one element of the trade dress at issue.
19        The Cumberland and Monsanto cases spend a lot of time
20  actually analyzing how the surveys were done and whether
21  they were done properly. And in that case it says, what is
22  the point of a control? "Proper controls approximate
23  background noise or confusion unrelated to similarities in
24  the protectable trade dress. This noise is subtracted from
25  the total confusion to isolate legally meaningful

BARBARA DACHMAN, RPR, OCR

1   confusion."
2        Dr. Mazis' choice of a white control was wrong. If a
3   white control was fine, well, then his survey had some
4   validity. If a white control was wrong, all of his survey
5   data is flawed, putting aside the other flaws with it. His
6   method doesn't net out consumers that simply say "anything
7   in a yellow box I think is Splenda."
8        In the Cumberland case -- this is the exact quote from
9   the Cumberland case -- "The controls of the two surveys were
10  inappropriate because they did not net out consumer
11  confusion based on legally irrelevant factors, namely, the
12  overall blue coloring and the similarity of the products'
13  names. Given the inadequacy of the controls, the expert
14  should have sought to directly approximate background noise
15  by analyzing the reasons people gave for their confusion."
16  What did they say was the reason? Did they say it was the
17  whole package? Overall design? Or did they just say
18  yellow? Those people shouldn't count.
19        When surveying for the overall impression, the control
20  should eliminate this noise. Again, in the Cumberland case,
21  the controls were inappropriate. "The tables showed the
22  most common reasons people gave for thinking NutraSweet was
23  made by the same company that made NatraTaste" -- these are
24  the two boxes (indicating) -- "was the overall blue coloring
25  of the boxes."

BARBARA DACHMAN, RPR, OCR

1   They said, "Do you think this is associated with any
2   other products?" People said this. They looked at what
3   those respondents said. These are the data tables that
4   Dr. Mazis showed, and there is no debate. The overall
5   leading-by-a-long-shot reason is background color. Not
6   overall impression, not the package. I will even give them
7   the images on the box, I think, if they are only talking
8   about a coffee cup. Probably not, but everybody says color.
9   That's supposed to be netted out from the survey. The only
10  way to do that is with a proper control.
11        The Court in Cumberland specifically described the
12  improper controls. One -- these cases are obviously about
13  these two boxes, light blue with some shadows. One, had a
14  predominantly white background with its most prominent
15  labels in bright yellow. They used the Equal box, which at
16  the time was white, red and green. And there is a Sweet
17  Thing package, but even though there is some blue on it, the
18  Court said it's a hodgepodge of blue, red and yellow, as
19  well as some green, white, black and brown. And then they
20  had one more control, a product called Sweet Servings. It
21  had picture of a glass and fruit. It didn't have a coffee
22  cup. And its background is a darker indigo blue. All of
23  those were found to be inappropriate. Those were not
24  acceptable controls. That's a far cry from the blank white
25  box that McNeil showed as a control in their survey.

BARBARA DACHMAN, RPR, OCR

1        So if it's supposed to share as many characteristics
2   as possible but not touch the overall impression, the issue
3   being assessed -- let's look at the Sugar Twin box. It's
4   got yellow, it's got white and it's got blue, and it's got a
5   coffee cup and it's got iced tea. It's got a yellow packet
6   too.
7        Is this -- is this too close to the overall issue
8   being measured, the overall impression in this case? No,
9   and their own witnesses say that. Miss~Sandler: "The
10  overall look and feel of Sugar Twin is very different from
11  that of Splenda."
12        During opening Mr. Zalesin says, "McNeil was aware of
13  Sugar Twin, but thinks, thought at the time and continues to
14  think, it comes in a neon-yellow package, with solid, dark,
15  bold, blue lettering that isn't confusing with the Splenda
16  package." Not just that it's not an infringement because it
17  comes first, but it's not confusing.
18        Miss~Sandler was asked the same question: "You don't
19  think Sugar Twin is confusing to Splenda?"
20        "No, I don't."
21        As a result, Sugar Twin is the ideal control. It
22  doesn't contain the elements that are even in the list of
23  elements, much less overall impression.
24        What is McNeil asserting in this case? We went
25  through this, you will remember, with Dr. Mazis.

BARBARA DACHMAN, RPR, OCR

1  Pastel-yellow colored background? No. Gradually lighter,
2  darker blue lettering? No. White cloud surrounding the
3  brand name? No. Steaming hot coffee on the right side of
4  the front panel? That's what they said is their trade
5  dress. No. Do they have packets resting on a coffee cup
6  saucer? Well, it doesn't have a saucer, so it certainly
7  doesn't have that. Yellow packets with blue lettering.
8  That's it. That's the only thing these two boxes have in
9  common. I don't think anybody spent a lot of time focusing
10  on the packets, but for sure that doesn't make this now have
11  an overall impression too close to the Splenda box.
12      Do they have a cold beverage in the foreground on the
13  left side, and with fruit? No. Does it have an
14  informational banner saying "made from [or made with]
15  sugar"? No.
16      As we said -- and I think it was even in Mr. Zalesin's
17  closing -- Mazis survey didn't test for the overall
18  impression. It counted the consumers who identified the
19  color yellow. People were shown the box, and when asked
20  "Why do you think that," the predominant answer was "the
21  color of the box."
22      He said, "Okay, I'll go through the numbers for you."
23  One hundred ten of these people thought it was the color of
24  the box. We've got some other numbers.
25      The design. I think that's maybe the proper test.

1  The people who said the design of the package. That's the
2  overall impression you are measuring.
3      "The brand I use or buy," other cases talk about
4  whether that's proper or that's not. But for sure, the
5  people who only said the color, that's 110 of those people.
6  They are not measuring overall impression. They are saying
7  "do you recognize yellow with anything."
8      The Cumberland case makes clear. "The above table
9  showed the two most common reasons people gave for thinking
10  NutraSweet was made by NutraTaste."
11      And just so everybody is clear, they are both still
12  out there. It was found that no injunction was granted.
13  They lost.
14      "The overall blue coloring of the boxes and the
15  similarities in the names." Those were the reasons people
16  said when you look at the data. The same reason -- when you
17  look at Dr. Mazis' data, people said "the color of the box."
18      "Neither of these reasons are relevant to plaintiff's
19  trade dress case under the Lanham Act. Appropriate controls
20  should have been designed to net out confusion based on
21  these two variables."
22      Dr. Mazis' survey is full of defects. We have 37
23  responses that were either miscounted or miscoded. We have
24  insufficient sample sizes. In some case now for the
25  control, perhaps as low as 63 people.

1  The test he used -- this is the test box he showed
2  people (indicating). It's got the swoosh on it. Well,
3  that's part of McNeil's registered trademark for Splenda.
4  You certainly are not supposed to leave source-identifying
5  items on the test box. As if it wasn't easy enough for
6  people in this comparison to pick Splenda from one and not
7  the other. Well, let's game it a little more by putting the
8  swoosh on there.
9      They were never given an instruction not to guess.
10  This is important and we will get to this on another slide.
11      The question asked in Dr. Mazis' survey is not, "Do
12  all these products -- do you believe every product in this
13  package comes from one source?" He asked people, "Have you
14  seen or purchased one product in a package that looks like
15  this?"
16      Well, here in Puerto Rico, they are a third of the
17  market, by their own numbers. You would think, if people
18  are guessing, you would probably get at least a third of
19  them that would say, "I'll pick that one. That's the one I
20  know of," because you are only asking people who know about
21  sugar substitutes.
22      The question is, "Do you believe only -- that all
23  products that come in this package come from one source?"
24  That's the right question. That's not what he asked.
25      Mr. Zalesin says, "Let's just not worry about those

1  37, because we got some on yellow paper and some on white,
2  and that's how we should handle it."
3      Well, the evidence on that is scant at best. We have
4  Dr. Mazis saying one thing and then saying the other, but
5  nobody ever came in to testify what happened. Nobody ever
6  came in and said, "I'm the guy who circled it wrong, and
7  that's what word should be counted." There is no evidence
8  on that. It's Dr. Mazis' either hearsay speculation, or
9  what have you.
10      When he was first asked, "Your survey -- the people
11  who filled these out circled which box was shown. Was it
12  test or control? And there are some colored paper. Which
13  one controls?"
14      Well, the reasonable thing to do is assume the people
15  you trained did it right. And that's what he says. "Would
16  you pay more attention to where the person circles as to
17  which product they showed -- which package they showed, or
18  would you go with the color of the paper?"
19      Well, I think it would be what somebody circled,
20  because that's an affirmative act. That's, "I didn't pick
21  up the wrong paper, they didn't run out of paper."
22  That's -- my survey questioner circled something to indicate
23  that's what was shown. The whole process is relying on what
24  those people write down.
25      He then came back and speculated, "Well, I think maybe

1  they should have been in the control."
2      But you will remember, he said, "I can't be sure what
3  happened." He's here as the expert. None of these other
4  people came to testify. He says, "I agree. I don't know
5  where these are supposed to be, but at this moment I would
6  exclude them."
7      Even if you say -- he comes back after lunch, you will
8  remember, he says, "I want to put them in. I want to keep
9  track of those. It makes my numbers look better."
10     The first 63 people that allegedly saw the control,
11 that are not miscoded, properly filled out, 71 percent say
12 they've seen or purchased this.
13     First of all, that's a total guess. That's
14 yea-saying, as he said. That's error, because there is no
15 way any of them ever could have seen or purchased this box.
16 It wasn't for sale here.
17     Seventy-one percent were saying, "Yes, we can get data
18 from those people. We can see why they thought that."
19     People are saying, "No, we never hear from them
20 again." They stopped -- no one asked them anymore
21 questions.
22     For the 37 miscoded surveys, 70 percent of them now
23 say no, they've never seen or purchased. The odds of it
24 switching between the 63 and the 37 are staggering, that
25 this could happen randomly, that this could be a natural

BARBARA DACHMAN, RPR, OCR

1  occurrence. And we will never know because Dr. Mazis
2  doesn't know and there is no way to tell what they think.
3      I asked Dr. Mazis -- you will remember -- "Is it ever
4  possible that somebody just starts circling things and puts
5  'no,' and then they are done with the survey, they are
6  finished?"
7      He said, "Yeah, that will be a real problem. That
8  will be something that would trouble me."
9      His own survey showed the large batches, particularly
10 the ones that are miscoded, are done at the last minute.
11 They are done the day the brief is due. I don't think he
12 can meet his burden to be a reliable witness when the survey
13 comes in, but certainly for these 37 there are some real
14 questions about what happened here.
15     Seventy-one percent of his control group -- people who
16 saw this (indicating) -- guessed that they saw or purchased
17 this. These are the 71 percent of the people we know saw
18 this. This says you exclude the 37. Seventy-one percent
19 said seen or purchased.
20     *Cumberland Packing* talks about guessing. "The leading
21 questions and the lack of an instruction against guessing
22 flaws the survey." His numbers show people are guessing
23 like wild.
24     On redirect Mr. Zaiesin said, "Well, you have an
25 instruction in there. You tell people, 'If you don't have

BARBARA DACHMAN, RPR, OCR

1  an opinion, please tell me.' So that's the same as telling
2  people not to guess." Well, it's not. It's different.
3      The *Cumberland* case. "At the end of the question he
4  attached the rather perfunctory, 'If you don't know, please
5  say so.'" The Court said, "That's not an explicit
6  instruction against guessing."
7      And it then went on. "Perhaps he believed that this
8  implicit instruction" -- the same one Dr. Mazis used --
9  "cured the flaws. In the Court's opinion, it did not."
10 People are still guessing, and the data shows that for his
11 survey.
12     Dr. Mazis's survey is questionable. His control is
13 wrong, but it's also error riddled, and nobody is really
14 sure of what numbers to use.
15     Under a document that actually was marked by the
16 plaintiffs as an exhibit, Dr. Mazis' testimony and opinions
17 should be excluded under *Daubert*. This is an issue that we
18 will brief for your Honor, because I think his survey data
19 is unreliable. I think it should be excluded, but it
20 certainly wouldn't, even if considered in light of these
21 flaws, get anywhere near the substantial burden on McNeil.
22     The only other way to show direct evidence of
23 secondary meaning is individual consumer testimony.
24     No single consumer or any other witness came here for
25 McNeil to testify that the trade dress has acquired

BARBARA DACHMAN, RPR, OCR

1  secondary meaning.
2      They talk a lot about their advertising expenditures
3  and that that somehow gets them around these problems.
4      Miss~Sandler said the advertisements don't even show
5  the box in this case. This isn't in either of the two
6  commercials they talked about.
7      We talked about how much money got spent on
8  commercials? This box (indicating) isn't in either of them.
9  But moreover, the advertising must be directed to the
10 features claimed as the trade dress. You have got to make
11 the connection between the box. You can't just show it in
12 the back. Merely featuring the product in your advertising
13 is no more probative of secondary meaning than are strong
14 sales.
15     McNeil has failed to meet the vigorous evidentiary
16 showing for secondary meaning. Its surveys asked the wrong
17 question. Its survey from Dr. Mazis is flawed and should be
18 excluded. There is no evidence of individual consumer
19 testimony, and its circumstantial support is inadequate and
20 not tailored to the trade dress in this case.
21     Likelihood of confusion. Can they again meet the
22 substantial -- can they first of all show a substantial
23 likelihood of success on the merits.
24     The First Circuit also says it's not just a
25 possibility of confusion. Whether it's a preliminary

BARBARA DACHMAN, RPR, OCR

1  injunction hearing or not, it is a substantial likelihood of
2  confusion.
3       When the percentages are under ten, they can become
4  evidence that indicates confusion is not likely at all.
5       Merisant's survey that -- the issue McNeil takes with
6  it is that they don't like the control and think we
7  shouldn't subtract out the number of people who associate
8  the Sugar Twin box (indicating) with the Splenda box
9  (indicating).  That's the argument as to what is the right
10  control in this case.
11       Is this somehow testing for the overall impression of
12  the Splenda box?  It is not.  Everyone asked says the
13  elements of this (indicating) -- the elements that are in
14  the trade dress are not in this box, and their own witness
15  says it's got on overall look and feel and it's not
16  confusing.
17       After netting out that confusion, roughly five percent
18  of people say there is any confusion between the Same with
19  sugar box and the Splenda box.
20       I am sounding like a broken record, I am sure, at this
21  point.
22       *Cumberland Packing*, your Honor.  "In the test of a
23  causal proposition, the appropriate use of controls is
24  crucial.  Here the proposition tested is whether consumers
25  are misled in the trade dresses into believing that

1  NatraTaste and NutraSweet emanate from the same source.
2  Proper controls will approximate background noise, the
3  amount of confusion existing due to reasons unrelated to the
4  overall impression i.e. the similarities in trade dresses."
5       The controls must -- as it says on the right side --
6  include the overall blue color in the boxes, because the
7  people are confused on that.  Well, that's not trade dress.
8  That's not a confusion about the overall impression.  And
9  the control should have been designed to net out that
10  confusion.
11       I said this in opening.  Mr. Zalesin didn't like that
12  I said it, and I am going to say it again:  Where is
13  McNeil's likelihood of confusion survey?  If this box
14  (indicating) is so easily confused by consumers with this
15  box (indicating), well, that's a pretty easy survey to get.
16       Court after court have said they have an obligation,
17  and if they don't do it, that's a fact the court needs to
18  take into account.
19       *Playboy Enterprises*.  Preliminary injunction denied.
20  "Plaintiff failed to provide a survey showing likelihood of
21  confusion.  This warrants a presumption that the results
22  would have been unfavorable."
23       *Braun v. Dynamics Corp*.  Their "failure to proffer
24  survey evidence as well as disinterested testimony" -- which
25  we will get to in a second -- "suggests the public is not

1  likely to be confused with respect to source."
2       *Merriam-Webster*.  "The lack of survey evidence counts
3  against finding actual confusion."
4       *Eagle Snacks*.  PI denied.  "Failure of a trademark
5  owner to run a survey to support its claims of brand
6  significance and/or likelihood of confusion, where it has
7  the financial means of doing so" -- there is not a lot of
8  debate about that -- "may give rise to the inference that
9  the contents of the survey would be unfavorable."
10       Sure, if you use a control that is rigged and not
11  yellow at all or not Sugar Twin, you could probably get a
12  great confusion survey.  But knowing what the proper
13  standard in *Cumberland Packing* is for the control -- you can
14  see the data.  Eight hundred people tested by Merisant's
15  survey expert.  There was about a five percent delta between
16  people who just were guessing that anything that comes in a
17  yellow box, whether it has the overall impression or not, is
18  Splenda and people who look at the Same package.
19       The prominent branding of the Same with sugar package
20  with its well-known -- this is stipulated -- the well-known
21  Same name here in Puerto Rico, weighs heavily against a
22  finding of consumer confusion.
23       This, by the way, is the *Bristol-Myers* case, which
24  Mr. Zalesin said they didn't win everything on.  Well, this
25  is certainly an issue they won on.  It's in the opinion and

1  they argued it then, they were successful, and now they
2  can't back away from it now.
3       Other cases, *Yankee Candle* in the First Circuit.  "No
4  reasonable juror could conclude that there is a likelihood
5  of confusion, where clearly marked company names are
6  features on the face of the products."
7       Moreover, the person we have to look at is the
8  reasonably prudent consumer.  Also in McNeil's briefs from
9  the *Bristol-Myers* case.
10       But if someone doesn't look at the front of the
11  package when they are in the store, well, that's not the
12  reasonably prudent consumer.  There is not a lot you can do
13  about that person.
14       You brand your products.  And the primary thing,
15  Mr. Zalesin said, "The headline.  It's over on the right
16  side."  Mr. Cuervo's discussion about the coffee cup somehow
17  became that everyone looks to the right side.  Well, the
18  headline of the newspaper is at the top, in the middle.  And
19  when you look at the box for Same with sugar, the brand name
20  is at the top and in the middle.
21       In this same sector of the marketplace -- again,
22  NatraTaste and NutraSweet -- it seems unlikely a reasonably
23  prudent purchaser would find the overall image of the two
24  boxes confusingly similar.  They both display different
25  product names prominently on the front of the box.  The

Defendants' Closing Argument (LoCascio)                    89

1   largest thing on the box is the name. It's the same thing
2   in this case for Same with sugar.
3          The only evidence of actual confusion is an employee
4   from plaintiffs' own law firm. We didn't -- I don't --
5   there were some references that I guess I yelled at her and
6   called her a liar. I don't recall that happening.
7          We asked her, "Hey, you swore out an affidavit and
8   said, 'Here's where I bought it.' That's the evidence that
9   came in when you filed your papers. Well, did you buy it
10  there?"
11         "Well, I'm not really sure."
12         "Well, you couldn't have bought it there because it
13  wasn't for sale there."
14         "I think maybe I bought it at a different store."
15         Well, that's not going to get to the substantial
16  likelihood of success on the merits. Affidavits that are
17  solicited and drafted by the lawyers based on interviews
18  with only their own customers, those are indicative of bias.
19  These are other cases that looked at affidavit evidence like
20  this.
21         Some cases reject plaintiff's own employees'
22  testimony. We've got the other two gentlemen who worked for
23  the distributor of Johnson & Johnson. Did the person from
24  Grande come down and say, "I'm the guy that actually works
25  in the store and I can't tell the difference"?

BARBARA DACHMAN, RPR, OCR

Defendants' Closing Argument (LoCascio)                    90

1          Did an individual off the street or who called in,
2   allegedly all these confused people, come and testify? No.
3   They haven't met their burden. There's been no neutral
4   third-party evidence of confusion.
5          The balance of harms is irreparable harm to Merisant
6   and to the public interest.
7          If the injunction is granted, Merisant will face --
8   you can't cut open the box, dump out all the product. You
9   can imagine the undertaking and the cost in trying to do
10  that. You just destroy the product at that point. If the
11  product can no longer be sold, Merisant will face a loss in
12  that regard.
13         It also faces a loss of consumer good will. "The
14  product I was buying is no longer on the shelves." Maybe
15  they buy regular Same and were thinking of switching to Same
16  with sugar. "That's not on the shelves anymore. What does
17  that mean? Should I have questions about the integrity of
18  the brand I buy?" They are distributors. It's going to be
19  good will lost there.
20         And at the supermarket level, it's going to be
21  significant good will in particular lost because in this
22  market you prepay your ads months ahead. The shopper comes
23  out. Everybody at home gets the shopper and says, "Sale on
24  Same with sugar," heads off to the store. And not only are
25  they unhappy, the supermarket is a little unhappy. But

BARBARA DACHMAN, RPR, OCR

Defendants' Closing Argument (LoCascio)                    91

1   then, as I understand, the people from DACO show up, as they
2   are prone to do, and it is now a much bigger problem for the
3   supermarket, passed on to a significant problem to Merisant.
4          McNeil makes no bones about what they want. They want
5   to remain the only product -- although Sugar Twin is out
6   there, but they don't really matter -- they want to remain
7   the only product associated with sugar in consumers' minds
8   and don't want consumers to have a lower-priced alternative.
9   This isn't complicated.
10         If I sell my product for six dollars -- there is
11  nobody else that sells a product people think has sugar in
12  it, has natural benefits in the sugar substitute market --
13  if somebody comes in at a lower price, well, stores are
14  going to want you to lower your price, consumers may want
15  you to lower your price, you may have to have more sales.
16  That's competition. That's not confusion.
17         In McNeil's own words, "The real complaint here is
18  that McNeil must now face serious competition from the
19  market leader when it had previously been the dominant
20  product. But as Justice Brandeis made clear long ago in the
21  Supreme Court 'shredded wheat' case, absent confusion
22  engendered by Merisant" -- and that has not been shown over
23  the three days we have been here -- "McNeil has no
24  protectable interest in stopping such competition."
25         On every issue, inherent distinctiveness, where is the

BARBARA DACHMAN, RPR, OCR

Defendants' Closing Argument (LoCascio)                    92

1   evidence of that? It hasn't been put in; there certainly
2   hasn't been a substantial likelihood of success on that
3   issue.
4          Secondary meaning. The evidence there not only
5   undermines their position, the survey that doesn't even
6   measure secondary meaning says 32 percent. That's not
7   nearly enough.
8          Dr. Mazis' testimony, all of his opinions are highly
9   questionable as to whether they should even come in.
10         Can they meet their burden on secondary meaning? No.
11  For likelihood of confusion, there's been no survey,
12  no neutral third-party evidence. They can't meet that test.
13         The balancing of harms in public interest, we don't
14  even get to. But if we get there, Merisant faces
15  significant injury, and the consuming public is currently
16  looking at a product they can readily distinguish based on a
17  brand they know at a lower price (indicating) that will not
18  be there, and then there will be significant questions about
19  the integrity of that and other products under that brand.
20         I don't think they can meet their burden on any of the
21  points. They need to meet their burden on all of the
22  points. They need to show it's protectable, they need to
23  show there is a likelihood of confusion, they need to show
24  that the balancing of the harms tips in their favor and the
25  public interest does, and on all accounts that they have met

BARBARA DACHMAN, RPR, OCR

1 that burden with a substantial likelihood of success on the
2 merits. Not on what Mr. Zalesin or I say, but on what was
3 said by the witnesses and the documents in this case.
4 The people that should have said that, if they
5 existed, weren't here, and the people who were here didn't
6 say that, or their evidence cannot be relied upon.
7 Thank you, your Honor.
8 THE COURT: Very well.
9 MR. ZALESIN: Can I have two minutes, your Honor?
10 THE COURT: Well, since you have the burden of
11 proof, yeah, I will allow you two minutes.
12 MR. ZALESIN: Thank you, your Honor.
13 Well, those were a lot of slides that went by very
14 quickly. I am not sure I read all of them. Frankly, your
15 Honor, I am not sure they all accurately characterized the
16 evidence. There is one that I am quite confident did not.
17 I think Mr. LoCascio put up a slide that had a quote
18 from Miss Sandler, McNeil's witness, saying, quote, "The
19 advertising never shows the trade dress at issue. Never
20 shows the package we are trying to protect."
21 As I recall, Mr. LoCascio was showing her a particular
22 ad and said, "Does this advertising show the trade dress in
23 question?"
24 She said, "No, this one doesn't."
25 But do the others? Here's Plaintiffs' Exhibit 63.

1 This is the one that we still owe you a translation for. I
2 think we've got it there, or it's just about done.
3 These are Puerto Rico-only ads. There is the trade
4 dress at issue. There is another one. Here is another one.
5 And there are more.
6 We advertised the trade dress in issue. Consumers
7 know our trade dress. That's how they know how to go buy
8 our product, except when they mistakenly buy Same.
9 Mr. LoCascio likes to talk about the fact that McNeil
10 doesn't have a registration on its trade dress.
11 Miss~Sandler told you that as a general matter of policy,
12 McNeil -- and this is whether it's Tylenol or any of the
13 products they sell -- does not register trade dresses. They
14 register trademarks and logos, they don't register trade
15 dresses. I believe that's a common practice in the
16 industry.
17 It doesn't make any difference. It is a red herring
18 issue. If you have a registration, you get a procedural
19 advantage in the litigation. You don't have to pro···
20 protectability. We haven't asked you to assume
21 protectability, we have proven it to you. Therefore, the
22 fact you can -- there is no negative inference to be drawn
23 from the fact that there is no registration. None was ever
24 sought, none was ever granted. It doesn't matter. It's
25 just a procedural issue.

1 The issue of the line of products. This case is not
2 about a line of products like the Yankee Candle case was
3 about a line of products. In Yankee Candle you had these
4 labels which looked different, quite different from each
5 other, because each one related to a different candle
6 fragrance or scent. So you had mandarin, which had pictures
7 of little oranges with a gold border. That was basically
8 the common element. And then you had gardenia, which had
9 pictures of gardenia flowers. The dominant elements of
10 those different labels were different floral depictions, and
11 the common elements were the gold and white lettering, I
12 believe is what it was.
13 That's not what we are talking about here. Yes, the
14 granular looks quite a bit like the packet, although there
15 is no granular product that's being accused of infringement,
16 so you don't really need to worry about that.
17 And then Mr. LoCascio says, "Well, there are different
18 sizes. There is the 50 and the 100 and the 200," and so
19 based on that he wants to bootstrap a-line-of-products
20 argument. It's the exact same trade dress, your Honor. It
21 just gets bigger as the box gets bigger. This isn't a case
22 about a line of products. It's a case about one package
23 that's infringed by one other package.
24 Finally, the Cumberland case. Both sides like to cite
25 the Cumberland case. I think it's very important for you to

1 spend some time with the Cumberland case and to understand
2 our -- I am sorry. Actually, before I get to the Cumberland
3 case, one other point I wanted to raise with you.
4 The issue of aesthetic functionality. Mr. LoCascio
5 says we put up a straw man type argument, a handle on a
6 jug, saying that's the only kind of functionality. You
7 know, that the colors are aesthetic items and can be
8 functional too.
9 Yes, they can, in the following way: Say I am selling
10 grape juice. I kind of got to use the color purple
11 somewhere on my label if I want people to understand that
12 this is a grape-flavored product. Or if I'm selling an
13 orange lollipop or an orange Popsicle, it's pretty important
14 that the color orange be part of that. That's the type
15 of -- that's the situation in which a color can be
16 functional.
17 There is nothing functional about the color yellow in
18 the no-calorie sweetener market. Every product before Sugar
19 Twin, which is a very small product, has managed to compete
20 without the color yellow. It isn't like orange for
21 orange-flavored things or purple for grape-flavored things.
22 Now, finally, Cumberland.
23 In Cumberland, the premise of those -- it's two cases.
24 There is the 1999 and the 1991 decision, as Mr. LoCascio
25 pointed out. The entire premise of those decisions is that

1   the colors, the background colors, are not protectable.
2   Why? Because when those products came on the market and
3   then the patents expired and they had to face competition
4   from generic aspartame products, there was no way they could
5   protect the light-blue color scheme because the law in most
6   circuits, including the Seventh Circuit, which was the one
7   that actually decided, said color isn't protectable.
8          This is the history of the aspartame category. This
9   is the Seventh Circuit writing in 1990. "As a rule, color
10  cannot be monopolized to distinguish a product. Color is
11  not subject to trademark monopoly except in connection with
12  some definite arbitrary symbol or design. This Court
13  believes that that should continue to be the law in this
14  Circuit."
15         So when the Equal people tried to stop others from
16  selling any products in blue, they lost because the law in
17  the Seventh Circuit was you can't own blue for a product.
18         And so now we have lots of generic and private label
19  and other branded aspartame sweeteners that come in blue
20  boxes, and we have lots of pink private label or unbranded
21  saccharin sweeteners that come in pink boxes, because when
22  those products came into the market, you couldn't protect a
23  color, and so generic competition was permitted in
24  like-colored packaging.
25         In 1995, the Supreme Court changed the ball game. In

1   Qualitex, they said color can be protected. "If you can
2   show that consumers associate a particular color" -- like
3   the yellow -- pastel-yellow color scheme on Splenda -- "with
4   one brand and only one brand, then you can get protection
5   for it."
6          So when Mr. LoCascio shows you all of these snippets
7   from the decision in the Cumberland case and says, "Color
8   doesn't count. It doesn't count at all. It's not a
9   protectable element. It's functional. Blue just means
10  aspartame," that's not the realm that we are in, your Honor.
11         Yellow is protectable as an element, or even
12  individually, which as I've said before, you don't have to
13  go that far. You don't need to get there. But it is a
14  protectable element.
15         And so that's why, when you use yellow as a control,
16  you've made a mistake because you've copied an important
17  element, and indeed a protectable element, and indeed, by
18  the evidence, perhaps the predominant element in the trade
19  dress. So that's why Sugar Twin is not the right control.
20         And, by the way, you know, in all of these blue
21  sweeteners like NutraSweet and NatraTaste, blue is being
22  used to communicate same and all aspartame. That's why blue
23  is here. Couldn't protect it, and that's how the blue is
24  being used competitively.
25         Yellow is being used, or pastel yellow, is being used

1   by Same, not to communicate that it's the same ingredient,
2   because it isn't. It isn't sucralose. Only Splenda is
3   sucralose. It's being used to communicate same product,
4   same brand, same source, and that's the problem.
5          Nothing further. Thanks.
6          THE COURT:  Very well.
7          Okay. Now, the issue then is submitted for decision,
8   and as I told you, you know, you would be submitting some
9   supplemental briefs, and it will be simultaneous.
10         Now, yesterday I got a message from my clerk saying
11  that March 17th was too soon for this, no?
12         MR. ZALESIN:  I think we discussed it with your
13  law clerk, your Honor, and agreed on, given the amount of
14  time that's passed and given the amount of evidence that has
15  been amassed, we would like three weeks instead of two. So
16  I think we agreed on March 24th.
17         THE COURT:  Okay.
18         Well, let's then make it March 26th, which is the
19  Friday of that week.
20         MR. ZALESIN:  That's okay. That's fine.
21         As long as it's not a Monday. We don't like briefs
22  due on Monday. That's a weekend killer.
23         THE COURT:  No, no, I know. I understand.
24         So by March 26th, you will have your briefs in, as
25  well as your proposed findings, okay? From each side.

1          MR. ZALESIN:  Very well.
2          MR. LOCASCIO:  Thank you, your Honor.
3          MR. ZALESIN:  Thank you very much.
4          THE COURT:  Very well.
5   And then -- and this is off the record.
6          (Discussion off the record.)
7          (Whereupon, at 12:40 p.m. court is adjourned.)

101

REPORTER'S CERTIFICATE

1
2        I, BARBARA DACHMAN, Official Court Reporter in the
3  United States District Court for the District of Puerto
4  Rico, appointed pursuant to the provisions of Title 28,
5  United States Code, Section 753, do hereby certify that the
6  foregoing is a true and correct transcript of the
7  proceedings had in the within entitled and numbered cause on
8  the date hereinbefore set forth; and I do further certify
9  that the foregoing transcript has been prepared under my
10  direction.
11
12
13
14                BARBARA DACHMAN
15
16
17
18
19
20
21
22
23
24
25

-- **[29]** 5/24 5/24 15/23 15/23 28/16 28/21 29/14 33/9 33/23 35/4 37/13 41/11 55/15 56/23 58/15 66/18 70/14 71/22 72/1 72/2 72/25 74/23 82/16 83/8 85/13 86/24 87/7 91/22 98/2

## $

**$200** [1] 10/10
**$200 million** [1] 10/10

## '

**'Here's** [1] 89/8
**'If** [2] 82/25 83/4
**'no** [1] 82/5
**'PM** [1] 34/7
**'PTO'** [1] 26/8
**'Puerto** [1] 26/9
**'Rico'** [1] 27/25
**'Same** [1] 35/17
**'shredded** [1] 91/21

## -

-- **[193]**
-------------------------- [1] 1/8

## 0

**04-1090** [1] 1/4
**075** [1] 23/14

## 1

**10** [1] 1/7
**100** [3] 18/12 63/8 95/18
**110** [1] 78/5
**1100** [1] 23/13
**12** [1] 100/7
**1207** [1] 55/15
**15** [1] 1/7
**17th** [1] 99/11
**18** [2] 23/4 23/6
**1957** [1] 52/22
**1958** [1] 27/24
**1982** [1] 53/12
**1990** [1] 97/9
**1991** [3] 35/21 40/10 96/24
**1992** [1] 59/21
**1995** [5] 10/14 10/22 37/5 38/14 97/25
**1999** [4] 57/2 65/22 65/23 96/24

## 2

**20.6** [1] 30/9
**20.6 percent** [1] 30/9
**200** [9] 16/4 17/16 17/16 18/12 20/18 44/24 45/1 63/9 95/18
**200 million** [1] 20/18
**200 million-dollar** [2] 44/24 45/1
**2000** [1] 55/5
**2001** [1] 65/23
**2004** [1] 1/6
**22** [3] 28/25 29/21 29/22
**22 percent** [3] 28/25 29/21 29/22
**237** [1] 18/22
**24.9** [3] 28/13 28/15 29/3
**24.9 percent** [3] 28/13 28/15 29/3
**24th** [1] 99/16
**25** [2] 28/12 30/11
**25 percent** [1] 30/11
**25 percent --** [1] 28/12
**26th** [2] 99/18 99/24
**28** [1] 101/4

## 3

**3.4** [2] 29/8 29/10
**3.4 percent** [2] 29/8 29/10
**3.7** [2] 29/21 29/23

**3.7 percent** [1] 29/23
**32** [5] 55/7 55/15 55/18 71/14 92/6
**32 percent** [5] 55/7 55/15 55/18 71/14 92/6
**37** [7] 17/9 78/22 80/1 81/22 81/24 82/13 82/18

## 4

**4.1** [1] 28/19
**4.1 percent** [1] 28/19
**40** [4] 25/23 26/24 27/16 100/7
**41** [1] 28/25
**41 percent** [1] 28/25
**45** [1] 3/9

## 5

**50** [6] 16/21 50/16 63/1 63/1 63/2 95/18
**58** [3] 15/7 15/10 16/8
**58.5** [1] 16/18
**58.5 percent** [1] 16/18

## 6

**6.6** [1] 30/2
**6.6 percent** [1] 30/2
**60** [5] 19/5 23/2 23/10 43/8 43/11
**60 percent** [4] 19/5 23/2 23/10 43/11
**60 percent --** [1] 43/8
**602** [1] 51/22
**62** [1] 16/17
**62.5** [1] 16/10
**62.5 percent** [1] 16/10
**63** [5] 18/23 78/25 81/10 81/24 93/25
**65** [1] 54/12
**65 percent** [1] 54/12
**66** [1] 55/5
**66 percent** [1] 55/5

## 7

**70** [1] 81/22
**70 percent** [1] 81/22
**71** [2] 81/11 82/17
**71 percent** [2] 81/11 82/17
**722-0132** [1] 1/24
**73** [2] 16/2 16/3
**73 percent** [2] 16/2 16/3
**75** [1] 4/14
**75 percent** [1] 4/14
**753** [1] 101/5
**787** [1] 1/24
**79** [1] 19/6
**79 percent** [1] 19/6

## 8

**80** [2] 53/14 53/15
**80 percent** [2] 53/14 53/15
**85** [1] 52/24
**85 percent** [1] 52/24
**87** [2] 15/23 16/3
**87 percent** [1] 15/23

## 9

**96** [1] 52/23
**96 percent** [1] 52/23
**97** [1] 47/14
**99** [1] 53/13
**99 percent** [1] 53/13

## A

**a-line-of-products** [1] 95/19
**a.m** [1] 1/7
**abbreviation** [1] 26/8
**ability** [1] 9/15
**able** [2] 31/23 64/15
**about** [79] 6/7 6/20 6/20 7/17 17/7 18/16

**18/25 19/5 20/20 23/13 23/17 24/19 25/19 26/21 27/16 28/4 30/13 33/15 34/11 36/2 37/10 38/25 39/6 39/12 40/10 41/10 42/12 42/16 43/4 43/8 46/20 46/23 55/25 57/8 57/23 59/13 62/7 62/17 62/19 62/20 62/25 63/4 63/10 64/4 64/23 65/11 67/13 68/2 68/6 69/3 70/12 73/7 75/8 75/12 78/3 79/20 79/25 82/14 82/20 84/2 84/6 84/7 86/8 87/8 87/15 88/13 88/16 90/17 91/4 92/18 94/2 94/9 95/2 95/3 95/13 95/16 95/22 95/22 96/17**
**about --** [1] 62/25
**above** [3] 16/20 62/13 78/8
**absence** [1] 66/22
**absent** [2] 49/10 91/21
**absolutely** [2] 46/25 55/21
**absorbent** [1] 60/10
**abusing** [2] 37/8 40/9
**acceptable** [1] 75/24
**accepted** [2] 39/13 60/3
**accommodations** [1] 49/4
**according** [2] 17/8 30/24
**account** [4] 5/14 21/18 56/6 86/18
**accounts** [1] 92/25
**accurately** [1] 93/15
**accusations** [2] 40/14 42/19
**accused** [4] 42/4 50/19 72/16 95/15
**Ace-K** [1] 47/24
**achieved** [1] 14/21
**acquired** [3] 52/8 65/6 83/25
**across** [1] 9/14
**act** [3] 50/10 78/19 80/20
**Act's** [1] 39/16
**action** [4] 39/16 39/19 39/24 40/1
**activities** [1] 27/5
**actual** [4] 27/8 41/22 87/3 89/3
**actually** [17] 16/10 16/14 21/15 22/25 26/2 38/20 47/18 51/18 60/24 61/6 64/8 70/9 73/20 83/15 89/24 96/2 97/7
**ad** [2] 67/5 93/22
**add** [1] 29/13
**addition** [1] 43/1
**additionally** [1] 37/25
**address** [1] 4/21
**adjourned** [1] 100/7
**admitted** [5] 27/21 32/9 47/1 47/20 68/16
**ads** [2] 90/22 94/3
**advantage** [2] 28/2 94/19
**advantages** [1] 58/13
**advertised** [1] 94/6
**advertisements** [1] 84/4
**advertising** [10] 10/9 19/13 19/18 20/8 20/13 84/2 84/9 84/12 93/19 93/22
**aesthetic** [4] 58/11 58/21 96/4 96/7
**affect** [3] 22/9 48/1 48/1
**affidavit** [2] 89/7 89/19
**Affidavits** [1] 89/16
**affirmative** [1] 80/20
**afforded** [1] 68/4
**after** [14] 20/4 21/11 25/8 37/5 42/15 51/3 57/4 58/18 58/18 65/10 67/2 81/7 85/17 86/16
**again** [21] 7/12 8/4 13/20 29/14 38/6 44/6 48/25 53/14 56/23 58/7 64/20 64/20 65/4 65/22 68/19 69/20 74/20 81/20 84/21 86/12 88/21
**again --** [1] 38/6
**against** [13] 16/4 31/24 33/15 47/6 47/10 50/13 50/14 50/15 50/20 82/21 83/6 87/3 87/21
**agents** [1] 63/20
**ago** [6] 16/24 25/23 26/25 27/16 68/7

103

## A

ago... [1] 91/20
agree [4] 7/18 12/15 25/8 81/4
agreed [3] 69/4 99/13 99/16
ahead [2] 13/7 90/22
aid [1] 34/15
aisle [5] 6/22 8/5 21/23 25/11 26/13
aisles [1] 20/3
AL [2] 1/4 1/7
alike [1] 29/6
all [66] 3/24 5/14 6/2 11/3 13/8 15/9
16/4 16/5 17/4 17/15 18/8 21/11 22/17
23/24 23/24 29/13 30/22 32/8 34/15
35/3 35/23 35/25 38/22 41/3 41/19
42/15 46/19 47/19 47/21 48/15 49/1
50/14 51/5 52/5 52/18 53/6 53/10 59/8
59/23 59/23 60/15 60/19 60/21 62/12
65/19 67/21 69/9 74/4 75/22 79/12
79/22 81/13 84/22 85/4 87/11 90/2 90/8
92/8 92/21 92/25 93/14 93/15 98/6 98/8
98/20 98/22
allegation [1] 41/8
allege [2] 52/17 52/18
allegedly [5] 39/19 61/14 69/19 81/10
90/2
allegedly -- [1] 61/14
allow [3] 12/25 13/1 93/11
allowed [2] 33/7 33/9
almost [5] 6/15 7/7 23/14 29/6 29/25
alone [8] 10/3 10/15 10/24 12/8 51/24
52/12 54/1 67/3
along [2] 3/6 58/4
already [3] 3/10 24/8 70/25
already -- [1] 70/25
also [19] 19/12 20/25 31/15 36/11 36/20
40/22 44/15 48/25 50/4 56/12 56/15
63/8 63/25 66/5 70/10 83/13 84/24 88/8
90/13
also -- [1] 63/25
alternative [2] 60/14 91/8
alternatively [1] 14/20
although [7] 6/11 22/20 37/13 43/12
66/14 91/5 95/14
always [15] 17/22 17/23 25/18 42/1 48/21
am [24] 4/5 7/1 13/17 29/22 33/7 33/9
33/21 45/9 49/14 55/21 59/8 61/3 61/10
62/10 62/22 67/6 85/20 86/12
93/14 93/15 93/16 96/2 96/9
amassed [1] 99/15
amazing [1] 3/18
America [2] 21/8 37/4
American [1] 25/6
among [4] 23/8 23/10 24/12 50/11
amorphous [1] 50/21
amount [3] 86/3 99/13 99/14
analgesic [1] 34/9
analysis [2] 21/19 61/15
analyzing [3] 58/19 73/20 74/15
angle [1] 25/12
angles [1] 41/1
annual [1] 10/10
annually [1] 20/15
another [9] 21/14 21/17 39/8 49/4 58/20
59/12 79/10 94/4 94/4
answer [2] 28/19 77/20
anticipate [1] 48/21
any [52] 4/14 4/15 4/15 5/10 5/21 7/2 7/3
10/16 11/16 11/25 12/3 18/12 18/25
20/20 22/21 24/3 25/15 28/24 29/17
30/15 31/11 32/7 33/12 35/12 37/18
39/14 40/12 41/2 43/7 43/7 44/13 48/2
55/23 57/8 58/3 59/24 61/7 62/14 63/22
66/20 70/16 71/3 71/5 73/8 75/1 81/15

83/24 85/18 92/20 94/12 94/17 97/16
anybody [3] 6/21 51/7 77/9
anymore [2] 81/20 90/16
anyone [3] 19/8 32/6 70/12
anything [6] 31/22 57/13 60/25 74/6
78/7 87/16
anywhere [1] 83/21
apart [1] 12/22
apologize [2] 48/20 61/1
appear [2] 4/2 27/2
appearance [3] 5/13 9/10 63/22
APPEARANCES [1] 2/1
appeared [1] 3/16
appellant's [2] 28/1 28/2
appellee [1] 27/22
applicable [1] 11/12
application [1] 50/10
applied [1] 14/25
apply [2] 37/21 58/11
appointed [1] 101/4
appreciated [1] 49/5
approach [1] 7/13
appropriate [2] 78/19 85/23
appropriated [1] 35/13
approximate [3] 73/22 74/14 86/2
approximately [1] 20/13
arbitrary [2] 66/18 97/12
are [220]
area [1] 24/24
aren't [5] 11/12 16/12 26/10 30/8 69/21
argued [1] 88/1
arguing [1] 39/16
argument [9] 36/20 37/18 39/5 60/23
68/6 68/8 85/9 95/20 96/5
arguments [4] 3/2 36/23 38/15 38/25
around [5] 5/20 24/22 53/10 66/18 84/3
article [1] 22/16
artificial [1] 47/23
artificially [1] 9/15
artwork [7] 7/5 8/22
as [126]
as -- [1] 60/9
aside [1] 74/5
ask [5] 48/18 60/16 70/12 70/17 70/19
asked [22] 10/5 12/15 14/10 15/17 15/21
30/22 50/23 54/16 70/13 70/18 76/18
77/19 79/11 79/13 79/24 80/10 81/20
82/3 84/16 85/12 89/7 94/20
asking [2] 13/17 79/20
asks [1] 16/7
aspartame [10] 11/4 11/5 45/5 47/24
56/21 97/4 97/8 97/19 98/10 98/22
asserted [6] 38/2 39/19 50/19 65/20
71/20 72/16
asserting [4] 50/2 51/9 61/22 76/24
asserts [1] 39/15
assess [1] 73/5
assessed [2] 72/5 76/3
assessed -- [1] 76/3
assessing [1] 19/15
assessment [1] 46/23
associate [12] 10/11 13/25 19/9 22/21
23/21 29/25 30/2 56/21 69/5 69/15 85/7
98/2
associated [12] 11/10 15/14 28/24 29/1
29/5 29/17 32/1 41/15 43/19 46/13 75/1
91/7
association [3] 15/3 24/13 73/12
Associations [1] 72/19
assume [3] 62/11 80/14 94/20
assumed [2] 18/2 18/3
assure [1] 46/11
assures [1] 46/4
astonishing [1] 46/25

attached [1] 83/4
attaches [1] 39/17
attaching [1] 6/8
attained [3] 10/18 61/13 61/14
attempt [1] 52/14
attention [3] 4/3 44/10 80/16
attracts [1] 44/10
attribute [3] 19/8 23/7 58/4
attributes [2] 57/22 63/17
authority [1] 33/12
automatically [5] 6/15 7/7 65/14 67/1
68/4
average [1] 27/14
avoid [1] 50/10
aware [9] 19/6 23/2 23/9 23/10 23/13
23/15 23/18 45/9 76/12
awareness [2] 19/20 30/21
away [1] 88/2
awful [1] 42/20

## B

back [21] 12/24 17/17 17/20 25/9 28/8
42/15 44/1 44/6 52/15 52/18 57/18
61/21 62/22 64/9 64/19 67/9 72/7 80/25
81/7 84/12 88/2
background [14] 5/19 10/25 35/20 54/1
54/2 72/20 73/23 74/14 75/5 75/14
75/22 77/1 86/2 97/1
bad [1] 56/3
bag [1] 25/25
bags [4] 26/3 27/2 27/7 27/22
baking [2] 62/21 64/13
balance [4] 4/20 44/15 49/11 90/5
balancing [2] 92/13 92/24
ball [1] 97/25
band [1] 26/6
banner [1] 77/14
bar [2] 26/6 37/9
BARBARA [3] 1/23 101/2 101/14
barbarad [1] 1/24
barely [1] 45/18
bargain [1] 37/23
base [1] 28/25
based [8] 39/6 47/14 72/19 74/11 78/20
89/17 92/16 95/19
basic [1] 10/15
basically [2] 36/2 95/7
basis [3] 10/1 39/3 40/6
batches [1] 82/9
battle [1] 57/1
be [96] 3/1 8/4 10/15 10/24 13/23 14/3
21/10 22/5 22/6 26/19 27/13 31/7 31/23
32/22 35/9 35/13 35/19 36/5 36/17
36/24 37/4 38/1 39/13 39/15 40/14 41/8
41/12 42/22 45/1 47/6 47/8 47/11 47/14
49/3 49/4 50/7 51/1 51/20 52/11 54/10
59/3 59/4 59/10 59/11 59/18 61/7 61/8
61/21 61/24 62/8 64/1 64/15 64/16
65/14 65/19 66/15 66/18 66/25 68/4
69/14 70/20 72/18 72/22 73/5 73/7 75/9
75/23 80/7 80/19 81/2 81/5 81/25 82/7
82/8 82/12 83/17 83/19 84/9 84/17 87/1
87/9 90/11 90/18 90/20 92/18 92/18
93/6 94/22 96/7 96/14 96/15 97/10
97/13 98/1 99/8 99/9
became [1] 88/17
because [81] 3/10 4/7 9/22 10/25 11/1
11/16 13/17 14/17 14/20 14/21 15/18
16/12 17/8 18/6 19/14 20/1 21/11 21/11
21/22 22/4 22/23 24/2 26/22 29/2 30/5
31/4 31/16 32/21 34/16 35/10 36/18
38/16 39/13 39/18 39/23 41/17 41/24
42/5 42/7 42/24 44/11 50/13 50/20 52/3
52/16 53/22 53/23 55/1 55/3 56/13

104

**B**

**because...** [32] 58/21 58/24 59/22 60/6
61/10 62/6 62/12 62/23 63/13 64/5
64/23 66/8 66/10 73/10 74/10 76/16
79/20 80/1 80/20 81/14 82/1 83/18 86/6
89/12 90/21 95/5 97/2 97/5 97/16 97/21
98/16 99/2
**become** [1] 85/3
**been** [40] 3/14 4/2 7/14 12/6 17/7 17/12
18/16 19/20 20/9 20/14 21/10 23/22
27/7 27/23 28/6 39/8 39/17 39/24 41/14
49/2 49/3 52/3 52/3 52/22 57/10 68/6
68/7 78/20 81/1 86/6 86/22 90/3 91/19
91/22 91/23 92/1 92/2 92/11 99/15
101/9
**Beer** [2] 68/22 69/24
**before** [19] 1/11 3/17 3/24 4/1 4/23 6/5
11/1 19/24 22/24 32/22 33/5 37/17
38/13 41/10 55/2 55/4 96/2 96/18 98/12
**begin** [1] 4/1
**beginning** [2] 10/22 28/4
**behalf** [2] 4/4 48/25
**being** [30] 15/13 16/19 19/22 20/2 41/13
47/11 54/2 54/6 61/16 61/17 61/24 62/3
62/3 62/4 65/20 70/15 71/20 72/4 72/12
72/16 73/16 73/16 76/8 76/8 95/15
98/21 98/24 98/25 98/25 99/3
**believe** [9] 4/23 28/17 28/22 29/15 60/18
79/12 79/22 94/15 95/12
**believed** [1] 83/7
**believes** [1] 97/13
**believing** [1] 85/25
**belongs** [1] 27/10
**bench** [1] 16/20
**bends** [1] 60/8
**benefit** [2] 37/25 47/21
**benefits** [1] 91/12
**best** [1] 80/3
**bet** [1] 40/16
**better** [8] 5/6 32/10 47/12 48/3 60/11
70/23 70/24 81/9
**between** [14] 24/20 27/6 27/7 35/2 36/7
40/12 64/6 72/15 72/19 73/12 81/24
84/11 85/18 87/15
**beverage** [1] 77/12
**bias** [1] 89/18
**big** [4] 18/16 25/17 35/4 54/15
**bigger** [4] 64/1 91/2 95/21 95/21
**biggest** [1] 45/5
**bit** [2] 3/7 95/14
**black** [3] 26/5 26/6 75/19
**blank** [1] 75/24
**blue** [60] 5/18 5/18 10/4 11/3 11/5 17/3
17/4 25/1 25/2 27/18 29/20 33/21 33/22
34/4 34/16 34/19 35/3 35/10 35/20
35/22 35/23 36/3 36/3 38/18 45/4 53/12
53/16 53/17 53/20 53/23 56/10 56/10
56/12 56/15 56/18 56/21 57/2 59/23
64/4 71/5 74/12 74/24 75/13 75/17
75/18 75/22 76/4 76/15 77/2 77/7 78/14
86/6 97/16 97/17 97/19 98/9 98/20
98/21 98/22 98/23
**bold** [1] 76/15
**bones** [1] 91/4
**book** [1] 25/22
**boost** [1] 32/16
**bootstrap** [1] 95/19
**border** [1] 95/7
**Boston** [2] 68/22 69/24
**both** [18] 7/21 14/7 24/23 27/2 27/6
32/12 32/13 32/13 56/24 59/5 65/24
69/3 70/8 70/10 71/22 78/11 88/24
95/24

**bottles** [1] 13/11
**bottom** [5] 5/25 26/6 32/18 37/13 50/8
**bought** [5] 42/1 42/6 89/8 89/12 89/14
**bowl** [1] 24/5
**box** [95] 11/17 11/20 11/25 12/1 14/5
14/11 15/8 16/5 16/10 16/14 16/14
16/19 16/25 17/10 17/15 17/18 19/22
19/24 24/24 25/13 27/10 27/18 28/19
29/4 30/1 30/7 31/8 31/10 34/7 34/11
34/18 34/18 35/4 36/3 36/3 42/3 44/9
45/7 45/7 51/19 51/20 53/1 53/16 53/19
54/25 53/14 53/15 57/12 57/24 58/5
58/8 62/8 62/10 64/24 66/25 67/3 70/14
71/14 73/4 81/17 81/18 82/12 84/21
84/22 85/3 87/13 88/12 90/9 90/11
92/10 92/16 92/20 93/9 94/22 96/7 96/9
96/15 98/1 98/1 98/4
**can** -- [1] 94/22
**can't** [29] 11/6 18/12 22/9 30/4 31/16
35/15 36/15 45/5 45/7 47/21 48/2 52/16
53/21 53/25 54/4 55/1 55/3 62/7 62/7
68/1 68/13 73/5 81/2 84/11 88/2 89/25
90/8 92/12 97/17
**can't** -- [1] 62/7
**Canada** [4] 54/17 54/17 54/18 54/20
**candid** [1] 61/19
**candle** [18] 8/16 55/25 56/1 56/3 56/3
56/3 56/5 58/18 62/23 62/24 64/13 65/8
66/13 66/23 88/3 95/2 95/3 95/5
**candles** [5] 8/18 8/20 65/12 69/21 69/22
**cannot** [2] 10/15 93/6 97/10
**capable** [1] 8/2
**capitalize** [3] 32/4 32/7 32/15
**capitalizing** [2] 44/8 46/17
**care** [1] 49/3
**careful** [1] 27/13
**carefully** [1] 50/9
**Carolina** [1] 59/7
**carried** [2] 4/7 9/5
**carry** [2] 4/16 33/17
**case** [141]
**case** -- [3] 67/15 74/8 74/9
**cases** [27] 3/19 4/14 11/12 13/2 16/22
20/7 26/1 35/11 35/18 36/4 40/12 45/11
49/14 55/21 55/22 55/23 56/24 58/12
59/2 69/25 73/19 75/12 78/3 88/3 89/19
89/21 96/23
**cases** -- [1] 26/1
**categories** [1] 59/20
**categorized** [1] 58/14
**category** [5] 7/10 7/11 52/22 60/12 97/8
**causal** [1] 85/23
**cause** [4] 24/10 24/12 33/9 101/7
**caused** [1] 72/15
**causes** [1] 33/10
**caution** [1] 43/12
**cells** [1] 31/21
**center** [1] 24/23
**Center's** [1] 71/21
**Central** [1] 50/8
**certain** [3] 31/24 37/24 39/22
**certainly** [21] 12/13 12/14 12/20 13/15
13/22 21/3 35/7 43/7 48/16 49/5 59/21
65/18 66/10 68/14 73/13 77/6 79/4
82/13 83/20 87/25 92/1
**certainly** -- [1] 12/13
**CERTIFICATE** [1] 101/1
**certify** [2] 101/5 101/8
**cetera** [3] 7/24 17/3 17/3
**challenge** [3] 9/10 38/8 40/5
**challenging** [2] 5/4 11/25
**change** [1] 10/21
**changed** [6] 11/14 26/25 27/17 27/22
38/14 97/25

**called** [3] 75/20 89/6 90/1
**calls** [1] 44/10
**calories** [2] 19/10 23/19
**came** [20] 11/2 17/17 27/8 32/21 35/10
42/15 45/15 50/5 56/17 58/2 68/9 70/18
80/5 80/6 80/25 81/4 83/24 89/9 97/2
97/22
**campaign** [4] 67/5 67/8 67/8 67/10
**can** [56] 5/6 6/1 11/8 6/10/15 15/2 20/20
21/5 21/18 23/4 29/12 32/22 44/25 45/3
45/6 47/9 49/4 51/25 52/2 52/10 52/11
52/25 53/14 53/15 57/12 57/24 58/5
58/8 62/8 62/10 64/24 66/25 67/3 70/14
71/14 73/4 81/17 81/18 82/12 84/21
84/22 85/3 87/13 88/12 90/9 90/11
92/10 92/16 92/20 93/9 94/22 96/7 96/9
96/15 98/1 98/1 98/4

**C**

**cafeteria** [1] 24/5
**Cafeteros** [1] 25/24
**calculations** [1] 20/16
**call** [1] 73/1

**Braun** [1] 86/23
**break** [1] 7/14
**brief** [2] 82/11 83/18
**briefing** [1] 68/8
**briefly** [2] 3/5 22/4
**briefs** [6] 49/25 59/16 88/8 99/9 99/21
99/24
**bright** [1] 75/15
**bring** [1] 54/5
**bringing** [1] 40/3
**Bristol-Myers** [8] 33/15 33/24 39/7 39/20
40/1 59/17 87/23 88/9
**broad** [1] 50/10
**broader** [1] 9/16
**broken** [2] 20/11 85/20
**brought** [2] 45/10 62/14
**brown** [1] 75/9
**built** [1] 32/16
**burden** [26] 4/8 4/16 9/5 42/23 49/7
49/17 49/23 52/8 52/13 64/12 64/14
68/14 68/19 68/21 68/23 68/24 69/2
71/15 82/12 83/21 90/3 92/10 92/20
92/21 93/1 93/10
**BURGOS** [1] 2/6
**business** [2] 42/11 54/10
**But** -- [1] 11/14
**buy** [11] 7/1 17/2 20/5 26/14 43/21 78/3
89/9 90/15 90/18 94/7 94/8
**buying** [5] 7/1 19/25 43/20 46/9 90/14

**bottles** column continues above. 

**brand** [48] 6/16 6/17 6/23 6/24 6/25 7/2
10/19 11/10 14/12 15/3 15/14 15/25
16/1 16/2 16/19 19/17 21/24 24/1 24/14
26/13 26/16 26/16 28/17 29/9 30/15
30/21 43/24 44/25 45/2 52/23 53/13
54/9 54/12 55/6 57/23 67/14 67/24 77/3
78/3 87/5 88/14 88/19 90/18 92/17
92/19 98/4 98/9 99/4
**branded** [1] 97/19
**Brandeis** [1] 91/20
**branding** [1] 87/19
**brands** [3] 23/9 28/24 29/17

**C**

changing [1] 13/9
characteristic [2] 72/4 73/14
characteristics [5] 9/3 62/2 72/2 72/11 76/1
characterized [1] 93/15
charge [1] 22/15
charged [1] 40/22
charging [1] 40/7
Chasen [1] 49/16
check [3] 41/18 71/4 71/6
check-box [1] 70/11
choice [2] 70/11 74/2
choices [2] 70/15 71/8
choose [1] 31/19
choosing [1] 32/9
chose [7] 28/8 31/4 32/3 45/13 45/14 48/10 64/21
chosen [1] 31/2
Cinemas [5] 37/1 37/5 37/11 37/15 59/9
circled [6] 17/11 17/12 80/6 80/11 80/19 80/22
circles [1] 80/16
circling [1] 82/4
circuit [40] 8/17 9/4 10/23 10/23 11/5 12/24 33/21 33/24 35/1 35/8 35/22 36/4 36/14 37/1 37/13 37/14 38/11 38/20 50/1 51/11 56/1 56/7 59/2 59/2 59/8 59/10 65/8 65/10 66/23 68/22 69/20 69/24 70/3 72/8 84/24 88/3 97/6 97/9 97/14 97/17
Circuit -- [2] 59/2 69/20
circuits [2] 10/21 97/6
circumstantial [2] 70/2 84/19
cite [6] 4/14 9/13 26/24 33/16 58/20 95/24
cited [3] 16/22 17/5 36/25
cites [1] 56/5
CIVIL [1] 1/4
claim [7] 5/1 5/2 35/8 40/3 47/6 47/11 50/21
claimed [1] 84/10
claims [7] 9/14 9/16 9/16 47/8 49/9 51/12 87/5
classic [2] 44/12 67/4
clear [6] 4/13 45/14 70/4 78/8 78/11 91/20
clearly [6] 4/24 35/14 49/25 50/2 50/12 88/5
clerk [2] 99/10 99/13
client [2] 4/4 49/1
close [9] 21/9 26/15 33/8 42/8 45/15 63/12 73/14 76/7 77/11
close -- [1] 73/14
closely [1] 9/23
closer [2] 27/18 33/8
closest [1] 57/24
closing [2] 3/10 77/17
closing -- [1] 77/17
cloud [4] 5/20 24/22 64/5 77/2
clouds [1] 24/23
co-opt [1] 44/25
co-opted [1] 12/6
Code [1] 101/5
coffee [28] 5/21 5/21 5/22 7/15 7/23 8/4 24/3 25/3 25/4 25/5 25/6 25/6 25/7 25/9 25/12 25/25 26/3 27/2 28/9 64/3 65/21 66/2 75/8 75/21 76/5 77/3 77/5 88/16
coincidence [1] 21/7
cold [1] 77/12
collection [3] 64/11 67/20 68/2
Colon [2] 25/24 25/25
color [84] 5/15 5/16 10/6 10/11 10/17 10/18 10/24 11/6 11/9 11/9 12/7 12/8 12/12 13/1 14/3 14/4 14/14 14/14 16/25 17/5 18/19 22/22 23/22 23/25 32/10 34/6 34/17 35/20 35/23 38/8 39/6 39/17 40/4 40/10 41/17 50/17 51/15 51/21 51/23 52/2 52/8 52/12 53/5 54/1 54/2 55/19 56/21 56/22 57/4 58/9 58/12 58/16 60/17 60/25 61/6 61/8 64/9 67/1 67/3 72/19 73/17 75/5 75/8 77/19 77/21 77/23 78/5 78/17 80/18 86/6 96/10 96/14 96/15 96/17 96/20 97/5 97/7 97/9 97/10 97/23 98/1 98/2 98/3 98/7
colored [2] 77/1 80/12
coloring [8] 5/17 13/25 56/23 57/5 58/20 74/12 74/24 78/14
colors [13] 7/5 10/3 10/14 12/11 12/24 38/12 40/5 52/20 59/20 60/5 96/7 97/1 97/1
combination [7] 8/1 8/6 8/13 11/20 66/14 66/15 66/17
combine [2] 28/15 29/2
combine -- [1] 28/15
come [22] 10/11 33/2 33/7 51/7 53/7 53/7 53/10 64/18 67/3 69/10 69/10 70/16 70/20 71/3 71/5 79/23 79/23 89/24 90/2 92/9 97/19 97/21
comes [36] 7/8 11/17 16/13 19/7 19/10 23/2 23/7 23/11 23/15 30/10 47/25 52/25 53/2 53/3 53/5 53/12 53/16 53/19 55/5 55/17 55/19 62/14 69/7 69/13 70/14 71/3 71/9 71/14 76/14 76/17 79/13 81/7 82/13 87/16 90/22 91/13
comments [1] 61/19
commercials [3] 67/7 84/6 84/8
committed [1] 39/22
common [17] 8/4 9/3 9/6 9/7 62/2 64/5 65/18 66/14 66/18 67/20 68/17 74/22 77/9 78/9 94/15 95/8 95/11
commonly [2] 7/23 66/1
communicate [4] 60/6 98/22 99/1 99/3
companies [3] 38/9 53/9 53/18
companies -- [1] 53/9
company [6] 1/7 18/10 28/17 42/19 74/23 88/5
comparison [2] 63/6 79/6
compete [5] 26/17 32/10 38/9 45/4 45/6 47/17 56/16 96/19
competing [1] 56/13
competition [6] 9/15 91/16 91/18 91/24 97/3 97/23
competitive [1] 58/13
competitively [1] 98/24
competitor [2] 33/2 46/12
competitors [2] 50/11 51/16
complaint [3] 50/3 72/8 91/17
complete [1] 3/21
completely [3] 40/15 41/8 41/19
complicated [1] 91/9
component [2] 14/4 14/6
composed [1] 16/9
concept [2] 9/1 14/23
concern [1] 9/13
concerns [1] 9/14
conclude [2] 66/21 88/4
conclusion [1] 27/22
conclusions [1] 49/15
conduct [1] 17/19
conducted [4] 15/6 17/14 17/17 40/17
Conference [1] 3/17
confident [1] 93/16
configuration [1] 65/9
confronted [1] 9/19
confuse [2] 5/5 71/1
confused [9] 21/15 27/7 35/9 36/18 54/6

86/7 86/14 87/1 90/2
confusing [4] 76/15 76/17 76/19 85/16
confusingly [10] 9/23 11/23 13/4 13/10 26/20 38/17 38/24 45/8 63/22 88/24
confusion [56] 13/2 21/17 24/11 24/12 24/14 24/15 24/16 27/8 30/12 33/10 33/14 39/4 40/17 41/22 42/22 45/23 51/5 52/17 54/1 55/11 61/15 67/17 64/18 72/10 72/15 72/17 73/6 73/12 73/23 73/25 74/1 74/11 74/15 78/20 84/21 84/25 85/2 85/4 85/17 85/18 86/3 86/8 86/10 86/13 86/21 87/3 87/6 87/12 87/22 88/5 89/3 90/4 91/16 91/21 92/11 92/25
conjunction [1] 60/20
connection [6] 11/15 24/13 32/14 60/1 84/11 97/11
connote [2] 18/2 18/4
connotes [1] 58/22
consider [4] 12/10 13/13 31/16 45/20
consideration [4] 14/3 19/15 37/19 45/19
considered [1] 83/20
consumer [18] 6/16 7/8 12/22 26/12 27/13 35/6 44/6 45/22 70/1 70/8 74/9 83/23 83/24 84/18 87/22 88/8 88/12 90/13
consumer's [1] 46/17
consumers [41] 5/5 6/13 10/11 13/25 14/9 15/7 19/6 19/22 20/5 21/13 21/15 22/21 23/21 24/12 26/17 27/3 28/10 30/8 30/24 31/25 36/17 44/11 46/10 47/3 56/21 58/3 58/22 63/14 64/2 69/5 69/15 69/18 70/2 74/6 77/18 85/24 86/14 91/8 91/14 94/6 98/2
consumers' [2] 44/10 91/7
consuming [1] 92/15
contain [1] 76/22
contained [1] 27/1
containing [4] 62/19
containing -- [1] 62/19
contention [1] 5/8
contents [1] 87/9
context [3] 38/18 53/24 61/22
continue [4] 13/25 43/16 45/3 97/13
continues [2] 13/24 76/13
contrary [2] 27/6 36/22
contrast [2] 23/17 29/7
contrast -- [1] 23/17
control [45] 15/11 16/11 17/9 17/11 30/6 31/3 31/4 31/16 31/19 43/19 51/4 51/5 59/19 62/1 69/16 71/24 71/25 72/11 72/18 72/22 73/3 73/5 73/8 73/22 74/2 74/3 74/4 74/19 75/10 75/20 75/25 76/21 78/25 80/12 81/1 81/10 82/15 83/12 85/6 85/10 86/9 87/10 87/13 98/15 98/19
control -- [2] 15/11 87/13
controls [12] 72/9 73/22 74/9 74/13 74/21 75/12 75/24 78/19 80/13 85/23 86/2 86/5
Conversely [1] 19/25
convincing [1] 4/13
cook [1] 48/2
Cooperativa [1] 25/24
cooperative [1] 31/7
copied [2] 21/3 98/16
copy [2] 21/12 41/7
copying [2] 21/10 46/2
corner [1] 6/1
Corning [1] 67/4
Corp [1] 86/23
corporation [1] 60/24
correct [1] 101/6

**C**

cost [3]  22/9 47/18 90/9
costs [2]  46/3 47/15
cotton [1]  60/9
could [23]  10/24 11/9 13/23 19/9 26/10
 32/23 33/2 34/23 35/22 38/22 45/15
 60/12 64/20 66/20 70/22 70/24 70/24
 81/15 81/25 81/25 87/11 88/4 97/4
couldn't [7]  38/23 41/1 57/3 61/2 89/12
 97/22 98/23
COUNSEL [2]  2/2 2/5
count [5]  17/16 17/19 74/18 98/8 98/8
counted [2]  77/18 80/7
countering [1]  36/6
counts [1]  87/2
couple [2]  44/23 57/19
course [17]  4/6 4/9 4/20 5/15 8/8 9/3
 10/13 14/4 15/6 16/23 19/2 20/10 27/5
 30/8 32/5 38/11 40/19
court [47]  1/1 1/11 3/10 4/2 6/6 7/7 7/20
 8/17 10/14 11/2 11/11 13/3 13/6 22/7
 26/1 26/24 34/11 37/11 37/17 37/21
 38/20 39/8 39/21 39/25 40/2 40/18
 45/24 49/2 52/10 56/14 56/20 66/6 66/7
 67/2 67/20 75/11 75/18 83/5 86/16
 86/16 86/17 91/21 97/12 97/25 100/7
 101/2 101/3
Court's [5]  38/13 56/2 83/9
courtroom [3]  13/1 46/24 53/10
courtroom -- [1]  53/10
courts [7]  5/12 10/22 16/21 37/10 40/8
 45/11 56/25
cover [1]  41/7
create [2]  6/3 26/11
creates [1]  8/2
cropped [2]  40/23 41/1
crucial [1]  85/24
cry [5]  34/20 34/21 53/6 71/15 75/24
cry -- [1]  34/20
Cuervo [11]  21/7 22/20 25/4 25/14 25/19
 30/18 32/8 42/16 43/12 47/1 63/2
Cuervo's [1]  88/16
Cumberland [25]  7/12 7/20 55/21 56/8
 56/24 61/14 65/22 67/15 73/19 74/8
 74/9 74/20 75/11 78/8 82/20 83/3 85/22
 87/13 95/24 95/25 96/1 96/2 96/22
 96/23 98/7
cup [16]  5/20 5/21 5/22 7/16 7/23 8/4
 25/3 25/4 64/3 66/2 66/18 75/8 75/22
 76/5 77/5 88/16
cups [2]  25/12 65/21
cured [1]  83/9
currently [1]  92/15
customer [3]  6/18 6/19 46/5
customer's [1]  46/3
customers [3]  65/14 68/11 89/18
cut [1]  90/8
cynical [2]  37/8 40/9

**D**

DACHMAN [3]  1/23 101/2 101/14
DACO [1]  91/1
danger [1]  50/11
dark [5]  5/18 17/14 25/2 34/16 76/14
darker [2]  75/22 77/2
data [21]  14/7 18/1 19/4 20/6 22/24
 22/24 30/18 31/21 52/23 53/13 54/9
 55/6 71/12 74/5 75/3 78/16 78/17 81/17
 83/10 83/18 87/14
data -- [1]  71/12
date [1]  101/8
Daubert [1]  83/17
day [3]  25/17 33/17 82/11

days [4]  11/8 12/24 68/9 91/23
de [2]  25/24 25/24
debate [4]  49/6 65/17 75/4 87/8
debunked [1]  40/19
decades [1]  19/21
December [1]  44/22
decide [9]  3/24 4/7 9/25 11/15 12/8 13/3
 13/9 13/20 13/22
decided [2]  39/3 97/7
decision [8]  39/9 51/2 51/6 56/1 65/23
 96/24 99/7 99/7
decisions [2]  46/4 96/25
decreasing [1]  27/24
deem [1]  65/2
deemed [2]  20/9 32/22
deep [3]  12/17 72/25 73/11
defects [1]  78/22
defend [3]  33/4 50/5 50/20
defendant [4]  21/12 27/17 28/9 45/12
Defendants [2]  1/8 2/5
defendants' [5]  11/22 12/6 30/20 43/9
 47/5
defending [3]  50/13 50/14 50/15
defense [1]  33/11
define [1]  50/9
defined [3]  49/25 50/7 50/12
definite [1]  97/12
definition [3]  60/21 64/16 67/25
defraud [1]  47/3
degenerate [1]  13/2
deliberately [1]  40/24
delta [1]  87/15
demonstrate [1]  65/4
denied [3]  8/17 86/19 87/4
denominator [3]  55/13 55/13 71/13
department [1]  42/10
depicted [1]  24/25
depictions [1]  95/10
derive [1]  43/11
described [3]  24/8 45/25 75/11
descriptive [2]  15/2 68/17
design [13]  5/8 5/12 8/24 15/10 27/25
 34/18 36/1 39/12 39/13 74/17 77/25
 78/1 97/12
designed [4]  37/7 54/17 78/20 86/9
designing [1]  71/24
desirable [1]  46/14
despite [3]  45/14 51/12 62/16
destroy [1]  90/10
detachable [2]  8/18 8/22
detail [1]  21/1
determine [3]  37/21 69/12 69/19
determines [1]  14/19
developed [2]  3/21 47/14
developing [1]  20/23
devoting [1]  4/3
dictate [1]  58/16
did [29]  7/20 16/11 17/25 26/24 27/4
 33/23 34/20 34/21 34/22 40/2 40/5
 42/13 54/16 55/12 56/4 57/1 62/16
 70/12 71/2 74/10 74/16 74/16 74/17
 80/15 83/9 89/9 89/23 90/1 93/16
didn't [17]  4/14 12/3 27/10 32/7 34/22
 38/15 70/17 70/19 70/25 75/21 77/17
 80/20 80/21 86/11 87/24 89/4 93/5
didn't -- [1]  89/4
difference [3]  63/14 89/25 94/17
differences [4]  24/20 26/11 27/6 35/2
different [47]  6/24 7/5 7/14 8/20 9/18
 11/3 12/2 12/11 12/14 12/17 12/20
 12/21 13/4 13/15 15/19 16/14 21/22
 26/5 32/17 33/1 38/19 40/1 40/11 40/25
 41/1 44/2 45/7 56/8 58/25 59/20 59/20
 62/23 63/13 63/16 63/16 64/8 70/25

76/10 83/2 88/24 89/14 95/4 95/4 95/5
 95/10 95/10 95/17
differentiate [2]  47/11 57/6
difficult [1]  9/9
dimensions [1]  50/22
direct [3]  69/25 70/4 83/22
directed [1]  84/9
direction [1]  101/10
directly [3]  47/6 47/10 74/14
discourages [1]  46/16
discovery [1]  57/10
discrete [2]  7/24 66/3
discuss [2]  21/1 21/17
discussed [2]  3/5 99/12
discusses [1]  37/12
discussing [1]  16/24
discussion [3]  48/24 88/16 100/6
disinterested [1]  86/24
disliked [1]  46/7
display [1]  88/24
displayed [4]  8/10 25/1 34/5 67/17
dispute [1]  39/11
distinct [2]  9/4 21/22
distinctive [27]  5/9 6/3 6/9 7/4 7/5 7/9
 7/17 8/7 8/14 9/2 9/11 14/18 14/18
 21/22 35/12 35/18 35/25 52/11 64/25
 65/6 66/6 66/10 66/17 66/25 67/13
 67/23 68/17
distinctiveness [10]  8/12 10/1 52/9 65/7
 65/16 67/19 68/1 68/4 68/13 91/25
distinctly [1]  40/1
distinguish [6]  7/25 35/11 61/25 66/4
 92/16 97/10
distinguishes [1]  10/19
distributor [1]  89/23
distributors [1]  90/18
DISTRICT [7]  1/1 1/1 1/11 37/4 56/9
 101/3 101/3
do [67]  3/3 5/11 7/25 8/25 10/6 10/8
 12/10 13/7 13/8 13/10 13/24 14/20 16/7
 24/18 25/21 27/15 28/8 28/11 28/16
 28/17 28/21 29/9 29/12 29/14 29/15
 29/21 30/17 31/10 35/11 44/3 47/9 50/1
 51/17 51/18 51/25 52/12 52/15 53/5
 53/6 54/12 55/1 55/17 55/19 63/6 65/1
 66/4 66/20 67/13 71/2 72/7 75/1 75/10
 77/5 77/12 77/20 78/7 79/11 79/12
 79/22 80/14 86/17 88/12 90/9 91/2
 93/25 101/5 101/8
doctrine [5]  22/3 37/7 37/14 37/21 58/11
document [6]  30/19 54/13 57/11 57/20
 57/22 83/15
documentary [1]  27/21
documents [1]  93/3
does [17]  19/14 22/6 32/11 35/1 42/1
 45/21 57/6 57/8 59/10 70/5 70/19 71/17
 77/13 90/16 92/25 93/22 94/13
doesn't [31]  14/12 19/21 26/9 31/21
 33/17 38/8 43/22 47/22 48/1 48/1 48/3
 51/7 59/14 59/24 60/9 67/24 69/20 74/6
 76/22 77/6 77/7 77/10 82/2 88/10 92/5
 93/24 94/10 94/17 94/24 98/8 98/8
doing [5]  20/16 20/19 60/17 60/23 87/7
dollars [7]  10/9 20/1 20/13 20/15 44/23
 44/24 91/10
dollars -- [1]  91/10
domain [1]  58/17
dominant [9]  19/8 25/15 26/15 36/5
 56/23 57/5 60/18 91/19 95/9
Domino's [3]  12/19 13/14 24/1
don't [48]  4/15 7/18 11/7 11/15 11/18
 13/11 36/9 36/10 43/6 43/13 53/9 53/17
 53/21 55/25 59/25 60/13 61/20 64/22

**D**

don't... [24] 65/17 69/22 76/18 76/20
77/9 81/4 82/11 82/25 83/4 84/4 85/6
86/17 89/4 89/6 91/6 91/8 92/13 92/20
94/14 94/19 95/16 98/12 98/13 99/21
don't -- [1] 89/4
done [19] 39/10 39/11 40/8 51/19 52/3
52/3 61/16 61/17 61/24 61/24 70/23
70/24 73/10 73/20 73/21 82/5 82/10
82/11 94/2
door [1] 52/15
DORA [1] 2/4
doubt [2] 18/25 71/23
down [11] 6/22 7/14 8/5 20/19 21/23
25/11 26/8 26/12 37/12 80/24 89/24
Dr [1] 62/16
Dr. [19] 28/14 70/8 71/17 73/8 74/2 75/4
76/25 78/17 78/22 79/11 80/4 80/8 82/1
82/3 83/8 83/12 83/16 84/17 92/8
Dr. Mazis [8] 28/14 73/8 75/4 76/25 80/4
82/1 83/8 84/17
Dr. Mazis -- [1] 82/3
Dr. Mazis' [10] 70/8 71/17 74/2 78/17
78/22 79/11 80/8 83/12 83/16 92/8
drafted [1] 89/17
drawn [1] 94/22
dress [115]
dress -- [1] 45/13
dresses [8] 8/11 35/2 36/7 67/18 85/25
86/4 94/13 94/15
drinking [1] 25/9
drugstore [1] 34/16
ducks [1] 57/12
due [3] 82/11 86/3 99/22
dump [1] 90/8
duplicate [1] 41/7
during [3] 27/24 40/19 76/12
duty [2] 45/14 50/9
dwarfs [1] 44/20
dying [1] 54/21
Dynamics [1] 86/23

**E**

each [9] 4/22 8/3 9/3 18/6 27/3 35/9
95/4 95/5 99/25
Eagle [1] 87/4
easier [1] 12/21
easily [2] 46/4 86/14
Eastern [1] 56/9
easy [3] 52/5 79/5 86/15
eat [1] 45/17
economic [1] 45/24
economy [1] 35/6
educated [1] 43/13
effect [2] 16/22 37/22
effort [2] 41/7 57/4
efforts [1] 20/23
eight [2] 59/15 87/14
either [8] 27/3 62/11 64/24 65/5 78/23
80/8 84/5 84/8
element [16] 13/12 14/8 14/15 44/16
54/4 60/18 61/8 64/5 73/18 95/8 98/9
98/11 98/14 98/17 98/17 98/18
elements [36] 6/15 7/14 7/19 7/21 7/25
8/1 8/13 11/20 14/5 15/10 19/15 31/17
35/12 35/18 35/25 38/23 42/23 48/15
51/10 51/10 60/20 60/22 61/7 65/18
65/25 66/3 66/21 67/21 68/2 68/16
76/22 76/23 85/13 85/13 95/9 95/11
elements -- [1] 15/10
eligible [1] 35/19
eliminate [1] 74/20
else [6] 6/21 28/11 53/22 60/25 62/10

91/11
else's [1] 36/16
emanate [1] 86/1
embraced [1] 37/14
emphasized [1] 61/6
empirical [1] 23/21
employee [1] 89/3
employees [2] 27/4 63/20
employees' [1] 89/21
empty [1] 41/8
enable [1] 48/5
encasing [1] 6/9
encourages [1] 46/14
end [1] 83/3
engendered [1] 91/22
enjoin [1] 63/19
enjoined [1] 26/20
enough [7] 21/22 21/23 54/25 59/9
64/25 79/5 92/7
entered [1] 18/1
Enterprises [1] 86/19
enthusiasm [1] 37/15
entire [13] 4/4 9/1 12/5 16/4 28/25 36/5
37/18 38/22 42/5 42/13 47/2 67/5 96/25
entitled [7] 4/8 5/3 5/10 10/4 61/21
66/15 101/7
Equal [12] 11/4 45/4 53/12 53/13 53/15
53/20 53/25 56/11 56/16 71/6 75/15
97/15
error [2] 81/14 83/13
Escalona [1] 30/17
ESQ [4] 2/3 2/4 2/6 2/6
essential [4] 32/7 22/13 39/2
essentially [4] 34/24 37/20 47/1 66/13
estoppel [16] 36/21 37/3 37/6 37/15
37/17 38/4 39/6 39/14 58/24 59/6 59/14
et [5] 1/4 1/7 7/24 17/3 17/3
evaluate [1] 46/17
even [48] 11/8 11/9 13/20 14/12 15/1
18/8 19/9 19/21 21/9 27/10 29/12 31/24
33/10 35/22 36/9 36/10 38/21 40/7
42/15 45/6 45/18 47/19 47/24 49/19
53/23 55/18 55/19 59/3 59/13 61/21
62/8 64/8 67/10 71/10 71/12 73/2 73/17
75/6 75/17 76/22 77/16 81/7 83/20 84/4
92/5 92/9 92/14 98/11
event [3] 4/15 39/14 40/12
ever [18] 11/7 13/3 15/21 16/15 18/9
31/13 32/6 52/12 58/2 63/9 68/9 70/12
80/5 80/15 82/3 94/23 94/24
every [8] 20/1 20/2 51/2 62/14 68/16
79/12 91/25 96/18
everybody [7] 55/9 60/2 71/23 72/23
75/8 78/11 90/23
everyone [5] 16/3 23/14 44/3 85/12
88/17
everyone's [1] 19/11
everything [5] 49/3 63/4 63/20 68/15
87/24
everywhere [1] 20/21 64/17
evidence [52] 4/14 15/4 19/2 19/12
20/25 21/11 21/14 21/25 23/21 24/16
26/22 27/21 28/18 29/24 30/1 30/3
30/13 34/14 41/3 41/19 47/19 49/22
51/12 58/12 61/12 61/12 68/7 68/15
68/16 69/25 70/3 70/4 70/5 71/22 80/3
80/7 83/22 84/18 85/4 86/24 87/2 89/3
89/8 89/19 90/4 92/1 92/4 92/12 93/6
93/16 98/18 99/14
evidence -- [1] 70/3
evidentiary [5] 22/21 68/23 68/25 70/6
84/15
evidently [1] 28/1
exact [5] 25/4 48/9 63/4 74/8 95/20

exactly [7] 13/19 26/10 29/6 36/14 47/7
59/18 60/7
examination [2] 27/20 28/4
Examining [1] 52/7
example [5] 12/14 13/14 24/21 58/21
67/4
Excedrin [5] 33/25 34/1 35/4 38/21
38/21
except [3] 34/6 94/8 97/11
exception [2] 72/4 72/12
exclude [2] 81/6 82/18
excluded [4] 40/24 83/17 83/19 84/18
exclusive [3] 53/9 53/15 53/17
exclusive -- [1] 53/15
exclusively [1] 14/1
exclusivity [1] 50/21
excuse [8] 5/24 11/18 17/4 17/9 28/17
30/17 33/13 37/13
exercise [1] 72/6
exhibit [6] 23/4 30/20 43/9 47/5 83/16
93/25
exist [1] 60/21
existed [2] 14/23 93/5
existing [3] 27/5 34/22 86/3
exists [1] 46/10
expected [1] 43/24
expenditures [3] 10/10 19/13 84/2
expensive [1] 20/22
experience [1] 43/23
experimental [1] 72/3
expert [6] 31/3 71/25 73/10 74/13 81/3
87/15
experts [1] 69/4
expired [1] 97/3
explain [1] 33/16
explained [1] 31/19
explicit [2] 20/24 83/5
explicitly [1] 15/15
extended [1] 49/4
extensively [1] 42/16
extent [2] 54/24 59/14
extraordinary [2] 37/17 49/2
extremely [3] 19/12 19/13 34/8
eye [1] 25/18

**F**

fabricate [1] 42/13
fabricating [1] 42/5
face [7] 19/23 43/2 88/6 90/7 90/11
91/18 97/3
face -- [1] 90/7
faces [3] 9/9 90/13 92/14
facing [1] 20/4
facings [1] 20/4
fact [10] 19/20 21/19 24/17 34/6 47/14
59/17 86/17 94/9 94/22 94/23
factor [2] 21/15 21/18
factors [1] 74/11
facts [3] 9/18 9/19 40/2
fades [2] 5/18 25/2
fading [1] 5/18
failed [3] 70/8 84/15 86/20
failure [2] 86/23 87/4
fair [3] 31/23 31/23 50/12
fairly [1] 67/7
falls [1] 4/6
false [2] 41/10 41/21
familiar [5] 8/19 27/20 30/8 30/23 52/25
famous [2] 25/23 25/25
far [9] 11/19 20/8 33/25 34/20 34/21
53/6 71/15 75/24 98/13
fast [2] 37/9 40/8
favor [3] 4/20 49/12 92/24
favors [1] 44/16

## F

feature [4]  7/23 33/25 36/5 66/1
features [6]  9/6 34/3 66/14 66/18 84/10
88/6
featuring [1]  84/12
federal [2]  51/24 71/21
feel [2]  76/10 85/15
feels [1]  57/25
few [4]  3/22 13/9 26/1 44/21
Fiberglass [1]  67/4
fifty [1]  54/23
fight [1]  28/7
figure [1]  59/19
filed [4]  3/15 50/3 50/4 89/9
filled [2]  80/11 81/11
filler [2]  47/21 47/22
final [2]  29/13 29/24
finally [6]  21/14 33/13 39/5 45/20 95/24
96/22
financial [3]  43/15 46/13 87/7
find [5]  10/15 24/6 33/12 59/14 88/23
finding [4]  20/9 40/7 87/3 87/22
findings [2]  15/15 99/25
finds [3]  39/21 39/25 40/2
fine [3]  64/12 74/3 99/20
finished [1]  82/6
firm [3]  33/19 42/10 89/4
first [47]  3/16 5/2 8/16 9/4 14/13 15/6
15/21 16/12 16/25 19/11 25/19 32/21
33/18 37/1 37/6 37/13 37/14 37/23
48/25 49/8 49/24 50/1 51/11 53/12 54/7
54/16 54/17 56/1 56/7 59/8 59/10 65/7
66/23 68/22 69/20 69/24 70/3 70/5
70/12 72/8 76/17 80/10 81/10 81/13
84/22 84/24 88/3
five [6]  20/15 20/18 31/14 48/20 85/17
87/15
five-percent [1]  43/10
flavor [2]  47/12 62/24
flawed [3]  70/10 74/5 84/17
flaws [4]  74/5 82/22 83/9 83/21
fledgling [3]  30/15 54/9 54/22
floral [1]  95/10
flowers [1]  95/9
focus [3]  5/6 54/4 54/5
focused [1]  67/10
focusing [1]  77/9
follow-up [1]  69/11
following [1]  96/9
force [1]  36/6
forced [1]  50/20
foregoing [2]  101/6 101/9
foreground [1]  77/12
form [2]  18/6 55/16
forms [6]  17/21 17/22 18/2 18/3 18/13
18/14
formula [1]  47/14
forth [3]  57/18 59/16 101/8
found [5]  14/5 66/6 66/8 75/23 78/12
foundation [2]  22/21 40/20
four [4]  16/15 16/17 49/8 70/15
Fourth [2]  59/2 59/2
fragrance [2]  8/23 95/6
fragrances [1]  8/20
frankly [2]  10/8 93/14
free [1]  44/8
freely [1]  35/13
Friday [1]  99/19
front [4]  66/9 77/4 88/10 88/25
fruit [2]  75/21 77/13
full [1]  78/22
function [1]  6/12
functional [14]  22/6 22/6 22/12 22/19

24/7 57/5 57/22 58/3 58/4 66/14 96/8
96/16 96/17 98/9
functionality [7]  22/3 57/9 58/5 58/11
58/21 96/4 96/6
functions [2]  6/12 48/2
further [4]  1/10 5/10 99/5 101/8
Furthermore [1]  56/20
fuss [1]  18/16
future [2]  13/23 50/11

## G

game [3]  26/25 79/7 97/25
gamesmanship [2]  37/8 40/10
GARCIA-GREGORY [1]  1/11
gardenia [3]  8/20 95/8 95/9
gave [5]  28/3 50/24 74/15 74/22 78/9
geared [2]  51/13 51/14
general [1]  94/11
generally [1]  9/16 40/5
generic [8]  7/22 60/3 60/7 65/25 67/21
67/4 97/18 97/23
gentlemen [1]  89/22
get [45]  9/24 15/11 15/18 16/18 18/12
20/5 21/16 27/18 30/9 43/10 44/5 44/6
45/16 48/5 49/14 50/16 52/5 55/23 57/3
57/12 57/12 57/12 57/24 61/13 62/7
62/17 64/22 67/7 70/3 71/9 71/13 79/10
79/18 81/17 83/21 86/15 86/25 87/11
89/15 92/14 92/14 94/18 96/2 98/4
98/13
gets [5]  64/12 84/3 90/23 95/21 95/21
getting [1]  44/7
give [3]  15/19 75/6 87/8
goes [4]  6/21 25/18 36/4 64/12
going [34]  4/16 13/1 13/3 21/1 22/15
22/16 24/6 26/18 26/23 27/15 31/6 32/8
32/20 33/12 33/14 35/3 43/5 43/5 45/1
45/10 54/24 54/25 55/2 55/22 56/24
57/13 64/15 67/8 71/23 86/12 89/15
90/18 90/20 91/14
gold [3]  58/20 95/7 95/11
gone [1]  36/1
Gonzalez [1]  49/16
good [11]  3/12 3/13 28/2 32/4 32/7
32/15 43/19 44/8 90/13 90/19 90/21
goods [3]  9/8 35/14 38/10
got [43]  17/19 23/14 26/3 26/5 26/23
30/5 30/11 30/12 31/8 33/6 35/3 36/18
42/2 45/4 45/4 47/18 50/2 50/23 55/17
57/14 59/3 59/4 63/8 64/1 69/1 69/12
70/7 76/4 76/4 76/4 76/4 76/5 76/5
77/24 79/2 80/1 84/7 84/10 85/15 89/22
94/2 96/10 99/10
gotten [1]  57/10
Gradually [1]  77/1
Grande [2]  42/6 89/24
grant [2]  46/23 48/18
granted [3]  78/12 90/7 94/24
granting [2]  4/21 48/16
granular [2]  95/14 95/15
Granutec [6]  39/9 39/10 39/11 39/14
39/15 58/25
Granutec -- [1]  39/10
grape [1]  96/10
grape-flavored [2]  96/12 96/21

great [2]  21/1 87/12
green [3]  51/19 75/16 75/19
GREGG [1]  2/6
grocery [2]  25/11 27/14
ground [1]  33/4
group [4]  55/9 71/24 72/1 82/15
group -- [1]  82/15
growing [1]  44/25
guarantee [2]  4/16 24/4
guess [9]  3/16 31/14 43/13 45/16 56/10
79/9 81/13 83/2 89/5
guessed [1]  82/16
guessing [8]  16/12 79/18 82/20 82/21
82/22 83/6 83/10 87/16
guidance [1]  59/18
guy [2]  80/6 89/24

## H

had [43]  10/23 12/2 19/6 23/17 27/25
28/7 28/15 28/16 36/14 37/14 40/1
40/13 41/9 42/16 44/2 46/24 48/9 50/3
51/19 56/11 56/12 56/12 56/14 56/15
66/8 67/6 68/7 68/8 68/8 70/24 74/3
75/13 75/20 75/21 91/19 93/17 95/3
95/6 95/6 95/8 95/8 97/3 101/7
had -- [1]  68/7
half [3]  3/15 15/7 15/10 16/8 16/17
20/14 47/15 57/11
halfway [1]  24/9
hand [1]  36/24
handle [4]  58/6 58/15 80/2 96/5
handle -- [1]  58/15
handled [1]  33/19
hanging [1]  33/6
happen [1]  65/19 67/9 81/25
happened [5]  17/13 18/24 80/5 81/3
82/14
happening [1]  89/6
happens [3]  37/4 51/3 60/15
harder [1]  64/14
hardly [1]  32/6
hardships [3]  4/20 44/15 49/11
harm [11]  4/18 43/2 43/4 43/6 43/18
44/7 44/12 45/3 49/11 49/12 90/5
harms [3]  90/5 92/13 92/24
has [69]  4/7 6/6 7/13 7/13 8/8 10/18
11/11 12/6 14/15 14/21 14/23 16/15
17/7 18/16 19/10 20/12 20/23 21/10
21/12 21/20 22/4 22/5 22/7 22/9 23/19
26/5 28/5 31/1 31/4 36/25 37/16 39/8
39/11 40/7 41/21 44/18 44/20 44/21
44/24 45/12 47/20 48/14 49/3 49/7 49/7
50/1 50/9 51/21 52/8 58/2 58/21 61/13
61/14 64/16 64/25 65/6 68/6 68/7 83/25
84/15 87/6 87/17 91/11 91/12 91/22
91/23 96/19 99/14 101/9
has -- [1]  45/12
hasn't [4]  26/25 52/14 92/1 92/2
have [180]
haven't [7]  19/19 24/2 49/22 57/10
68/14 90/3 94/20
having [5]  7/4 9/2 32/23 43/24 44/9
he [43]  4/13 4/14 12/15 15/17 15/21
15/25 16/7 16/11 16/13 22/22 25/14
28/1 30/18 30/22 31/4 31/4 32/11 32/11
32/14 46/7 62/16 62/17 63/1 63/6 73/10
77/22 79/1 79/1 79/13 79/24 80/10
80/15 80/25 81/2 81/4 81/7 81/8 81/14
82/7 82/11 83/3 83/7 95/19
he'll [1]  38/6
He's [1]  81/3
head [1]  20/16
headline [3]  25/17 88/15 88/18
heads [1]  90/24

# H

**hear [4]** 32/20 33/14 61/2 81/19
**heard [5]** 24/19 31/13 32/6 63/2 69/3
**hearing [3]** 1/10 3/1 85/1
**hearsay [1]** 80/8
**heaviest [1]** 68/21
**heavily [1]** 87/21
**heavy [2]** 4/6 9/5
**held [7]** 10/24 21/10 26/19 38/12 38/20
38/20 64/16
**help [3]** 7/25 46/16 66/4
**helps [1]** 46/11
**her [12]** 28/4 41/11 41/12 42/6 43/19
54/14 54/16 59/23 89/5 89/6 89/7 93/21
**her -- [1]** 41/11
**here [54]** 6/6 9/19 12/4 16/23 17/13
20/12 20/19 23/12 26/6 26/23 30/18
32/8 32/18 33/5 34/20 35/3 35/25 36/13
36/23 37/12 39/6 39/21 44/4 45/23
49/15 50/5 51/20 52/15 54/23 55/23
56/6 56/11 57/24 59/10 60/17 65/8
66/19 68/25 69/23 72/6 79/16 81/3
81/16 82/14 83/24 85/24 87/21 91/17
91/23 93/5 93/5 94/4 95/13 98/23
**here -- [2]** 32/8 91/23
**here's [5]** 6/24 11/14 31/10 70/15 93/25
**hereby [1]** 101/5
**hereinbefore [1]** 101/8
**HERIBERTO [1]** 2/6
**herring [1]** 94/17
**Hey [3]** 53/5 58/8 89/7
**hid [1]** 40/18
**high [4]** 19/12 19/13 19/19 19/21
**higher [1]** 64/12
**highly [4]** 4/24 92/8
**him [1]** 67/7
**his [16]** 4/12 21/8 38/5 40/16 73/8 74/3
74/4 74/5 82/9 82/12 82/15 82/22 83/10
83/12 83/18 92/8
**history [1]** 97/8
**hodgepodge [1]** 75/18
**holding [2]** 39/1 39/2
**holding -- [1]** 39/1
**Hollywood [1]** 50/18
**home [3]** 24/9 42/2 90/23
**honest [1]** 41/23 42/12
**honesty [1]** 42/11
**Honor [59]** 3/4 3/5 3/13 3/23 4/3 4/6
4/23 6/5 7/10 8/15 8/19 9/19 10/25
11/14 12/14 12/17 13/13 13/19 14/15
14/19 17/17 18/17 20/7 20/25 22/11 23/5
23/23 28/4 29/22 30/14 33/12 33/19-
36/13 37/3 39/9 40/6 40/13 41/10 42/12
44/4 44/18 45/9 46/22 48/4 48/18 49/5
59/8 59/13 61/2 83/18 85/22 93/7 93/9
93/12 93/15 95/20 98/10 99/13 100/2
**Honor -- [1]** 20/25
**HONORABLE [1]** 1/11
**hope [2]** 3/21 3/23
**host [1]** 9/7
**hot [1]** 77/3
**hour [2]** 3/6 48/20
**house [1]** 67/5
**how [19]** 3/3 13/3 17/24 18/25 27/17
28/4 30/17 43/6 43/13 48/2 63/17 69/11
69/12 73/20 80/2 84/7 94/7 94/7 98/23
**however [2]** 4/16 55/22
**human [1]** 25/18
**hundred [6]** 10/9 17/19 17/20 44/23
77/23 87/14
**hundreds [1]** 20/1

# I

**I'll [8]** 15/11 22/3 40/16 41/18 71/4 71/6
77/22 79/19
**I'm [7]** 14/2 21/1 43/24 80/6 89/11 89/24
96/12
**I've [1]** 98/12
**i.e [3]** 58/15 58/15 86/4
**iced [6]** 7/16 7/24 64/3 65/20 66/2 76/5
**idea [2]** 58/5 62/22
**ideal [1]** 76/21
**identical [1]** 39/20
**identification [1]** 6/13
**identified [4]** 6/2 29/7 71/7 77/18
**identifies [2]** 10/19 35/14
**identify [9]** 6/10 14/10 36/12 50/2 51/11
52/25 53/14 53/15 71/14
**identify -- [1]** 53/14
**identifying [2]** 8/3 18/18
**If -- [1]** 55/21
**ignored [3]** 18/6 18/10 18/11
**image [2]** 47/13 88/23
**images [3]** 7/23 66/2 75/7
**imagine [2]** 27/14 90/9
**imitate [1]** 26/17
**imitating [1]** 46/12
**immediately [1]** 6/16
**impacted [1]** 51/6
**impeach [1]** 41/11
**impeached [1]** 41/13
**impeaching [1]** 60/23
**implicit [1]** 83/8
**importance [1]** 55/24
**important [11]** 5/15 11/14 14/8 14/14
44/4 45/24 46/8 79/10 95/25 96/13
98/16
**imposed [1]** 37/16
**impossible [1]** 21/5
**Imprecision [1]** 50/18
**impression [23]** 53/23 53/24 54/3 54/5
56/25 62/5 62/13 62/15 71/18 72/13
74/19 75/6 76/2 76/8 76/23 77/11 77/18
78/2 78/6 85/11 86/4 86/8 87/17
**impressive [1]** 20/8
**improper [1]** 75/12
**in -- [1]** 67/3
**in-house [1]** 70/7 70/11
**inability [1]** 46/17
**inadequacy [1]** 74/13
**inadequate [1]** 84/19
**inappropriate [3]** 74/10 74/21 75/23
**INC [1]** 1/4
**incentive [1]** 28/7
**incident [3]** 41/25 42/13 42/14
**incidentally [1]** 12/23
**include [3]** 30/5 67/24 86/6
**included [1]** 64/14
**including [3]** 10/22 51/12 97/6
**inconsistent [2]** 38/1 40/12
**incorporated [1]** 11/22
**increasing [1]** 27/23
**indeed [4]** 33/8 40/13 98/17 98/17
**indeterminate [1]** 50/22
**indicate [1]** 80/22
**indicates [4]** 10/20 51/25 58/12 85/4
**indicating [41]** 12/2 14/12 15/8 15/23
16/11 16/19 17/10 23/25 29/20 31/8
33/9 33/22 42/20 53/19 56/16 56/17
56/19 57/14 57/21 62/19 62/21 63/1
63/4 63/13 63/24 65/24 69/17 72/2
72/24 72/25 73/13 74/24 79/2 82/16
84/8 85/8 85/9 85/13 86/14 86/15 92/17
**indication [3]** 6/14 8/11 67/18
**indicative [1]** 89/18

**indicator [3]** 61/8 65/15 68/11
**indigo [1]** 75/22
**individual [6]** 9/17 9/25 70/2 83/23
84/18 90/1
**individually [3]** 66/2 68/2 98/12
**industry [3]** 56/21 65/19 94/16
**inference [3]** 21/3 87/8 94/22
**inferior [1]** 46/16
**influence [1]** 72/4
**information [2]** 18/5 18/10
**informational [1]** 77/14
**infringed [1]** 95/23
**infringement [6]** 5/1 35/17 40/3 50/20
76/16 95/15
**infringes [1]** 11/17
**infringing [2]** 32/23 33/5
**ingredient [1]** 99/1
**inherent [6]** 10/1 65/7 65/15 68/1 68/13
91/25
**inherently [15]** 5/9 6/3 7/9 14/18 14/19
21/21 52/11 65/5 66/6 66/10 66/17
66/25 67/12 67/23 68/17
**initial [2]** 3/17 37/22
**initially [2]** 37/13 37/14
**injunction [16]** 1/10 3/22 43/2 43/17
44/13 44/17 46/23 48/15 48/16 49/10
49/12 50/4 78/12 85/1 86/19 90/7
**injunctive [3]** 4/9 4/22 63/19
**injury [5]** 43/15 45/9 45/13 45/18 92/15
**instance [2]** 53/18 60/4
**instances [1]** 67/11
**instead [4]** 43/21 44/5 65/4 99/15
**instruction [5]** 79/9 82/21 82/25 83/6
83/8
**instructions [1]** 17/24
**insufficient [1]** 78/24
**insulation [1]** 67/9
**integral [2]** 8/10 67/17
**integrity [2]** 90/17 92/19
**intend [2]** 3/8 48/11
**intent [1]** 51/15
**intention [1]** 41/2
**interact [1]** 63/17
**interest [13]** 4/21 45/20 45/21 45/22
46/20 46/24 48/12 48/17 49/13 90/6
91/24 92/13 92/25
**interesting [2]** 10/25 26/21
**interestingly [1]** 59/1
**interpret [1]** 4/17
**interviewers [2]** 17/21 18/10
**interviews [8]** 17/9 17/10 17/11 17/14
17/17 18/23 18/23 89/17
**intimate [1]** 35/12
**into -- [1]** 34/12
**investment [3]** 44/18 44/20 45/18
**irrelevant [1]** 74/11
**irreparable [6]** 4/18 43/2 43/6 44/12
49/11 90/5
**irrevocably [1]** 39/22
**is [479]**
**is -- [1]** 42/9
**isn't [23]** 14/19 18/24 22/18 41/2 43/2
43/17 44/13 56/3 56/4 57/11 57/2 67/8
68/21 71/23 76/15 84/5 84/8 91/9 95/21
90/20 97/7 99/2 99/2
**isn't -- [1]** 68/21
**isolate [1]** 73/25
**isolation [2]** 7/22 66/1
**issue [54]** 5/7 7/11 16/23 20/12 22/2
33/13 33/14 33/18 36/12 37/1 39/21
46/21 50/6 50/25 52/19 55/24 56/18
58/13 59/15 61/16 61/25 64/2 64/23
66/24 67/25 68/21 69/5 69/16 69/18
70/9 70/13 71/1 72/5 72/13 72/20 73/7

## I

**issue... [18]** 73/14 73/17 73/18 76/2 76/7 83/17 85/5 87/25 91/25 92/3 93/19 94/4 94/6 94/18 94/25 95/1 96/4 99/7
**issue -- [1]** 33/18
**issued [3]** 43/3 43/17 44/14
**issues [5]** 39/20 46/20 51/6 64/1 65/18
**it [282]**
**it -- [1]** 73/1
**it's [154]**
**it.' [1]** 89/8
**item [5]** 9/17 22/8 46/5 46/5 46/18
**item -- [1]** 46/5
**items [3]** 46/6 79/5 96/7
**its [35]** 4/7 4/25 9/20 10/20 22/9 27/17 27/17 27/22 27/23 35/10 36/15 36/23 37/19 38/23 40/5 41/6 44/25 49/9 49/12 50/9 63/23 64/16 64/16 67/24 67/25 68/19 71/24 75/14 75/22 84/16 84/17 84/19 87/5 87/20 94/10
**itself [1]** 64/20

## J

**JAG [1]** 1/4
**January [2]** 41/25
**January -- [1]** 41/25
**JAY [1]** 1/11
**Johnson [2]** 89/23 89/23
**Juan [1]** 1/6
**judge [7]** 1/11 21/19 25/21 26/25 32/18 40/17 54/1
**judicial [11]** 36/21 37/2 37/6 37/8 37/15 38/4 39/14 40/9 58/24 59/6 59/14
**Judiciary [1]** 71/21
**jug [3]** 58/6 58/15 96/6
**juice [1]** 96/10
**junior [2]** 35/13 36/11
**juror [2]** 66/20 88/4
**just [45]** 5/16 5/21 7/2 7/3 13/9 15/2 16/12 20/18 20/20 21/2 23/4 27/14 28/8 31/10 34/4 35/11 35/15 38/18 38/23 42/17 43/13 45/7 47/21 47/22 49/19 52/4 53/22 61/10 63/18 65/2 66/9 74/17 76/16 78/11 79/25 82/4 84/11 84/24 87/16 90/10 94/2 94/25 95/21 98/9
**Justice [1]** 91/20

## K

**keep [2]** 11/14 81/8
**keeping [1]** 48/12
**key [1]** 72/3
**killer [1]** 99/22
**kind [6]** 26/19 26/22 43/18 47/16 96/6 96/10
**knew [2]** 55/14 62/13
**know [57]** 3/14 5/8 6/22 6/23 7/1 7/15 8/18 12/25 14/2 14/4 18/16 20/5 21/23 25/21 26/5 26/6 26/8 29/9 29/10 29/11 30/17 31/6 35/16 36/9 36/10 41/17 43/6 43/13 43/15 46/9 48/20 53/5 53/13 54/12 55/6 55/17 55/19 59/25 60/20 61/4 61/20 71/2 71/13 79/20 79/20 81/4 82/1 82/2 82/17 83/4 92/17 94/7 94/7 96/7 98/20 99/8 99/23
**knowing [1]** 87/12
**known [1]** 4/10
**knows [4]** 33/19 42/11 59/8 62/6

## L

**label [7]** 8/24 9/7 27/22 66/13 96/11 97/18 97/20
**labels [10]** 8/18 8/22 9/1 9/2 9/7 58/19

65/12 75/15 95/4 95/10
**lack [2]** 82/21 87/2
**language [1]** 70/14
**Lanham [3]** 39/16 50/10 78/19
**large [1]** 82/9
**largest [2]** 42/10 89/1
**last [4]** 3/5 3/22 61/1 82/10
**lately [1]** 23/23
**later [1]** 14/25
**Latin [1]** 21/8
**launch [2]** 51/19 54/16
**launched [1]** 54/17
**law [37]** 10/16 10/21 11/1 11/8 14/24 25/22 27/12 33/19 35/21 35/23 37/2 38/14 40/3 40/10 42/10 46/1 46/10 46/11 46/14 46/18 47/15 56/3 56/6 58/19 59/9 59/16 59/19 65/8 65/8 65/5 65/10 69/24 89/4 97/5 97/13 97/16 99/13
**law -- [1]** 38/14
**lawyers [1]** 89/17
**leader [5]** 27/19 52/21 54/19 60/6 91/19
**leading [1]** 82/20
**leading-by-a-long-shot [1]** 75/5
**leads [1]** 27/21
**least [5]** 10/14 33/7 33/9 34/1 79/18
**leave [1]** 79/4
**left [2]** 15/9 77/13
**left-hand [1]** 5/25
**legal [2]** 33/12 39/22
**legally [4]** 41/12 72/17 73/25 74/11
**legitimate [1]** 42/21
**less [11]** 3/20 3/20 20/8 36/5 36/6 36/11 47/15 47/18 54/13 66/16 76/23
**let [2]** 42/2 5/6 15/4 15/15 33/16 37/2 48/25 60/16 62/22
**let's [18]** 17/12 19/23 24/16 30/13 32/1 34/10 37/6 52/20 57/12 57/17 57/19 65/7 70/5 71/13 76/3 79/7 79/25 99/18
**lettering [8]** 5/17 17/3 17/4 24/25 76/15 77/2 77/7 95/11
**lettering -- [1]** 17/3
**letters [1]** 13/9
**level [2]** 19/20 90/20
**liar [2]** 42/18 89/6
**lie [1]** 45/21
**light [5]** 5/18 17/4 25/1 75/13 83/20
**light-blue [1]** 97/5
**lighter [1]** 77/1
**like [54]** 5/24 5/25 11/25 12/2 14/10 15/22 16/1 19/17 20/6 25/5 25/6 25/21 25/23 27/18 28/8 31/20 32/25 33/3 35/11 36/14 41/22 42/1 42/20 42/20 43/21 43/22 44/5 44/11 46/10 47/16 48/6 48/10 48/12 52/4 57/25 57/25 57/25 57/25 61/7 72/23 79/14 82/23 85/6 85/20 86/11 89/19 95/2 95/24 96/20 98/2 98/21 99/15 99/21
**like-colored [1]** 97/24
**liked [1]** 46/7
**likelihood [25]** 4/10 21/17 26/14 40/17 49/17 51/4 61/15 64/18 65/5 68/20 69/2 72/10 73/6 84/21 84/23 85/1 86/13 86/20 87/6 88/4 89/16 92/2 92/11 92/23 93/1
**likely [12]** 4/24 4/25 5/5 24/10 24/12 33/14 42/22 43/1 49/9 66/16 85/4 87/1
**likes [3]** 62/25 63/1 94/9
**limit [1]** 9/15
**limits [1]** 51/8
**line [16]** 8/18 9/1 9/2 9/9 9/14 32/18 45/15 45/16 63/15 64/13 69/22 69/23 95/1 95/2 95/3 95/22
**link [1]** 32/12

**list [5]** 26/11 50/24 58/4 72/14 76/22
**litigant [2]** 37/9 37/22
**litigant's [1]** 37/18
**litigation [2]** 38/1 94/19
**little [3]** 3/7 5/6 19/17 30/15 31/5 62/23 79/7 90/25 95/7
**lives [1]** 42/7
**LoCASCIO [13]** 2/6 4/12 10/5 32/20 38/5 40/16 93/17 93/21 94/9 95/17 96/4 96/24 98/6
**location [1]** 5/23
**logo [2]** 5/25 67/14 67/24
**logos [1]** 94/14
**lollipop [1]** 96/13
**long [5]** 14/24 35/13 58/4 91/20 99/21
**long-standing [1]** 27/17
**longer [4]** 45/1 48/21 90/11 90/14
**look [39]** 5/13 21/9 22/17 24/5 24/21 24/25 25/3 25/10 25/20 26/5 29/6 29/24 30/5 32/1 33/8 36/8 51/13 52/20 53/23 56/25 58/24 61/1 63/18 64/9 65/7 66/9 66/18 70/5 71/12 76/3 76/10 78/16 78/17 81/9 85/15 87/18 88/7 88/10 88/19
**looked [9]** 11/25 42/3 44/1 55/14 67/20 70/22 75/2 89/19 95/4
**looking [5]** 21/2 21/6 26/13 50/17 92/16
**looks [16]** 14/10 15/22 16/1 20/6 25/5 25/6 31/20 32/24 33/3 42/20 44/11 58/18 71/18 79/14 88/17 95/14
**loose [2]** 37/9 40/8
**lose [2]** 14/20 43/5
**loses [1]** 43/19
**loss [2]** 90/11 90/13
**lost [4]** 78/13 90/19 90/21 97/16
**lot [18]** 24/19 29/10 33/14 40/13 42/19 54/9 55/22 57/23 65/17 68/6 68/21 69/3 73/19 77/9 84/2 87/7 88/12 93/13
**lots [2]** 97/18 97/20
**low [14]** 7/21 8/19 11/7 23/20 52/21 52/24 53/18 56/13 56/14 56/17 65/25 67/16 71/4 78/25
**lower [4]** 91/13 91/14 91/15 92/17
**lower-priced [2]** 60/14 91/8
**lucky [1]** 54/10
**lunch [1]** 81/7
**lying [1]** 42/4

## M

**machine [1]** 63/3
**made [30]** 4/12 5/23 5/24 18/16 37/22 38/25 41/23 42/12 44/2 44/18 44/21 46/6 47/6 47/8 47/8 47/11 47/17 48/6 48/7 53/20 56/17 57/25 63/3 74/23 74/23 77/14 77/14 78/10 91/20 98/16
**Maine [1]** 37/5
**major [1]** 34/3
**make [15]** 3/9 13/10 16/11 34/23 47/22 53/18 53/19 53/20 56/11 56/14 60/4 77/10 84/10 94/17 99/18
**makes [8]** 8/13 28/18 28/22 29/15 60/11 63/14 78/8 81/9 91/4
**making [5]** 27/25 37/23 39/5 46/3 49/3
**man [1]** 96/5
**managed [1]** 96/19
**mandarin [2]** 8/21 95/6
**Manual [2]** 52/7 71/21
**manufactured [1]** 60/7
**manufacturer [5]** 11/4 11/7 28/24 29/18 29/19
**manufacturers [1]** 60/4
**many [13]** 10/21 11/21 19/18 19/19 31/17 35/18 37/16 55/22 62/1 69/12 72/2 72/11 76/1

**M**

**March [5]** 1/6 99/11 99/16 99/18 99/24
**March 17th [1]** 99/11
**March 24th [1]** 99/16
**March 26th [1]** 99/18
**mark [5]** 16/20 43/20 46/2 46/5 52/8
**mark -- [1]** 46/5
**marked [3]** 46/6 83/15 88/5
**market [31]** 7/6 10/7 10/12 19/20 20/12 20/14 20/24 26/16 27/19 28/5 31/1 32/24 33/2 33/7 41/3 43/10 48/11 48/13 52/21 52/22 54/19 55/9 60/5 65/13 79/17 90/22 91/12 91/19 96/18 97/2 97/22
**market -- [1]** 91/12
**marketing [5]** 20/23 44/21 47/4 60/3 61/18
**marketplace [6]** 14/22 24/15 52/20 54/7 67/22 88/21
**marketplace -- [1]** 88/21
**markets [1]** 21/8
**marks [3]** 13/8 14/24 15/1
**matter [10]** 19/14 37/22 49/5 59/5 59/11 59/12 69/20 91/6 94/11 94/24
**matter -- [1]** 91/6
**matters [3]** 19/14 39/25 70/19
**may [17]** 8/4 19/17 25/9 25/22 35/13 35/19 36/5 36/11 37/17 39/9 44/4 58/11 66/15 66/18 87/8 91/14 91/15
**maybe [6]** 12/7 33/10 77/25 80/25 89/14 90/14
**Mazis [13]** 15/7 28/14 31/19 40/19 62/16 73/8 75/4 76/25 80/4 82/1 82/3 83/8 84/17
**Mazis' [11]** 70/8 71/17 74/2 77/17 78/17 78/22 79/11 80/8 83/12 83/16 92/8
**McNeil [74]** 4/7 4/24 9/21 11/17 19/3 20/12 20/23 21/19 23/1 31/18 31/23 32/3 32/23 33/15 33/20 34/21 36/21 38/8 38/14 38/15 38/25 39/7 39/15 39/18 39/21 40/2 40/4 40/8 40/17 40/22 41/5 41/14 41/21 44/16 44/18 44/24 47/9 48/14 49/7 49/7 49/11 50/1 50/8 51/7 51/8 51/21 52/14 57/14 57/15 57/17 59/13 59/14 59/17 60/19 61/4 61/22 62/6 64/16 64/20 67/12 67/24 68/9 75/25 76/12 76/24 83/21 83/25 84/15 85/5 91/4 91/18 91/23 94/9 94/12
**McNeil -- [4]** 11/17 33/20 61/4 94/12
**McNeil's [21]** 10/5 12/18 28/5 38/7 38/9 40/11 41/9 42/23 48/18 52/22 53/4 53/12 54/8 57/22 60/23 68/23 79/3 86/13 88/8 91/17 93/18
**MCNEIL-PPC [1]** 1/4
**me [22]** 4/22 5/6 5/25 11/18 15/4 15/15 17/4 17/9 28/17 30/18 30/22 33/13 33/16 37/2 37/14 48/25 53/15 60/16 62/22 70/14 70/16 82/8
**me -- [2]** 5/25 37/14
**me.' [1]** 83/1
**mean [9]** 5/11 5/12 19/21 22/6 24/18 32/11 35/11 59/24 90/17
**meaning [50]** 5/11 10/18 14/21 14/23 19/3 19/16 20/9 21/11 21/19 22/1 51/2 51/4 52/12 52/18 53/1 53/6 55/10 58/3 61/13 64/18 64/25 65/6 66/16 66/23 67/1 67/11 68/5 68/18 68/20 68/25 69/4 69/8 69/9 69/13 69/19 70/1 70/9 70/17 70/21 71/16 72/6 72/10 73/6 83/23 84/1 84/13 84/16 92/4 92/6 92/10
**meaningful [2]** 72/17 73/25
**means [5]** 4/13 15/1 22/6 87/7 98/9
**measure [1]** 92/6

**measured [7]** 62/3 62/3 62/4 63/11 63/12 73/16 76/8
**measurement [1]** 61/23
**measurements [1]** 63/12
**measures [1]** 57/25
**measuring [2]** 78/2 78/6
**meet [13]** 22/10 64/15 64/24 68/1 68/13 68/19 82/12 84/15 84/21 92/10 92/12 92/20 92/21
**meeting [2]** 69/2 71/15
**mentions [1]** 30/24
**mere [1]** 21/6
**merely [2]** 40/4 84/12
**MERISANT [35]** 1/7 4/5 7/13 8/15 17/8 17/9 21/3 22/4 28/6 30/20 32/14 34/22 36/8 36/25 39/5 40/7 40/18 42/15 43/8 44/7 44/16 44/20 45/3 45/10 49/1 50/5 50/13 63/20 90/5 90/7 90/11 91/3 91/22 92/14
**Merisant -- [1]** 17/9
**Merisant's [11]** 12/15 18/22 28/13 29/4 31/3 33/11 47/1 47/20 73/10 85/5 87/14
**merit [1]** 9/11
**merits [15]** 3/20 4/1 4/11 4/25 37/19 43/2 49/9 49/18 49/19 49/20 49/21 65/5 84/23 89/16 93/2
**Merriam-Webster [1]** 87/2
**message [3]** 57/24 58/22 99/10
**met [5]** 48/16 49/22 68/14 90/3 92/25
**method [1]** 74/6
**middle [2]** 81/18 88/20
**might [3]** 44/3 60/13 73/7
**million [7]** 10/9 10/10 20/13 20/15 20/18 20/18 44/24
**million-dollar [2]** 44/24 45/1
**millions [1]** 19/25 20/1
**mind [6]** 11/15 16/13 19/11 36/14 46/25 48/9
**mind -- [1]** 11/15
**minds [1]** 91/7
**minimal [1]** 30/15
**minute [1]** 82/10
**minutes [4]** 3/9 48/20 93/9 93/11
**miscoded [4]** 78/23 81/11 81/22 82/10
**miscounted [1]** 78/23
**misled [1]** 85/25
**Miss [30]** 10/6 12/18 19/5 28/3 32/5 41/9 41/23 41/23 42/9 42/18 43/4 43/18 43/21 44/1 51/17 54/14 55/12 57/16 59/22 61/5 61/9 63/11 64/7 70/22 71/12 76/9 76/18 84/4 93/18 94/11
**Miss Sandler [3]** 19/5 57/16 93/18
**Miss Sandler's [1]** 61/19
**Miss Sifontes [1]** 42/18
**mistake [5]** 18/7 41/24 42/12 44/3 98/16
**mistakenly [1]** 94/8
**mix [3]** 24/14 26/18 27/13
**mixed [1]** 27/13
**mixing [1]** 28/11
**moment [5]** 9/24 15/12 16/24 21/16 81/5
**moment -- [1]** 15/12
**Monday [3]** 49/5 99/21 99/22
**money [5]** 19/18 54/25 58/15 67/7 84/7
**monopolized [1]** 97/10
**monopoly [1]** 97/11
**Monsanto [3]** 11/4 56/8 73/19
**month [1]** 19/7
**months [2]** 44/21 90/22
**more [29]** 3/7 10/10 12/21 16/1 19/9 22/15 27/13 29/11 33/10 37/2 45/23 44/7 47/13 47/16 47/22 48/3 48/6 48/6 60/25 61/6 62/24 64/8 73/2 75/20 79/7 80/16 84/13 91/15 94/5
**moreover [3]** 54/14 84/9 88/7

**morning [2]** 3/13 3/14
**most [13]** 6/10 7/13 16/24 17/5 19/8 19/23 31/2 33/25 35/5 74/22 75/14 78/9 97/5
**mother [1]** 42/6
**motion [6]** 3/23 11/16 11/19 13/22 48/18 50/4
**move [3]** 65/1 65/3 66/18
**Mr. [43]** 4/12 10/5 21/7 22/20 25/4 25/14 25/19 30/17 30/18 32/8 32/8 38/5 40/16 42/16 43/12 47/1 49/6 50/15 51/25 55/7 55/25 58/6 62/25 63/2 65/1 66/5 67/15 76/12 77/16 79/25 82/24 86/11 87/24 88/15 88/16 93/2 93/17 93/21 94/9 95/17 96/4 96/24 98/6
**Mr. Cuervo [11]** 21/7 22/20 25/4 25/14 25/19 30/18 32/8 42/16 43/12 47/1 63/2
**Mr. Cuervo's [1]** 88/16
**Mr. Escalona -- [1]** 30/17
**Mr. LoCascio [12]** 4/12 10/5 32/20 38/5 40/16 93/17 93/21 94/9 95/17 96/4 96/24 98/6
**Mr. Zalesin [16]** 49/6 50/15 51/25 55/7 55/25 58/6 62/25 65/1 66/5 76/12 79/25 82/24 86/11 87/24 88/15 93/2
**Mr. Zalesin's [2]** 67/15 77/16
**Mrs. [1]** 6/21
**Mrs. Sifontes [1]** 6/21
**much [22]** 3/3 4/3 4/12 12/3 20/5 26/25 31/20 33/8 33/9 43/6 43/13 44/11 48/10 49/6 51/12 60/13 64/4 64/14 76/23 84/7 91/2 100/3
**multiple [1]** 70/11
**must [11]** 9/10 27/7 37/21 37/22 38/1 65/4 68/19 69/15 84/9 86/5 91/18
**must -- [1]** 86/5
**my [15]** 4/4 20/16 24/3 33/19 36/18 46/25 49/1 49/1 59/23 80/22 81/9 91/10 96/11 99/10 101/9

**N**

**name [36]** 5/20 8/8 14/12 15/9 16/7 16/19 24/21 30/1 30/2 33/22 34/1 34/2 34/5 34/25 35/4 35/16 36/3 36/5 36/11 36/12 36/16 36/17 36/18 52/23 53/13 54/12 66/8 66/11 67/14 67/22 67/24 71/7 77/3 87/21 88/19 89/1
**namely [1]** 74/11
**names [8]** 24/23 34/3 35/5 38/19 74/13 78/15 88/5 88/25
**national [1]** 20/10
**nationally [2]** 20/18 44/19
**NatraTaste [15]** 6/24 7/21 8/9 53/19 56/15 65/24 65/24 66/9 66/12 67/16 74/23 78/10 86/1 88/22 98/21
**natural [8]** 32/13 47/13 47/16 47/23 48/3 48/6 81/25 91/12
**nature [1]** 58/15
**near [2]** 42/6 83/21
**nearly [1]** 92/7
**necessarily [2]** 19/21 58/14
**necessary [2]** 5/2 68/24
**need [11]** 3/3 3/24 49/3 59/10 61/25 92/21 92/22 92/22 92/23 95/16 98/13
**needs [5]** 13/13 50/7 59/11 61/24 86/17
**negative [1]** 94/22
**Neither [1]** 78/18
**neon [3]** 12/19 72/25 73/11
**neon-yellow [1]** 76/14
**net [4]** 74/6 74/10 78/20 86/9
**netted [1]** 75/9
**netting [1]** 85/17
**neutral [2]** 90/3 92/12
**never [23]** 10/24 19/23 25/9 32/22 32/23

**N**

never... **[18]** 35/22 36/17 41/2 43/15 44/5 44/6 51/24 52/3 52/3 52/11 63/12 66/25 79/9 81/19 81/23 82/1 93/19 93/19

nevertheless **[2]** 25/10 58/16

new **[10]** 21/9 22/23 24/11 27/10 33/2 43/9 47/2 48/5 48/8 56/9

newspaper **[2]** 25/16 88/18

next **[3]** 9/4 55/22 71/9

night **[2]** 20/17 34/17

nighttime **[5]** 34/13 34/14 34/16 34/18 35/24

no **[67]** 11/9 14/20 15/19 16/14 18/9 18/13 18/21 19/10 20/11 22/18 23/19 23/20 31/5 32/6 35/17 40/6 42/21 45/1 47/21 48/12 51/21 51/23 57/10 58/2 61/3 64/3 64/3 68/7 68/9 70/13 75/4 76/8 76/20 77/1 77/2 77/3 77/5 77/13 77/15 78/12 80/7 81/14 81/19 81/20 81/23 82/2 83/24 84/13 84/18 88/3 90/2 90/3 90/11 90/14 91/4 91/23 92/10 92/11 92/12 93/24 94/22 94/23 95/15 97/4 99/11 99/23 99/23

no-calorie **[21]** 7/3 9/21 10/7 10/12 11/16 13/21 15/13 15/22 16/6 16/8 21/25 22/8 22/12 22/14 22/17 30/20 30/22 31/13 32/24 63/21 96/18

nobody **[6]** 62/10 63/9 80/5 80/5 83/13 91/11

noise **[10]** 15/11 16/16 23/18 72/17 72/21 73/23 73/24 74/14 74/20 86/2

noise -- **[1]** 23/18

non-infringing **[2]** 32/19 32/21

none **[4]** 21/7 81/3 94/23 94/24

North **[1]** 59/7

not **[187]**

nothing **[4]** 7/17 10/13 96/17 99/5

notice **[1]** 4/4

noticed **[1]** 24/2

now **[37]** 4/6 10/3 11/11 17/7 19/14 21/1 24/18 29/19 30/4 31/23 34/10 37/11 38/5 40/11 43/16 44/1 45/17 51/25 54/4 54/25 56/4 59/17 60/2 64/4 67/3 68/8 77/10 78/24 81/22 88/1 88/2 91/2 91/18 96/22 97/18 99/7 99/10

number **[7]** 16/9 18/20 18/20 30/9 37/5 37/12 85/7

numbered **[1]** 101/7

numbers **[15]** 19/13 20/8 20/10 20/10 23/20 29/2 29/24 55/7 55/13 77/22 77/24 79/17 81/9 82/22 83/14

NutraSweet **[8]** 6/23 53/20 53/25 74/22 78/10 86/1 88/22 98/21

NutraSweet -- **[1]** 88/22

**O**

oath **[1]** 42/11

objection **[1]** 10/17

objectives **[1]** 10/16

obligation **[1]** 86/16

obscure **[1]** 19/17

obtain **[1]** 37/24

obvious **[1]** 10/16

obviously **[4]** 28/7 45/22 71/22 75/12

occur **[1]** 43/5

occurrence **[1]** 82/1

OCR **[1]** 1/23

odds **[1]** 81/23

of -- **[3]** 16/9 26/19 96/15

off **[12]** 14/24 27/19 30/2 37/6 41/18 48/23 48/24 51/8 90/1 90/24 100/5 100/6

off -- **[1]** 30/2

offer **[1]** 3/8

offered **[1]** 46/18

office **[5]** 52/1 58/7 58/7 58/10 64/24

officer **[1]** 61/4

Official **[1]** 101/2

often **[2]** 6/10 41/4

Oh **[3]** 12/25 14/13 41/18

okay **[17]** 3/1 3/11 3/12 6/22 14/16 24/7 26/2 54/10 54/21 62/13 66/9 67/23 77/22 99/7 99/17 99/20 99/25

old **[3]** 27/18 27/19 35/3

once **[1]** 67/22

one **[112]**

One -- **[1]** 75/12

one-year **[1]** 43/11

ones **[3]** 18/9 24/6 82/10

only **[58]** 3/14 4/24 8/12 9/24 13/17 13/21 14/3 14/15 15/14 15/25 16/15 17/1 18/23 19/2 22/24 29/8 31/12 32/9 41/16 47/9 48/4 48/7 50/15 52/11 53/2 53/3 54/4 55/18 58/2 58/5 62/8 62/25 63/6 64/5 64/14 66/11 69/6 69/25 70/18 70/20 71/7 72/15 75/7 75/9 77/8 78/5 79/20 79/22 83/22 89/3 89/18 90/24 91/5 91/7 92/4 96/6 98/4 99/2

only -- **[1]** 79/22

open **[1]** 90/8

opening **[7]** 4/12 38/5 40/16 49/25 65/2 76/12 86/11

opening -- **[1]** 38/5

opinion **[6]** 26/2 36/15 66/7 83/1 83/9 87/25

opinions **[3]** 56/8 83/16 92/8

opposed **[1]** 9/7

opposite **[2]** 39/19 59/18

opulence **[1]** 58/23

oral **[1]** 3/1

orange **[8]** 8/21 8/23 8/24 51/20 96/13 96/13 96/14 96/20

orange-flavored **[1]** 96/21

oranges **[1]** 95/7

order **[7]** 3/6 21/19 22/5 32/16 37/24 50/9 71/2

ordinarily **[1]** 15/1

ordinary **[6]** 27/5 27/13 33/21 33/21 34/4 38/18

ordinary-course-of-business **[1]** 30/19

orientation **[1]** 5/16

origin **[2]** 65/15 68/12

originally **[1]** 72/7

other **[59]** 8/6 11/25 12/3 14/4 14/11 14/25 16/23 17/11 18/12 18/19 19/3 20/17 21/7 21/8 21/24 22/2 26/7 26/9 27/3 28/24 29/17 31/11 34/6 34/8 35/9 36/4 36/6 42/23 44/25 46/6 47/6 47/10 47/17 53/9 53/17 57/6 59/23 59/24 60/1 61/7 69/25 71/7 74/5 75/2 77/24 78/3 79/7 80/4 81/3 83/22 83/24 88/3 89/19 89/22 92/19 95/5 95/23 96/3 97/19

others **[10]** 6/2 7/6 7/15 8/21 38/12 46/1 51/13 68/22 93/25 97/15

otherwise **[5]** 12/1 22/25 34/4 35/23 72/17

ought **[2]** 29/20 36/23

our **[13]** 4/16 4/20 5/7 6/3 16/22 20/7 27/20 30/9 81/12 94/9 94/7 94/8 96/2

our -- **[1]** 96/2

out **[50]** 5/19 14/15 15/11 20/11 25/4 28/18 28/22 29/2 29/9 29/14 29/15 31/11 31/11 35/10 36/24 40/14 40/24 41/8 41/12 41/14 41/16 42/5 42/19 53/12 54/14 55/5 56/17 57/19 59/1

59/14 59/19 62/4 66/11 72/23 74/6 74/10 75/9 78/12 78/20 80/11 80/21 81/11 85/7 85/17 86/9 89/7 90/8 90/23 91/5 96/25

outcome **[1]** 13/24

oval-shaped **[2]** 5/20 24/23

over **[19]** 3/22 15/2 20/13 22/3 23/12 36/1 43/10 43/19 45/16 54/25 55/13 55/22 56/11 57/1 57/13 66/19 66/20 88/15 91/22

over-the-counter **[1]** 39/18

overall **[44]** 5/8 5/11 5/13 8/5 8/13 11/20 51/14 52/19 53/22 53/24 54/3 54/5 56/25 61/23 61/24 62/4 62/13 62/15 66/6 71/18 72/14 72/14 74/17 74/19 74/24 75/4 75/6 76/2 76/7 76/8 76/10 76/23 77/11 77/17 78/2 78/6 78/14 85/11 85/15 86/4 86/6 86/8 87/17 88/23

overly **[1]** 50/10

owe **[1]** 94/1

Owens **[1]** 67/4

own **[24]** 7/18 10/6 11/6 11/9 51/15 51/17 52/22 53/12 54/8 54/11 55/6 55/16 57/22 61/19 69/16 76/9 79/17 82/9 85/14 89/4 89/18 89/21 91/17 97/17

owner **[1]** 87/5

**P**

p.m **[1]** 100/7

pack **[5]** 50/16 50/17 63/2 63/8 63/9

pack -- **[1]** 50/16

package **[69]** 5/2 5/4 5/5 5/9 5/13 5/17 5/23 6/4 8/2 8/14 9/20 9/20 9/22 9/23 9/25 11/22 17/22 17/23 18/3 18/4 19/10 21/10 23/3 23/8 23/11 23/16 24/11 25/1 25/15 26/15 28/14 31/20 51/2 54/18 55/20 56/12 56/12 56/15 58/1 58/1 62/18 62/18 63/25 64/20 67/12 69/7 69/10 70/15 70/16 72/16 72/16 72/19 73/1 74/17 75/6 75/17 76/14 76/16 78/1 79/13 79/14 79/23 80/17 87/18 87/19 88/11 93/20 95/22 95/23

package -- **[1]** 28/14

packages **[10]** 13/14 13/16 21/7 25/20 50/14 53/6 63/16 71/3 71/5 72/19

package -- **[1]** 28/14

packet **[7]** 7/16 64/8 64/9 66/19 66/19 76/5 95/14

packets **[11]** 9/21 11/3 23/23 24/6 53/11 62/20 65/21 66/3 77/5 77/7 77/10

Packing **[3]** 82/20 85/22 87/13

pages **[3]** 57/15 57/19 57/21

pain **[1]** 34/14

panel **[1]** 77/4

Panther **[1]** 67/6

Pantone **[1]** 51/22

paper **[9]** 17/15 17/18 18/19 66/3 80/1 80/12 80/18 80/21 80/21

papers **[6]** 6/3 16/22 20/7 38/7 72/8 89/9

paperwork **[1]** 52/1

part **[15]** 7/13 8/10 8/12 8/13 12/23 26/4 39/2 39/13 40/24 60/3 67/15 67/17 73/13 79/3 96/14

particular **[25]** 5/21 5/22 5/22 6/9 7/2 7/8 7/19 8/3 10/19 11/6 11/10 13/3 15/3 15/3 36/12 37/25 49/2 55/24 62/18 66/17 69/7 69/7 90/21 93/21 98/2

particularly **[6]** 7/17 9/5 9/9 13/24 58/8 82/9

parties **[2]** 27/2 59/5

# P

parts [1] 66/24
party [6] 37/7 37/16 38/2 50/19 59/12 68/24
passed [2] 91/3 99/14
past [2] 19/7 46/7
pastel [15] 5/18 10/4 12/1 12/10 12/16 13/18 13/22 32/10 51/7 51/22 52/5 52/16 62/8 72/22 98/25
pastel-yellow [2] 77/1 98/3
Patent [1] 58/7
patented [1] 47/9
patents [1] 97/3
Patriot [5] 36/25 37/5 37/11 37/15 59/9
pause [1] 34/10
pay [4] 60/13 60/13 67/7 80/16
people [102]
people -- [1] 23/8
per [3] 3/6 3/9 3/10
perceived [2] 65/14 68/11
percent [64] 4/14 15/7 15/10 15/23 16/2 16/3 16/3 16/9 16/10 16/15 16/17 16/18 16/21 19/5 19/6 23/2 23/10 23/16 23/18 28/12 28/13 28/15 28/19 28/25 28/25 29/3 29/8 29/10 29/21 29/22 29/22 29/23 30/2 30/9 30/11 31/1 33/6 43/8 43/11 47/15 52/23 52/24 53/13 53/14 53/15 54/12 54/13 54/22 54/23 54/23 55/5 55/7 55/15 55/18 71/14 81/11 81/17 81/22 82/15 82/17 82/18 85/17 87/15 92/6
percent -- [1] 15/10
percentage [4] 19/22 20/17 23/15 31/25
percentages [4] 15/18 16/4 17/5 85/3
perfunctory [1] 83/4
perhaps [4] 63/13 78/25 83/7 98/18
period [1] 43/11
perjured [1] 41/22
permitted [2] 13/21 97/23
person [5] 30/24 80/16 88/7 88/13 89/23
personnel [3] 27/9 27/12 28/10
pervasiveness [1] 19/16
PEÑAGARICANO [1] 2/4
pharmaceutical [1] 39/18
phenomenal [1] 30/12
philosophy [1] 12/23
photograph [1] 40/23
photographs [3] 20/3 27/1 40/25
PI [1] 87/4
pick [4] 25/16 79/6 79/19 80/20
picture [2] 26/2 75/21
pictures [6] 12/2 17/2 20/3 20/3 95/6 95/9
pieces [1] 7/15
pink [23] 11/8 52/21 52/22 53/1 53/1 53/2 53/10 53/11 56/9 56/9 56/12 56/14 56/22 67/4 67/5 67/6 67/6 67/9 67/10 71/3 71/3 97/20 97/21
place [2] 3/18 42/13
plain [1] 35/3
plaintiff [4] 8/25 9/8 44/13 86/20
plaintiff's [5] 7/25 8/2 66/4 78/18 89/21
plaintifs [4] 1/5 2/2 63/23 83/16
plaintiffs' [5] 12/6 23/4 23/6 89/4 93/25
Planet [1] 50/18
Playboy [1] 86/19
player [1] 54/15
playing [2] 37/9 40/8
pleadings [1] 62/12
please [5] 23/4 23/8 25/22 83/1 83/4
plus [1] 33/22
PM [10] 33/15 33/25 34/2 34/7 36/22 38/7 38/16 38/21 39/3 39/7

point [12] 3/25 14/13 16/24 31/25 42/7 58/24 62/4 64/17 73/22 85/21 90/10 96/3
pointed [4] 14/15 25/4 59/1 96/25
points [4] 51/1 59/15 92/21 92/22
policy [2] 9/13 94/11
poor [1] 41/23
Popsicle [1] 96/13
popular [2] 16/13 26/16
position [12] 25/13 36/21 36/22 37/25 39/7 39/19 39/22 39/23 47/5 47/10 60/19 92/5
positioned [1] 24/22
positioning [1] 47/13
positions [3] 40/11 50/3 50/5
positive [1] 43/23
possibility [2] 49/19 84/25
possible [6] 13/23 62/2 72/3 72/12 76/2 82/4
possibly [1] 22/10
potential [1] 46/4
potentially [1] 18/23
practice [2] 60/4 94/15
pre-1995 [1] 11/12
pre-Qualitex [1] 57/2
pre-Splenda [1] 56/10
preclude [1] 51/16
predates [1] 56/2
predisposed [1] 6/13
predominant [5] 6/12 17/6 61/8 77/20 98/18
predominantly [1] 75/14
preexisting [2] 11/1 34/11
preliminary [10] 1/10 3/22 4/8 4/19 4/21 44/17 48/15 50/4 84/25 86/19
premise [3] 47/2 96/23 96/25
preparation [1] 18/7
prepared [2] 62/12 101/9
prepay [1] 90/22
preprinted [1] 18/6
presence [3] 8/9 34/7 67/16
present [2] 44/14 50/11
presentation [2] 3/3 57/15
presents [1] 9/14
presumably [1] 20/4
presumed [1] 27/12
presumption [2] 64/22 86/21
pretty [3] 64/3 86/15 96/13
prevail [1] 38/15
prevailed [1] 38/16
prevent [2] 37/7 53/21
preventing [2] 45/22 46/1
previously [2] 10/23 91/19
price [2] 91/13 91/14 91/15 92/17
primary [1] 88/14
prime [1] 58/20
principles [1] 45/24
printed [3] 17/15 17/18 18/9
prior [5] 27/24 38/3 39/19 39/23 41/10
private [2] 97/18 97/20
privilege [1] 4/2
probability [3] 49/18 49/20 49/21
probably [12] 3/7 3/19 35/6 42/6 60/8 60/8 60/9 60/10 61/20 75/8 79/18 87/11
probative [2] 69/25 84/13
problem [4] 82/7 91/2 91/3 99/4
problems [1] 84/3
procedural [2] 94/18 94/25
proceed [1] 15/18
proceeding [4] 13/23 37/23 38/3 40/22
proceedings [2] 13/2 101/7
process [4] 37/8 40/9 77/8 80/23
producer [2] 6/14 46/6 46/11
product [59] 6/7 6/9 6/11 6/17 7/8 8/3 8/6 12/6 13/24 20/6 22/24 34/13 36/9 36/17 39/18 42/20 45/5 45/17 46/14 47/2 47/7 47/22 48/2 48/8 48/12 54/7 60/7 63/7 63/23 63/25 65/9 66/11 69/7 71/2 71/7 75/20 79/12 79/14 80/17 84/12 88/25 90/8 90/10 90/11 91/4 91/5 91/7 91/10 91/11 91/20 92/16 94/8 95/15 96/12 96/18 96/19 97/10 97/17 99/3
product -- [2] 34/13 91/5
production [1] 46/15
products [46] 8/1 9/2 9/9 9/11 9/14 13/10 23/10 24/14 24/17 24/20 31/11 32/12 34/6 34/9 34/16 35/6 35/9 35/24 38/17 46/15 46/16 47/6 47/10 47/16 47/17 57/7 60/5 63/15 64/13 66/4 69/9 75/2 79/12 79/23 88/6 88/14 92/19 94/13 95/1 95/2 95/3 95/22 97/2 97/4 97/16 97/22
products -- [2] 23/10 79/12
products' [1] 74/12
Professor [3] 15/7 31/19 40/19
proffer [1] 86/23
progress [1] 15/20
prohibited [1] 39/15
prohibits [1] 40/3
prominent [6] 26/4 27/25 33/25 34/2 75/14 87/19
prominently [3] 8/10 67/17 88/25
prone [1] 91/2
pronounce [1] 47/25
proof [2] 3/24 93/11
proper [16] 51/3 51/4 51/5 55/9 55/9 64/1 71/11 71/18 73/2 73/5 73/22 75/10 77/25 78/4 86/2 87/12
properly [2] 73/21 81/11
proposed [1] 99/25
proposition [2] 85/23 85/24
propositions [1] 33/16
protect [17] 9/1 9/6 9/8 11/5 11/8 22/11 31/18 31/24 35/22 38/22 46/10 63/7 63/15 93/20 97/5 97/22 98/23
protectability [7] 5/7 21/21 22/2 39/4 64/23 94/20 94/21
protectable [27] 10/1 10/15 10/24 11/21 12/7 12/8 12/25 14/17 14/21 21/20 24/8 24/9 38/13 38/22 39/1 54/6 65/2 67/3 73/24 91/24 92/22 97/1 97/7 98/9 98/11 98/14 98/17
protectable -- [1] 38/13
protected [3] 22/5 54/2 98/1
protection [15] 5/3 5/10 8/17 9/12 9/22 10/5 13/1 35/19 39/6 39/17 51/24 52/2 64/21 66/15 98/4
prove [9] 4/18 24/10 31/22 42/17 49/8 58/5 68/20 68/24 94/19
proven [1] 94/21
provide [1] 86/20
provides [1] 58/13
proving [2] 5/1 52/8
provisions [1] 101/4
prtc.net [1] 1/24
prudent [2] 88/8 88/12 88/23
PTO [1] 52/7
public [15] 4/21 45/20 45/21 45/22 46/20 46/24 48/12 48/17 49/13 58/16 86/25 90/6 92/13 92/15 92/25
Pueblo [4] 41/25 42/1 42/8 42/17
Pueblo -- [1] 41/25
PUERTO [30] 1/1 1/6 15/13 16/6 16/15 20/11 20/19 20/21 25/6 25/9 25/23 25/24 26/20 28/5 28/9 30/8 30/16 30/23 31/5 31/6 42/10 44/19 44/22 49/15 54/23 59/7 79/16 87/21 94/3 101/3

**P**

pull [1] 45/17
purchase [1] 43/25
purchased [8] 15/22 15/25 79/14 81/12
81/15 81/23 82/16 82/19
purchaser [1] 88/23
purchasers [2] 15/12 16/6
purchasing [1] 46/3
purely [1] 58/14
purple [2] 96/10 96/21
purpose [11] 6/8 7/4 22/8 27/23 27/25
32/9 48/4 48/8 48/9 57/6 72/18
pursuant [1] 101/4
pushed [1] 62/6
put [20] 20/23 26/14 31/3 34/24 36/16
42/19 45/6 51/13 57/17 57/17 57/19
66/19 66/19 67/5 67/22 71/22 81/8 92/1
93/17 96/5
puts [9] 28/18 28/22 29/1 29/9 29/14
29/15 31/11 31/11 82/4
putting [7] 26/2 27/9 48/8 66/11 68/14
74/5 79/7

**Q**

Q-Tip [1] 60/7
Q-Tips [2] 59/23 60/11
qualify [1] 66/16
Qualitex [8] 11/2 13/6 38/14 45/25 52/10
58/18 67/2 98/1
quality [5] 22/9 22/16 46/15 46/18 47/12
quantified [1] 49/17
quarter [1] 29/25
question [25] 17/7 18/13 18/21 28/16
28/19 28/21 29/15 32/2 42/21 53/6
65/12 69/11 70/14 70/15 70/19 71/9
71/10 73/9 76/18 79/11 79/22 79/24
83/3 84/17 93/23
questionable [2] 83/12 92/9
questioner [1] 80/22
questionnaire [1] 41/17
questionnaires [3] 18/8 18/19 41/6
questions [8] 15/17 15/18 28/16 81/21
82/14 82/21 90/17 92/18
quick [1] 43/12
quickly [5] 15/5 42/24 46/4 46/17 93/14
quite [4] 10/8 93/16 95/4 95/14
quotations [1] 38/6
quote [6] 6/5 67/16 70/7 74/8 93/17
93/18
quote -- [1] 67/16
quotes [1] 31/4

**R**

raise [1] 96/3
raised [2] 17/7 22/4
randomly [1] 81/25
rate [1] 30/12
rather [3] 40/4 68/15 83/4
read [3] 55/23 66/7 93/14
readily [1] 92/16
real [4] 18/25 82/7 82/13 91/17
reality [1] 26/12
realize [2] 27/4 27/11
realized [2] 42/3 44/2
really [12] 11/12 24/2 32/11 43/13 54/15
55/23 61/16 63/12 83/13 89/11 91/6
95/16
realm [1] 98/12
reap [1] 46/12
reason [12] 16/23 16/25 17/1 38/15 50/7
52/3 59/25 66/7 73/2 74/16 75/5 78/16
reason -- [2] 59/25 78/16
reasonable [3] 66/20 80/14 88/4

reasonably [3] 88/8 88/12 88/22
reasons [8] 24/7 48/17 74/15 74/22 78/9
78/15 78/18 86/3
recall [6] 17/1 18/7 23/1 39/9 89/6 93/21
recalling [1] 41/25
recent [3] 6/7 6/7 37/2
recent -- [1] 6/7
recognition [5] 21/12 30/15 31/5 53/4
69/8
recognize [8] 14/14 16/18 16/25 17/2
19/22 52/23 69/6 78/7
recognized [3] 15/13 54/11 70/18
recognizes [2] 55/9 62/17
record [14] 3/21 4/23 19/4 19/12 20/25
27/1 48/23 48/24 61/12 61/12 64/9
85/20 100/5 100/6
rectangular [1] 36/3
red [6] 26/3 34/12 56/22 75/16 75/18
94/17
redirect [1] 82/24
reduce [1] 22/16
reduces [1] 46/2
refer [2] 6/16 12/19
reference [2] 59/1 71/21
references [1] 89/5
reflects [2] 18/17 47/13
regard [3] 6/14 65/23 90/12
register [3] 94/13 94/14 94/14
registered [1] 79/3
registration [3] 94/10 94/18 94/23
regular [1] 90/15
reject [1] 89/21
rejected [2] 36/24 39/8
rejecting [2] 35/8 37/18
related [3] 28/23 29/16 95/5
relating [2] 9/16 56/9
relevant [3] 20/6 31/15 78/18
reliability [1] 71/24
reliable [1] 82/12
relied [1] 93/6
relief [5] 4/9 4/19 4/22 63/19 64/10
relies [2] 8/15 19/3
relievers [1] 34/15
relying [1] 80/23
remain [3] 58/16 91/5 91/6
remains [1] 6/12
remarkable [2] 20/17 30/3
remarkably [3] 24/18 25/20 33/3
remember [16] 15/17 23/8 23/13 25/14
27/8 28/3 28/15 40/23 41/11 49/24
49/25 57/18 76/25 81/2 81/8 82/3
removed [1] 15/9
removed -- [1] 15/9
repackage [1] 45/6
repeatedly [1] 5/12
repetition [1] 29/3
reporter [2] 41/12 101/2
REPORTER'S [1] 101/1
representation [1] 59/11
representations [1] 37/24
representative [1] 16/5
reputation-related [1] 46/13
requested [2] 63/19 64/10
requests [1] 57/11
required [2] 51/10 72/7
requirements [6] 37/15 37/20 38/4 68/23
69/1 70/6
requires [1] 68/4
requiring [1] 49/17
resemblance [1] 12/3
respect [4] 5/7 13/11 37/11 87/1
respective [2] 8/10 67/18
respondent [2] 18/2 18/4
respondents [1] 75/3

response [1] 17/6
responses [3] 15/19 29/13 78/23
restaurant [2] 20/20 23/23
resting [2] 7/16 77/5
result [1] 76/21
results [5] 18/11 19/1 23/6 40/18 86/21
review [5] 15/4 15/15 17/13 24/16 39/25
rewards [1] 46/13
Rican [2] 25/6 25/9
RICO [28] 1/1 1/6 15/13 16/6 16/15
20/11 20/19 20/21 25/24 25/24 26/3
26/21 28/5 28/9 30/8 30/16 30/23 31/5
31/6 42/10 44/19 44/22 49/16 54/23
59/7 79/16 87/21 101/4
Rico' [1] 26/9
Rico-only [1] 94/3
riddled [1] 83/13
ride [1] 44/8
ridiculous [1] 22/17
rigged [1] 87/10
right [28] 7/18 13/19 14/6 18/21 18/22
21/1 23/11 23/12 25/15 25/18 26/2
43/16 47/25 53/21 55/13 59/19 60/10
65/1 71/10 71/13 77/3 79/24 80/15 85/9
86/5 88/15 88/17 98/19
rights [6] 51/21 51/23 52/14 53/9 53/17
57/3
rise [1] 87/8
risk [1] 49/10
role [1] 8/8
room [1] 72/24
rough [1] 20/16
roughly [1] 85/17
row [1] 57/12
RPR [1] 1/23
rule [3] 45/13 58/9 97/9
ruling [1] 38/13
run [3] 55/12 80/21 87/5
runs [1] 42/9

**S**

saccharin [2] 56/22 97/21
sacrificing [1] 47/12
said [83] 4/13 5/12 9/4 10/8 11/6 12/25
13/6 15/23 16/2 16/3 16/16 17/21 18/8
19/7 19/9 19/10 23/2 25/14 25/14 28/4
29/4 31/4 33/21 35/22 38/7 40/16 40/21
41/5 41/9 41/14 41/21 41/24 46/1 49/6
50/23 51/8 55/12 56/20 57/1 57/11
57/17 59/22 61/11 62/6 64/7 64/12 66/5
67/2 67/21 68/10 69/17 75/1 75/2 75/3
75/18 77/4 77/16 77/22 78/1 78/5 78/16
78/17 80/6 81/2 81/14 82/7 82/19 82/24
83/5 84/4 86/11 86/12 86/16 87/24
88/15 89/8 93/3 93/4 93/22 93/24 97/7
98/1 98/12
said -- [1] 77/16
sale [6] 42/7 42/17 46/18 81/16 89/13
90/23
sales [9] 10/10 19/13 20/8 27/23 32/16
43/5 54/23 84/14 91/15
same [101] 5/4 5/5 9/23 11/22 12/11
12/12 12/16 13/15 13/18 21/10 23/23
24/11 24/14 25/4 25/6 25/12 25/12
25/20 26/10 27/10 27/18 28/14 28/19
29/2 29/4 29/8 29/11 29/12 29/19 29/20
29/21 29/23 30/1 30/3 30/11 31/24
32/17 33/3 34/5 34/23 34/25 35/16
36/10 36/17 38/22 39/13 39/21 42/4
42/17 43/10 43/21 44/5 44/22 45/4 45/6
46/6 46/11 47/2 47/2 47/5 47/20 48/5
48/9 51/19 59/4 59/4 59/5 59/5 59/11
60/6 60/7 60/12 63/3 63/4 69/21 73/4
73/17 74/23 76/18 78/16 83/1 83/8

**S**

**same...** [19] 85/18 86/1 87/18 87/19 87/21 88/19 88/21 89/1 89/2 90/15 90/15 90/24 94/8 95/20 99/1 99/1 99/3 99/4 99/4

**sample** [2] 52/2 78/24

**San** [1] 1/6

**Sandler** [23] 10/6 12/18 19/5 28/3 32/5 41/9 43/4 43/18 51/17 54/14 55/12 57/16 59/22 61/5 63/11 64/7 70/22 71/13 76/9 76/18 84/4 93/18 94/11

**Sandler's** [1] 61/19

**satisfied** [1] 3/23

**satisfy** [1] 70/6

**saucer** [3] 7/17 77/6 77/6

**saves** [1] 58/15

**saw** [12] 14/7 27/9 29/4 44/1 53/10 55/7 70/12 72/13 81/10 82/16 82/16 82/17

**say** [72] 3/19 4/1 4/14 6/6 6/8 7/20 10/2 15/19 16/9 16/10 21/5 22/12 22/13 23/10 23/15 24/11 26/4 27/20 28/25 29/1 29/20 29/21 29/21 29/22 29/22 29/23 30/4 30/10 31/10 31/14 32/20 33/23 35/1 35/16 36/13 36/17 40/7 42/21 43/22 45/11 48/9 48/14 51/1 51/7 52/4 54/14 54/25 55/2 55/3 55/6 58/8 60/13 62/10 63/2 67/12 69/21 74/6 74/16 74/16 74/17 76/9 79/19 81/7 81/11 81/23 83/5 85/18 86/12 89/24 93/2 93/6 96/9

**say --** [3] 29/2 45/11 81/7

**saying** [27] 11/16 11/19 14/2 14/8 16/18 32/11 33/1 45/5 53/1 53/2 53/14 59/17 60/24 61/3 61/9 61/10 62/10 73/4 77/14 78/6 80/4 80/4 81/17 81/19 93/18 96/6 99/10

**says** [34] 7/7 26/8 27/12 35/1 35/16 37/12 43/8 50/1 52/1 52/7 52/10 55/25 56/5 58/19 59/3 65/23 71/24 73/21 75/8 76/12 79/25 80/15 81/4 81/8 82/18 84/24 85/12 85/15 86/5 90/23 92/6 95/17 96/5 98/7

**says --** [1] 58/19

**scant** [1] 80/3

**scent** [3] 8/23 62/24 95/6

**Scheduling** [1] 3/17

**scheme** [6] 5/15 5/16 39/17 40/4 97/5 98/3

**schemes** [1] 38/8

**Scientific** [1] 71/21

**scope** [1] 9/16

**screen** [2] 50/8 72/23

**second** [19] 5/3 10/23 30/4 33/20 33/24 34/10 35/1 35/8 35/22 36/4 36/13 38/1 38/11 38/20 43/18 49/9 50/16 67/15 86/25

**second --** [2] 50/16 86/25

**secondary** [50] 5/11 10/18 14/21 14/23 19/3 19/15 20/9 21/11 21/18 22/1 33/13 51/2 51/3 52/12 52/17 53/1 53/6 55/10 61/13 64/18 64/25 65/6 66/16 66/22 67/1 67/11 68/5 68/18 68/20 68/24 69/4 69/8 69/9 69/13 69/19 70/1 70/9 70/17 70/21 71/15 72/6 72/9 73/6 83/23 84/1 84/13 84/16 92/4 92/6 92/10

**secondary --** [1] 33/13

**section** [2] 36/15 101/5

**sector** [1] 88/21

**see** [14] 5/6 5/14 8/5 14/5 15/9 18/18 25/17 28/19 41/18 62/1 63/20 73/4 81/18 87/14

**seek** [1] 63/19

**seeking** [7] 9/8 9/21 31/18 37/16 38/9

63/7 63/15

**seeks** [2] 4/9 9/6

**seems** [2] 72/23 88/22

**seen** [14] 6/5 7/12 15/21 16/15 19/23 20/3 23/23 31/13 63/8 79/14 81/12 81/15 81/23 82/19

**segmentation** [6] 19/4 23/1 23/7 41/14 53/4 70/8

**select** [1] 71/25

**self-inflicted** [2] 45/13 45/18

**sell** [7] 20/15 20/18 22/14 45/7 46/16 91/10 94/13

**sell --** [1] 94/13

**selling** [5] 53/22 63/21 96/9 96/12 97/16

**sells** [1] 91/11

**send** [2] 52/1 52/1

**sends** [1] 58/22

**senior** [1] 54/24

**sentence** [1] 61/1

**separate** [1] 10/5

**series** [2] 9/9 15/17

**serious** [1] 91/18

**serve** [2] 6/11 57/5

**Servings** [1] 75/20

**set** [4] 9/6 9/18 59/15 101/8

**seven** [2] 23/16 59/15

**Seventh** [7] 10/23 11/5 12/24 38/12 97/6 97/9 97/17

**Seventy-one** [3] 81/17 82/15 82/18

**Seventy-one percent** [3] 81/17 82/15 82/18

**several** [3] 9/10 10/22 38/12

**shade** [9] 13/2 13/4 13/5 13/15 51/22 73/4 73/8 73/12 73/17

**shades** [1] 12/11

**shading** [2] 13/12 13/13

**shadows** [1] 75/13

**sham** [1] 48/11

**shape** [3] 5/17 24/22 63/5

**shapes** [1] 13/11

**share** [9] 9/2 28/5 31/1 33/7 43/10 62/2 72/11 73/15 76/1

**shares** [3] 28/6 31/17 72/2

**she** [22] 10/8 41/13 41/24 41/24 41/25 42/1 42/1 42/2 42/5 42/8 42/12 42/13 43/19 44/2 44/2 46/7 61/11 61/19 61/20 62/12 62/13 93/24

**she's** [2] 42/4 42/10

**shelf** [2] 20/4 20/4

**shelves** [3] 27/1 90/14 90/16

**shock** [1] 29/6

**shopper** [3] 27/14 90/22 90/23

**shopping** [1] 46/3

**shops** [2] 41/24 42/8

**short** [4] 3/10 3/18 4/4 28/6

**shot** [3] 25/12 40/25 67/10

**should** [29] 17/12 39/12 39/15 46/9 46/23 51/1 58/16 59/18 61/7 61/8 61/21 62/1 71/25 72/11 72/22 74/14 74/20 78/20 80/2 80/7 81/1 83/17 83/19 84/17 86/9 90/17 92/9 93/4 97/13

**shouldn't** [2] 74/18 85/7

**show** [40] 4/10 4/19 9/10 22/25 23/5 30/7 31/8 31/9 37/2 38/6 38/23 43/1 44/15 49/22 52/12 62/25 63/1 64/23 66/7 66/15 67/7 67/9 68/15 68/19 69/1 69/15 70/9 70/12 71/17 82/22 83/22 84/4 84/11 84/22 91/1 92/22 92/23 92/3 93/22 98/2

**showed** [25] 15/23 16/1 16/8 16/13 21/8 28/18 28/23 29/10 29/16 30/18 34/14 38/5 41/20 55/16 59/22 66/5 69/18 74/21 75/4 75/25 78/9 79/1 80/17 80/17

82/9

**showed --** [2] 55/16 80/17

**showing** [6] 4/8 5/10 68/5 84/16 86/20 93/21

**shown** [15] 15/8 16/5 16/10 18/2 18/4 20/7 28/13 48/14 51/2 77/19 80/11 80/23 91/22

**shows** [15] 4/24 21/25 41/3 41/15 47/19 50/16 52/17 52/18 61/15 68/16 71/14 83/10 93/19 93/20 98/6

**sic** [1] 7/24

**side** [17] 3/6 3/10 25/15 25/15 25/18 31/9 31/10 33/8 33/9 62/14 63/9 77/3 77/13 86/5 88/16 88/17 99/25

**side --** [1] 86/5

**sides** [4] 14/7 59/5 71/22 95/24

**Sifontes** [7] 6/21 41/23 41/23 42/9 42/18 43/21 44/1

**signal** [1] 6/16

**significance** [1] 87/6

**significant** [8] 8/11 35/3 49/10 67/18 90/21 91/3 92/15 92/18

**similar** [22] 9/24 11/23 13/4 13/10 21/6 21/9 24/18 25/21 26/20 26/22 28/1 30/9 31/21 33/4 34/8 38/17 38/24 39/20 45/8 47/15 63/22 88/24

**similarities** [6] 24/19 36/7 72/15 73/23 78/15 86/4

**similarity** [3] 27/7 31/9 74/12

**similarly** [1] 46/6

**simple** [2] 11/24 70/13

**simply** [5] 11/19 35/9 36/15 39/22 74/6

**simultaneous** [1] 99/9

**simultaneously** [1] 46/15

**since** [6] 3/15 3/16 37/16 44/21 52/22 93/10

**single** [1] 83/24

**sinking** [2] 28/6 28/7

**situation** [2] 32/17 96/15

**situations** [1] 46/10

**six** [1] 91/10

**size** [6] 5/16 5/22 63/4 63/5 63/14 63/16

**sizes** [3] 63/16 78/24 95/18

**skyrocketed** [1] 28/5

**slap** [1] 35/15

**slapped** [1] 66/9

**sleep** [1] 34/15

**slide** [5] 23/12 28/14 59/3 79/10 93/17

**slides** [1] 93/13

**small** [2] 49/7 96/19

**smaller** [1] 15/18

**Snacks** [1] 87/4

**snippets** [1] 98/6

**so** [74] 3/1 4/3 9/18 9/23 11/21 12/7 13/20 14/14 14/17 15/21 16/13 16/17 18/9 18/25 19/20 21/6 21/21 23/7 23/14 23/20 24/7 24/9 26/3 27/19 28/10 29/24 30/10 31/6 35/1 35/15 35/25 38/25 41/18 42/11 44/3 44/11 45/8 47/10 47/16 47/18 48/10 48/14 49/4 50/23 54/3 54/24 56/3 59/20 64/16 65/13 66/21 67/20 67/25 68/3 68/10 68/18 69/15 76/1 77/6 78/11 83/1 86/14 87/7 95/6 95/16 95/18 97/15 97/18 97/23 98/6 98/15 98/19 99/15 99/24

**so-called** [2] 19/16 45/12

**so.'** [1] 83/5

**sold** [9] 19/19 20/2 22/18 31/2 32/21 32/22 41/3 41/4 90/11

**solely** [1] 72/19

**solicited** [1] 89/17

**solid** [1] 76/14

**some** [41] 9/3 15/19 16/22 19/18 20/16 23/17 24/13 26/21 29/3 31/9 32/14 37/2

## S

some... [29] 38/6 39/11 57/15 58/10 58/12 58/21 59/18 66/24 66/24 67/7 67/9 68/8 70/2 73/12 74/3 75/13 75/17 75/19 77/24 78/24 80/1 80/1 80/12 82/13 89/5 89/21 96/1 97/12 99/8
somebody [7] 33/2 36/16 55/1 64/7 80/19 82/4 91/13
somehow [5] 32/1 41/7 84/3 85/11 88/16
someone [5] 53/21 55/3 60/12 73/4 88/10
something [10] 3/6 15/1 26/15 41/7 44/2 58/8 60/16 71/23 80/22 82/8
somewhere [2] 62/11 96/11
soon [1] 99/11
sorry [4] 11/6 29/22 33/21 96/2
sort [1] 24/15
sorts [1] 35/25
sought [5] 51/24 52/14 64/21 74/14 94/24
sounding [1] 85/20
source [23] 6/10 6/13 6/17 7/8 8/3 10/20 15/3 35/14 36/12 53/2 53/3 53/7 53/8 69/6 69/10 69/11 69/13 69/14 79/13 79/23 86/1 87/1 99/4
source-identifying [2] 46/2 79/4
source-indicative [1] 66/22
span [1] 3/18
speak [1] 4/5
special [1] 9/14
specific [6] 9/7 51/10 58/13 64/10 64/11 65/11
specifically [2] 33/23 75/11
spectrum [1] 73/15
speculated [1] 80/25
speculation [1] 80/8
spend [3] 54/25 73/19 96/1
spent [6] 19/18 20/12 20/12 57/3 77/9 84/7
spent -- [1] 20/12
Splenda [115]
Splenda -- [3] 20/4 30/1 98/3
Splenda's [1] 73/1
sponsored [3] 28/23 29/17 41/21
square [1] 36/2
staff [1] 49/2
staggering [1] 81/24
stake [4] 44/24 44/25 45/23 45/24
stand [1] 59/22
standard [9] 4/9 44/17 48/15 52/6 59/6 59/9 68/1 68/13 87/13
standards [2] 58/10 64/24
standpoint [2] 61/18 63/18
start [3] 24/17 27/19 37/6
started [2] 14/24 60/1
starts [2] 25/1 82/4
state [1] 40/2
stated [1] 40/4
statement [4] 4/12 41/10 41/12 47/13
STATES [7] 1/1 1/11 6/6 35/6 37/4 101/3 101/5
Steaming [1] 77/3
steer [1] 45/14
step [2] 37/17 62/22
stepped [1] 45/16
stepping [1] 61/21
STEVEN [1] 2/3
stick-on [1] 8/22
sticking [1] 48/4
still [8] 24/10 33/6 47/23 54/10 73/7 78/11 83/10 94/1
stimulus [2] 71/25 72/3
stipulated [1] 87/20

stipulated -- [1] 87/20
stood [1] 12/1
stop [2] 59/24 97/15
stopped [1] 81/20
stopped -- [1] 81/20
stopping [1] 91/24
store [13] 6/22 20/2 25/11 27/3 27/9 27/12 28/10 43/20 46/8 88/11 89/14 89/25 90/24
store -- [1] 20/2
stores [3] 19/19 31/2 91/13
story [1] 25/17
straightforward [2] 12/4 42/25
strategy [1] 47/4
straw [1] 96/5
street [1] 90/1
strong [3] 49/17 49/20 84/13
strongly [1] 36/11
stuck [1] 19/1
study [11] 19/4 23/1 23/7 40/17 41/6 41/15 53/4 54/11 70/8 70/11 71/25
stuff [2] 46/8 67/21
stunt [1] 31/21
subject [1] 97/11
submitted [1] 99/7
submitting [1] 99/8
subsidiary [1] 6/12
substantial [17] 4/10 4/13 4/17 49/14 49/16 52/9 52/13 65/4 68/19 69/1 83/21 84/22 84/22 85/1 89/15 92/2 93/1
substantial -- [1] 84/22
substantially [1] 49/8
substitute [11] 7/2 7/11 28/18 28/22 29/9 29/16 52/21 55/8 55/15 60/12 91/12
substituted [1] 41/6
substitutes [5] 32/13 54/8 54/19 69/21 79/21
subtract [3] 16/17 30/11 85/7
subtracted [2] 72/18 73/24
Sucaryl [1] 63/3
succeed [2] 4/25 49/9
success [11] 4/11 43/1 49/18 49/19 49/20 49/21 65/5 84/23 89/16 92/2 93/1
successful [3] 20/22 59/11 88/1
successfully [1] 38/2
such [7] 4/3 5/2 6/15 9/15 40/5 66/15 91/24
sucralose [2] 99/2 99/3
sue [1] 32/23
suffer [4] 4/18 43/16 44/13 45/10
suffering [1] 43/16
sufficient [1] 13/9
sufficiently [1] 9/11
sugar [96] 5/24 5/24 5/24 5/25 7/2 7/11 9/23 11/25 12/20 13/14 19/17 19/23 22/22 22/23 23/13 23/15 23/18 23/21 23/24 23/25 24/3 24/5 28/18 28/22 29/9 29/16 30/7 30/7 30/9 30/10 30/13 30/14 30/25 31/7 31/12 31/16 31/16 31/25 32/4 32/6 32/13 32/14 32/19 33/5 33/10 41/2 47/2 47/5 47/7 47/8 47/11 47/15 47/17 47/18 47/20 48/1 48/7 48/8 48/9 52/20 54/8 54/8 54/11 54/19 54/21 55/8 55/14 57/23 58/1 58/4 69/21 72/24 73/10 76/3 76/10 76/13 76/19 76/21 77/15 79/21 85/8 85/19 87/11 87/19 88/19 89/2 90/16 90/24 91/5 91/7 91/11 91/12 96/18 98/19
sugar -- [1] 23/13
suggest [5] 3/7 41/2 51/15 52/15 72/22
suggested [2] 3/5 65/2
suggestive [2] 8/2 8/23
suggests [2] 58/6 86/25

sum [2] 21/21 48/14
supermarket [3] 90/20 90/25 91/3
supplanted [1] 56/4
supplemental [1] 99/9
support [2] 84/19 87/5
supportive [1] 20/9
supposed [5] 17/18 75/9 76/1 79/4 81/5
Supreme [16] 6/6 7/6 10/14 11/2 11/11 13/6 22/7 26/1 38/13 45/24 52/10 56/2 56/4 67/2 91/21 97/25
sure [19] 4/5 16/11 45/9 49/3 49/14 55/21 59/8 67/6 67/22 70/24 77/10 78/4 81/2 83/14 85/20 87/10 89/11 93/14 93/15
surprising [1] 31/15
surrounding [1] 77/2
survey [58] 15/6 15/16 15/20 17/8 19/1 19/4 23/14 28/11 28/13 29/4 29/25 30/18 31/7 36/8 39/10 39/11 39/12 51/13 55/10 55/14 55/16 62/16 70/5 71/11 71/17 71/18 72/1 72/10 72/10 74/3 74/4 75/9 75/25 77/17 78/22 79/11 80/10 80/22 82/5 82/9 82/12 82/22 83/11 83/12 83/18 84/17 85/5 86/13 86/15 86/20 86/24 87/2 87/5 87/9 87/12 87/15 92/5 92/11
survey -- [1] 80/10
surveyed [1] 52/24
surveying [1] 74/19
surveys [8] 14/7 57/12 70/1 70/7 73/20 74/9 81/22 84/16
suspect [1] 38/6
Sweet [2] 75/16 75/20
Sweet'N [12] 7/21 8/9 11/7 52/21 52/24 53/18 56/13 56/14 56/17 65/25 67/16 71/4
sweetened [1] 47/24
sweetener [18] 7/3 9/21 10/7 10/12 11/17 13/21 15/12 15/22 16/6 16/8 22/8 22/14 31/13 32/24 47/22 54/12 63/21 96/18
sweeteners [15] 7/22 11/4 21/25 22/13 22/17 24/3 30/20 30/23 52/25 56/22 66/1 71/14 97/19 97/21 98/21
switching [2] 81/24 90/15
swoosh [2] 79/2 79/8
swore [1] 89/7
symbol [1] 97/12
symbols [2] 6/14 6/15

## T

table [1] 78/8
tables [2] 74/21 75/3
tabulated [3] 18/1 18/11 19/1
tailored [1] 84/20
take [21] 4/22 15/2 21/18 24/3 24/5 24/21 24/25 25/3 28/1 34/22 35/15 36/15 37/17 50/3 54/25 57/19 59/20 60/14 60/19 63/2 86/18
taken [5] 3/18 7/13 11/21 37/25 49/3
takes [2] 48/21 85/5
taking [6] 5/13 14/3 15/11 36/23 56/6 60/17
talk [9] 27/16 30/13 54/9 63/9 67/13 69/3 78/3 84/2 94/9
talked [3] 59/13 84/6 84/7
talking [14] 6/20 6/20 25/19 34/11 36/2 37/10 62/19 62/20 62/25 64/4 65/11 68/2 75/7 95/13
talks [1] 82/20
taste [6] 43/22 43/22 44/5 47/21 47/25 48/1
tasted [1] 42/2
tastes [3] 5/24 5/25 57/25

**T**

tea [6]  7/16 7/24 64/3 65/21 66/2 76/5
team [2]  4/4 49/1
technique [1]  71/11
tell [12]  6/15 7/7 8/6 12/22 30/22 53/15
70/14 70/16 82/22 82/25 83/1 89/25
telling [1]  83/1
ten [2]  77/23 85/3
tend [2]  14/9 25/8
tenth [3]  31/1 33/6 54/22
term [1]  12/17
terms [2]  49/3 63/16
test [21]  17/10 22/10 31/20 51/1 51/3
51/4 53/4 65/15 69/8 69/8 69/16 70/21
72/11 77/17 77/25 79/1 79/1 79/5 80/12
85/22 92/12
test -- [1]  69/16
testament [1]  20/22
tested [2]  85/24 87/14
testified [2]  22/20 44/22
testify [6]  27/9 42/16 80/5 81/4 83/25
90/2
testimony [15]  23/17 24/19 28/3 41/10
41/22 46/25 68/9 70/1 71/17 83/16
83/23 84/19 86/24 89/22 92/8
testing [2]  64/2 85/11
than [20]  3/7 3/21 9/16 9/18 10/10 13/15
16/1 19/9 27/13 29/12 33/10 36/12
47/15 48/21 54/13 60/1 60/25 61/6
62/24 84/13
thank [8]  4/2 26/1 48/19 49/1 93/7 93/12
100/2 100/3
Thanks [1]  99/5
that [541]
that -- [3]  70/3 85/5 87/8
that's [153]
That's -- [1]  80/22
the -- [3]  12/5 12/17 46/20
their [58]  6/12 7/23 8/11 9/15 26/13 27/5
29/24 36/9 43/9 45/14 45/17 47/3 51/1
51/15 51/16 51/22 54/11 55/6 55/16
56/14 57/17 59/16 60/5 60/24 60/24
62/10 63/19 66/1 67/5 67/8 67/8 67/10
67/12 67/13 67/19 68/14 69/16 69/16
71/15 72/1 72/8 72/8 74/15 75/25 76/9
77/4 79/17 84/2 85/14 86/23 89/18 90/3
92/5 92/10 92/20 92/21 97/3 99/6
them [42]  11/21 12/22 15/17 15/21
16/13 17/4 17/16 17/19 20/11 24/23
26/18 27/14 29/13 31/8 31/9 33/8 34/15
36/1 38/19 48/5 57/3 57/6 57/13 59/24
64/6 64/14 68/22 70/16 70/17 70/18
70/19 75/6 79/19 81/6 81/8 81/15 81/19
81/20 81/22 84/3 84/8 93/14
them -- [2]  34/15 36/1
themselves [2]  35/19 45/10
then [36]  15/25 16/7 28/21 40/18 40/24
41/6 41/11 41/17 42/3 42/4 50/12 50/13
57/13 63/8 66/5 67/23 69/10 71/9 71/12
73/5 74/3 75/19 80/4 80/25 82/5 83/7
88/1 91/1 92/18 95/8 95/17 97/3 98/4
99/7 99/18 100/5
then -- [1]  100/5
theoretical [1]  10/16
theory [1]  18/22
there [124]
there -- [1]  59/3
there's [2]  90/3 92/11
thereby [1]  46/14
therefore [11]  5/9 6/13 10/18 26/20
32/22 33/7 35/2 35/17 36/23 61/7 94/21
these [60]  4/22 6/2 7/7 7/25 11/3 13/13
13/14 16/4 20/3 20/6 21/24 22/17 23/8

23/9 23/20 24/20 25/10 25/11 25/20
30/23 32/12 34/3 34/14 35/9 35/20
38/25 41/22 44/12 50/25 51/9 53/2 60/3
62/25 63/18 64/24 65/17 66/3 66/21
74/23 75/3 75/12 75/13 77/8 77/23
78/18 78/21 79/12 80/11 81/3 81/5
82/13 82/17 83/20 84/3 89/19 90/2 94/3
95/3 98/6 98/20
these -- [1]  25/10
they [270]
they -- [1]  70/18
they've [5]  20/14 45/4 45/4 81/12 81/23
thicker [1]  26/5
thing [24]  9/24 11/14 14/9 14/13 16/12
19/11 33/1 42/5 46/22 49/24 52/11
55/18 57/18 57/24 60/10 63/6 64/1
75/17 77/8 80/4 80/14 88/14 89/1 89/1
things [12]  6/2 7/7 11/19 21/6 26/21
37/12 49/8 57/23 64/11 82/4 96/21
96/21
think [80]  3/4 4/15 10/6 10/8 10/8 11/7
12/3 12/17 12/18 14/10 14/11 14/17
16/7 18/17 18/25 20/22 21/2 23/18
24/13 25/4 28/16 29/1 29/4 29/11 29/11
29/12 29/14 29/19 30/11 31/10 31/25
33/11 36/10 42/24 43/20 44/4 44/22
46/23 48/5 49/22 51/17 58/25 59/3
61/11 61/18 64/5 65/17 66/20 69/3 69/9
69/12 69/22 70/6 70/16 73/6 74/7 75/1
75/7 76/14 76/19 77/9 77/16 77/20
77/25 79/17 80/19 80/25 82/22 82/11
83/18 83/19 85/6 89/14 91/11 92/20
93/17 94/2 95/15 99/12 99/16
thinking [4]  3/14 74/22 78/9 90/15
thinks [3]  71/23 72/24 76/13
third [5]  26/7 44/7 44/16 79/16 79/18
third-party [2]  90/4 92/12
this [271]
those [40]  6/14 7/18 11/8 11/12 17/19
17/23 19/6 20/10 29/2 37/20 38/4 38/15
46/16 46/20 48/17 51/5 52/14 55/13
57/21 60/21 63/20 67/2 67/11 74/18
75/3 75/23 75/23 78/5 78/15 79/25
80/24 81/9 81/18 89/18 93/13 95/10
96/23 96/25 97/2 97/22
those -- [1]  96/23
though [4]  14/12 24/10 31/24 75/17
thought [5]  42/2 45/15 76/13 77/23
81/18
thousand [1]  44/23
three [14]  3/15 3/16 20/13 20/14 28/6
43/4 55/24 63/15 63/18 65/19 68/7 68/8
91/23 99/15
through [9]  15/20 37/8 40/9 42/24 49/21
52/15 65/1 76/25 77/22
throughout [1]  72/9
thus [2]  10/19 36/6
time [18]  3/3 3/18 4/3 13/8 14/24 15/2
38/11 42/7 46/11 56/18 57/4 60/15
73/19 75/16 76/13 77/9 96/1 99/14
tips [2]  4/20 92/24
Title [1]  101/4
titles [1]  56/11
to -- [1]  55/17
today [3]  33/2 51/20 59/22
together [3]  6/3 32/12 38/23
told [9]  10/14 19/5 22/7 32/5 43/4 43/18
63/11 94/11 99/8
too [7]  31/17 31/20 76/6 76/7 77/11 96/8
99/11
took [7]  34/11 34/24 36/21 39/7 42/13
48/20 50/5
Tools [1]  50/8

top [4]  24/24 26/7 88/18 88/20
total [2]  38/17 44/23 73/25 81/13
touch [1]  76/2
tougher [1]  12/4
toward [2]  51/14 51/14
track [1]  81/9
trade [136]
trademark [22]  10/16 10/17 14/24 35/19
43/7 44/13 46/1 46/9 46/19 51/21 51/23
51/24 52/1 52/17 58/7 58/8 58/10 64/21
64/24 79/3 87/4 97/11
trademarks [4]  8/9 66/25 67/17 94/14
trained [2]  17/24 80/15
transcript [2]  101/6 101/9
translation [1]  94/1
translations [1]  42/9
trial [1]  68/25
tribunal [2]  37/23 37/24
tried [8]  3/20 8/25 11/5 11/8 28/1 35/21
41/11 97/15
trouble [1]  82/8
true [5]  32/18 59/21 59/21 61/20 101/6
truth [1]  42/11
try [5]  3/9 28/7 44/6 47/24 72/23
trying [12]  22/10 26/16 26/17 31/7 32/4
32/14 32/15 44/5 52/4 59/18 90/9 93/20
turn [5]  4/22 34/13 34/17 34/19 57/13
turned [5]  34/12 40/14 40/24 41/8 41/12
turns [1]  42/5
twelve [1]  3/11
Twin [39]  11/25 12/20 13/14 19/17 19/23
30/7 30/7 30/9 30/10 30/13 30/14 30/25
31/7 31/12 31/16 31/17 31/25 32/4 32/6
32/19 32/23 33/5 33/10 41/2 54/8 54/11
54/21 72/24 73/11 76/3 76/10 76/13
76/19 76/21 85/8 87/11 91/5 96/19
98/19
Twin -- [1]  30/9
two [98]  5/1 11/19 12/11 13/18 17/12
18/5 18/9 18/18 21/2 21/6 23/18 24/22
25/8 25/11 25/20 26/3 28/15 31/21
32/12 35/2 35/4 35/9 36/7 38/16 38/18
40/12 40/25 40/25 55/24 56/8 62/25
63/11 68/7 70/4 70/7 74/9 74/24 75/13
77/8 78/9 78/21 84/5 88/23 89/22 93/9
93/11 96/23 99/15
Tylenol [21]  33/15 34/2 34/3 34/5 34/6
34/7 34/9 34/11 34/17 34/18 35/4 35/7
36/2 36/12 36/22 38/7 38/16 38/24 39/3
39/7 94/12
type [4]  44/7 60/6 96/5 96/14
typeface [1]  34/5
types [5]  14/25 43/4 44/12 66/24 70/4
typical [1]  43/6
typically [3]  16/21 34/12 38/8

**U**

U.S [4]  54/15 54/15 54/15 54/15
Unaided [1]  30/21
unbelievable [1]  47/3
unbranded [1]  97/20
uncertain [1]  50/21
uncertainty [1]  50/11
under [6]  78/19 83/15 83/17 85/3 92/19
101/9
undermines [1]  92/5
understand [4]  91/1 96/1 96/11 99/23
undertaking [1]  90/9
undisputed [1]  30/14
undoubtedly [1]  27/4
unequivocally [2]  21/25 38/2
unexpected [2]  65/13 68/11
unfair [1]  50/19
unfamiliar [1]  31/12

**U**

unfavorable [2] 86/22 87/9
unfortunate [1] 26/14
unfortunately [1] 40/13
unfounded [1] 41/19
unhappy [2] 90/25 90/25
unimportant [1] 14/9
unique [7] 9/11 15/2 55/2 65/13 66/21 68/3 68/10
uniquely [2] 10/12 11/9
UNITED [7] 1/1 1/11 6/6 35/6 37/4 101/3 101/5
unlike [1] 35/20
unlikely [1] 88/22
unnecessary [1] 12/7
unproved [1] 40/15
unquote [1] 70/7
unrelated [3] 39/23 73/23 86/3
unreliable [2] 70/10 83/19
unsympathetic [1] 45/11
Unum [1] 37/3
unusual [4] 65/13 66/21 68/3 68/10
up [23] 8/14 11/2 17/16 17/19 18/20 21/6 21/21 24/14 25/16 26/18 27/14 28/11 29/13 31/20 32/16 41/7 58/2 67/7 68/10 80/21 91/1 93/17 96/5
upon [4] 8/16 39/6 39/25 93/6
upright [1] 12/1
us [7] 10/14 21/8 22/7 27/21 30/18 50/24 55/3
use [17] 7/18 10/17 13/21 22/7 22/22 34/18 40/5 55/8 57/13 60/12 62/11 78/3 83/14 85/23 87/10 96/10 98/15
used [28] 12/16 12/17 12/18 16/21 17/22 17/23 18/13 18/14 18/21 19/7 28/14 34/5 38/8 43/24 57/15 57/25 60/5 65/19 73/8 73/10 75/15 79/1 83/8 98/22 98/24 98/25 98/25 99/3
used -- [3] 28/14 79/1 83/8
user [2] 35/13 54/24
user's [1] 36/11
users [2] 43/12 55/8
using [4] 17/14 18/20 51/16 60/2
usually [2] 41/24 42/8
utilitarian [1] 58/14
utilized [2] 39/23 63/22
utterly [1] 40/20

**V**

vagueness [1] 50/18
validity [1] 74/4
value [1] 47/12
variables [1] 78/21
various [4] 8/19 8/20 21/8 23/9
varying [1] 17/5
venture [1] 3/19
version [9] 17/11 17/12 18/5 18/5 18/5 18/8 18/9 18/20 18/20
versions [2] 18/21 70/25
versus [4] 36/1 56/9 56/10 64/10
very [33] 3/12 6/8 7/10 9/18 12/4 13/15 14/8 14/14 20/19 20/19 23/20 23/20 28/1 31/15 31/15 32/17 32/17 33/1 39/5 41/4 42/24 45/11 48/22 58/25 76/10 93/8 93/13 95/25 96/19 99/6 100/1 100/3 100/4
vicinity [1] 3/8
video [1] 67/10
view [2] 58/25 69/12
viewed [5] 7/22 7/24 38/17 65/25 66/3
vigorous [4] 68/23 68/25 70/6 84/15
virtually [2] 12/5 21/5

virtue [1] 10/9
voluminous [1] 3/20

**W**

wait [1] 30/4
Wal-Mart [6] 6/8 56/2 56/5 56/5 58/18 65/11
walk [1] 21/23
walking [1] 25/11
walks [1] 26/12
want [23] 4/1 4/2 22/14 23/5 25/16 26/1 26/13 43/24 58/8 60/6 60/13 66/19 70/25 73/1 81/8 81/8 91/4 91/4 91/6 91/8 91/14 91/14 96/11
wanted [5] 22/22 34/13 34/17 57/3 96/3
wants [2] 32/11 61/19 63/6 63/9 67/12 95/19
war [1] 7/10
warrants [1] 86/21
was [110]
was -- [1] 56/10
wasn't [7] 32/3 42/3 42/7 73/8 79/5 81/16 89/13
way [23] 18/13 20/16 22/18 24/25 25/16 26/7 28/8 30/5 35/5 35/10 35/21 36/19 48/11 54/14 58/3 58/5 60/1 60/8 62/16 75/10 81/15 82/2 83/22 87/23 96/9 97/4 98/20
ways [1] 18/18
we [169]
we'd [2] 12/3 18/22
we've [9] 6/2 26/23 36/1 40/13 47/18 77/24 89/22 94/2 96/5
week [3] 3/5 57/11 99/19
weekend [1] 99/22
weeks [7] 3/15 3/16 3/22 25/8 55/22 68/7 99/15
weigh [1] 55/23
weighs [2] 49/12 87/21
well [67] 3/9 3/13 4/5 4/10 7/15 13/24 14/2 16/20 20/19 25/5 26/4 30/4 30/13 32/1 33/4 35/16 36/17 43/22 45/21 47/7 47/19 48/22 49/1 50/12 55/3 57/8 59/5 59/8 60/9 62/24 63/6 63/24 71/4 73/2 73/13 74/3 75/19 77/6 79/2 79/7 79/16 80/3 80/14 80/19 80/25 82/24 83/2 86/7 86/15 86/24 87/24 88/11 88/17 89/9 89/11 89/12 89/15 91/13 93/8 93/10 93/13 95/17 99/6 99/18 99/25 100/1 100/4
well-known [3] 67/13 87/20 87/20
well-known -- [1] 87/20
well-recognized [1] 35/5
went [10] 15/25 35/10 42/1 42/17 44/1 54/14 69/18 76/24 83/7 93/13
were [61] 10/22 11/24 12/24 15/8 16/24 17/11 17/8 17/8 17/14 17/15 17/15 17/16 17/17 17/18 17/18 17/21 17/22 17/23 17/24 17/24 18/2 18/3 18/13 18/14 18/18 18/21 18/22 19/1 23/13 27/9 35/23 38/12 39/1 39/1 39/2 40/11 51/10 52/24 56/13 57/15 63/12 63/12 72/7 73/20 73/21 74/9 74/21 75/23 77/19 78/15 78/23 79/9 81/17 88/1 89/5 90/15 93/5 93/13 95/10 95/11
weren't [1] 93/5
what [147]
what's [7] 3/18 29/14 46/23 47/7 54/2 54/19 57/23
whatever [5] 45/9 51/22 59/25 60/10 72/25
wheat' [1] 91/21
when [70] 3/4 6/21 7/1 7/22 8/5 12/24 14/10 16/10 16/17 17/12 17/16 17/19

18/1 18/17 19/15 19/25 20/5 21/16 21/23 25/10 26/12 26/14 28/13 28/15 28/19 29/2 29/13 29/24 30/7 32/3 33/8 35/21 36/14 38/17 40/20 41/11 42/16 45/11 46/8 46/22 48/9 53/23 54/2 57/2 57/17 58/19 59/1 59/18 61/23 62/6 65/25 66/9 71/12 74/19 77/19 78/16 78/16 80/10 82/12 85/3 88/11 88/9 89/9 91/19 94/8 97/2 97/15 97/21 98/6 98/15
when -- [1] 59/1
where [18] 10/17 24/21 25/18 27/10 42/6 42/8 42/12 45/21 47/25 54/16 58/12 80/16 81/5 86/12 87/6 88/5 89/8 91/25
Whereupon [1] 100/7
wherever [1] 66/19
whether [27] 4/7 9/25 12/8 12/15 13/3 13/9 21/19 24/12 39/12 46/23 53/24 53/25 54/22 55/2 55/10 55/11 57/1 59/21 62/8 65/12 73/20 78/4 84/25 85/24 87/17 92/9 94/12
which [46] 5/17 6/15 8/17 8/20 8/22 9/21 9/24 12/5 15/1 15/7 16/5 17/11 19/5 20/8 20/15 21/14 27/2 27/23 30/19 34/12 35/20 38/7 38/14 43/11 44/10 50/21 55/8 62/16 63/3 71/2 72/13 75/15 80/11 80/12 80/17 80/17 86/24 87/23 95/4 95/6 95/8 96/15 96/19 97/6 98/12 99/18
while [3] 58/13 62/22 66/17
white [36] 5/19 5/20 5/22 10/4 17/17 17/18 17/22 17/23 18/3 18/4 18/8 18/12 18/14 18/14 18/23 23/24 23/24 23/25 23/25 24/6 24/22 25/12 51/5 64/5 73/9 74/2 74/3 74/4 75/14 75/16 75/19 75/24 76/4 77/2 80/1 95/11
who [40] 15/8 16/3 19/6 23/9 23/13 27/4 27/8 28/16 28/17 29/4 29/7 29/14 30/11 41/23 46/16 47/1 52/24 53/18 53/20 55/8 55/14 55/14 56/11 56/14 56/17 69/12 71/13 77/18 78/1 78/5 79/20 80/6 80/11 82/15 85/7 87/16 87/18 89/22 90/1 93/5
who -- [1] 41/23
whoa [2] 30/4 43/22
whoever [4] 28/22 29/1 29/15 31/11
whole [7] 57/18 57/18 57/19 62/18 68/3 74/17 80/23
whose [1] 72/4
why [27] 6/15 7/6 8/7 10/25 11/2 11/11 14/10 14/11 16/23 16/25 19/14 20/6 21/11 22/22 32/21 32/21 33/17 39/25 46/9 47/25 63/5 77/20 81/18 97/2 98/15 99/19 98/22
wild [2] 82/23
will [63] 3/1 4/18 9/24 18/6 18/17 19/22 21/16 28/2 32/4 32/7 32/15 36/17 42/23 43/11 43/15 43/16 43/19 44/6 44/8 44/13 46/12 47/14 48/21 49/14 49/14 49/22 49/24 49/25 50/16 51/13 58/24 60/14 61/13 62/1 62/17 64/25 65/1 65/2 65/14 66/7 70/3 75/6 76/25 79/10 81/2 81/7 82/1 82/3 82/7 82/8 83/18 86/2 86/25 90/7 90/11 90/13 90/19 90/21 92/17 92/18 93/11 99/9 99/24
win [1] 87/24
wind [2] 21/6 31/20
withheld [1] 41/5
within [2] 27/25 101/7
without [9] 4/19 5/10 16/19 22/20 24/3 37/18 40/20 47/12 96/20
witness [14] 10/5 12/15 12/18 41/9 47/1 47/20 60/24 62/14 68/9 68/9 82/12 83/24 85/14 93/18

## W

witnesses [6]  27/8 41/22 51/15 62/10
  76/9 93/3
won [1]  87/25
won't [2]  47/24 57/19
word [10]  4/13 4/17 6/9 12/19 13/8
  14/24 26/3 27/25 31/3 80/7
words [3]  6/11 26/10 91/17
wore [1]  56/10
work [2]  4/6 60/9
worked [1]  89/22
works [3]  36/19 60/2 89/24
world [1]  62/11
worry [4]  55/25 64/22 79/25 95/16
worth [2]  20/1 20/15
worthy [1]  45/19
would [31]  3/6 3/19 12/15 14/3 21/5
  21/11 34/18 35/9 36/13 40/7 41/17
  42/21 48/9 48/14 48/17 61/22 69/14
  70/20 79/17 79/18 79/19 80/15 80/18
  80/19 81/5 82/8 86/22 87/9 88/23 99/8
  99/15
wouldn't [2]  51/20 83/20
wound [1]  18/20
wrap [1]  67/6
wrapped [1]  66/3
wrappings [1]  27/6
write [1]  80/24
writing [2]  64/4 97/9
wrong [9]  10/13 58/6 73/7 74/2 74/4
  80/6 80/21 83/13 84/16
wrote [1]  36/15

## Y

Yankee [19]  8/16 8/25 9/6 9/8 55/25
  56/1 56/2 56/3 56/3 56/5 58/18 62/23
  64/13 65/8 66/13 66/23 88/3 95/2 95/3
yea-saying [1]  81/14
yeah [10]  25/3 26/4 29/1 29/20 31/14
  41/18 59/23 67/22 82/7 93/11
year [1]  20/1
years [7]  20/14 25/23 26/25 27/16 27/24
  28/6 37/5
yelled [1]  89/5
yellow [125]
yellow -- [3]  17/14 44/19 98/3
yellows [1]  64/8
Yep [1]  23/11
yes [11]  13/12 14/14 15/24 16/3 28/25
  32/18 51/18 61/5 81/17 95/13 96/9
yesterday [12]  3/16 12/14 22/20 25/5
  25/14 30/17 32/9 42/16 43/9 46/24
  47/20 99/10
yet [1]  42/7
York [1]  56/9
you [331]
you've [5]  26/3 35/3 63/8 98/16 98/16
your [77]  3/3 3/4 3/5 3/13 3/23 4/3 4/6
  4/23 6/5 7/10 8/15 8/18 9/19 10/25
  11/24 12/14 12/17 13/12 13/19 14/15
  14/19 17/7 18/17 20/7 20/25 22/11 23/5
  23/23 26/1 28/4 29/22 30/14 33/12
  33/19 36/13 36/16 36/16 37/3 39/9 40/6
  40/13 41/10 42/12 44/4 44/18 45/9
  46/22 48/4 48/18 49/5 52/1 55/14 59/8
  59/13 61/2 67/5 67/22 80/10 83/18
  84/12 85/22 88/14 89/9 90/22 91/14
  91/15 93/7 93/9 93/12 93/14 95/20
  98/10 99/12 99/13 99/24 99/25 100/2

## Z

ZALESIN [17]  2/3 49/6 50/15 51/25 55/7
  55/25 58/6 62/25 65/1 66/5 76/12 79/25

82/24 86/11 87/24 88/15 93/2
Zalesin's [2]  67/15 77/16
zeroed [1]  60/25